# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ASHLEY ALBERT,<br>PO Box 52<br>Nashua, NH 03061<br><br>ASHLEY BAXTER,<br>40 SW Wasco St. #3<br>Cascade Locks, OR 97014<br><br>KARINA JAKEWAY, and<br>3419 North Cheyenne St.<br>Tacoma, WA 98407<br><br>MELINDA JABBIE,<br>4919 Chester Street, Apt. # 203<br>Oxon Hill, MD  20745<br>County of Residence: Prince George's County<br><br>on behalf of themselves and all others<br>similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br>GLOBAL TEL*LINK CORP.,<br>3120 Fairview Park Drive<br>Suite 300<br>Falls Church, VA 22042<br><br>SECURUS TECHNOLOGIES, LLC, and<br>4000 International Parkway<br>Carrollton, TX 75007<br><br>3CINTERACTIVE CORP.,<br>750 Park of Commerce Blvd<br>Suite 400<br>Boca Raton, FL 33487<br><br>          Defendants. | CIVIL ACTION NO. 8:20-CV-1936<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ............................................................................................................ 1

II.  JURISDICTION AND VENUE ..................................................................................... 7

III. PARTIES ......................................................................................................................... 9

   A.  Plaintiffs ..................................................................................................................... 9

   B.  Defendants ................................................................................................................ 10

   C.  Agents and Coconspirators ...................................................................................... 11

IV.  TRADE AND INTERSTATE COMMERCE ............................................................... 11

V.   FACTUAL ALLEGATIONS ....................................................................................... 11

   A.  Background ............................................................................................................... 11

      1.   Value of ICS Calls .......................................................................................... 11

      2.   Government Contracts for ICS Calls ............................................................... 12

      3.   Per-Minute ICS Calls ...................................................................................... 14

      4.   GTL and Securus Dominate the Market for ICS Calls.................................... 14

   B.  Defendants Conspired to Fix the Prices of Single Calls ......................................... 15

      1.   Securus Launched a Single Call Program ....................................................... 15

      2.   Securus Incorporated PayNow and Text2Connect in ICS Contracts .............. 17

      3.   3CI Operates Securus's PayNow and Text2Connect Programs....................... 17

      4.   Securus Was the Largest and Most Important Client of 3CI .......................... 18

      5.   GTL and Other ICS Providers Developed Cheaper Single Call Programs.................... 19

      6.   GTL Agreed to Fix Single Call Prices with Securus and 3CI........................ 20

      7.   As a Result of the Anticompetitive Agreement, the Single Call Programs
         Provided by Securus and GTL Were Identical.............................................. 24

ii

8.   Both Securus's and GTL's Single Call Programs Coerced Consumers to Purchase Those Calls.................................................................................... 29

9.   Defendants' Agreement Restrained Competition in the Market for Single Calls.......... 31

10.  Securus and GTL Simultaneously Began Phasing Out 3CI-Operated Single Calls in 2018 ....................................................................................................34

11.  Plus Factors Render the ICS Industry Susceptible to Price-Fixing ............................... 34

12.  Antitrust Injury Suffered by Plaintiffs and Subclass Members ...................................... 40

C.   Defendants Made Fraudulent Misrepresentations and Omissions About Transaction Fees to Contracting Governments and Consumers ............................................................ 41

1.   Defendants Concealed the Amount of the Transaction Fees Paid to 3CI ..................... 42

2.   True Amount of the Transaction Fees Paid to 3CI for Single Calls .............................. 43

3.   Misrepresentations and Omissions to Contracting Governments and Consumers about Transaction Fees Paid to 3CI.............................................................. 45

a.   Misrepresentations and Omissions to Contracting Governments during Direct Communications and Negotiations.................................................................. 46

b.   Misrepresentations and Omissions in Written Bids Submitted to, and ICS Contracts with, Governments ................................................................................. 49

c.   Misrepresentations and Omissions in Monthly Commission Reports Provided to Contracting Governments ...................................................................... 50

d.   Misrepresentations and Omissions in Public Websites to Contracting Governments and Consumers........................................................................................ 52

e.   Misrepresentations and Omissions to Consumers in Billing Charges for $14.99 Single Calls .......................................................................................... 54

f.   Omissions to Consumers in Billing Charges for $9.99 Calls ...................................... 55

4.   Defendants' Misrepresentations and Omissions about Transaction Fees Injured Plaintiffs, the Class and Subclasses........................................................................ 56

VI.  STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS........................ 58

A.   Continuing Violation ................................................................................................ 58

B.   Fraudulent Concealment ........................................................................................... 59

1.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct............. 59

2.    Defendants Actively Concealed their Misconduct and Overcharges ............................ 60

VII.  CLASS ACTION ALLEGATIONS .................................................................................. 62

VIII. CAUSES OF ACTION ................................................................................................... 65

IX.   PRAYER FOR RELIEF .................................................................................................. 115

X.    JURY TRIAL DEMAND ............................................................................................... 116

Plaintiffs Ashley Albert, Ashley Baxter, Karina Jakeway, and Melinda Jabbie (collectively, "Plaintiffs") bring this action against Defendants Global Tel*Link Corp. ("GTL"), Securus Technologies, LLC ("Securus"), and 3Cinteractive Corp. ("3CI") on behalf of themselves and on behalf of a nationwide class (the "Class") and three nationwide subclasses (the "Subclasses"). The Class and each Subclass include persons and entities that have paid or will pay $9.99 or $14.99 to receive a single collect call operated by 3CI from an inmate in a prison or jail in the United States.

## I.      INTRODUCTION

1.      This case concerns a scheme by the Defendants—including the nation's two largest providers of telephone calling services for inmates—to fix inflated prices for calls between incarcerated individuals and their family members, friends, attorneys, and others, while also repeatedly lying to local governments and their own customers about the costs of those calls in order to charge the inflated prices.

2.      During the period from January 2010 through the present ("Class Period"), Securus and then GTL implemented a new payment method for receiving a collect call from an inmate— the "single call" option. These single calls charged an astronomical flat price to accept a one-time collect call from an inmate. Securus and GTL were able to charge these excessive single call prices by agreeing to eliminate competition between themselves and to fix the same inflated single call prices to consumers in violation of the federal antitrust laws. Securus and GTL implemented this scheme to charge artificially inflated prices for single calls through and with the assistance of 3CI, a marketing company and payment processor.

3.      Defendants also engaged in a widespread pattern of fraudulent misrepresentations and omissions to governments and consumers for the purpose of charging inflated prices for single calls. Namely, in communications with both governments and consumers, Securus and GTL lied

by indicating that the extremely high prices of single calls were justified because the bulk of revenue from those calls went to 3CI in the form of unavoidable "transaction fees." In truth, Securus and GTL were paying 3CI a mere fraction of the supposed "transaction fees" and secretly pocketing the difference. This deceptive scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

4.      To place phone calls from correctional facilities to family, friends, lawyers, and others, inmates must use special inmate calling services ("ICS"). Inmates and their call recipients cannot choose their ICS provider. Instead, local and state governments contract with a single ICS provider to provide ICS within a given facility.

5.      Securus and GTL are the two leading ICS providers in the United States. For the past decade, Securus and GTL have dominated the market for the provision of ICS. They implement and charge for approximately 80% of the telephone calls placed by inmates in prisons and jails around the country.

6.      To provide ICS, Securus, GTL, and other companies enter into contracts with local and state governments that operate prisons and jails. Those contracts identify the rates to be charged to consumers for ICS calls. Those contracts also promise to provide local or state governments a specified percentage of the revenue—called "site commissions"—that is earned from the ICS calls made from prisons or jails. Site commissions average approximately 50%.

7.      When the market is competitive, Securus, GTL, and other companies compete for contracts with local and state governments by submitting bids for the provision of ICS to jails and prisons. Local and state governments typically select winning bids based on the reasonableness of the ICS call rates and the size of the site commission percentage.

8.      For many collect calls made by inmates, Securus, GTL and other ICS providers

charge consumers a per-minute rate. The recipient of such collect calls typically establishes an account with the ICS provider using a credit card, which permits the recipient to receive multiple calls from the inmate over a period of time. For collect calls made through the account, the recipient's credit card is charged the applicable per-minute rate, which is specified in the contract between the government entity and the ICS provider. In 2017, the average cost of a collect call from a state prison in the United States that charged a per-minute rate and lasted a total of 15 minutes was approximately $1.87.

9.      In 2010, Securus launched a new kind of collect call option for inmates: the "single call." To accept a single call, the call recipient did not need to establish an account and did not pay a per-minute rate. Instead, Securus charged an excessive flat price to accept a single call, regardless of the duration of the call. Securus offered two single call options that effectively charged recipients at least one dollar per minute: PayNow, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Text2Connect, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes. Securus included the PayNow and Text2Connect programs in ICS contracts with state and local governments (in addition to offering traditional collect calls that charge a per-minute rate to consumers who set up an account).

10.     When Securus included the single call programs in contracts with state and local governments, it paid especially low site commissions. Securus paid site commissions of only $1.60 for each $14.99 PayNow call and only $0.30 for each $9.99 Text2Connect call. As a result, state and local governments received a site commission of only 3% or 11% from each single call sold by Securus, in comparison to the approximately 50% received on average from traditional per-minute ICS calls.

11.     The single calls provided by Securus were marketed and implemented by and

3

through 3CI. In particular, 3CI offered collect call recipients the PayNow and Text2Connect options, processed the $14.99 and $9.99 charges, and managed the single call websites. When Securus launched its single call program through 3CI, Securus was the largest and most important client of 3CI, accounting for approximately 80% of 3CI's revenue.

12.     Soon after Securus launched its PayNow program in 2010, GTL began developing its own single call program, then called AdvancePay OneCall ("APOC"). The APOC program offered recipients of collect calls from inmates the ability to pay for the calls without establishing an account. For each single call, the APOC program charged call recipients a transaction fee of up to $3 plus a per-minute rate equal to the per-minute rate that recipients with established accounts paid. Additionally, the APOC program paid site commissions to local and state governments at the same percentage that GTL paid for traditional per-minute calls. In other words, GTL's APOC program would not only charge call recipients significantly less for single calls than Securus's PayNow and Text2Connect programs, but also share a greater percentage of the resulting revenue to state and local governments than Securus's PayNow and Text2Connect programs.

13.     If, as it had planned prior to the conspiracy, GTL had competed with Securus for ICS contracts by aggressively marketing and offering single call programs, such as APOC, that were more affordable for consumer call recipients and more lucrative for state and local governments, Securus would have been forced to lower its single call rates and also increase related site commissions in order to remain competitive.

14.     Instead, Securus and GTL entered into an agreement to eliminate price competition and fix the prices of single calls in violation of the antitrust laws. The groundwork for the price-fixing agreement was laid when, in November 2012, Securus purchased 3CI's patent covering technology used to charge mobile phone accounts for single calls. According to a former 3CI

executive, 3CI was subsequently not permitted to provide services involving the patented technology to GTL without Securus's express permission and approval of the contract terms.

15.     In early 2013, at the direction of Securus, 3CI approached GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced as those provided by 3CI for Securus. Initially, GTL rejected 3CI's offer, noting that GTL was developing its own single call program, APOC. Yet, prior to the launch of GTL's APOC program, Securus and 3CI successfully persuaded GTL to avert price competition over single calls and to, instead, agree to provide a single call program that was indistinguishable from Securus's single call program and priced at exactly the same rates. According to a former manager at GTL, the CEOs of GTL and Securus held private, in-person dinners during that time at which they "shared strategic information" and discussed "what prices should be charged for ICS calls."

16.     As a result of and in furtherance of the agreement to fix single call prices, GTL entered into a contract with 3CI that directed 3CI to market and implement single calls on GTL's behalf. GTL subsequently offered two single call options through 3CI: Collect2Card, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Collect2Phone, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes.

17.     The single call programs offered by Securus and GTL through 3CI were identical. For example, both Securus's PayNow option and GTL's Collect2Card option charged credit cards the same price of $14.99 per call lasting up to 15 minutes and provided governments with non-negotiable site commissions of exactly $1.60 per call. Similarly, both Securus's Text2Connect option and GTL's Collect2Phone option charged mobile phone accounts the same price of $9.99 per call lasting up to 10 minutes and provided governments with non-negotiable site commissions of exactly $0.30 per call.

18.     To justify charging consumers excessive rates and paying governments low site commissions, Defendants made a series of material misrepresentations and omissions to both governments and consumers about the magnitude of the transaction fees associated with single calls operated by 3CI. Specifically, Defendants repeatedly and falsely represented that *most* of the revenue from each such single call went to pay transaction fees imposed by 3CI to implement those calls. In actuality, the transaction fees paid by Securus and GTL to 3CI to operate single calls comprised *less than half* of the $14.99 or $9.99 charged for those calls. Although the actual value of those transaction fees was, according to a former GTL employee, a "well-kept industry secret," several former executives of Defendants have conceded that the *majority* of each $14.99 or $9.99 charge for a 3CI-operated single call was ultimately retained by Securus or GTL.

19.     Defendants made the misrepresentations and omissions in at least six ways. First, when negotiating with state and local governments to include single call programs in ICS contracts, Securus and GTL informed those governments that most of the $14.99 and $9.99 charges for single calls was comprised of necessary transaction fees paid to third parties such as 3CI. Second, the ICS contracts entered into by Securus and GTL with those governments failed to disclose and/or affirmatively misrepresented the actual value of those transaction fees. Third, in monthly reports provided to contracting governments that itemize and calculate site commissions, Securus and GTL failed to disclose and/or affirmatively misrepresented both the revenue they retained from single calls and the value of the associated transaction fees. Fourth, the websites for Securus's PayNow and GTL's Collect2Card both falsely state that the $14.99 single call charge "is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee." Fifth, when consumers paid $14.99 for Securus's PayNow or GTL's Collect2Card, their credit card statements misleadingly included two lines for the charge—one line for a $1.80 "Call Fee" and another line for a fabricated

6

$13.19 "Transaction Fee." Sixth, when consumers paid $9.99 for Securus's Text2Collect or GTL's Collect2Phone single calls, Defendants failed to disclose the actual transaction fees paid to 3CI from such calls.

20.     Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for such calls. Contracting governments would *not* have permitted Securus and GTL to charge such high prices for single calls in light of the actual costs of implementing them. Indeed, the amounts that Securus and GTL retained from each single call—after the deduction of all transaction fees—were *several times higher* than what consumers would pay for the same call had those consumers been charged the per-minute rate expressly agreed to by contracting governments and contained in ICS contracts.

21.     In sum, Securus and GTL entered into an agreement to eliminate price competition over, and charge identical supracompetitive prices for, single calls processed by 3CI. In order to charge those inflated prices, Defendants lied to governments and consumers by fabricating the transaction fees paid to 3CI to implement those single calls.

22.     Accordingly, Plaintiffs, on behalf of themselves and on behalf of the Class and Subclasses, bring this action to enjoin Defendants from continuing their unlawful conduct and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs assert claims against Defendants for violating the Sherman Act, 15 U.S.C. § 1 and RICO, 18 U.S.C. § 1962 et seq.

## II.    JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337; 15 U.S.C. §§ 15(a) and 26; and 18 U.S.C. § 1964. This Court also has subject

matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class and each Subclass contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class and each Subclass is a citizen of a state different from a Defendant.

24.     This Court has personal jurisdiction over Defendants. Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, members of the Class and Subclasses located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Securus and GTL contracted with local governments in this district to provide ICS to inmates in prisons or jails;

- All Defendants charged artificially inflated prices for single calls to consumers in this district;

- 3CI processed credit cards provided by consumers in this district when they accepted single calls from inmates; and

- All Defendants made misrepresentations to consumers and governments in this district regarding the enormity of transaction fees associated with single calls.

25.     Venue is proper in this District under 15 U.S.C. § 22, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants transacted substantial business, was found, had agents in, and/or resided in this District; a substantial part of the events giving rise to Plaintiff Melinda Jabbie's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### III.   PARTIES

#### A.   Plaintiffs

26.     Plaintiff Ashley Albert is a resident of the state of New Hampshire. On June 13, 2016, she paid $14.99 to accept a PayNow single call that was sold by Securus. On July 1, 2016, she paid $14.99 to accept a PayNow single call that was sold by Securus.

27.     Plaintiff Ashley Baxter is a resident of the state of Oregon. On July 3, 2019, she paid $14.99 to accept a PayNow single call that was sold by Securus. On July 4, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 5, 2019, she paid $14.99 per call to accept five separate PayNow single calls that were sold by Securus. On July 6, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 7, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 8, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 9, 2019, she paid $14.99 to accept a PayNow single call that was sold by Securus.

28.     Plaintiff Karina Jakeway is a resident of the state of Washington. On December 12, 2019, she paid $9.99 per call to accept two Text2Connect single calls that were sold by Securus. On December 13, 2019, she paid $14.99 per call to accept three PayNow single calls that were sold by Securus.

29.     Plaintiff Melinda Jabbie is a resident of the state of Maryland. During the period 2013 through 2015, she paid $14.99 per call to accept several Collect2Card single calls that were sold by GTL.

### B.     Defendants

30.     Defendant GTL is an Idaho corporation with its principal place of business in Falls Church, Virginia. It is one of the two largest providers of ICS in the United States. GTL and its subsidiaries provide ICS to approximately 2,300 correctional facilities and 1.8 million inmates, in all 50 states, the District of Columbia, and Puerto Rico. GTL contracted with state, county, and municipal governments to provide ICS throughout relevant period.

31.     Defendant GTL operates through wholly owned subsidiaries to provide ICS in the United States. Operating subsidiaries of GTL during the relevant period include, among others: DSI-ITI, Inc., an Idaho corporation headquartered in Falls Church, Virginia; Value-Added Communications, Inc., an Idaho corporation headquartered in Falls Church, Virginia; and Public Communications Services, Inc., an Idaho corporation headquartered in Falls Church, Virginia.

32.     Defendant Securus is a privately held Delaware corporation with its principal place of business in Carrollton, Texas. Securus is one of the two largest providers of ICS in the United States. Securus and its subsidiaries provide ICS to approximately 3,400 correctional facilities and 1.2 million inmates, in all 50 states. Securus contracted with state, county, and municipal governments to provide ICS throughout the relevant period.

33.     Defendant Securus operates through wholly owned subsidiaries to provide ICS in the United States. Operating subsidiaries of Securus during the relevant period include, among others: T-Netix, Inc., a Delaware corporation headquartered in Dallas, Texas, and T-Netix Telecommunications Services, Inc., a Delaware corporation headquartered in Dallas, Texas.

34.     Defendant 3CI is a Delaware company with its principal place of business in Boca Raton, Florida. 3CI is a mobile marketing company and payment processor that provides

10

technology and expertise to facilitate telecommunications services. During the relevant period, 3CI contracted with Securus and GTL to charge consumers around the country for ICS single calls.

### C.     Agents and Coconspirators

35.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.

## IV.     TRADE AND INTERSTATE COMMERCE

36.     Defendants' activities were within the flow of interstate commerce of the United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States. Among other things, Defendants contracted with state and local governments around the country to provide ICS; many of the ICS calls provided by Defendants involved interstate communications between an inmate in one state and a recipient of the call in another state; and Defendants made fraudulent misrepresentations through interstate mail and interstate wires to state and local governments and consumers around the country.

## V.     FACTUAL ALLEGATIONS

### A.     Background

#### 1.     Value of ICS Calls

37.     On any given day, there are approximately 2.3 million people incarcerated in prisons and jails in the United States. Over 11 million people cycle through prisons and jails in the United States each year. Those inmates often make telephone calls to family members, friends, lawyers, and others approved by correctional facilities. Indeed, hundreds of millions of calls are placed by inmates in jails and prisons in the United States each year.

38.     These ICS calls are extremely important to the health of inmates and their families.

11

When detention facilities totally isolate inmates from their communities, those inmates often suffer damage to their mental, physical, and cognitive health. Additionally, when incarcerated parents lack regular contact with their children, those children—2.7 million of them nationwide—suffer from higher rates of truancy, depression, and poor school performance.

39.     ICS calls are also important for maintaining community safety, as they materially lower recidivism rates. In a report published on May 8, 2013, the Prison Policy Initiative explained, "Affordable phone calls are directly related to the safety and well-being of all communities because communication reduces the likelihood that incarcerated people will commit another offense after their release."

40.     Additionally, ICS calls are indispensable to the effective functioning of the judicial system. Inmates impeded from placing telephone calls are often precluded from effective consultation with their attorneys and thus denied adequate legal representation.

41.     The costs of making ICS costs are often borne by the families of inmates. Those families tend to be poorer than average. As the nonprofit Prison Policy Initiative has noted, "The high prices of these communications products act like a regressive tax, charging the people who have the least the most to keep in touch. As a result, more than a third of families of incarcerated people fall into debt to cover phone and visitation costs."

### 2.     Government Contracts for ICS Calls

42.     Inmates cannot choose their ICS providers. Instead, local and state governments determine which ICS providers will provide ICS calls to inmates in each prison and jail.

43.     To provide ICS calls to inmates, ICS providers enter into contracts with local and state governments that operate prisons and jails. Each of these local and state governments enters into an exclusive contract with an ICS provider, granting that company a monopoly for the duration

of the contract over the provision of ICS calls to inmates in the prisons and jails operated by the contracting government.

44.     The exclusive ICS contracts specify the rates that ICS providers must charge consumers for calls with inmates. Those contracts also promise to provide the contracting governments a specified percentage of the revenue—called "site commissions"—that is collected by the ICS provider from those ICS calls. Site commissions average approximately 50%.

45.     When the ICS market is competitive, ICS providers compete with each other for contracts with local and state governments by submitting bids for the provision of ICS calls to jails and prisons. In such circumstances, ICS providers attempt to secure those contracts by making bids that offer lower ICS call rates and higher site commission percentages. Local and state governments typically select winning bids based on the reasonableness of the ICS call rates and the size of the site commission percentage.

46.     State and local governments that contract with ICS providers are often focused on limiting the cost of ICS calls to consumers. A former Securus employee involved in negotiating ICS contracts stated that government officials were sensitive to the cost of calls to consumers. He explained that government officials were particularly concerned that family members and friends of inmates would have difficulty paying for expensive ICS calls and that, in turn, the contracting governments would receive complaints from constituents.

47.     Many state and local governments have publicly expressed their commitment to limiting the cost of ICS calls to consumers. For example, multiple state and local governments have enacted regulations requiring prisons and jails to secure the lowest price for consumers of ICS calls. Many other state and local governments have formally modified their requests for ICS contract bids to emphasize and prioritize reducing the cost of ICS calls to consumers. And other

13

state and local governments have announced the goal of reducing prices for consumers when entering into new contracts for ICS.

3.    *Per-Minute ICS Calls*

48.    A majority of ICS calls made by inmates are charged at a per-minute rate. The payor of such calls typically establishes an account with a credit card or deposit, which permits the inmate to make multiple calls over a period of time. In order to set up an account, ICS providers often require account holders to deposit a minimum balance and to pay deposit and payment processing fees on those deposits. Calls made by the inmate through the account are charged the applicable per-minute rate.

49.    The applicable per-minute rate is specified in the written contract negotiated and entered by the ICS provider and the government that operates the jail or prison. Additionally, the site commission in the contract specifies what percentage of that per-minute rate will be shared with the contracting government.

50.    In 2017, the average cost of a collect call from an inmate in a state prison in the United States that charged the contracted per-minute rate and lasted a total of 15 minutes was approximately $1.87, *i.e.* approximately 12.47 cents per minute for a 15-minute call.

4.    *GTL and Securus Dominate the Market for ICS Calls*

51.    Securus and GTL dominate the market for the provision of ICS. They charge for, and connect, approximately 80% of the telephone calls placed by inmates in prisons and jails around the country.

52.    Securus and GTL achieved market dominance primarily through acquisitions and mergers of rivals. The following chart prepared by the Prison Policy Initiative illustrates the frequency of acquisitions by Securus and GTL, or their predecessors, over the last 35 years.

14



53.     Both GTL and Securus are owned by private equity firms. The private equity firm

American Securities purchased GTL in 2011 for approximately one billion dollars, and Platinum

Equity purchased Securus in November 2017 for approximately $1.6 billion.

**B.      Defendants Conspired to Fix the Prices of Single Calls**

*1.      Securus Launched a Single Call Program*

54.     In 2010, Securus launched an ICS "single call" program. "Single calls" are ICS

collect calls that charge a one-time fee to the call recipient's credit card or mobile phone account

without the recipient having to establish an account with the ICS provider.

55.     Securus simultaneously launched two kinds of single calls: PayNow, which charges

single calls to credit cards, and Text2Connect, which charges single calls to mobile phone accounts.

56.     PayNow single calls charge recipients a flat price of $14.99 for a collect call lasting up to 15 minutes, regardless of the duration of the call. The $14.99 price for PayNow single calls is charged to credit cards that are provided by call recipients. PayNow single calls can be made to both landline and mobile phones.

57.     Text2Connect single calls charge recipients a flat price of $9.99 for a collect call lasting up to 10 minutes, regardless of the duration of the call. The $9.99 price for Text2Connect single calls is charged to the mobile phone accounts of call recipients. Accordingly, Text2Connect single calls can only be made to mobile phones.

58.     Despite the high prices associated with PayNow and Text2Connect single calls, Securus provides abnormally low site commissions from those calls to contracting governments. Specifically, Securus provides site commissions to contracting governments of only (1) $1.60 from each $14.99 PayNow call, which is less than 11% of the price of the call and (2) $0.30 from each $9.99 Text2Connect call, which is less than 3% of the price of the call. As a result, state and local governments received site commission payments of only 3% or 11% from each single call sold by Securus, in comparison to the approximately 50% received on average from traditional per-minute ICS collect calls.

59.     A former employee of Securus stated that both the $1.60 and $0.30 in site commission payments to contracting governments from PayNow and Text2Connect calls were "standard" and "non-negotiable" across all ICS contracts providing those single-call options and, further, that those site commission amounts were exclusively determined by Securus executives.

2.      *Securus Incorporated PayNow and Text2Connect in ICS Contracts*

60.      In 2010, Securus began inserting PayNow and Text2Connect single call programs in ICS contracts with state and local governments. In addition to including the PayNow and Text2Connect single call programs, those ICS contracts continued to offer the option of traditional collect calls, which charged a much lower per-minute rate to consumers who could establish an account.

61.      Securus swiftly incorporated the PayNow and Text2Connect programs into ICS contracts with state and local governments. According to a former executive of Securus, the single-call services offered by Securus, *i.e.* PayNow and Text2Connect, were "automatically enabled" as part of ICS contracts with governments. The former Securus executive estimated that 98 percent of the company's ICS contracts with local governments contained both single-call programs. Another former Securus employee said he was "heavily pressured" not to "let any contract out the door" that omitted PayNow and Text2Connect.

3.      *3CI Operates Securus's PayNow and Text2Connect Programs*

62.      Securus contracted with 3CI to develop, market, implement, and operate the PayNow and Text2Connect single call programs. Accordingly, all the transaction and incremental costs for each PayNow and Text2Connect call were assumed and expended by 3CI.

63.      To market and implement PayNow single calls, 3CI's system contacted collect call recipients by phone call. If the call recipient agreed to accept the $14.99 charge for the PayNow call, 3CI subsequently collected the recipient's credit card information, processed and billed the $14.99 charge and connected the caller to the call recipient. Under the direction of Securus, 3CI also established and managed the website for the PayNow program, which provided information about PayNow single calls to governments and consumers.

64.     Similarly, to market and implement Text2Connect single calls, 3CI's system contacted call recipients via text message and phone call. If the call recipient accepted the $9.99 charge, 3CI subsequently charged the $9.99 price to the recipient's mobile phone account by sending a premium text message. 3CI was able to process such charges via text message because 3CI had contracted with multiple mobile phone carriers to do so. Notably, those mobile phone carriers capped the amount that 3CI could charge for Text2Connect calls at $9.99. Under the direction of Securus, 3CI established and managed the website for the Text2Connect program.

65.     In order to operate the Text2Connect single call program, 3CI utilized a patent that was developed by the company. The patent—U.S. Patent No. 8,190,121 ("System and Method for Authorizing and Monetizing Collect Cellular Telephone Calls")—involves a mechanism for charging a collect call to a mobile phone account. The patented technology first determines whether a mobile phone carrier accepts service charges and, if so and after authorization from the call recipient, connects the caller to the call recipient and simultaneously charges a fee to the mobile phone number. 3CI applied for the patent on April 15, 2008, and the patent was issued on May 29, 2012.

66.     In exchange for operating the PayNow and Text2Connect programs and marketing them to consumers, 3CI received a transaction fee from each such single call. When a recipient of a PayNow or a Text2Connect call was charged $14.99 or $9.99 respectively, 3CI would retain a portion of that fee as a transaction fee and transmit the remainder to Securus.

### 4.     *Securus Was the Largest and Most Important Client of 3CI*

67.     When Securus launched the PayNow and Text2Connect single call programs, the company became, by far, the largest, most important, and most influential client of 3CI. At the time, Securus alone accounted for approximately 80% of the total revenue that 3CI earned,

according to a former 3CI employee.

68.     A former employee of 3CI said that Securus was internally referred to as "the whale" and, further, that Securus was the "reason we can keep the air on" and the "reason 3CI is where they are today." Another former employee of 3CI explained that Securus "paid their paychecks" and that 3CI "would be fucked if we lost Securus." Another former employee of 3CI called Securus a "cash cow" that was "keeping us afloat."

69.     Due to the indispensability of Securus to 3CI's profitability and viability, it was of paramount importance for 3CI to serve the interests of and satisfy Securus, including by facilitating the price-fixing agreement with GTL that eliminated price competition over single calls.

            5.     *GTL and Other ICS Providers Developed Cheaper Single Call Programs*

70.     Soon after Securus launched the PayNow and Text2Connect programs in 2010, GTL began developing its own single call program. That single call program—called APOC—charged the credit cards of call recipients a transaction fee of up to $3 combined with the applicable standard per-minute rate. In other words, GTL permitted call recipients to pay the per-minute rate established in ICS contracts when accepting a single call, all without having to set up an account and only by paying a transaction fee of $3 or less. Based on the approximately 12.47-cent per-minute rate in 2017 for a call lasting 15 minutes, the average APOC single call from a state prison *lasting a full 15 minutes* would cost no more than $4.88 in 2017—less than one-third the cost of Securus's $14.99 PayNow call.

71.     In addition to charging consumers significantly lower rates than Securus's single call programs, GTL's APOC program was designed to make higher site commission payments to contracting governments than Securus's single call programs. Specifically, APOC paid site commissions to contracting governments at the same percentage that GTL was paying for

traditional per-minute calls, which was approximately 50% on average. Accordingly, while the average APOC single call from a state prison lasting 15 minutes would have cost no more than $4.88 in 2017, the average site commission paid to contracting governments from each such APOC call would have been approximately $2.44, which is more than the $1.60 in site commission paid by Securus from each PayNow call.

6. *GTL Agreed to Fix Single Call Prices with Securus and 3CI*

72. Rather than compete with Securus for ICS contracts with state and local governments by offering a single call program—APOC—that would simultaneously lower consumer charges and increase site commissions, GTL entered into an agreement with Securus and 3CI to restrain such competition and fix single call prices. Shortly prior to the launch of GTL's APOC program, Securus and 3CI persuaded GTL to forego price competition over single calls and, instead, contract with 3CI to provide a single call program that was indistinguishable from, and charged the exact same prices as, Securus's PayNow and Text2Connect programs.

73. The formation of Defendants' agreement to restrain competition was facilitated by Securus's acquisition of 3CI's patent related to charging single calls to mobile phone accounts. Specifically, on November 7, 2012, Securus purchased 3CI's patent referenced above (U.S. Patent No. 8,190,121) that covers technology used to charge mobile phone accounts for Text2Connect single calls. Securus purchased the patent from 3CI for approximately $20 million and, as part of that transaction, also made a multimillion-dollar payment to 3CI to prepay for future single call transactions and guarantee 3CI's business for a period of time. When Securus purchased the patent, it simultaneously awarded patent exclusivity to 3CI, thereby providing 3CI with an exclusive license to use the patent for a period of 10 years. Importantly, according to a former employee of 3CI, the company could not use the licensed patent to provide services to a competitor of Securus

20

without the express approval of Securus.

74.    Soon after Securus acquired the patent from 3CI in 2012, Securus and 3CI agreed that 3CI would approach GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced to those provided by 3CI for Securus. As a result of the patent exclusivity agreement with Securus, 3CI could not contract with GTL to offer a single call option that charged mobile phone accounts (*i.e.* another version of Text2Connect) without Securus's express approval.

75.    A former 3CI executive explained that 3CI was not able to provide the technology it patented for charging mobile phone accounts to GTL without Securus's express permission. As a condition of providing that permission, Securus insisted that any agreement between 3CI and GTL contain terms that require GTL's single call program to charge the same prices as Securus's single call program. The former 3CI executive explained that, because 3CI could not contract with GTL without Securus's express approval, all three companies had "more room for overcharging on the single call model based on their interests."

76.    In late 2012, at the direction of Securus, 3CI approached GTL to persuade GTL to enter into a contract for 3CI to provide a single call program. According to a former 3CI executive, GTL initially declined 3CI's offer and claimed that GTL could develop, and was developing, its own single call platform without going through 3CI. Yet, Securus and 3CI ultimately persuaded GTL to contract with 3CI to provide a single call program that was indistinguishable in every material way, including price, from Securus's single call program, even though GTL was already developing a rival single call program, APOC, that promised to charge lower rates and pay higher site commissions. Specifically, Securus and 3CI persuaded GTL to contract with 3CI so that GTL and Securus could both charge the exact same inflated price for single calls and pay the exact same

low site commissions from those calls. Defendants thus unlawfully agreed to eliminate price competition regarding single calls between Securus and GTL, allowing all three Defendants to reap profits above and beyond what they would have earned in a competitive market.

77.     This horizontal agreement to eliminate competition and fix single call prices was reached by senior executives of Securus and GTL. A former manager of GTL, who was employed at the company from 2011 through 2016, stated that although "Securus and GTL publicly identified themselves as fierce competitors in the ICS industry," in reality, "behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success." He stated that, during his employment, he attended a dinner with the following three executives of GTL: Brian Oliver, then Chief Executive Officer of GTL; Jeffrey Haidinger, then President and Chief Operating Officer of GTL; and John Baker, then Senior Vice President of Consumer Channels and Payment Services for GTL. The former GTL manager explained that during that dinner, "both Brian Oliver and Jeffrey Haidinger boasted about how they met regularly with Rick Smith, then Chief Executive Officer of Securus, for dinner and drinks and about how they shared strategic information with Rick Smith during those dinners and drinks. Brian Oliver then explained to me that when he and Jeffrey Haidinger met with Rick Smith for dinners and drinks, the three of them would discuss what prices should be charged for ICS calls and which companies were securing which ICS contracts, among other industry issues."

78.     The horizontal agreement between ostensible competitors Securus and GTL to fix single call prices was also reached with the direct assistance and active participation of 3CI. A former 3CI executive explained that 3CI was "way, way in bed with Securus" and that there was "a lot of handshaking between" the two companies "behind the scenes." While the former 3CI executive was not directly involved in 3CI's relationship with Securus or GTL, he said he could

think of no plausible explanation, in the absence of a conspiracy, for Securus and GTL to be identically pricing their single call programs, and he suspected that there was an agreement between Securus, 3CI, and GTL to charge artificially high prices for single calls. He explained that 3CI "wanted GTL's business really bad" and would have negotiated terms favorable to both Securus and GTL to secure contracts with both companies. He also noted that a price-fixing agreement was made more achievable by the fact that only a small set of 3CI executives, including CEO John Duffy and COO Mark Smith, simultaneously managed the relationships with both Securus and GTL.

79.     In early 2013, as a result of and in furtherance of Defendants' agreement to eliminate competition and fix single call prices, GTL formally entered into a contract with 3CI to provide single calls that customers could pay for via charges to both credit cards and mobile phone accounts. As part of that agreement, GTL agreed to charge consumers the exact same rates that Securus charged for those single products. Specifically, GTL agreed to charge $9.99 for single calls lasting up to 10 minutes that are billed to mobile phone accounts, which is exactly what Securus charges for Text2Connect calls, and to charge $14.99 for single calls lasting up to 15 minutes that are billed to credit cards, which is exactly what Securus charges for PayNow calls.

80.     As part of the same agreement, GTL also agreed to pay contracting governments the exact same site commissions from those single calls as Securus. Specifically, GTL agreed to pay site commissions of only $0.30 from each single call that charges $9.99 to a mobile phone account, which is exactly what Securus paid from Text2Connect calls, and to pay site commissions of only $1.60 from each single call that charges $14.99 to a credit card, which is exactly what Securus paid from PayNow calls.

      7.     *As a Result of the Anticompetitive Agreement, the Single Call Programs*
              *Provided by Securus and GTL Were Identical*

81.     In the summer of 2013, GTL launched its single call program with two single call options operated by 3CI. The single call option that charged $14.99 to the credit cards of call recipients was branded "Collect2Card." The single call option that charged $9.99 to the mobile phone accounts of call recipients was branded "Collect2Phone."

82.     Securus's PayNow program and GTL's Collect2Card program are, in all material ways, identical and indistinguishable. Both programs:

- charge recipients of collect calls a flat fee per call lasting up to 15 minutes, regardless of the duration of the call;

- charge the exact same price of $14.99 per single call;

- charge $14.99 per single call to credit cards obtained from call recipients;

- provide governments with non-negotiable site commissions of exactly $1.60 per call;

- are marketed and implemented by 3CI;

- utilize websites that contain virtually identical language;

- utilize websites whose domain names are registered with and owned by 3CI;

- direct consumers to addresses in Boca Raton, Florida, where 3CI is headquartered.

83.     The extraordinary similarity between Securus's PayNow program and GTL's Collect2Card program is evident when comparing screenshots of the homepages of their respective websites. Aside from using a different stock photo, the pages are effectively identical:





84.    Securus's Text2Connect program and GTL's Collect2Phone program were also, in all material ways, identical and indistinguishable. Both programs:

- charge recipients of collect calls a flat fee per call lasting up to 10 minutes, regardless of the duration of the call;

- charge the exact same price of $9.99 per single call;

- charge $9.99 per call by billing the call recipient's mobile phone account through a premium text message;

- provide governments with non-negotiable site commissions of exactly $0.30 per call;

- are marketed and implemented by 3CI;

- utilize websites that contain virtually identical language;

- utilize websites whose domain names are registered with and owned by 3CI;

- direct consumers to the same address in Boca Raton, Florida, where 3CI is headquartered.

85.    The extraordinary similarity between Securus's Text2Connect program (which was publicly referred to as "Text Collect") and GTL's Collect2Phone program is also evident when comparing the layout and language of the homepages of their respective websites:



**collect2phone™**      Home   Pricing   How Does It Work?   FAQ   Contact   Privacy

Collect2Phone™ enables a participating mobile subscriber to receive collect calls to their mobile phone. The call charges appear on the call recipient's mobile phone bill, similar to the way a traditional land line collect call works. You only pay for each call you choose and affirmatively accept twice during the call transaction process.

### How Can I Get Collect2Phone?

If your mobile carrier supports the service, then you can receive and pay for Collect2Phone calls.

If the call is originating from a correctional facility, that facility will have to allow calls using the Collect2Phone service. Many correctional facilities have in place strong inmate call restrictions, so this type of call may not be allowed.

### Who Can Take Advantage of Collect2Phone?

Collect2Phone is designed for people who need to place reverse charge or collect calls to family or friends and have the call recipient accept and pay for the charges.

It's also intended for people that want to hear from loved ones, especially those who are only able to originate a collect type call (for example, if the caller is incarcerated in some manner).

With Collect2Phone, friends and family alike can connect with their loved ones and pay for each call using the convenience of a mobile phone. There are no accounts to set up — you only pay for the calls you choose to accept.

### Service Details

$9.99 will be charged for **each** call you choose to accept. Call charges and the maximum allotted call time will be disclosed prior to the two parties being connected and only *after* the call recipient affirmatively acknowledges and agrees to stated terms of service. The charges will appear on the call recipient's wireless bill and/or be deducted from your prepaid balance. A receipt will be sent to the wireless subscriber via text message.

Message and data rates may apply. All purchases must be authorized by account holder by double opt-in procedure. Accepting party should be at least thirteen (13) years of age. Users under eighteen (18) must have parental permission to participate.

To stop receiving calls from inmates, your cell phone number must be blocked.

To block your cell phone number, visit contact us or call 877-214-3710

**To opt out at any time, reply with the word STOP to your Collect2Phone receipt.**

**For help, reply with the word HELP** to your Collect2Phone receipt. The Collect2Phone receipt/message will be received from 39106, 39106.

27



**Text Collect**

Home | Pricing | How Does It Work? | FAQ | Contact | Privacy

# Collect Calls. Made Easy.

## What is Text Collect?

Text Collect® enables a participating mobile subscriber to receive collect calls to their mobile phone. The call charges appear on the call recipient's mobile phone bill, similar to the way a traditional land line collect call works. You only pay for each call you choose and affirmatively accept twice during the call transaction process.

### How Can I Get Text Collect?

If your mobile carrier supports the service then you can receive and pay for Text Collect calls.

If the call is originating from a correctional facility, that facility will have to allow calls using the Text Collect service. Many correctional facilities have in place strong inmate call restrictions, so this type of call may not be allowed.

### Who Can Take Advantage of Text Collect?

Text Collect is designed for people who need to place reverse charge or collect calls to family or friends and have the call recipient accept and pay for the charges.

It's also intended for people that want to hear from loved ones, especially those who are only able to originate a collect type call (for example, if the caller is incarcerated in some manner).

With Text Collect, friends and family alike can connect with their loved ones and pay for each call using the convenience of a mobile phone. There are no accounts to set up — you only pay for the calls you choose to accept.

### Service Details

$9.99 will be charged for **each** call you choose to accept. Call charges and the maximum allotted call time will be disclosed prior to the two parties being connected and only *after* the call recipient affirmatively acknowledges and agrees to stated terms of service. The charges will appear on the call recipient's wireless bill and/or be deducted from your prepaid balance. A receipt will be sent to the wireless subscriber via text message.

Message and data rates may apply. All purchases must be authorized by account holder by double opt-in procedure. Accepting party should be at least thirteen (13) years of age. Users under eighteen (18) must have parental permission to participate.

To stop receiving calls from inmates, your cell phone number must be blocked.

To block your cell phone number visit Contact Us or call 866-229-6829.

**To opt out at any time, reply with the word STOP** to your Text Collect receipt.

**For help, reply with the word HELP** to your Text Collect receipt. The Text Collect receipt/message will be received from either 34817, 45709.

86.     The similitude of the single call programs employed by Securus and GTL was a direct consequence of their anticompetitive agreement. Securus and GTL instructed 3CI to charge identical prices for their single calls and to establish websites with the above content for those single calls.

        8.     *Both Securus's and GTL's Single Call Programs Coerced Consumers to Purchase Those Calls*

87.     In addition to charging the same inflated prices and paying the same low site commissions, Securus's and GTL's single call programs also employed highly similar automated systems that effectively coerced consumers to pay for those expensive single calls rather than establish accounts to be charged much lower per-minute rates.

88.     When inmates placed collect calls to mobile phones from prisons or jails that employed the 3CI-operated single call programs of Securus or GTL, call recipients typically heard an automated message that provided the following three options: (1) "If you would like to continue this call of up to 15 minutes by accepting a charge to your credit or debit card of $14.99, please press 1"; (2) "if you would like to continue this call of up to 10 minutes by accepting a charge to your mobile telephone bill of $9.99, please press 2"; (3) "If you would like to set up or add funds to a prepaid … account in order to pay for future calls, please press 3." (If the call recipient was using either a landline or a mobile phone unable to accept premium text messages, only the first and third options would typically be provided by the automated system.)

89.     As the call options make clear, the only way for the call recipient to connect with the caller *during that call* was to pay $14.99 or $9.99 for a single call. If, instead, the call recipient opted to create a traditional account in order to be charged the much lower per-minute rate, the recipient would have to disconnect from the incoming collect call, subsequently establish an account with a credit card or deposit, and hope the caller would be able to make the collect call at

29

a later time. In other words, to accept the incoming collect call, recipients of 3CI-operated single calls transmitted by Securus and GTL could *not* avoid paying $14.99 or $9.99 per call. In December 2014, the Alabama Public Service Commission concluded, "Call scripts structured in such a way are misleading and deceptive. They create the misconception that the consumer's only options are to either accept the inmate's call at the provider's single payment service price or reject the inmate's collect call."

90.     Securus and GTL also made it difficult to establish accounts to pay the lower per-minute call rates. To set up such accounts, both companies established minimum deposit requirements and also charged credit card and deposit processing fees. Indeed, some consumers paid for single calls because they could not afford the deposit minimums. GTL's website states that if "you do not have sufficient credit card funds for a minimum deposit, there is [an option] that allows you to pay for just one call."

91.     A former Securus employee explained, "The process for setting up a pre-paid account was often cumbersome, time-consuming and frustrating. Many family members and friends of inmates gave up and subsequently accepted a PayNow or Text2Collect call. Securus failed to provide the expertise and information required by recipients of ICS collect calls to efficiently set up pre-paid accounts." A former GTL employee stated that "it was not an honest business" and that GTL's strategy "was to drive consumers to the costliest ICS product and take advantage of consumers' captivity to generate higher revenue and profit."

92.     In December 2015, Securus's then-CEO, Richard Smith, acknowledged the extreme pressure that call recipients face to accept Securus's exorbitantly priced single calls. Specifically, Smith wrote:

30

Often, when an individual is arrested and first taken to jail, their most urgent need is to communicate with a family member or close friend. It can take several days for those parties to set up a new account with a provider like Securus, but PayNow and Text2Connect allow those parties to receive calls instantly. This can literally be the difference between life and death for some arrestees, who may be desperate and despondent at being cast into the dangerous and unfamiliar environment of a jail. And even in less desperate cases, the loss of freedom for a day or two, if a communications delay results in a delay in posting bail, is an irreparable and incalculable loss.

93.     As a result, not only are inmates' loved ones and lawyers powerless to select their ICS provider, but many of them are also unable to set up an account that charges a lower per-minute rate rather than accept an expensive single call.

> 9.     *Defendants' Agreement Restrained Competition in the Market for Single Calls*

94.     When GTL launched the Collect2Card and Collect2Phone single call programs in 2013, it amended multiple existing ICS contracts with state and local governments around the country to add the Collect2Card and Collect2Phone options and charge $14.99 and $9.99, respectively, for single calls.

95.     As part of launching Collect2Card and Collect2Phone, GTL also delayed the rollout of APOC. Upon information and belief, although GTL eventually made APOC operational in 2014, it marketed Collect2Card and Collect2Phone as the primary single call products to state and local governments and only proposed APOC as an alternative in the event contracting governments rejected the 3CI-operated single calls.

96.     Thus, Defendants succeeded in eliminating and restraining price competition in the market for single calls. As a result of their anticompetitive agreement, both Securus and GTL charged, and profited from, the exact same artificially inflated prices of $14.99 and $9.99 for single calls and also paid the same artificially-depressed site commissions of $1.60 and $0.30 from those single calls to contracting governments.

97.     Due to the anticompetitive agreement, GTL refrained from criticizing Securus's PayNow and Text2Connect programs when bidding for and negotiating ICS contracts with contracting governments because GTL was offering identical single call programs in the form of Collect2Card and Collect2Phone. On the contrary, as discussed in Section C below, both Securus and GTL made similar fraudulent misrepresentations and omissions about their high-priced single call products to contracting governments as part of their deceptive campaigns to persuade those contracting governments to accept them.

98.     In the absence of Defendants' anticompetitive price-fixing agreement, GTL would have vigorously competed with Securus for contracts with state and local governments by, in part, offering lower-priced single calls that simultaneously generated higher site commissions. In so doing, GTL would have marketed its single call products to distinguish them as superior to Securus's, distinctions which would have included the lower cost to consumers and higher return to governmental entities. Such competition, in turn, would have forced Securus to materially lower the prices charged to consumers for PayNow and Text2Connect calls.

99.     Indeed, whenever made aware of GTL's APOC alternative, contracting governments have predictably and overwhelmingly favored APOC over Collect2Card and Collect2Phone. A former GTL employee stated that APOC was much more "palatable to facilities" than Collect2Card and Collect2Phone. Had GTL not entered into the anticompetitive agreement with 3CI and Securus, single calls that GTL provided through the Collect2Card and Collect2Phone programs would have, instead, been provided through the cheaper APOC program, providing substantial savings to many consumers.

100.    If, in the absence of a price-fixing conspiracy, GTL would have sought to supplement APOC by offering a single call option that charged mobile phone accounts, GTL

would not have needed to contract with 3CI to do so. In fact, much smaller competitors to Securus and GTL independently developed their own single call programs that charged single calls to mobile phone accounts. In order to do so without running afoul of the patent obtained by 3CI, these much smaller companies simply contracted with competitors to 3CI, which used their own technology to charge fees to mobile phone accounts through premium text messages.

101.    For example, during much of the relevant period, NCIC Inmate Communications ("NCIC") offered a single call option that charged $5.99 to the mobile phone accounts of call recipients—40% less than the $9.99 charged by Securus's Text2Connect program. The CEO of NCIC, Bill Pope, said that it was "very easy" to develop a program that offered single calls to mobile phone users and that NCIC successfully contracted with GoLive Mobile, a competitor to 3CI, to charge $5.99 to mobile phone accounts. Indeed, on January 15, 2016, the Alabama Public Service Commission wrote, "NCIC charged $5.99 for the same single payment service that Securus and GTL offer at $9.99. The [Commission] reasonably concludes that if NCIC offered the service at $5.99, industry giants Securus and GTL can as well."

102.    Additionally, even if, in the absence of a price-fixing conspiracy, GTL would have contracted with 3CI to access technology that facilitated charging single calls to mobile phone accounts, GTL would *not* have also: (1) contracted with 3CI to provide single calls that charge credit cards, when GTL was *already* developing APOC, a more competitively priced single call program that charges credit cards, (2) charged the exact same $14.99 price as Securus for each single call charged to a credit card, and (3) charged the exact same $9.99 price as Securus for each single call charged to a mobile phone account. GTL only took those three actions as a direct consequence of the agreement with Securus to eliminate competition and fix single call prices.

33

> 10.    *Securus and GTL Simultaneously Began Phasing Out 3CI-Operated Single Calls in 2018*

103.    Beginning in 2018, both Securus and GTL stopped including provisions in ICS contracts that permitted the charging of $14.99 and $9.99 for single calls operated by 3CI. Instead, both Securus and GTL began offering single calls at much lower rates without the involvement of 3CI. This simultaneous reversal further demonstrates that the prices Securus and GTL charged for 3CI-operated single calls were inflated and fixed by agreement between Securus and GTL.

104.    GTL began phasing out the use of Collect2Card and Collect2Phone in 2018. In lieu of marketing those 3CI-operated single call products, GTL has continued to offer APOC, which only charges recipients of single calls the applicable per-minute rate, plus a transaction fee of up to $3, and which provides contracting governments with site commission payments equal to the percentage collected from traditional per-minute calls.

105.    Securus similarly began phasing out PayNow and Text2Connect calls in August 2018. Securus replaced those 3CI-operated calls with a program called AdvanceConnect Single-Calls, which also only charges recipients of single calls the applicable per-minute rate, plus a transaction fee of up to $3, and which also provides contracting governments with site commission payments equal to the percentage collected from traditional per-minute calls.

106.    Although both Securus and GTL began phasing out Collect2Card, Collect2Phone, PayNow, and Text2Connect in new ICS contracts in 2018, those products continue to be offered under certain existing ICS contracts and to charge the same inflated prices. Accordingly, call recipients purchasing those 3CI-operated single call products in or after 2018 have continued to be harmed by paying inflated amounts.

> 11.    *Plus Factors Render the ICS Industry Susceptible to Price-Fixing*

107.    The ICS industry is characterized by numerous features, or plus factors, that render

34

the industry particularly susceptible to the type of collusion described herein. These include: (1) industry concentration; (2) high barriers to entry; (3) inelastic supply and demand; (4) personal relationships between executives at competing ICS providers; (5) numerous opportunities to collude; (6) strong financial motive to conspire; and (7) extraordinary profits.

108.    The ICS industry is highly concentrated. For the past decade, Securus and GTL have dominated the market for the provision of ICS. They charge for, and connect, approximately 80% of all the ICS calls in the United States. An analyst from Moody's characterized the ICS market as "largely duopolistic."

109.    The ICS industry is characterized by high entry barriers. These barriers include the high cost of building a viable telecommunications system that can provide ICS to prisons and jails; bidding for and prevailing on contracts with state and local governments, which often require a substantial outlay of upfront capital; and complying with various regulations imposed by federal and state governments. Indeed, assembling a workable telecommunications system and securing ICS contracts with government entities requires a multimillion-dollar investment. As a result, it is exceptionally expensive and logistically complex for new ICS providers to emerge and compete with Securus and GTL.

110.    Additionally, smaller ICS providers that ostensibly compete with Securus and GTL have faced substantial hurdles to capturing greater market share. For example, many state and local governments require ICS providers to make substantial upfront payments as a condition of winning ICS contracts. Securus and GTL can afford to make such payments, but smaller ICS providers often lack the capital necessary to do so. A former GTL employee explained that the bidding process for ICS contracts often automatically excludes smaller competitors from the process.

111.    The market for ICS is also characterized by inelastic supply and inelastic demand.

An increase in the price of single calls causes no increase, or only a relatively small increase, in the supply of single calls, as each state and local government only enters into one contract at a time with a single ICS provider and, further, just two ICS providers dominate the market. Similarly, an increase in the price of single calls causes no decrease, or only a relatively small decrease, in the demand for single calls, because family members, friends and lawyers must often accept these important calls from inmates despite the excessive price and, further, those call recipients are unable to select their own, more affordable ICS providers. Indeed, when a former manager of GTL asked his superiors whether the company could lower the prices of single calls to inmates' families, he was told that single call prices "should not be lowered" in part "because the family and friends of inmates are a captive audience without the ability to select an alternative provider."

112.    Because governments, not inmates, choose ICS providers, inmates and their families, friends and lawyers are captive markets for ICS providers. In a 2013 report, the Prison Policy Institute explained, "In an ordinary market for goods or services, consumers have the freedom to select the best seller. In the prison phone market, though, state and local government entities grant monopolies to telephone companies by entering into exclusive contracts. The actual consumers of the telephone service—the families of incarcerated persons—have no input on the contracts or ability to take their business elsewhere." Ajit Pai, the chairman of the Federal Communications Commission, explained in a statement issued in 2013 that "choice and competition are not hallmarks of life behind bars. Inmates cannot choose among multiple carriers for lower rates."

113.    Executives of the Defendants have close personal relationships with each other. Securus and GTL have publicly indicated that they detest each other and ostensibly engage in vigorous competition for ICS contracts with state and local governments. Yet, a former manager

at GTL explained that, despite appearances, senior executives of Securus and GTL "regularly communicated with each other to facilitate each other's success." According to the former GTL manager, then CEO of GTL, Brian Oliver, boasted that he met regularly with then CEO of Securus, Richard Smith, for drinks and dinner and that the two CEOs "shared strategic information" and discussed "what prices should be charged for ICS calls" during those private meetings. Similarly, a former Securus employee said that executives at Securus and GTL were "friends," and another former Securus executive said that the "industry was very incestual."

114.    Indeed, many executives of GTL are former employees of Securus and vice versa. For example, George McNitt, the current Vice President of Technical Services at GTL, was previously the Director of Product Development at Securus. In fact, the current private equity owner of Securus—Platinum Equity LLC—is controlled and operated by CEO Tom Gores, and his brother Alec Gores is the founder and CEO of the Gores Group, which is the former private equity owner of GTL.

115.    Defendants have had numerous opportunities to collude. Executives from Securus and GTL regularly attended conferences of professionals in charge of correctional facilities, including those hosted by the American Jail Association, National Sheriffs Association, and Corrections Technology Association. For example, during the relevant period, annual summits of the Corrections Technology Association were supported by two platinum sponsors—Securus and GTL—and at least 20 employees from Securus and GTL attended each summit. A former GTL manager explained that, at these conferences and summits, employees of GTL and Securus "regularly shared with one another considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments."

116.    There was a particularly strong financial motive for Securus and GTL to fix single

call prices. In sharp contrast to traditional per-minute ICS calls, single calls allowed Securus and

GTL to simultaneously charge consumers exorbitantly high prices and pay contracting

governments abnormally low site commissions. Accordingly, after Securus launched its single call

program in 2010, Securus was eager to prevent GTL from disrupting the extraordinary profitability

of that program.

117.    The following charts, which were prepared by the Prison Policy Initiative, reflect

the distribution of revenue from Securus's PayNow and Text2Connect single call programs in

Genesee County in Michigan during the month of April 2013—*before GTL entered the single call

market*. The charts demonstrate how Securus's single call program reduced revenue paid to

contracting governments and increased revenue collected by Securus, thus motivating Securus to

reach an agreement with GTL to eliminate price competition over single calls.





Single call programs are disproportionate source of Securus' income

An analysis of phone expenditures in Genesee County, Mich. in April 2013

118.   The Alabama Public Service Commission concluded, "Although single payment calls account for 14% of the calls and 17% of the minutes at the facility, they are responsible for 42% of all the revenue generated. The site commissions paid for the single payment calls was 7.9% of their associated revenue while the provider paid the facility 54% on the remaining inmate call revenue. . . . It is, therefore, readily apparent why single payment calls are attractive for the providers that offer them."

119.   Defendants' conspiracy to restrain competition over, and fix the prices of, single calls generated extraordinary profits for Securus and GTL. For example, as demonstrated in the chart below, Securus's gross profit margin climbed from 32% in 2009 before the launch of PayNow and Text2Connect to 57% in 2017. That steady increase in gross profit margin was, in large part, due to the growth of Securus's single call program. Notably, due to Defendants' price-fixing agreement, Securus's profit margins continued to grow even after GTL's entry in the single call market in 2013.



### 12.  *Antitrust Injury Suffered by Plaintiffs and Subclass Members*

120.    As a result of Defendants' anticompetitive conduct alleged herein, the price of ICS

single calls in the United States was fixed, stabilized, or maintained at artificially inflated levels

from 2013 through the present. A former GTL employee stated that the 3CI-operated single calls

were "exorbitantly expensive" and that consumers were paying "too much." A former Securus

executive said that Securus was "profiteering" off inmates and their families.

121.    The purpose of the conspiratorial conduct of the Defendants was to inflate, fix, or

maintain the price of ICS single calls in the United States. As a direct and foreseeable result of that

conspiratorial conduct, Plaintiffs and the following persons and entities (hereafter the "Nationwide

Antitrust Subclass") paid artificially inflated rates for 3CI-operated single calls:

> All persons and entities that, during the period January 1, 2013 until the present,
> paid: (i) a flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of
> $14.99 through GTL's Collect2Card program; (iii) a flat fee of $9.99 through
> Securus's Text2Connect program; and/or (iv) a flat fee of $9.99 through GTL's
> Collect2Phone program.

122.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the other members of the Nationwide Antitrust Subclass have sustained injury to their businesses or property, having paid more for ICS single calls from 2013 through the present than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Nationwide Antitrust Subclass have suffered damages.

123.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

124.     In a competitive market, Securus and GTL would have competed for ICS contracts with state and local governments by reducing the price of their single calls and increasing the associated site commissions. As a result, Plaintiffs and other members of the Nationwide Antitrust Subclass would have paid substantially less than $14.99 or $9.99 for such calls from 2013 through the present.

**C.     Defendants Made Fraudulent Misrepresentations and Omissions About Transaction Fees to Contracting Governments and Consumers**

125.     When Securus and GTL implemented their single call programs operated by 3CI, Defendants reaped extraordinary profits by charging consumers excessive flat rates (*i.e.* $14.99 and $9.99 per call) that were substantially higher than traditional per-minute rates and by providing contracting governments with site commissions that were a mere fraction of those paid from traditional per-minute calls.

126.     Defendants were able to charge such excessive prices for single calls, while simultaneously paying such abnormally low site commissions, by making a series of fraudulent misrepresentations and omissions to contracting governments and consumers. Specifically, in communications with contracting governments and consumers, Defendants claimed that most of the prices charged and collected from single calls made through 3CI were expended on necessary transaction fees paid to 3CI to implement and operate those calls, which justified the high single

call prices. In truth, most of the monies collected by 3CI as "transaction fees" from single calls were immediately kicked back to Securus and GTL as profit.

           *1.      Defendants Concealed the Amount of the Transaction Fees Paid to 3CI*

127.    In exchange for marketing and implementing Securus's and GTL's single call programs, 3CI retained a transaction fee from each single call. When implementing a single call, 3CI collected the revenue charged to the call recipient, retained a portion of that revenue as a transaction fee, and transmitted the remainder to Securus or GTL.

128.    Defendants carefully and systematically concealed the true amount of the transaction fees that 3CI received as compensation from each $14.99 and $9.99 single call. Defendants concealed those actual amounts paid to 3CI from contracting governments, consumers and even most of their own employees.

129.    A former executive of Securus explained that the company concealed how much 3CI and Securus received from each PayNow and Text2Connect call from the vast majority of Securus's own employees as well as from government officials and consumers. He explained that "only a handful of senior executives" at Securus possessed that information, and they were very careful not to share it with others or discuss it openly.

130.    Even a former Sales Director of Securus was not informed of the amounts that 3CI and Securus actually received from each PayNow or Text2Connect call, despite explicitly requesting such information. The former Sales Director repeatedly asked his superiors how revenue from PayNow and Text2Connect was allocated between 3CI and Securus, but they never provided the numerical breakdown to him. Instead, his superiors *falsely* informed him that 3CI received the majority of the revenue from each PayNow and Text2Connect call and, further, that contracting governments received *more* revenue from each PayNow and Text2Connect call than

Securus did. The former Sales Director passed that fraudulent message on to his sales team, which in turn communicated it widely to government officials during ICS contract negotiations, as detailed below.

131.    Similarly, a former manager of GTL said that the actual amount of money that 3CI received from each Collect2Card and Collect2Phone call was a "well-kept industry secret" and that the vast majority of GTL employees did not know and could not access that secret. He explained that "only a limited number of employees at Securus and GTL knew the actual numerical values of the transaction fees that were paid by Securus and GTL to a third-party vendor to implement single calls" and that those employees "concealed those numerical values from other employees of Securus and GTL and from governments."

2.    *True Amount of the Transaction Fees Paid to 3CI for Single Calls*

132.    Although Defendants actively concealed the true amounts of the transaction fees paid to 3CI from single calls, Plaintiffs were able to uncover those transaction fee amounts through a painstaking and extensive investigation that involved contacting confidential witnesses with the assistance of a licensed private investigator.

133.    To implement PayNow and Collect2Card calls (*i.e.* single calls charged to the credit cards of consumers), Securus and GTL paid fixed transaction fees to 3CI that were less than one-third of the $14.99 price charged to consumers' credit cards. Specifically, according to former employees of Defendants, 3CI received approximately $4.35 as a fixed transaction fee from each $14.99 single call made through PayNow or Collect2Card. The remainder of the $14.99 (*i.e.* $10.64) was transmitted by 3CI to Securus or GTL as income.

134.    A former 3CI executive explained that transaction fees charged for PayNow and Collect2Card calls were not "that high" and that, as a result, the "lion's share" of the $14.99 in

43

revenue generated from those calls was provided to and retained by Securus and GTL, not 3CI. Likewise, a former GTL employee explained that "most of the revenue" from Collect2Card calls was transmitted to and retained by GTL.

135.    Similarly, to implement Text2Connect and Collect2Phone calls (*i.e.* single calls charged to the mobile phone accounts of consumers), Securus and GTL paid transaction fees to 3CI that were less than half of the $9.99 price charged to consumers' mobile phone accounts. According to former employees of Defendants, 3CI retained no more than $4.99 from each Text2Connect and Collect2Phone call. Thus, at least $5 from each such call was transmitted by 3CI to Securus or GTL as profit.

136.    The transaction fees charged by 3CI to market and operate Text2Connect and Collect2Phone calls were not flat amounts, but rather determined as a percentage of the overall single call price. A portion of those transaction fees was used by 3CI to pay mobile phone carriers, such as Verizon and AT&T, whenever their subscribers were charged for a single call via premium text message, and those mobile phone carriers were compensated according to a percentage of the price of the single call. As a result, had Securus and GTL opted to charge less than $9.99 for Text2Connect and Collect2Phone calls, the transaction fees paid to 3CI to operate those calls would have been proportionally reduced.

137.    For example, the CEO of NCIC, Bill Pope, approached 3CI in 2008 to develop and sell a single call product that would charge $5.99 to the mobile phone accounts of call recipients. During the negotiations, 3CI stated that it would charge NCIC a transaction fee of $2.99 from each $5.99 single call. Ultimately, NCIC decided against working with 3CI and, instead, contracted with another company to sell single calls priced at $5.99.

      3.     *Misrepresentations and Omissions to Contracting Governments and Consumers about Transaction Fees Paid to 3CI*

138.    Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for such calls. State and local contracting governments would *not* have permitted Securus and GTL to charge such high prices for single calls considering the actual costs of implementing them. Indeed, the amounts that Securus and GTL retained from each single call—after the deduction of all transaction fees—were *several times higher* than what consumers would pay for the same call had those consumers been charged the per-minute rate expressly agreed to by contracting governments and contained in ICS contracts.

139.    As a result, in order to charge the excessive prices of $14.99 and $9.99 for single calls, Defendants engaged in a widespread pattern of fraudulent misrepresentations and omissions to contracting governments and consumers regarding the enormity of the transaction fees paid to 3CI. Specifically, Securus and GTL made misrepresentations and omissions to contracting governments that substantially inflated the size of the transaction fees paid to 3CI from single calls, and Securus and GTL also instructed 3CI to make those misrepresentations and omissions to both contracting governments and consumers. At the direction of Securus and GTL, 3CI subsequently charged excessive single call prices to consumers that reflected those inflated transaction fees and simultaneously kicked back the majority of the revenue from those charges to Securus and GTL.

140.    With respect to PayNow and Collect2Card calls, Defendants falsely claimed that a whopping $13.19 of the $14.99 charged to the credit cards of consumers was, in fact, paid to 3CI as transaction fees, leaving Securus and GTL with only $1.80 in revenue from each such call. Based on that misrepresentation, Securus and GTL asserted to contracting governments and consumers that because the actual calling rate for PayNow and Collect2Card calls was only $1.80

for a call lasting up to 15 minutes after the deduction of transaction fees, the $14.99 price was justified. Securus and GTL also argued to contracting governments that because those companies only received $1.80 from each PayNow and Collect2Card call, the site commission payments of $1.60 from each such call were generous, amounting to approximately 89% of the revenue collected by Securus and GTL from those calls.

141.    Similarly, with respect to Text2Connext and Collect2Phone calls, Defendants falsely claimed that the majority of the $9.99 charged to the mobile phone accounts of consumers was, in fact, paid to 3CI as transaction fees. Based on that misrepresentation, Securus and GTL asserted to contracting governments that because the actual calling rate charged for each Text2Connext and Collect2Phone call was merely a fraction of $9.99 after the deduction of transaction fees, that price was justified. Securus and GTL also argued to contracting governments that because those companies only received a small share of $9.99 from each PayNow and Collect2Card call, the site commissions of $0.30 paid to contracting governments from each such single call were fair.

142.    Defendants made the material misrepresentations and omissions about the transaction fees associated with their single call products in at least six distinct forms: (1) during direct communications and negotiations with contracting governments; (2) in written bids submitted to, and written contracts entered into with, contracting governments; (3) in monthly written commission reports provided to contracting governments; (4) on public websites directed toward consumers and governments; (5) in billing charges made to consumers' credit cards; and (6) in billing charges made to consumers' mobile phone accounts.

> *a.*    *Misrepresentations and Omissions to Contracting Governments during Direct Communications and Negotiations*

143.    When Securus and GTL negotiated with state and local governments to secure ICS

contracts, they falsely informed those governments that the extraordinarily high prices and low site commissions associated with 3CI-operated single calls were a direct consequence of mandatory transaction fees paid to a third-party vendor. Specifically, whenever a contracting government raised questions about either the high single call prices or low site commissions, both Securus and GTL would assert that transaction fees consumed a substantial majority of the $14.99 and $9.99 charged to consumers, thereby justifying the high prices and low commissions.

144.    A former Securus executive explained that the company's sales force avoided identifying the price of single calls, and the site commissions associated with them, during negotiations with governments, and instead encouraged contracting governments to focus on the low rates and high site commissions associated with per-minute calls.

145.    Another former Securus executive stated that he, and the account managers that reported to him, did *not* proactively disclose the transaction fees associated with single calls when negotiating with contracting governments. Rather, he explained that the Securus salesforce would address transaction fees if a contracting government raised concerns about the cost of PayNow and Text2Connect calls to consumers. At that point, the Securus salesforce would falsely inform the contracting government that (1) the "vast majority" of the $14.99 collected from each PayNow call, and the "vast majority" of the $9.99 collect from each Text2Connect call, was necessarily paid to a third-party vendor (*i.e.* 3CI) to cover transaction fees and (2) as a result of those necessary transaction fee payments to 3CI, "the contracting governments received more in revenue from each PayNow and Text2Connect call than Securus received." In reality, Securus was receiving more than *six times* the revenue from PayNow calls, and more than *16 times* the revenue from Text2Connect calls, than it was providing to contracting governments in the form of site commissions.

146.     The former Securus executive explained that, during his tenure, "the vast majority of governments that contracted with Securus raised concerns about the high prices charged to consumers for Securus's single calls and specifically wanted to know why those particular calls were so expensive and how the revenues from those single calls were allocated." The former Securus executive explained that he and the account managers he supervised "spent a substantial amount of time deflecting complaints from contracting governments about the high prices of Securus's single calls." The former Securus executive personally fielded questions from contracting governments about the high prices of PayNow and Text2Connect calls during in-person meetings, over the telephone, and by email.

147.     The former Securus executive explained that, in response to the substantial pushback from contracting governments regarding the price of PayNow and Text2Connect calls, the company's salesforce successfully relied on misrepresentations regarding the enormity of unavoidable transaction fees paid to 3CI, and the minor share of revenue received by Securus, to counter such concerns and persuade governments to ultimately accept the single call rates. The former Securus employee explained that those misrepresentations "were effective in persuading" governments to include PayNow and Text2Connect in ICS contracts.

148.     Similarly, a former employee of GTL explained that "many county and other local governments raised concerns with Securus and GTL about the high price of single calls." He stated that to persuade those and other governments to accept single calls in ICS contracts, "both Securus and GTL informed governments that the high price of single calls was not the result of those companies collecting substantial profit from single calls but rather a direct consequence of sizable transaction fees that were an unavoidable part of the cost of implementing those calls."

48

149.    A former deputy sheriff of a county stated that when Securus was negotiating an ICS contract with him, he "raised concerns about the price" of single calls with Securus and "requested that Securus lower the price of those single calls." He explained that, in response, Securus stated that "the high cost of the single calls was attributable to substantial transaction fees that had to be paid to a third-party vendor to implement those calls."

> b.    *Misrepresentations and Omissions in Written Bids Submitted to, and ICS Contracts with, Governments*

150.    When Securus and GTL submitted bids for and entered into ICS contracts, both companies omitted critical information about their respective 3CI-operated single call programs in the documents. While many pages of the bids and contracts delved into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents only cursorily mentioned single call programs. Many bids and contracts failed to even mention the price of the single calls (*i.e.* $14.99 and $9.99), and those that did so failed to identify the dollar value of the site commission ($1.60 and $0.30). And *none* of the bids and contracts disclosed how much would actually be paid from single call charges to 3CI as a transaction fee or how much Securus and GTL would actually receive from such calls in revenue. As a result, when entering into ICS contracts with Securus and GTL during the relevant period, contracting governments were uninformed of either the true size of the transaction fees associated with single calls or how the site commission payments compared to the revenue retained by Securus and GTL.

151.    A former Securus executive explained that the company did not disclose the actual amount of the transaction fees charged by Securus for PayNow calls either in ICS contracts with governments or during negotiations leading to such contracts.

152.    In fact, in some ICS contracts, Securus and GTL not only omitted the true value of the transaction fees associated with 3CI-operated single calls, but also inaccurately indicated that

the *entire* $14.99 and $9.99 charges for single calls constituted transaction fees paid to vendors.

For example, the following is an excerpt from an ICS contract between Securus and Harris County,

Texas that was executed on November 9, 2010:

| 3rd Party Vendor Transaction Fees | |
|---|---|
| Western Union – End User Deposit Fee | Optional Fee of up to $11.99 charged for the expedited wiring of funds |
| Text2Connect – Wireless Text Message Fee | Optional Fee of up to $9.99 may be charged by end users wireless provider to complete promotional call and facilitate account establishment |
| Instant Pay Credit Card Calling | Provides the option for end users to receive and pay for a call with a credit card or debit card at the time of call without establishing an account. Fee of up to $14.99 including credit card charges. |

   c. *Misrepresentations and Omissions in Monthly Commission Reports Provided to Contracting Governments*

   153. When Securus and GTL contracted to provide ICS to governments, the companies

distributed monthly commission reports to those governments. When addressing per-minute calls,

those monthly reports identified the number of per-minute calls made, the duration of the per-

minute calls, the revenue collected from the per-minute calls, and the amount of that revenue

shared with the contracting governments as site commissions.

   154. In those same monthly reports, however, when addressing single calls, both Securus

and GTL either omitted comparable and material information about, and/or made affirmative

misrepresentations regarding, 3CI-operated single calls and the transaction fees associated with them.

155.    In many monthly commission reports, Securus and GTL only listed the number of single calls made and the dollar value of the site commissions paid to the contracting governments—*not* the price of the single calls, the revenue received by Securus or GTL from those calls, or the percentage value of the site commission payments. Such information was deliberately omitted to prevent contracting governments from determining the amount of revenue received by Securus and GTL from such calls or the amount in transaction fees actually paid to 3CI.

156.    In other monthly commission reports, Securus and GTL explicitly misrepresented the amount of revenue that they received from 3CI-operated single calls and, in turn, the site commission percentage paid to the contracting government. In so doing, Securus and GTL disguised the magnitude of the transaction fees paid to 3CI to implement those calls.

157.    For example, the below is an excerpt from a monthly commission report provided to the Sheriff's Office in Merced County, California for the month of February 2015. The excerpt shows that for Collect2Phone single calls, GTL reported that it received *zero dollars* in revenue from each such call—even though GTL actually received the majority of the $9.99 charge from each such call. The excerpt further shows that for Collect2Card calls, GTL reported that it only received $1.80 from each such $14.99 call and, in turn, paid $1.60 of that $1.80 to the Sheriff's Office in site commissions—even though GTL actually received approximately $10.64 in revenue from each Collect2Card call. The difference between what GTL actually received in revenue from these single calls and what GTL reported it received in the monthly commission report reflects the inflated transaction fee that was fabricated by GTL.

| Call Type | # Calls | % of Total Calls | # Minutes | % of Total Minutes | Revenue | % of Total Revenu | Commission % | Total Commission |
|---|---|---|---|---|---|---|---|---|
| Debit Local | 3,941 | 18.46% | 31,173 | 17.83% | $15,198.78 | 25.31% | 70.00% | $10,639.15 |
| Debit Intrastate Intralata | 2,105 | 9.86% | 15,873 | 9.08% | $7,915.98 | 13.18% | 70.00% | $5,541.19 |
| Debit Intrastate Interlata | 1,241 | 5.81% | 11,256 | 6.44% | $5,160.36 | 8.59% | 70.00% | $3,612.25 |
| Debit Interstate Interlata | 9,365 | 43.88% | 68,330 | 39.08% | $14,349.30 | 23.89% | 0.00% | $0.00 |
| Collect Local | 661 | 3.10% | 3,840 | 2.20% | $2,447.25 | 4.08% | 70.00% | $1,713.08 |
| Collect Intrastate Intralata | 138 | 0.65% | 965 | 0.55% | $551.75 | 0.92% | 70.00% | $386.23 |
| Collect Intrastate Interlata | 24 | 0.11% | 202 | 0.12% | $104.50 | 0.17% | 70.00% | $73.15 |
| Collect Interstate Interlata | 1 | 0.00% | 15 | 0.01% | $3.75 | 0.01% | 0.00% | $0.00 |
| Collect2Phone Local | 176 | 0.82% | 2,234 | 1.28% | $0.00 | 0.00% | 100.00% | $52.80 |
| Collect2Phone Intrastate Intral | 128 | 0.60% | 1,747 | 1.00% | $0.00 | 0.00% | 100.00% | $38.40 |
| Collect2Phone Intrastate Inter | 57 | 0.27% | 721 | 0.41% | $0.00 | 0.00% | 100.00% | $17.10 |
| Collect2Phone Interstate Inter | 25 | 0.12% | 298 | 0.17% | $0.00 | 0.00% | 0.00% | $0.00 |
| Collect2Card Local | 135 | 0.63% | 1,813 | 1.04% | $243.00 | 0.40% | 100.00% | $216.00 |
| Collect2Card Intrastate Intral | 120 | 0.56% | 1,465 | 0.84% | $216.00 | 0.36% | 100.00% | $192.00 |
| Collect2Card Intrastate Interla | 74 | 0.35% | 1,016 | 0.58% | $133.20 | 0.22% | 100.00% | $118.40 |
| Collect2Card Interstate Interla | 16 | 0.07% | 205 | 0.12% | $28.80 | 0.05% | 0.00% | $0.00 |

158.     Thus, the monthly commission reports concealed from contracting governments both the actual revenue received by Securus and GTL from their single calls and the actual transaction fees associated with those single calls.

> d.     *Misrepresentations and Omissions in Public Websites to Contracting Governments and Consumers*

159.     In public websites established and managed by 3CI and accessible to consumers and governments, Defendants repeatedly made misrepresentations about the enormity of the transaction fees associated with their single calls that charged $14.99 to consumers' credit cards. Specifically, the websites for both Securus's PayNow program and GTL's Collect2Card program stated that each single call charging $14.99 involves a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of Securus and GTL, 3CI included the following language on the "Pricing" page of both websites during the relevant period:

> The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement.

160.    The following images are screenshots from the websites of Securus's PayNow and GTL's Collect2Card programs:





161.    The statements on the websites for PayNow and Collect2Card regarding the transaction fees and call fees for each $14.99 call are plainly false. As noted above, the "Transaction Fee" charged by Securus and GTL and paid to 3CI was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by Securus and GTL was not $1.80, but rather approximately $10.64. Both websites fail to disclose to consumers and contracting governments that a substantial majority of the so-called "Transaction Fee" charged for the $14.99 single calls is kicked back to Securus and GTL as profit.

162.    When establishing and updating the websites, 3CI knew of the misrepresentations that Securus and GTL were making to contracting governments and, at their direction, intentionally aligned the false pricing information on its website to be consistent with Securus's and GTL's misrepresentations to contracting governments.

163.    The misrepresentations and omissions on the websites are particularly significant to consumers considering the blanket omission of information about transaction fees during the point of sale. When consumers received a 3CI-operated single call, they were asked to approve the total charge of $14.99 or $9.99 by the automated system without Securus, GTL, or 3CI disclosing the size of the transaction fee.

> e.    *Misrepresentations and Omissions to Consumers in Billing Charges for $14.99 Single Calls*

164.    In addition to making misrepresentations on the websites for PayNow and Collect2Card, Defendants misrepresented the amounts of the "Transaction Fee" and "Call Fee" associated with those products in the billing charges made to consumers' credit cards. At the direction of Securus and GTL, 3CI charged consumers two distinct, fraudulent charges whenever they accepted a PayNow or Collect2Card call: a fraudulent "Transaction Fee" and a fraudulent "Call Fee." Specifically, for each PayNow call charged by Securus and each Collect2Card call

54

charged by GTL, the $14.99 call was billed to consumers as the following two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80.

165.    The following is an image of actual billing charges to Plaintiff Ashley Albert, who paid a total of $14.99 for a PayNow call on June 13, 2016:



| 06/13/16 | CHECKCARD 0611 1TEL.COM TRANSACTION FE 877-2247002 FL 2443654616400080820677274 | -13.19 |
| 06/13/16 | CHECKCARD 0611 1TEL.COM PER CALL FEE 877-2247002 FL 2443654616400080820677308 | -1.80 |

166.    A former GTL manager explained that although inmates' families were billed $13.19 in transaction fees whenever they accepted a Collect2Card call, most of that charge was *not* used to pay a transaction fee but rather was retained by GTL as profit. Another former GTL employee said that Collect2Card single calls were highly profitable for the company because the "bulk" of the $13.19 in transaction fees charged to consumers was kicked back to GTL as revenue, rather than paid to 3CI. A former 3CI executive explained that the company did *not* receive $13.19 in transaction fees from PayNow and Collect2Card calls and, instead, a substantial majority of the $14.99 charged to consumers was kicked back to and retained by Securus and GTL.

167.    As a result, consumers around the country who paid $14.99 for a single call provided by GTL or Securus were expressly charged for a fabricated and artificially inflated transaction fee.

                    *f.*    *Omissions to Consumers in Billing Charges for $9.99 Calls*

168.    When Securus and GTL charged consumers for Text2Collect and Collect2Phone calls, those consumers paid $9.99 for each such call. That $9.99 charge constituted a substantial overcharge, as it reflected an amount accepted by contracting governments as a result of misrepresentations and omissions by Securus and GTL regarding the magnitude of the transaction fees paid to 3CI to implement such calls.

169.    The $9.99 charges for Text2Collect and Collect2Phone appeared on premium text messages and mobile phone billing statements received by call recipients. Those $9.99 charges failed to disclose either the actual transaction fee paid to 3CI for such calls, or that Securus and GTL collected most of the revenue from such calls in the form of kickbacks from 3CI.

    4. *Defendants' Misrepresentations and Omissions about Transaction Fees Injured Plaintiffs, the Class and Subclasses*

170.    The fraudulent misrepresentations and omissions made by Defendants regarding transaction fees caused Plaintiffs and the members of the Class and Subclasses to be overcharged for 3CI-operated single calls.

171.    With respect to PayNow and Collect2Card calls, instead of charging Plaintiffs and members of the Class and Subclasses the actual transaction fees paid to 3CI of approximately $4.35 per call, Defendants charged them $13.19 per call in artificially inflated and fabricated transaction fees, failing to disclose to contracting governments or consumers that Securus and GTL were pocketing $8.84 of the purported transaction fees. Similarly, with respect to Text2Connect and Collect2Phone calls, instead of charging Plaintiffs and members of the Class and Subclasses a price reflective of the actual transaction fees paid to 3CI, Defendants charged them an excessive price that was inflated due to fabricated transaction fees, failing to disclose to contracting governments or consumers that Securus and GTL were pocketing most of the $9.99 charge.

172.    Had Defendants accurately disclosed the value of the transaction fees to contracting governments and consumers, Plaintiffs and members of the Class and Subclasses would have paid substantially less money for 3CI-operated single calls. Informed of the actual value of the transaction fees, a sufficient number of contracting governments would have insisted on lower-priced single call programs when selecting bids for, and negotiating the terms of, ICS contracts that the $9.99 and $14.99 prices charged nationwide would have been revised substantially lower.

A former Securus executive explained that if contracting governments "had been informed that the transaction fees associated with PayNow and Text2Connect comprised less than half of the prices of those calls," then those governments "would have insisted on both lowering the price of single calls to consumers and increasing the amount of the commissions paid to those governments." Similarly, a former GTL manager explained that had contracting governments learned "that the actual value of transaction fees paid to a third-party vendor to implement single calls was less than half of the price charged to consumers for those single calls," then "the majority of those governments would have insisted on lowering the price of single calls to consumers."

173.    Indeed, each contracting government had already negotiated an acceptable per-minute rate for ICS calls with Securus or GTL. Accordingly, if Defendants had disclosed that, *even after the deduction of actual transaction fees*, charges for 3CI-operated single calls were substantially greater than the negotiated per-minute rate for calls, contracting governments would have required a reduction of those single call prices. In response, Securus and GTL would have been forced to reduce the prices of their single call products.

174.    Because PayNow, Text2Connect, Collect2Card, and Collect2Phone are national programs with nationwide websites that charge uniform rates across the country, pressure from multiple state and local contracting governments opposing unjustified and excessive single call prices would have resulted in Securus and GTL making nationwide reductions to those prices. Indeed, around the time when Securus and GTL began phasing out 3CI-operated single calls, there was increasing scrutiny of those companies' single call prices. A former Securus executive explained that the company ultimately phased out 3CI-operated single calls in 2018 because of "the increasing volume of complaints" from contracting governments about the high prices. In the

absence of their fraudulent misrepresentations and omissions about transactions fees, Defendants would not have been able to charge those high prices for single calls in the first place.

## VI.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   Continuing Violation

175.   During the relevant period, Defendants' anticompetitive conspiracy and fraudulent misrepresentations were continuing violations in which Defendants repeatedly invaded the interests of Plaintiffs and members of the Class and Subclasses by adhering to, enforcing, and reaffirming the anticompetitive agreement to fix the prices of 3CI-operated single calls and by continuously making fraudulent misrepresentations and omissions regarding the size of transaction fees associated with those calls to contracting governments and consumers. Indeed, Defendants continue to charge $14.99 for PayNow and Collect2Card calls and $9.99 for Text2Connect and Collect2Phone calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those single calls.

176.   Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive price-fixing agreement throughout the relevant period was consummated through, among other conspiratorial acts, private communications between Defendants and the charging of the price-fixed rate for 3CI-operated single calls.

177.   Defendants' continuing fraudulent misrepresentations and omissions regarding transaction fees throughout the relevant period were consummated through, among other communications, statements made to government officials during negotiations for ICS contracts, statements contained in written ICS contracts entered into with governments, statements contained in monthly commission reports provided to contracting governments, statements on public websites accessible to consumers and governments, and statements made to consumers in billing

58

charges.

**B.    Fraudulent Concealment**

*1.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct*

178.    Plaintiffs and members of the Class and Subclasses had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Class and Subclasses did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the misconduct alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy and in fraudulent misrepresentations and omissions that did not reveal facts that would put Plaintiffs or other members of the Class and Subclasses on inquiry notice that they had been overcharged for 3CI-operated single calls.

179.    Defendants' anticompetitive conspiracy and fraudulent misrepresentations and omissions were and are, by their very nature, self-concealing. ICS providers are not exempt from antitrust regulation, and thus, Plaintiffs reasonably believed that ICS providers competed with one another to offer ICS. Moreover, no publicly available source disclosed that the transaction fees paid by Securus and GTL to 3CI during the relevant period comprised a mere fraction of the prices of the single calls, rather than a majority of those prices as Defendants repeatedly stated. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of single call prices charged to consumers by Defendants. Indeed, Plaintiffs' counsel only managed to discover Defendants' misconduct through an intensive and lengthy investigation with the assistance of licensed investigators who identified and communicated with confidential witnesses.

180.    Plaintiffs exercised reasonable diligence. Plaintiffs and members of the Class and Subclasses could not have discovered Defendants' misconduct and overcharges at an earlier date

by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to conceal their misconduct and overcharges.

2.      *Defendants Actively Concealed their Misconduct and Overcharges*

181.    Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful conduct and overcharges from Plaintiffs and the other members of the Class and Subclasses. Defendants only engaged in unlawful conduct in a manner specifically designed to avoid detection.

182.    During the relevant period, Defendants actively concealed from Plaintiffs and members of the Class and Subclasses that the actual transaction fees associated with their 3CI-operated single calls were significantly smaller than the amounts that Defendants charged, and that Securus and GTL collected the difference between those figures in the form of kickbacks from 3CI. For example, in public websites published throughout the relevant period, Defendants falsely broadcast that transaction fees associated with PayNow and Collect2Card calls were $13.19, rather than approximately $4.35. When charging consumers for those single calls, Defendants specifically billed consumers for a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80.

183.    Defendants also actively concealed the true amount of the transaction fees associated with 3CI-operated single calls from government officials. In communications with contracting governments, Defendants falsely and repeatedly represented, in both oral and written communications, that the vast majority of the prices charged for 3CI-operated single calls comprised necessary transaction fees paid to a third-party vendor.

184.    In fact, Defendants concealed their overcharges for fabricated transaction fees so effectively that most employees of Securus and GTL were unaware of (1) the actual value of the transaction fees paid to 3CI to implement single calls and (2) how much Securus and GTL actually

received in revenue from 3CI-operated single calls. A former executive of Securus explained that only a handful of executives were permitted to know exactly how much Securus received from each PayNow and Tex2Connect call, and a former manager of GTL said that the amount 3CI received from each Collect2Card and Collect2Phone call was a "well-kept industry secret" inaccessible to the vast majority of GTL employees.

185.    Defendants also fraudulently concealed their conspiracy to fix single call prices from Plaintiffs and other members of the Class and Subclasses through various means and methods. To establish and effectuate the conspiracy without an accessible paper trail, Defendants conducted surreptitious oral communications during confidential meetings between senior executives. For example, according to a former manager of GTL, the CEOs of GTL and Securus held private, in-person dinners during which they "shared strategic information" and discussed "what prices should be charged for ICS calls."

186.    Defendants also publicly represented during the relevant period that Securus and GTL fiercely competed with each other for ICS contracts with governments. For example, in a 10-K Form filed with the Securities and Exchange Commission on March 15, 2010, Securus wrote, "In the inmate telecommunications business, we historically have competed with numerous independent providers of inmate telephone systems such as Global Tel*Link . . . ." A former manager of GTL explained, "While I was employed at GTL, Securus and GTL publicly identified themselves as fierce competitors in the ICS industry. In reality, behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success."

187.    By virtue of Defendants' fraudulent concealment of their unlawful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and other members of the Class and Subclasses have as a result of

Defendants' misconduct alleged in this Complaint.

## VII.    CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and

23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following

proposed class and subclasses:

**Nationwide Class:**
All persons and entities that, during the period January 1, 2010 until the present, paid: (i) a
flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of $14.99 through
GTL's Collect2Card program; (iii) a flat fee of $9.99 through the Securus's Text2Connect
program; and/or (iv) a flat fee of $9.99 through GTL's Collect2Phone program.

**Nationwide Antitrust Subclass:**
All persons and entities that, during the period January 1, 2013 until the present, paid: (i) a
flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of $14.99 through
GTL's Collect2Card program; (iii) a flat fee of $9.99 through Securus's Text2Connect
program; and/or (iv) a flat fee of $9.99 through GTL's Collect2Phone program.

**Nationwide Securus Subclass:**
All persons and entities that, during the period January 1, 2010 until the present, paid: (i) a
flat fee of $14.99 through Securus's PayNow program; and/or (ii) a flat fee of $9.99
through Securus's Text2Connect program.

**Nationwide GTL Subclass:**
All persons and entities that, during the period January 1, 2013 until the present, paid: (i) a
flat fee of $14.99 through GTL's Collect2Card program; and/or (ii) a flat fee of $9.99
through GTL's Collect2Phone program.

189.    The following persons and entities are excluded from the proposed Class and

Subclasses: Defendants and their employees, subsidiaries, affiliates, predecessors, officers,

directors, legal representatives, heirs, and successors; co-conspirators; federal, state, and local

governmental entities; and the judge, judicial officers, and associated court staff assigned to this

case and their immediate family members.

190.    The Class and each Subclass are so numerous that joinder of all members in this

action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the Class

and each Subclass contains thousands of members.

191.   The Class and each Subclass is readily identifiable and is one for which records should exist.

192.   Each named Plaintiff's claims are typical of those of the Class and subclasses the named Plaintiff seeks to represent. Each named Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and subclasses that the named Plaintiff seeks to represent, and the relief sought by each named Plaintiff is common to the Class and subclasses the named Plaintiff seeks to represent.

193.   Plaintiffs and members of the Class and Subclasses were injured by the same unlawful conduct, which resulted in each of them paying more for telephone calls with inmates than they would have in the absence of the unlawful conduct.

194.   Plaintiffs will fairly and adequately protect and represent the interests of the Class and Subclasses. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class and Subclasses.

195.   Questions of law and fact common to the members of the Class and Subclasses predominate over questions, if any, that may affect only individual members of the Class or Subclasses because Defendants have acted and refused to act on grounds generally applicable to the members of the Class and Subclasses.

196.   Questions of law and fact common to the Class and/or Subclasses include:

   a.   Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the price of 3CI-operated single calls charged to consumers;

   b.   The duration of the antitrust conspiracy alleged herein and the acts performed by

Defendants and their co-conspirators in furtherance of the conspiracy;

c.   Whether Defendants made material misrepresentations and omissions to contracting governments and consumers about the size of transaction fees associated with 3CI-operated single calls;

d.   The extent to which Securus and/or GTL accepted undisclosed kickbacks from the fabricated transaction fees charged to consumers;

e.   Whether the misconduct by Defendants constituted violations of the Sherman Antitrust Act;

f.   Whether the misconduct by Defendants constituted violations of RICO;

g.   Whether Defendants fraudulently concealed their misconduct;

h.   The extent to which Defendants' misconduct inflated the price of 3CI-operated single calls charged to consumers; and

i.   The nature and scope of injunctive relief necessary to restore competition, transparency, and/or lawful pricing to the ICS market.

197.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

198.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class and Subclasses compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class

and Subclasses to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class and Subclasses is impractical, and the prosecution of separate actions by individual members of the Class and Subclasses would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

199. Defendants have acted on grounds generally applicable to the Class and Subclasses, thereby making final injunctive relief appropriate with respect to the Class and Subclasses as a whole.

## VIII.   CAUSES OF ACTION

### COUNT 1
### CONSPIRACY TO FIX PRICES IN VIOLATION OF
### SECTION 1 OF SHERMAN ANTITRUST ACT
### (On behalf of the Nationwide Antitrust Subclass against All Defendants)

200. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint.

201. Beginning on or about January 1, 2013, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to prevent and eliminate price competition over single calls between Securus and GTL and to fix, inflate, maintain, and stabilize the price of 3CI-operated single calls charged to consumers in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

202. In formulating and carrying out the alleged agreement, understanding, and

conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:

    a.  Reached agreements to fix, inflate, maintain, and stabilize the prices of PayNow, Text2Connect, Collect2Card and Collect2Phone calls charged to consumers in the United States;

    b.  Charged the fixed, inflated, maintained and stabilized price of $14.99 for PayNow and Collect2Card calls to consumers in the United States;

    c.  Charged the fixed, inflated, maintained and stabilized price of $9.99 for Text2Connect and Collect2Phone calls to consumers in the United States;

    d.  Delayed, diminished and deprioritized the introduction of a lower-priced alternative to 3CI-operated single calls that had been developed by GTL; and

    e.  Prevented price competition over single calls between Securus and GTL when they bid for, and entered into, contracts with state and local governments to provide ICS.

203.    Defendants' conspiracy to fix single call prices is a *per se* violation of Section 1 of the Sherman Act.

204.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.  Price competition in the sale of ICS single calls was restrained, suppressed, or eliminated in the United States;

    b.  Prices for PayNow, Text2Connect, Collect2Card and Collect2Phone calls charged by Defendants were fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

    c.    Consumers who purchased PayNow, Text2Connect, Collect2Card and/or Collect2Phone calls were deprived of the benefits of free and open competition.

205.    Plaintiffs and the other members of the Nationwide Antitrust Subclass have been injured and will continue to be injured in their businesses and property by paying more for PayNow, Text2Connect, Collect2Card and/or Collect2Phone calls than they would have paid and will pay in the absence of the combination and conspiracy.

**COUNT 2**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide Securus Subclass against Defendant Securus)**

206.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint.

207.    At all relevant times, Securus constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as it was capable of holding a legal or beneficial interest in property.

208.    At all relevant times, the corporation 3CI constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

209.    The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided mobile marketing services to brands and retailers throughout the United States and across multiple states, and the Enterprise transacted business through the use of the United States mails and interstate telephone wires. The Enterprise also communicated with Securus in furtherance of the pattern of racketeering activity and scheme to defraud described below using the interstate wires and interstate mail.

210.    Securus is a separate entity and separate corporation, distinct from the Enterprise itself, and Securus unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

211.   The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged. A bona fide for-profit corporation that provides mobile marketing services to a broad array of clients, the Enterprise employed senior executives with defined roles who directed and managed the daily operations of the Enterprise within an established chain of command and who reported to a governing board of directors. During the relevant period, the Enterprise engaged in conduct unrelated to the pattern of racketeering, including providing mobile marketing services to clients other than Securus and GTL.

212.   A common and shared purpose of the Enterprise was to deceive contracting governments and Nationwide Securus Subclass members regarding the value of transaction fees associated with PayNow and Text2Connect calls and to overcharge Nationwide Securus Subclass members for those single calls.

213.   Securus participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. Securus participated in the conduct and operation of the Enterprise through, among other things, purchasing a patent associated with billing ICS single calls to mobile phone accounts from the Enterprise and granting the Enterprise exclusive use of the patent; contracting with the Enterprise to establish and operate Securus's PayNow and Text2Connect programs; directing the Enterprise to process charges to Nationwide Securus Subclass members for making PayNow and Text2Connect calls; directing the Enterprise to specifically charge $14.99 for PayNow calls and $9.99 for Text2Connect calls; directing the Enterprise to establish and maintain a website for the PayNow and Text2Connect programs; directing the Enterprise to falsely represent on the website for the PayNow program that the $14.99

charge was attributable to a $13.19 "Transaction Fee" and a $1.80 "Call Fee"; approving and directing the Enterprise to contract with GTL to establish and operate GTL's Collect2Card and Collect2Phone programs; directing the Enterprise to make misrepresentations and material omissions about transaction fees associated with PayNow and Text2Connect calls to contracting governments and Nationwide Securus Subclass members, including through websites and billing statements; directing the Enterprise to charge fabricated and artificially inflated transaction fees to Nationwide Securus Subclass members; instructing the Enterprise to kick back a majority of those fabricated and artificially inflated transaction fees to Securus; and directing the Enterprise to separately charge $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept PayNow calls. Securus could not have accomplished the pattern of racketeering activity, or profited from it, without the Enterprise or participating in the conduct of the Enterprise.

214.    As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, Securus repeatedly made material misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls and paid to the Enterprise, which constitutes a pattern of racketeering activity. The misrepresentations constituting the pattern of racketeering activity permitted the Enterprise to charge higher prices for PayNow and Text2Connect calls and to kick back a share of the revenue received from fabricated and artificially inflated transaction fees associated with PayNow and Text2Connect calls to Securus.

215.    From January 2010 through present, to effectuate the Enterprise's purposes of deceiving government officials and Nationwide Securus Subclass members regarding the value of transaction fees associated with PayNow and Text2Connect calls and overcharging Nationwide Securus Subclass members for those calls, Securus engaged in a pattern of racketeering activity.

69

As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, Securus repeatedly and knowingly transmitted fraudulent misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls and paid to the Enterprise, via mail and wires. Specifically, during the period 2010 through present, on at least hundreds of occasions each year, both Securus and the Enterprise each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls and paid to the Enterprise.

216.     The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

217.     *Mail Fraud.* Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved Securus knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included Securus knowingly and intentionally mailing misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees associated with PayNow and Text2Connect calls and paid to the Enterprise for the fraudulent purpose of overcharging Nationwide Securus Subclass members for those calls.

218.   *Wire Fraud*. Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved Securus knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included Securus knowingly and intentionally electronically transmitting misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees associated with PayNow and Text2Connect calls and paid to the Enterprise for the fraudulent purpose of overcharging Nationwide Securus Subclass members for those calls.

219.   The scheme to defraud involved Securus, as part of and in connection with the conduct and operation of the Enterprise, knowingly making misrepresentations and omissions regarding the value of the transaction fees associated with PayNow and Text2Connect calls and paid to the Enterprise—using either mail or electronic communications—to contracting governments and Nationwide Securus Subclass members on multiple occasions from January 2010 through present. Those misrepresentations and omissions were made for the purpose of overcharging Nationwide Securus Subclass members for PayNow and Text2Connect calls. Those misrepresentations and omissions specifically include, but are not limited to:

- <u>Misrepresentations and Omissions to Contracting Governments during Negotiations</u>: During negotiations with contracting governments, Securus falsely informed those governments that most of the $14.99 price for PayNow calls and the $9.99 price for Text2Connect calls stem from and constitute necessary transaction fees paid to the Enterprise. Securus specifically instructed that, in the event contracting governments raised questions about the high prices of PayNow and Text2Connect calls, the company's sales team should claim that a substantial majority of the charges are comprised of necessary transaction fees and, further, that the contracting governments receive more revenue from PayNow and Text2Connect calls than Securus does. These statements were false; a mere fraction of the $14.99 and $9.99 charges consisted of transaction fees paid to the Enterprise, and Securus received several times more in revenue from PayNow and Text2Connect calls than it paid to contracting governments. These misrepresentations were made over the interstate wires and mail, including phone communications and e-mail. According to a former Securus executive, these

71

misrepresentations were made to the vast majority of contracting governments. Some of those misrepresentations were made by Securus to the following contracting governments during the following time periods:

- o  Harris County, Texas – Fall of 2010
- o  Kendall County Sheriff's Office, Illinois – Fall of 2013
- o  King County, Washington – Winter of 2014
- o  Calaveras County Sheriff's Office – Fall of 2015

- Misrepresentations and Omissions in Bids and Contracts with Governments: When Securus submitted bids and entered into written contracts with governments to provide ICS, Securus deliberately omitted and/or misrepresented critical information about its PayNow and Text2Connect programs. While many pages of the bids and contracts delved into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents failed to disclose how much would actually be paid from PayNow and Text2Connect call revenue to the Enterprise as a "transaction fee" or how much Securus would actually receive and retain from each PayNow and Text2Connect call. Some of Securus's bids and contracts failed to even identify the $14.99 price for PayNow calls and $9.99 price for Text2Connect calls, and other bids and contracts submitted by Securus construed the entirety of the $14.99 and $9.99 prices as transaction fees. These omissions and misrepresentations were made in bids and contracts that were transmitted via electronic wires and/or mail to governments. Such omissions and misrepresentations were made in bids submitted by, and ICS contracts entered by, Securus that provided a PayNow and/or Text2Connect calling option, including contracts with the following governments that were executed on the following dates:

- o  Harris County, Texas – November 8, 2010
- o  Asotin County Sheriff's Office, Washington – September 6, 2011
- o  Dukes County Sheriff's Department, Massachusetts – December 17, 2012
- o  State of North Dakota – October 24, 2016

- Misrepresentations and Omissions in Monthly Commission Reports to Governments: During the Class Period, Securus provided monthly commission reports to contracting governments that identified the number of per-minute calls made, the duration of those per-minute calls, the revenue collected from those per-minute calls, and the amount of that revenue shared with the governments as site commissions. In those same monthly reports, however, when addressing PayNow and Text2Connect calls, Securus either (1) misrepresented the amount of revenue received by, and transaction fees paid by, Securus from such calls, or (2) only listed the number of those single calls made and the dollar value of the site commissions paid to the contracting governments—not the prices of PayNow or Text2Connect calls, revenue received by Securus from PayNow or Text2Connect calls, or the percentage value of the site commission payments from PayNow or Text2Connect calls. For that reason, the monthly reports failed to accurately inform contracting governments of the actual revenue received by Securus from PayNow and Text2Connect calls or the actual transaction fees paid to the

Enterprise from PayNow and Text2Connect calls. These misrepresentations and omissions were made in monthly commission reports submitted by Securus via mail and/or electronic wires to contracting governments, including to the following governments during the following time periods:

- o County of Genesee, Michigan – April 2013
- o State of North Dakota – October 2016 through June 2017
- o Napa County, California – July 2015 through April 2018
- o Clatsop County, Oregon – June 2019 through September 2019

- Misrepresentations and Omissions through Websites: In multiple versions of Securus's public website for its PayNow program, Securus falsely stated that each $14.99 single call involved a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of Securus, the Enterprise included the following language on the "Pricing" page of the PayNow website: "The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement." The website was established and operated by the Enterprise (through wire transmissions) at the express instruction of Securus, which determined and approved the website's content. The website was established on or about October 27, 2010; it operated continuously during the Class Period; it was renewed in the month of January during each year of the Class Period; and it was updated on multiple occasions during the Class Period, including in or near:

- o April 2011
- o April 2013
- o March 2018
- o December 2018

- Misrepresentations and Omissions in Billing Charges to Nationwide Securus Subclass Members for PayNow Calls: At the direction of Securus, the Enterprise misrepresented the amounts of the "Transaction Fee" and "Call Fee" in the billing charges for PayNow calls made to members of the Nationwide Securus Subclass. Specifically, when charging for PayNow calls, the Enterprise charged and billed Nationwide Securus Subclass members for two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. Each and every such charge constituted a fraudulent misrepresentation by Securus; the "Transaction Fee" paid to the Enterprise was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by Securus was not $1.80, but rather approximately $10.64. Those fraudulent charges were made at the direction of Securus, and through and with the assistance of the Enterprise, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide Securus

Subclass members during the Class Period, including on the billing statements of the following named Plaintiffs on the following dates:

- o Ashley Albert – June 13, 2016; July 1, 2016
- o Ashley Baxter – July 3, 2019; July 4, 2019; July 5, 2019; July 6, 2019; July 7, 2019; July 8, 2019; July 9, 2019
- o Karina Jakeway – December 13, 2019

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide Securus Subclass Members for Text2Collect Calls</u>: When the Enterprise charged consumers for Text2Collect calls at the direction of Securus, those consumers paid a single $9.99 charge. That $9.99 charge constituted a substantial overcharge, as it reflected an amount agreed to by contracting governments based on misrepresentations by Securus regarding the enormity of the transaction fees paid to the Enterprise. These $9.99 charges to consumers, reflected in both premium text messages and mobile phone billing statements, failed to disclose either the actual transaction fee paid to the Enterprise or that Securus collected most of the revenue from such calls, in the form of kickbacks from the Enterprise. Those fraudulent charges were made at the direction of Securus, and through and with the assistance of the Enterprise, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide Securus Subclass members during the Class Period, including on the billing statement of Plaintiff Karina Jakeway on December 12, 2019.

220.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2010, and the frequency and duration of the misrepresentations and omissions establishes continuity over a substantial period of time.

221.    Many of the precise dates of the thousands of predicate acts that are part of the pattern of racketeering activity, such as communications with contracting governments and billing charges to Nationwide Securus Subclass members, are hidden from Plaintiffs and cannot be alleged without access to Securus's and 3CI's books and records.

222.    The misrepresentations and omissions made by Securus as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with PayNow and Text2Connect calls from contracting governments and Nationwide Securus Subclass members and, instead, disclosing and broadcasting fabricated and

artificially inflated transaction fees, and (2) overcharging Nationwide Securus Subclass members for PayNow and Text2Connect calls by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide Securus Subclass members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing PayNow and Text2Connect calls, and contracting governments would have prevented Securus from charging Nationwide Securus Subclass members those fabricated and artificially inflated transaction fees.

223.     The repeat misrepresentations and omissions made by Securus gave rise to the expectation by the Enterprise that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

224.     The multiple predicate acts committed by Securus that underlie the pattern of racketeering activity were related to each other; were designed to work in conjunction with each other to assist Securus and the Enterprise in overcharging and profiting at the expense of Nationwide Securus Subclass members; and posed, and continue to pose, a threat of racketeering activity recurring in the future. Indeed, Securus and the Enterprise continue to charge $14.99 for PayNow calls and $9.99 for Text2Connect calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those single calls.

225.     Securus engaged in and directed the pattern of racketeering with the knowledge of the falsity of its misrepresentations to, and omissions from, contracting governments and Nationwide Securus Subclass members, and Securus operated the Enterprise with the specific intent to deceive and defraud Nationwide Securus Subclass members.

226.     Securus and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above

permitted Securus and the Enterprise to substantially overcharge Nationwide Securus Subclass members for, and increase their respective profits from, PayNow and Text2Connect calls.

227.     Based on the foregoing, Securus has violated 18 U.S.C. § 1962(c).

228.     As a direct and proximate result of the racketeering activities of Securus, Plaintiffs and other Nationwide Securus Subclass members have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by Securus. Plaintiffs and other Nationwide Securus Subclass members were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide Securus Subclass members.

229.     Pursuant to 18 U.S.C. § 1964(c), Securus is liable for three times the damages that Plaintiffs and other Nationwide Securus Subclass members have suffered, plus the costs of bringing this suit, including attorneys' fees.

**COUNT 3**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide Securus Subclass against Securus and 3CI)**
**(Pled in the Alternative to Count 2)**

230.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint, except for paragraphs 206 and 229.

231.     At all relevant times, Securus and 3CI each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

232.     At all relevant times, Securus and 3CI together constituted an "Enterprise" within

76

the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish a joint purpose. That common and shared purpose was to deceive contracting governments and Nationwide Securus Subclass members regarding the value of transaction fees associated with PayNow and Text2Connect calls and to overcharge Nationwide Securus Subclass members for those calls.

233.   The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided ICS single calls to consumers throughout the United States and across multiple states, and the Enterprise transacted business through the use of the United States mails and interstate telephone wires. The Enterprise also communicated in furtherance of the pattern of racketeering activity and scheme to defraud described below using the interstate wires and interstate mail.

234.   Securus and 3CI are each separate entities and separate corporations, distinct from the Enterprise itself, and each of them unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

235.   For at least ten years, the Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.

236.   Securus participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. Securus participated in the conduct and operation of the Enterprise through, among other things, purchasing a patent associated with billing ICS single calls to mobile phone accounts from 3CI and granting 3CI exclusive use of that patent; contracting with 3CI to establish and operate Securus's PayNow and Text2Connect programs; directing 3CI to process charges to Nationwide Securus Subclass members for making PayNow

and Text2Connect calls; directing 3CI to specifically charge $14.99 for PayNow calls and $9.99 for Text2Connect calls; directing 3CI to establish and maintain a website for the PayNow and Text2Connect programs; directing 3CI to falsely represent on the website for the PayNow program that the $14.99 charge was attributable to a $13.19 "Transaction Fee" and a $1.80 "Call Fee"; approving and directing 3CI to contract with GTL to establish and operate GTL's Collect2Card and Collect2Phone programs; making misrepresentations and material omissions to contracting governments about the transaction fees paid to 3CI in order to implement PayNow and Text2Connect calls; directing 3CI to make misrepresentations and material omissions about transaction fees associated with PayNow and Text2Connect calls to contracting governments and Nationwide Securus Subclass members, including through websites and billing statements; directing 3CI to charge fabricated and artificially inflated transaction fees to Nationwide Securus Subclass members; instructing 3CI to kick back a majority of those fabricated and artificially inflated transaction fees to Securus; and directing 3CI to separately charge $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept PayNow calls.

237.    3CI participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. 3CI participated in the conduct and operation of the Enterprise through, among other things, selling a patent associated with charging mobile phone accounts for ICS single calls to Securus and simultaneously obtaining exclusive use of that patent; contracting with Securus to sell and implement ICS single calls; facilitating the establishment of, and implementing, an agreement between Securus and GTL to charge the same inflated prices for single calls; establishing and maintaining websites for single calls provided by Securus; charging $14.99 for PayNow calls and $9.99 for Text2Connect calls; charging fabricated and artificially inflated transaction fees to Nationwide Securus Subclass members for those single

calls; kicking back a majority of those fabricated and artificially inflated transaction fees to Securus; making misrepresentations and material omissions about transaction fees that 3CI received from Securus to contracting governments and Nationwide Securus Subclass members, including through websites and billing statements; and separately charging $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept PayNow calls.

238.    Neither Securus nor 3CI could have accomplished the pattern of racketeering activity, or profited from it, alone and without participating in the conduct of the Enterprise.

239.    As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, Securus and 3CI repeatedly made material misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls, which constitutes a pattern of racketeering activity. The misrepresentations constituting the pattern of racketeering activity permitted the Enterprise to charge higher prices for PayNow and Text2Connect calls and to kick back a share of the revenue received from fabricated and artificially inflated transaction fees associated with PayNow and Text2Connect calls to Securus.

240.    From January 2010 through present, to effectuate the Enterprise's purposes of deceiving government officials and Nationwide Securus Subclass members regarding the value of transaction fees associated with PayNow and Text2Connect calls and overcharging Nationwide Securus Subclass members for those calls, Securus and 3CI engaged in a pattern of racketeering activity. As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, Securus and 3CI repeatedly and knowingly transmitted fraudulent misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls, via

mail and wires. Specifically, during the period January 2010 through present, on at least hundreds of occasions each year, Securus and 3CI each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the value of the transaction fees that were associated with PayNow and Text2Connect calls.

241.    The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

242.    *Mail Fraud*. Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved Securus and 3CI knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included Securus and 3CI knowingly and intentionally mailing misrepresentations and omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees associated with PayNow and Text2Connect calls for the fraudulent purpose of overcharging Nationwide Securus Subclass members for those calls.

243.    *Wire Fraud*. Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved Securus and 3CI knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included Securus and 3CI knowingly and intentionally electronically transmitting misrepresentations and

omissions to contracting governments and Nationwide Securus Subclass members regarding the value of the transaction fees associated with PayNow and Text2Connect calls for the fraudulent purpose of overcharging Nationwide Securus Subclass members for those calls.

244.    The scheme to defraud involved Securus and 3CI, as part of and in connection with the conduct and operation of the Enterprise, knowingly making misrepresentations and omissions regarding the value of the transaction fees associated with PayNow and Text2Connect calls—using either mail or electronic communications—to contracting governments and Nationwide Securus Subclass members on multiple occasions during the period January 2010 through present. Those misrepresentations and omissions were made for the purpose of overcharging Nationwide Securus Subclass members for PayNow and Text2Connect calls. Those misrepresentations and omissions specifically include, but are not limited to:

- Misrepresentations and Omissions to Contracting Government during Negotiations: During negotiations with contracting governments, Securus falsely informed those governments that most of the $14.99 price for PayNow calls and the $9.99 price for Text2Connect calls stem from and constitute necessary transaction fees paid to 3CI. Securus specifically instructed that, in the event contracting governments raised questions about the high prices of PayNow and Text2Connect calls, the company's sales team should claim that a substantial majority of the charges are comprised of necessary transaction fees and, further, that the contracting governments receive more revenue from PayNow and Text2Connect calls than Securus does. These statements were false; a mere fraction of the $14.99 and $9.99 charges consisted of transaction fees paid to 3CI, and Securus received several times more in revenue from PayNow and Text2Connect calls than it paid to contracting governments. These misrepresentations were made over the interstate wires and mail, including phone communications and e-mail. According to a former Securus executive, these misrepresentations were made to the vast majority of contracting governments. Some of those misrepresentations were made by Securus to the following contracting governments during the following time periods:

  o  Harris County, Texas – Fall of 2010
  o  Kendall County Sheriff's Office, Illinois – Fall of 2013
  o  King County, Washington – Winter of 2014
  o  Calaveras County Sheriff's Office – Fall of 2015

- <u>Misrepresentations and Omissions in Bids and Contracts with Governments</u>: When Securus submitted bids and entered into written contracts with governments to provide ICS, Securus deliberately omitted and/or misrepresented critical information about its PayNow and Text2Connect programs. While many pages of the bids and contracts delved into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents failed to disclose how much would actually be paid from PayNow and Text2Connect call revenue to 3CI as a "transaction fee" or how much Securus would actually receive and retain from each PayNow and Text2Connect call. Some of Securus's bids and contracts failed to even identify the $14.99 price for PayNow calls and $9.99 price for Text2Connect calls, and other bids and contracts submitted by Securus construed the entirety of the $14.99 and $9.99 prices as transaction fees. These misrepresentations and omissions were made in bids and contracts that were transmitted via electronic wires and/or mail to governments. Such misrepresentations and omissions were made in bids submitted by, and ICS contracts entered by, Securus that provided a PayNow and/or Text2Connect calling option, including contracts with the following governments that were executed on the following dates:

    o Harris County, Texas – November 8, 2010
    o Asotin County Sheriff's Office, Washington – September 6, 2011
    o Dukes County Sheriff's Department, Massachusetts – December 17, 2012
    o State of North Dakota – October 24, 2016

- <u>Misrepresentations and Omissions in Monthly Commission Reports to Governments</u>: During the Class Period, Securus provided monthly commission reports to contracting governments that identified the number of per-minute calls made, the duration of those per-minute calls, the revenue collected from those per-minute calls, and the amount of that revenue shared with the governments as site commissions. In those same monthly reports, however, when addressing PayNow and Text2Connect calls, Securus either (1) misrepresented the amount of revenue received by, and transaction fees paid by, Securus from such calls, or (2) only listed the number of those single calls made and the dollar value of the site commissions paid to the contracting governments—not the prices of PayNow or Text2Connect calls, revenue received by Securus from PayNow or Text2Connect calls, or the percentage value of the site commission payments from PayNow or Text2Connect calls. For that reason, the monthly reports failed to accurately inform contracting governments of the actual revenue received by Securus from PayNow and Text2Connect calls or the actual transaction fees paid to 3CI from PayNow and Text2Connect calls. These misrepresentations and omissions were made in monthly commission reports submitted by Securus via mail and/or electronic wires to contracting governments, including to the following governments during the following time periods:

    o County of Genesee, Michigan – April 2013
    o State of North Dakota – October 2016 through June 2017
    o Napa County, California – July 2015 through April 2018
    o Clatsop County, Oregon – June 2019 through September 2019

- <u>Misrepresentations and Omissions through Websites</u>: In multiple versions of Securus's public website for its PayNow program, Securus falsely stated that each $14.99 single call involved a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of Securus, 3CI included the following language on the "Pricing" page of the PayNow website: "The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement." The website was established and operated by 3CI (through wire transmissions) at the express instruction of Securus, which determined and approved the website's content. The website was established on or about October 27, 2010; it has operated continuously during the Class Period; it was renewed in the month of January during each year of the Class Period; and it was updated on multiple occasions during the Class Period, including in or near:

    o April 2011
    o April 2013
    o March 2018
    o December 2018

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide Securus Subclass Members for PayNow Calls</u>: At the direction of Securus, 3CI misrepresented the amounts of the "Transaction Fee" and "Call Fee" in the billing charges for PayNow calls made to members of the Nationwide Securus Subclass. Specifically, when charging for PayNow calls, Securus and 3CI charged and billed Nationwide Securus Subclass members for two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. Each and every such charge constituted a fraudulent misrepresentation; the "Transaction Fee" paid to 3CI was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by Securus was not $1.80, but rather approximately $10.64. Those fraudulent charges were made at the direction of Securus, and through and with the assistance of 3CI, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide Securus Subclass members during the Class Period, including on the billing statements of the following named Plaintiffs on the following dates:

    o Ashley Albert – June 13, 2016; July 1, 2016
    o Ashley Baxter – July 3, 2019; July 4, 2019; July 5, 2019; July 6, 2019; July 7, 2019; July 8, 2019; July 9, 2019
    o Karina Jakeway – December 13, 2019

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide Securus Subclass Members for Text2Collect Calls</u>: When 3CI charged consumers for Text2Collect calls

at the direction of Securus, those consumers paid a single $9.99 charge. That $9.99 charge constituted a substantial overcharge, as it reflected an amount agreed to by contracting governments based on misrepresentations by Securus regarding the enormity of the transaction fees paid to 3CI to implement such calls. These $9.99 charges to consumers, reflected in both premium text messages and mobile phone billing statements, failed to disclose either the actual transaction fee paid to 3CI or that Securus collected most of the revenue from such calls, in the form of kickbacks from 3CI. Those fraudulent charges were made at the direction of Securus, and through and with the assistance of 3CI, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide Securus Subclass members during the Class Period, including on the billing statement of Plaintiff Karina Jakeway on December 12, 2019.

245.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2010, and the frequency and duration of the misrepresentations and omissions establishes continuity over a substantial period of time.

246.    Many of the precise dates of the thousands of predicate acts that are part of the pattern of racketeering activity, such as communications with contracting governments and billing charges to Nationwide Securus Subclass members, are hidden from Plaintiffs and cannot be alleged without access to Securus's and 3CI's books and records.

247.    The misrepresentations and omissions made by Securus and 3CI as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with PayNow and Text2Connect calls from contracting governments and Nationwide Securus Subclass members and, instead, disclosing and broadcasting fabricated and artificially inflated transaction fees, and (2) overcharging Nationwide Securus Subclass members for PayNow and Text2Connect calls by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide Securus Subclass members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing PayNow and Text2Connect calls, and

contracting governments would have prevented Securus and 3CI from charging Nationwide Securus Subclass members those fabricated and artificially inflated transaction fees.

248.    The repeat misrepresentations and omissions made by Securus and 3CI gave rise to the expectation by the Enterprise that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

249.    The multiple predicate acts committed by Securus and 3CI that underlie the pattern of racketeering activity were related to each other; were designed to work in conjunction with each other to assist Securus, 3CI and the Enterprise in overcharging and profiting at the expense of Nationwide Securus Subclass members; and posed, and continue to pose, a threat of racketeering activity recurring in the future. Indeed, the Enterprise continues to charge $14.99 for PayNow calls and $9.99 for Text2Connect calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those calls.

250.    Securus and 3CI engaged in and directed the pattern of racketeering with the knowledge of the falsity of their misrepresentations to, and omissions from, contracting governments and Nationwide Securus Subclass members, and Securus and 3CI operated the Enterprise with the specific intent to deceive and defraud Nationwide Securus Subclass members.

251.    Securus, 3CI and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above permitted Securus, 3CI and the Enterprise to substantially overcharge Nationwide Securus Subclass members for, and increase their respective profits from, PayNow and Text2Connect calls.

252.    Based on the foregoing, Securus and 3CI have violated 18 U.S.C. § 1962(c).

253.    As a direct and proximate result of the racketeering activities of Securus and 3CI, Plaintiffs and other Nationwide Securus Subclass members have been injured in their business and

property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by Securus and 3CI. Plaintiffs and other Nationwide Securus Subclass members were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide Securus Subclass members.

254.     Pursuant to 18 U.S.C. § 1964(c), Securus and 3CI are liable for three times the damages that Plaintiffs and other Nationwide Securus Subclass members have suffered, plus the costs of bringing this suit, including attorneys' fees.

## COUNT 4
## VIOLATION OF RICO, 18 U.S.C. § 1962(C)
### (On behalf of Nationwide GTL Subclass against Defendant GTL)

255.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint.

256.     At all relevant times, GTL constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as it was capable of holding a legal or beneficial interest in property.

257.     At all relevant times, the corporation 3CI constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

258.     The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided mobile marketing services to brands and retailers throughout the United States and across multiple states, and the Enterprise transacted business through the use of the United States mails and interstate telephone wires. The Enterprise also communicated with GTL in furtherance of the pattern of racketeering activity and scheme to defraud described below using the interstate wires and interstate mail.

259.    GTL is a separate entity and separate corporation, distinct from the Enterprise itself, and GTL unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

260.    The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged. A bona fide for-profit corporation that provides mobile marketing services to a broad array of clients, the Enterprise employed senior executives with defined roles who directed and managed the daily operations of the Enterprise within an established chain of command and who reported to a governing board of directors. During the relevant period, the Enterprise engaged in conduct unrelated to the pattern of racketeering, including providing mobile marketing services to clients other than Securus and GTL.

261.    A common and shared purpose of the Enterprise was to deceive contracting governments and Nationwide GTL Subclass members regarding the value of transaction fees associated with Collect2Card and Collect2Phone calls and to overcharge Nationwide GTL Subclass members for those calls.

262.    GTL participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. GTL participated in the conduct and operation of the Enterprise through, among other things, contracting with the Enterprise to establish and operate GTL's Collect2Card and Collect2Phone programs; directing the Enterprise to process charges to Nationwide GTL Subclass members for making Collect2Card and Collect2Phone calls; directing the Enterprise to specifically charge $14.99 for Collect2Card calls and $9.99 for Collect2Phone calls; directing the Enterprise to establish and maintain a website for the

Collect2Card and Collect2Phone programs; directing the Enterprise to falsely represent on the website for the Collect2Card program that the $14.99 charge was attributable to a $13.19 "Transaction Fee" and a $1.80 "Call Fee"; directing the Enterprise to make misrepresentations and material omissions about transaction fees associated with Collect2Card and Collect2Phone calls to contracting governments and Nationwide GTL Subclass members, including through websites and billing statements; directing the Enterprise to charge fabricated and artificially inflated transaction fees to Nationwide GTL Subclass members; instructing the Enterprise to kick back a majority of those fabricated and artificially inflated transaction fees to GTL; and directing the Enterprise to separately charge $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept Collect2Card calls. GTL could not have accomplished the pattern of racketeering activity, or profited from it, without the Enterprise or participating in the conduct of the Enterprise.

263.    As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, GTL repeatedly made material misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees that were associated with Collect2Card and Collect2Phone calls and paid to the Enterprise, which constitutes a pattern of racketeering activity. The misrepresentations constituting the pattern of racketeering activity permitted the Enterprise to charge higher prices for Collect2Card and Collect2Phone calls and to kick back a share of the revenue received from fabricated and artificially inflated transaction fees associated with Collect2Card and Collect2Phone calls to GTL.

264.    From January 2013 through present, to effectuate the Enterprise's purposes of deceiving contracting governments and Nationwide GTL Subclass members regarding the value of transaction fees associated with Collect2Card and Collect2Phone calls and overcharging

Nationwide GTL Subclass members for those calls, GTL engaged in a pattern of racketeering activity. As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, GTL repeatedly and knowingly transmitted fraudulent misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees that were associated with Collect2Card and Collect2Phone calls and were paid to the Enterprise, via mail and wires. Specifically, during the period 2013 through present, on at least hundreds of occasions each year, both GTL and the Enterprise each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the value of the transaction fees that were associated with Collect2Card and Collect2Phone calls and paid to the Enterprise.

265.    The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

266.    *Mail Fraud*. Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved GTL knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included GTL knowingly and intentionally mailing misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls and paid to the Enterprise for the fraudulent purpose of overcharging Nationwide GTL Subclass members for those calls.

267.   *Wire Fraud*. Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved GTL knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included GTL knowingly and intentionally electronically transmitting misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls and paid to the Enterprise for the fraudulent purpose of overcharging Nationwide GTL Subclass members for those calls.

268.   The scheme to defraud involved GTL, as part of and in connection with the conduct and operation of the Enterprise, knowingly making misrepresentations and omissions regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls and paid to the Enterprise—using either mail or electronic communications—to contracting governments and Nationwide GTL Subclass members on multiple occasions from January 2013 through present. Those fraudulent misrepresentations and omissions were made for the purpose of overcharging Nationwide GTL Subclass members for Collect2Card and Collect2Phone calls. Those misrepresentations and omissions specifically include, but are not limited to:

- <u>Misrepresentations and Omissions to Contracting Government during Negotiations</u>: During negotiations with contracting governments, GTL falsely informed those governments that most of the charges for Collect2Card and Collect2Phone calls stem from and constitute necessary transaction fees paid to the Enterprise. Specifically, GTL employees informed contracting governments that a substantial majority of the $14.99 charge for Collect2Card calls and the $9.99 charge for Collect2Phone calls were comprised of necessary transaction fees that justified those high single call prices and left GTL with a mere fraction of the revenue to share with the governments. These statements were false; a minority of the $14.99 and $9.99 charges consisted of transaction fees paid to the Enterprise, and GTL received several times more in revenue from Collect2Card and Collect2Phone calls than it paid to contracting governments as site commissions. These misrepresentations and omissions were made over the interstate wires and mail, including phone communications and e-mail. Some of those

90

misrepresentations and omissions were made by GTL to the following contracting government during the following time periods:

- County of El Paso, Texas – Summer of 2013
- County of Orange, California – Fall of 2014
- Hanover County, Virginia – Summer of 2015
- Mississippi Department of Corrections – January 2016

• <u>Misrepresentations and Omissions in Bids and Contracts with Governments</u>: When GTL submitted bids and entered into written contracts with governments to provide ICS calls, GTL deliberately omitted and/or misrepresented critical information about its Collect2Card and Collect2Phone programs. While many pages of the bids and contracts delve into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents failed to disclose how much would actually be paid from Collect2Card and Collect2Phone call revenue to the Enterprise as a "transaction fee" or how much GL would actually receive and retain from each Collect2Card and Collect2Phone call. Some of GTL's bids and contracts failed to even identify the $14.99 price for each Collect2Card call and $9.99 price for each Collect2Phone call, and other bids and contracts submitted by GTL construed the entirety of the $14.99 and $9.99 prices as transaction fees. These misrepresentations and omissions were made in bids and contracts that were transmitted via electronic wires and/or mail to governments. Such misrepresentations and omissions were made in bids submitted by, and ICS contracts entered by, GTL that provided a Collect2Card and/or Collect2Phone calling option, including contracts with the following governments that were executed on the following dates:

- County of El Paso, Texas – September 10, 2013
- County of Orange, California – October 9, 2014
- Hanover County, Virginia – July 1, 2015
- Mississippi Department of Corrections – February 29, 2016

• <u>Misrepresentations and Omissions in Monthly Commission Reports to Governments</u>: During the relevant period, GTL provided monthly commission reports to contracting governments that identified the number of per-minute calls made, the duration of those per-minute calls, the revenue collected from those per-minute calls, and the amount of that revenue shared with the governments as site commissions. In those same monthly reports, however, when addressing Collect2Card and Collect2Phone calls, GTL either (1) misrepresented the amount of revenue received by, and transaction fees paid by, GTL from such calls, or (2) only listed the number of those single calls made and the dollar value of the site commissions paid to the contracting governments—not the price of Collect2Card or Collect2Phone calls, revenue received by GTL from Collect2Card or Collect2Phone calls, or the percentage value of the site commission payments from Collect2Card or Collect2Phone calls. For that reason, the monthly reports failed to accurately inform contracting governments of the actual revenue received by GTL from Collect2Card and Collect2Phone calls or the actual transaction fees paid to the Enterprise from Collect2Card and Collect2Phone calls. These misrepresentations and

omissions were made in monthly commission reports submitted by GTL via mail and/or electronic wires to contracting governments, including to the following governments during the following time periods:

- o Norfolk County, Massachusetts – January 2015 through March 2015
- o Merced County, California – January 2015 through March 2015
- o County of Orange, California – January 2015 through April 2018

- <u>Misrepresentations and Omissions through Websites</u>: In multiple versions of GTL's public website for its Collect2Card program, GTL falsely states that each $14.99 single call involves a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of GTL, the Enterprise included the following language on the "Pricing" page of the Collect2Card website: "The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement." The website was established and operated by the Enterprise (through wire transmissions) at the express instruction of GTL, which determined and approved the website's content. The website was established on or about July 2, 2013; it has operated continuously since that date; it was renewed in the month of July during each year from 2014 through 2019; and it was updated on multiple occasions during the relevant period, including in or near May 16, 2017.

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide GTL Subclass Members for Collect2Card Calls</u>: At the direction of GTL, the Enterprise misrepresented the amounts of the "Transaction Fee" and "Call Fee" in the billing charges for Collect2Card calls made to members of the Nationwide GTL Subclass. Specifically, when charging for a Collect2Card call, the Enterprise charged and billed Nationwide GTL Subclass members for two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. Each and every such charge constituted a fraudulent misrepresentation; the "Transaction Fee" paid to the Enterprise was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by GTL was not $1.80, but rather approximately $10.64. Those fraudulent charges were made at the direction of GTL, and through and with the assistance of the Enterprise, which collected the credit information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. The fraudulent charges appeared on the billing statements of thousands of Nationwide GTL Subclass members during the relevant period, including on the billing statements of Melinda Jabbie during the period 2013 through 2015.

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide GTL Subclass Members for Collect2Phone Calls</u>: When the Enterprise charged consumers for Collect2Phone calls at the direction of GTL, those consumers paid a single $9.99 charge. That $9.99 charge constituted a substantial overcharge, as it reflected an

amount agreed to by contracting governments based on misrepresentations by GTL regarding the enormity of the transaction fees paid to the Enterprise to implement such calls. These $9.99 charges to consumers, reflected in both premium text messages and mobile phone billing statements, failed to disclose either the actual transaction fee paid to the Enterprise or that GTL collected most of the revenue from such calls, in the form of kickbacks from the Enterprise. Those fraudulent charges were made at the direction of GTL, and through and with the assistance of the Enterprise, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide GTL Subclass members during the relevant period.

269.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2013, and the frequency and duration of the misrepresentations and omissions establishes continuity over a substantial period of time.

270.    Many of the precise dates of the thousands of predicate acts that are part of the pattern of racketeering activity, such as communications with contracting governments and billing charges to Nationwide GTL Subclass members, are hidden from Plaintiffs and cannot be alleged without access to GTL's and 3CI's books and records.

271.    The misrepresentations and omissions made by GTL as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with Collect2Card and Collect2Phone calls from contracting governments and Nationwide GTL Subclass members and, instead, disclosing and broadcasting fabricated and artificially inflated transaction fees, and (2) overcharging Nationwide GTL Subclass members for Collect2Card and Collect2Phone calls by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide GTL Subclass members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing Collect2Card and Collect2Phone calls, and contracting

governments would have prevented GTL from charging Nationwide GTL Subclass members those fabricated and artificially inflated transaction fees.

272.   The repeat misrepresentations and omissions made by GTL gave rise to the expectation by the Enterprise that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

273.   The multiple predicate acts committed by GTL that underlie the pattern of racketeering activity were related to each other; were designed to work in conjunction with each other to assist GTL and the Enterprise in overcharging and profiting at the expense of Nationwide GTL Subclass members; and posed, continue to pose, a threat of racketeering activity recurring in the future.  Indeed, GTL and the Enterprise continue to charge $14.99 for Collect2Card calls and $9.99 for Collect2Phone calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those single calls.

274.   GTL engaged in and directed the pattern of racketeering with the knowledge of the falsity of its misrepresentations to, and omissions from, contracting governments and Nationwide GTL Subclass members, and GTL operated the Enterprise with the specific intent to deceive and defraud Nationwide GTL Subclass members.

275.   GTL and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above permitted GTL and the Enterprise to substantially overcharge Nationwide GTL Subclass members for, and increase their respective profits from, Collect2Card and Collect2Phone calls.

276.   Based on the foregoing, GTL has violated 18 U.S.C. § 1962(c).

277.   As a direct and proximate result of the racketeering activities of GTL, Plaintiffs and other Nationwide GTL Subclass members have been injured in their business and property in an

amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by GTL. Plaintiffs and other Nationwide GTL Subclass members were the intended target of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide GTL Subclass members.

278.    Pursuant to 18 U.S.C. § 1964(c), GTL is liable for three times the damages that Plaintiffs and other Nationwide GTL Subclass members have suffered, plus the costs of bringing this suit, including attorneys' fees.

## COUNT 5
## VIOLATION OF RICO, 18 U.S.C. § 1962(C)
### (On behalf of Nationwide GTL Subclass against GTL and 3CI)
### (Pled in the Alternative to Count 4)

279.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint, except for paragraphs 255 and 278.

280.    At all relevant times, GTL and 3CI each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

281.    At all relevant times, GTL and 3CI together constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish a joint purpose. That common and shared purpose was to deceive contracting governments and Nationwide GTL Subclass members regarding the value of transaction fees associated with Collect2Card and Collect2Phone calls and to overcharge Nationwide GTL Subclass members for those calls.

282.    The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided ICS single calls to consumers throughout the United States

and across multiple states, and the Enterprise transacted business through the use of the United States mails and interstate telephone wires. The Enterprise also communicated in furtherance of the pattern of racketeering activity and scheme to defraud described below using the interstate wires and interstate mail.

283.    GTL and 3CI are each separate entities and separate corporations, distinct from the Enterprise itself, and each of them unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

284.    For at least seven years, the Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.

285.    GTL participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. GTL participated in the conduct and operation of the Enterprise through, among other things, contracting with 3CI to establish and operate GTL's Collect2Card and Collect2Phone programs; directing 3CI to process charges to Nationwide GTL Subclass members for making Collect2Card and Collect2Phone calls; directing 3CI to specifically charge $14.99 for Collect2Card calls and $9.99 for Collect2Phone calls; directing 3CI to establish and maintain a website for the Collect2Card and Collect2Phone programs; directing 3CI to falsely represent on the website for the Collect2Card program that the $14.99 charge was attributable to a $13.19 "Transaction Fee" and a $1.80 "Call Fee"; making misrepresentations and material omissions to contracting governments about the transaction fees paid to 3CI in order to implement Collect2Card and Collect2Phone calls; directing 3CI to make misrepresentations and material omissions about transaction fees associated with Collect2Card and Collect2Phone calls to

contracting governments and Nationwide GTL Subclass members, including through websites and billing statements; directing 3CI to charge fabricated and artificially inflated transaction fees to Nationwide GTL Subclass members; instructing 3CI to kick back a majority of those fabricated and artificially inflated transaction fees to GTL; and directing 3CI to separately charge $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept Collect2Card calls.

286.    3CI participated in the conduct and operation of the Enterprise and perpetrated particular racketeering acts in furtherance thereof. 3CI participated in the conduct and operation of the Enterprise through, among other things, contracting with GTL to sell and implement ICS single calls; facilitating the establishment of, and implementing, an agreement between Securus and GTL to charge the same inflated prices for single calls; establishing and maintaining websites for single calls provided by GTL; charging $14.99 for Collect2Card calls and $9.99 for Collect2Phone calls; charging fabricated and artificially inflated transaction fees to Nationwide GTL Subclass members for those single calls; kicking back a majority of those fabricated and artificially inflated transaction fees to GTL; making misrepresentations and material omissions about transaction fees that 3CI received from GTL to contracting governments and Nationwide GTL Subclass members, including through websites and billing statements; and separately charging $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accept Collect2Card calls.

287.    Neither GTL nor 3CI could have accomplished the pattern of racketeering activity, or profited from it, alone or without participating in the conduct of the Enterprise.

288.    As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, GTL and 3CI repeatedly made material misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the

97

transaction fees that were associated with Collect2Card and Collect2Phone calls, which constitutes a pattern of racketeering activity. The misrepresentations constituting the pattern of racketeering activity permitted the Enterprise to charge higher prices for Collect2Card and Collect2Phone calls and to kick back a share of the revenue received from fabricated and artificially inflated transaction fees associated with Collect2Card and Collect2Phone calls to GTL.

289.   From January 2013 through present, to effectuate the Enterprise's purposes of deceiving government officials and Nationwide GTL Subclass members regarding the value of transaction fees associated with Collect2Card and Collect2Phone calls and overcharging Nationwide GTL Subclass members for those calls, GTL and 3CI engaged in a pattern of racketeering activity. As part of, in furtherance of, and in connection with the conduct and operation of the Enterprise, GTL and 3CI repeatedly and knowingly transmitted fraudulent misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees that were associated with Collect2Card and Collect2Phone calls, via mail and wires. Specifically, during the period January 2013 through present, on at least hundreds of occasions each year, GTL and 3CI each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the value of the transaction fees that were associated with Collect2Card and Collect2Phone calls.

290.   The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

291.    *Mail Fraud*. Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved GTL and 3CI knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included GTL and 3CI knowingly and intentionally mailing misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls for the fraudulent purpose of overcharging Nationwide GTL Subclass members for those calls.

292.    *Wire Fraud*. Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved GTL and 3CI knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included GTL and 3CI knowingly and intentionally electronically transmitting misrepresentations and omissions to contracting governments and Nationwide GTL Subclass members regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls for the fraudulent purpose of overcharging Nationwide GTL Subclass members for those calls.

293.    The scheme to defraud involved GTL and 3CI, as part of and in connection with the conduct and operation of the Enterprise, knowingly making misrepresentations and omissions regarding the value of the transaction fees associated with Collect2Card and Collect2Phone calls—using either mail or electronic communications—to contracting governments and Nationwide GTL Subclass members on multiple occasions during the period January 2013 through present. Those misrepresentations and omissions were made for the purpose of overcharging Nationwide GTL

Subclass members for Collect2Card and Collect2Phone calls. Those misrepresentations and omissions specifically include, but are not limited to:

- <u>Misrepresentations and Omissions to Contracting Government during Negotiations</u>: During negotiations with contracting governments, GTL falsely informed those governments that most of the charges for Collect2Card and Collect2Phone calls stem from and constitute necessary transaction fees paid to 3CI. Specifically, GTL employees informed contracting governments that a substantial majority of the $14.99 charge for Collect2Card calls and the $9.99 charge for Collect2Phone calls were comprised of necessary transaction fees that justified those high single call prices and left GTL with a mere fraction of the revenue to share with the governments. These statements were false; a minority of the $14.99 and $9.99 charges consisted of transaction fees paid to 3CI, and GTL received several times more in revenue from Collect2Card and Collect2Phone calls than it paid to contracting governments as site commissions. These misrepresentations and omissions were made by GTL over the interstate wires and mail, including phone communications and e-mail. Some of those misrepresentations and omissions were made by GTL to the following contracting government during the following time periods:

  - County of El Paso, Texas – Summer of 2013
  - County of Orange, California – Fall of 2014
  - Hanover County, Virginia – Summer of 2015
  - Mississippi Department of Corrections – January of 2016

- <u>Misrepresentations and Omissions in Bids and Contracts with Governments</u>: When GTL submitted bids and entered into written contracts with governments to provide ICS calls, GTL deliberately omitted and/or misrepresented critical information about its Collect2Card and Collect2Phone programs. While many pages of the bids and contracts delve into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents failed to disclose how much would actually be paid from Collect2Card and Collect2Phone call revenue to 3CI as a "transaction fee" or how much GL would actually receive and retain from each Collect2Card and Collect2Phone call. Some of GTL's bids and contracts failed to even identify the $14.99 price for each Collect2Card call and $9.99 price for each Collect2Phone call, and other bids and contracts submitted by GTL construed the entirety of the $14.99 and $9.99 prices as transaction fees. These misrepresentations and omissions were made in bids and contracts that were transmitted via electronic wires and/or mail to governments. Such misrepresentations and omissions were made in bids submitted by, and ICS contracts entered by, GTL that provided a Collect2Card and/or Collect2Phone calling option, including contracts with the following governments that were executed on the following dates:

  - County of El Paso, Texas – September 10, 2013
  - County of Orange, California – October 9, 2014
  - Hanover County, Virginia – July 1, 2015

100

- o   Mississippi Department of Corrections – February 29, 2016

- **Misrepresentations and Omissions in Monthly Commission Reports to Governments**: During the relevant period, GTL provided monthly commission reports to contracting governments that identified the number of per-minute calls made, the duration of those per-minute calls, the revenue collected from those per-minute calls, and the amount of that revenue shared with the governments as site commissions. In those same monthly reports, however, when addressing Collect2Card and Collect2Phone calls, GTL either (1) misrepresented the amount of revenue received by, and transaction fees paid by, GTL from such calls, or (2) only listed the number of those single calls made and the dollar value of the site commissions paid to the contracting governments—not the price of Collect2Card or Collect2Phone calls, revenue received by GTL from Collect2Card or Collect2Phone calls, or the percentage value of the site commission payments from Collect2Card or Collect2Phone calls. For that reason, the monthly reports failed to accurately inform contracting governments of the actual revenue received by GTL from Collect2Card and Collect2Phone calls or the actual transaction fees paid to 3CI from Collect2Card and Collect2Phone calls. These misrepresentations and omissions were made in monthly commission reports submitted by GTL via mail and/or electronic wires to contracting governments, including to the following governments on the following dates:

  - o   Norfolk County, Massachusetts – January 2015 through March 2015
  - o   Merced County, California – January 2015 through March 2015
  - o   County of Orange, California – January 2015 through April 2018

- **Misrepresentations and Omissions through Websites**: In multiple versions of GTL's public website for its Collect2Card program, GTL falsely states that each $14.99 single call involves a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of GTL, 3CI included the following language on the "Pricing" page of the Collect2Card website: "The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement." The website was established and operated by 3CI (through wire transmissions) at the express instruction of GTL, which determined and approved the website's content. The website was established on or about July 2, 2013; it has operated has continuously since that date; it was renewed in the month of July during each year from 2014 through 2019; and it was updated on multiple occasions during the relevant period, including in or near May 16, 2017.

- **Misrepresentations and Omissions in Billing Charges to Nationwide GTL Subclass Members for Collect2Card Calls**: At the direction of GTL, 3CI misrepresented the amounts of the "Transaction Fee" and "Call Fee" in the billing charges for Collect2Card calls made to members of the Nationwide GTL Subclass. Specifically, when charging for Collect2Card calls, GTL and 3CI charged and billed Nationwide

101

GTL Subclass members for two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. Each and every such charge constituted a fraudulent misrepresentation; the "Transaction Fee" paid to 3CI was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by GTL was not $1.80, but rather approximately $10.64. Those fraudulent charges were made at the direction of GTL, and through and with the assistance of 3CI, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide GTL Subclass members during the relevant period, including on the billing statements of Melinda Jabbie during the period 2013 through 2015.

- <u>Misrepresentations and Omissions in Billing Charges to Nationwide GTL Subclass Members for Collect2Phone Calls</u>: When 3CI charged consumers for Collect2Phone calls at the direction of GTL, those consumers paid a single $9.99 charge. That $9.99 charge constituted a substantial overcharge, as it reflected an amount agreed to by contracting governments based on misrepresentations by GTL regarding the enormity of the transaction fees paid to 3CI to implement such calls. These $9.99 charges to consumers, reflected in both premium text messages and mobile phone billing statements, failed to disclose either the actual transaction fee paid to 3CI or that GTL collected most of the revenue from such calls, in the form of kickbacks from 3CI. Those fraudulent charges were made at the direction of GTL, and through and with the assistance of 3CI, which collected the credit card information and processed the charges. The fraudulent charges and billing statements were made via wire transmissions and/or mail. Those fraudulent charges appeared on the billing statements of thousands of Nationwide GTL Subclass members during the relevant period.

294.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2013, and the frequency and duration of the misrepresentations and omissions establishes continuity over a substantial period of time.

295.    Many of the precise dates of the thousands of predicate acts that are part of the pattern of racketeering activity, such as communications with contracting governments and billing charges to Nationwide GTL Subclass members, are hidden from Plaintiffs and cannot be alleged without access to GTL's and 3CI's books and records.

296.    The misrepresentations and omissions made by GTL and 3CI as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with Collect2Card and Collect2Phone calls from contracting

governments and Nationwide GTL Subclass members and, instead, disclosing and broadcasting fabricated and artificially inflated transaction fees, and (2) overcharging Nationwide GTL Subclass members for Collect2Card and Collect2Phone calls by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide GTL Subclass members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing Collect2Card and Collect2Phone calls, and contracting governments would have prevented GTL and 3CI from charging Nationwide GTL Subclass members those fabricated and artificially inflated transaction fees.

297.    The repeat misrepresentations and omissions made by GTL and 3CI gave rise to the expectation by the Enterprise that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

298.    The multiple predicate acts committed by GTL and 3CI that underlie the pattern of racketeering activity were related to each other; were designed to work in conjunction with each other to assist GTL, 3CI and the Enterprise in overcharging and profiting at the expense of Nationwide GTL Subclass members; and posed, and continue to pose, a threat of racketeering activity recurring in the future. Indeed, the Enterprise continues to charge $14.99 for Collect2Card calls and $9.99 for Collect2Phone calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those calls.

299.    GTL and 3CI engaged in and directed the pattern of racketeering with the knowledge of the falsity of their misrepresentations to, and omissions from, contracting governments and Nationwide GTL Subclass members, and GTL and 3CI operated the Enterprise with the specific intent to deceive and defraud Nationwide GTL Subclass members.

300.     GTL, 3CI and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above permitted GTL, 3CI and the Enterprise to substantially overcharge Nationwide GTL Subclass members for, and increase their respective profits from, Collect2Card and Collect2Phone calls.

301.     Based on the foregoing, GTL and 3CI have violated 18 U.S.C. § 1962(c).

302.     As a direct and proximate result of the racketeering activities of GTL and 3CI, Plaintiffs and other Nationwide GTL Subclass members have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by GTL and 3CI. Plaintiffs and other Nationwide GTL Subclass members were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide GTL Subclass members.

303.     Pursuant to 18 U.S.C. § 1964(c), GTL and 3CI are liable for three times the damages that Plaintiffs and other Nationwide GTL Subclass members have suffered, plus the costs of bringing this suit, including attorneys' fees.

**COUNT 6**
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)**
**(On behalf of Nationwide Class against Securus and GTL)**

304.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint.

305.     At all relevant times, Securus and GTL each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

104

306.    At all relevant times, the corporation 3CI constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

307.    During the period January 2010 through present, Securus and GTL knowingly and intentionally conspired with each other and the Enterprise to violate 18 U.S.C. § 1962(c). Securus and GTL conspired to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

308.    Securus and GTL conspired with each other and with the Enterprise to knowingly, intentionally and repeatedly transmit fraudulent misrepresentations and omissions, via mail and wires, to contracting governments and Nationwide Class members regarding the price of, and the value of the transaction fees associated with, single calls operated by the Enterprise.

309.    In furtherance of the conspiracy, Securus, GTL, and the Enterprise agreed, among and between them, to purposefully and intentionally make misrepresentations and omissions, through the mail and wires, regarding the price of, and the value of the transaction fees associated with, single calls operated by the Enterprise to contracting governments and Nationwide Class members.

310.    During the Class Period, in furtherance of the conspiracy, Securus, GTL, and the Enterprise each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the price of, and the value of the transaction fees associated with, single calls operated by the Enterprise, including through, as described above: public websites for single calls operated by the Enterprise; billing charges to consumers for those single calls; statements to contracting governments during negotiations for ICS contracts; bids submitted to and written ICS contracts with contracting governments; and monthly commission reports provided to contracting governments. These actions constitute mail

and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and serve as predicate acts to a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1) and (5).

311.   Securus, GTL, and the Enterprise engaged in the pattern of racketeering with the knowledge of the falsity of their misrepresentations to, and omissions from, contracting governments and Nationwide Class members, and Securus and GTL conspired with the Enterprise with the specific intent to deceive and defraud Nationwide Class members.

312.   Securus, GTL, and the Enterprise knew that making misrepresentations and omissions, through the mail and wires, regarding the price of, and the value of the transaction fees associated with, single calls operated by the Enterprise constituted a pattern of racketeering activity.

313.   Securus and GTL conspired with each other and the Enterprise to engage in the pattern of racketeering activity for the common and shared purposes of (1) deceiving contracting governments and Nationwide Class members regarding the price of, and the value of transaction fees associated with, single calls operated by the Enterprise and (2) overcharging Nationwide Class members for those single calls.

314.   Securus and GTL made, and directed the Enterprise to make, the same fraudulent misrepresentations and omissions by design. After agreeing to fix the prices of single calls, Securus and GTL simultaneously made, and directed the Enterprise to make, the material misrepresentations and omissions to contracting governments and consumers in order to charge those artificially inflated, fixed prices. Indeed, according to a former GTL manager, employees of GTL and Securus "regularly shared with one another considerable strategic information" including "how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments."

315.    Securus and GTL adopted the goal of furthering or facilitating the criminal endeavor of the Enterprise by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including by: falsely informing contracting governments during contract negotiations that most of the $14.99 price for PayNow and Collect2Card calls and the $9.99 price for Text2Connect and Collect2Phone calls stem from and constitute necessary transaction fees paid to the Enterprise; making misrepresentations and omissions about the transaction fees associated with those single calls operated by the Enterprise when submitting bids and entering into written contracts with governments; making misrepresentations and omissions about the transaction fees associated with those single calls operated by the Enterprise when submitting monthly commission reports to contracting governments; and directing the Enterprise to make misrepresentations and omissions about transaction fees associated with single calls to contracting governments and Nationwide Class members, including through public websites and billing charges to consumers for those calls.

316.    The misrepresentations and omissions made by Securus, GTL, and the Enterprise in furtherance of their conspiracy and as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with single calls operated by the Enterprise from contracting governments and Nationwide Class members and, instead, disclosing and broadcasting fabricated and artificially inflated transaction fees, and (2) overcharging Nationwide Class members for single calls operated by the Enterprise by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide Class members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing single calls

from Securus and GTL through the Enterprise, and contracting governments would have prevented Securus, GTL and the Enterprise from charging Nationwide Class members those fabricated and artificially inflated transaction fees.

317.    Securus, GTL, and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above permitted Securus, GTL, and the Enterprise to substantially overcharge Nationwide Class members for, and increase their respective profits from, single calls operated by the Enterprise.

318.    Based on the foregoing, Securus and GTL have violated 18 U.S.C. § 1962(d).

319.    As a direct and proximate result of the conspiracy between and racketeering activities of Securus, GTL, and the Enterprise, Plaintiffs and other Nationwide Class members have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by Securus and GTL. Plaintiffs and other Nationwide Class members were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide Class members.

320.    Pursuant to 18 U.S.C. § 1964(c), Securus and GTL are liable for three times the damages that Plaintiffs and other Nationwide Class members have suffered, plus the costs of bringing this suit, including attorneys' fees.

## COUNT 7
## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)
### (On behalf of Nationwide Class against Securus, GTL and 3CI)
### (Pled in the Alternative to Count 6)

321.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint, except for

paragraphs 304 and 320.

322.   At all relevant times, Securus, GTL, and 3CI each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

323.   At all relevant times, Securus, GTL, and 3CI together constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish a joint purpose. That common and shared purpose was to deceive contracting governments and Nationwide Class members regarding the price of, and value of transaction fees associated with, 3CI-operated single calls and to overcharge Nationwide Class members for those calls.

324.   The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided ICS single calls to consumers throughout the United States and across multiple states, and the Enterprise transacted business through the use of the United States mails and interstate telephone wires. The Enterprise also communicated in furtherance of the pattern of racketeering activity and scheme to defraud described below using the interstate wires and interstate mail.

325.   Securus, GTL, and 3CI are each separate entities and separate corporations, distinct from the Enterprise itself, and each of them unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

326.   The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.

327.    Securus, GTL, and 3CI participated in the conduct and operation of the Enterprise through, among other things:

- Securus purchased a patent associated with billing ICS single calls to mobile phone accounts from 3CI and granted 3CI exclusive use of that patent;

- Securus and GTL agreed to charge the same inflated prices for 3CI-operated single calls;

- Securus approved and directed 3CI to contract with GTL to establish and operate GTL's single call programs;

- Securus and GTL contracted with 3CI to establish and operate their single call programs;

- Securus and GTL directed 3CI to specifically charge $14.99 for PayNow and Collect2Card calls and $9.99 for Text2Collect and Collect2Phone calls;

- 3CI processed charges to Nationwide Class members for making single calls provided by Securus and GTL;

- 3CI established and maintained websites for single call programs provided by Securus and GTL;

- Securus and GTL directed 3CI to falsely represent on the websites for the PayNow and Collect2Card program that the $14.99 charge was attributable to a $13.19 "Transaction Fee" and a $1.80 "Call Fee";

- Securus and GTL made misrepresentations and omissions directly to contracting governments—during negotiations for ICS contracts, in written bids and ICS contracts, and in commission reports—about transaction fees paid to 3CI to implement single calls;

110

- 3CI made misrepresentations and omissions about transaction fees associated with single calls provided by Securus and GTL to contracting governments and Nationwide Class members, including through websites and billing statements;

- 3CI separately charged $13.19 for a "Transaction Fee" and $1.80 for a "Call Fee" to consumers who accepted Securus's PayNow calls and GTL's Collect2Card calls;

- 3CI charged fabricated and artificially inflated transaction fees to Nationwide Class members when they purchased single calls provided by Securus and GTL; and

- 3CI kicked back a majority of those fabricated and artificially inflated transaction fees to Securus and GTL.

328.    Neither Securus, nor GTL, nor 3CI could have accomplished the pattern of racketeering activity, or profited from it, alone or without participating in the conduct of the Enterprise.

329.    During the relevant period, Securus, GTL, and 3CI knowingly and intentionally conspired with the Enterprise to violate 18 U.S.C. § 1962(c). Securus, GTL, and 3CI conspired to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

330.    Securus, GTL, and 3CI conspired with the Enterprise to knowingly, intentionally and repeatedly transmit fraudulent misrepresentations and omissions, via mail and wires, to contracting governments and Nationwide Class members regarding the price of, and the value of the transaction fees associated with, 3CI-operated single calls.

331.    In furtherance of the conspiracy, Defendants and the Enterprise agreed, among and between them, to purposefully and intentionally make misrepresentations and omissions, through

the mail and wires, regarding the price of, and the value of the transaction fees associated with, 3CI-operated single calls to contracting governments and Nationwide Class members.

332.    During the Class Period, in furtherance of the conspiracy, Defendants and the Enterprise each transmitted electronic information and paper documents, through the mail and wires, containing fraudulent misrepresentations and omissions regarding the price of, and the value of the transaction fees associated with, 3CI-operated single calls, including through, as described above: public websites for single calls operated by 3CI; billing charges to consumers for those single calls; statements to contracting governments during negotiations for ICS contracts; written bids submitted to, and ICS contracts with, contracting governments; and monthly commission reports provided to contracting governments. These actions constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and serve as predicate acts to a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1) and (5).

333.    Defendants and the Enterprise engaged in the pattern of racketeering with the knowledge of the falsity of their misrepresentations to and omissions from contracting governments and Nationwide Class members, and Defendants conspired with the Enterprise with the specific intent to deceive and defraud Nationwide Class members.

334.    Defendants and the Enterprise knew that making misrepresentations and omissions, through the mail and wires, regarding the price of, and the value of the transaction fees associated with, 3CI-operated single calls constituted a pattern of racketeering activity.

335.    Defendants conspired with the Enterprise to engage in the pattern of racketeering activity for the common and shared purposes of (1) deceiving contracting governments and Nationwide Class members regarding the price of, and the value of transaction fees associated with, 3CI-operated single calls and (2) overcharging Nationwide Class members for those calls.

336.    Defendants made, and directed the Enterprise to make, the same fraudulent misrepresentations and omissions by design. After Securus and GTL agreed to fix the prices of single calls, Defendants simultaneously made, and directed the Enterprise to make, the material misrepresentations and omissions to contracting governments and consumers in order to charge those artificially inflated, fixed prices. Indeed, according to a former GTL manager, employees of GTL and Securus "regularly shared with one another considerable strategic information" including "how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments."

337.    Defendants adopted the goal of furthering or facilitating the criminal endeavor of the Enterprise by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including by: Securus and GTL falsely informing contracting governments during ICS contract negotiations that most of the $14.99 price for PayNow and Collect2Card calls and the $9.99 price for Text2Connect and Collect2Phone calls stem from and constitute necessary transaction fees paid to 3CI; Securus and GTL making misrepresentations and omissions about the transaction fees associated with 3CI-operated single calls when submitting bids to, and entering into written contracts with, governments; Securus and GTL making misrepresentations and omissions about the transaction fees associated with 3CI-operated single calls when submitting monthly commission reports to contracting governments; 3CI making misrepresentations and omissions about  transaction fees associated with 3CI-operated single calls to Nationwide Class members through public websites and billing charges; and 3CI kicking back most of the revenue from charging Nationwide Class members for fabricated and inflated transaction fees to Securus and GTL.

113

338.    The misrepresentations and omissions made by Securus, GTL, 3CI and the Enterprise in furtherance of their conspiracy and as part of the pattern of racketeering were communicated for the purpose of (1) concealing the true and actual transaction fees associated with 3CI-operated single calls from contracting governments and Nationwide Class members and, instead, disclosing and broadcasting fabricated and artificially inflated transaction fees, and (2) overcharging Nationwide Class members for 3CI-operated single calls by charging them for the fabricated and artificially inflated transaction fees. Had the fraudulent misrepresentations and omissions not been made, Nationwide Class members would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing single calls from Securus and GTL through 3CI, and contracting governments would have prevented the Enterprise from charging Nationwide Class members those fabricated and artificially inflated transaction fees.

339.    Defendants and the Enterprise received substantial financial benefits from their participation in the pattern of racketeering. In particular, the racketeering activity described above permitted Defendants and the Enterprise to substantially overcharge Nationwide Class members for, and increase their respective profits from, 3CI-operated single calls.

340.    Based on the foregoing, Securus, GTL, and 3CI have violated 18 U.S.C. § 1962(d).

341.    As a direct and proximate result of the conspiracy between and racketeering activities of Defendants and the Enterprise, Plaintiffs and other Nationwide Class members have been injured in their business and property in an amount to be proven at trial. These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by Defendants. Plaintiffs and other Nationwide Class members were the intended targets of those violations of 18 U.S.C. § 1962, and their injuries were reasonably foreseeable and intended consequences thereof. There are no

independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Plaintiffs and other Nationwide Class members.

342.    Pursuant to 18 U.S.C. § 1964(c), Securus, GTL, and 3CI are liable for three times the damages that Plaintiffs and other Nationwide Class members have suffered, plus the costs of bringing this suit, including attorneys' fees.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and the Subclasses, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class and Subclasses defined herein, appoint Plaintiffs as representatives of the Class and Subclasses, appoint Plaintiffs' counsel of record as counsel for the Class and Subclasses, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class and Subclasses, once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Defendants' actions alleged herein be adjudged and decreed to be in violation of the RICO statute, 18 U.S.C. § 1962;

D.    Plaintiffs and the other members of the Class and Subclasses recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a) and 18 U.S.C. § 1964(c);

E.    Plaintiffs and the other members of the Class and Subclasses be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

115

F.  Defendants, their affiliates, successors, heirs, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracies, combinations, overcharges, misrepresentations or omissions alleged herein, or from engaging in any other conduct, conspiracy, combination, overcharges, misrepresentations or omissions having a similar purpose or effect;

G.  Plaintiffs and the other members of the Class and Subclasses recover the costs of this lawsuit and reasonable attorneys' fees, as provided by law; and

H.  Plaintiffs and the other members of the Class and Subclasses be granted such other relief as the case may require and deemed proper to this Court.

## X.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.


Dated: June 29, 2020                    Respectfully submitted,

                                        /s/ Matthew K. Handley
                                        Matthew K. Handley (D. Md. Bar # 18636)
                                        Rachel E. Nadas (*pro hac vice* forthcoming)
                                        HANDLEY FARAH & ANDERSON PLLC
                                        777 6th Street, NW, Eleventh Floor
                                        Washington, DC 20001
                                        Telephone: (202) 559-2433
                                        mhandley@hfajustice.com
                                        rnadas@hfajustice.com

                                        George F. Farah (*pro hac vice* forthcoming)
                                        Rebecca P. Chang (*pro hac vice* forthcoming)
                                        HANDLEY FARAH & ANDERSON PLLC
                                        81 Prospect Street
                                        Brooklyn, NY 11201
                                        Telephone: (212) 477-8090

116

gfarah@hfajustice.com
rchang@hfajustice.com

William A. Anderson (*pro hac vice* forthcoming)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Benjamin D. Brown (*pro hac vice* forthcoming)
Brent W. Johnson (*pro hac vice* forthcoming)
Robert A. Braun (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
rbraun@cohenmilstein.com

Christopher J. Bateman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
cbateman@cohenmilstein.com

Benjamin D. Elga (*pro hac vice* forthcoming)
Kelly Jo Popkin (*pro hac vice* forthcoming)
JUSTICE CATALYST LAW, INC.
81 Prospect Street
Brooklyn, NY 11201
Telephone: 518-732-6703
belga@justicecatalyst.org
kpopkin@justicecatalyst.org

Brian J. Shearer (*pro hac vice* forthcoming)
Craig L. Briskin (*pro hac vice* forthcoming)
JUSTICE CATALYST LAW, INC.
718 7th St. NW
Washington, DC 20001
Telephone: 518-732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Daniel Marshall (*pro hac vice* forthcoming)
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
dmarshall@hrdc-law.org

Hannah E.M. Lieberman (D. Md. Bar #05456)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Ste 400
Washington, DC 20005
Telephone: (202) 319-1040
Hannah_Lieberman@washlaw.org