# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| ASHLEY ALBERT, et al., | Civil Action No. 8:20-CV-1936 |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| GLOBAL TEL*LINK CORP., et al., | |
| Defendants. | |

MORGAN LEWIS & BOCKIUS, LLP
Jason R. Scherr, Bar No. 25633
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.6000
F: 202.373.6001
jr.scherr@morganlewis.com

Elizabeth Herrington*
77 W. Wacker Drive
Chicago, IL 60601
T: 312.324.1000
F: 312.324.1001
beth.herrington@morganlewis.com

R. Brendan Fee*
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5000
F: 215.963.5001
brendan.fee@morganlewis.com

COUNSEL FOR DEFENDANT SECURUS
TECHNOLOGIES, LLC

ARNOLD AND PORTER KAYE SCHOLER LLP
Jonathan I. Gleklen, Bar No. 21350
Katherine Clemons*
Monique Boyce*
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
T: (202) 942-5000
F: (202) 942-5999
jonathan.gleklen@arnoldporter.com
katherine.clemmons@arnoldporter.com
monique.boyce@arnoldporter.com

Charles Scott Lent*
Javier Ortega*
250 West 55th Street
New York, NY 10019-9710
T: (212) 836-8000
F: (212) 836-8689
scott.lent@arnoldporter.com
javier.ortega@arnoldporter.com

COUNSEL FOR DEFENDANT GLOBAL
TEL*LINK CORP.

- AND -

WILLIAMS & CONNOLLY LLP
Jonathan B. Pitt, Bar No. 16086
Colette T. Connor*
725 Twelfth Street, NW
Washington, DC 20005
T: 202.434.5000
F: 202.434.5029
jpitt@wc.com
cconnor@wc.com

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Jay B. Shapiro*
150 West Flagler Street, Suite 2200
Miami, FL 33130
T: 305.789.3229
F: 305.789.2664
jshapiro@stearnsweaver.com

COUNSEL FOR DEFENDANT
3CINTERACTIVE CORP.

* admitted *pro hac vice*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

ALLEGATIONS OF THE COMPLAINTAND FACTS SUBJECT TO JUDICIAL
     NOTICE ......................................................................................................3

LEGAL STANDARD.............................................................................................9

ARGUMENT .......................................................................................................10

I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT................10

      A.     Plaintiffs Fail Adequately to Allege a Price-Fixing Agreement Between
            Securus and GTL. .............................................................................10

            1.     Plaintiffs Do Not Allege Direct Evidence of a Conspiracy. ......................11

            2.     Plaintiffs Fail Adequately to Allege Circumstantial Evidence of a
                  Conspiracy Based on Parallel Conduct......................................................13

                  a.     Plaintiffs' own Complaint explains why it would have been
                        irrational for GTL to launch its single-call product at a
                        price below Securus's. ..............................................................15

                  b.     Plaintiffs' purported "plus factors" do not plausibly suggest
                        a conspiracy to fix prices. .............................................................16

      B.     Any Agreement Between Securus and 3Ci or Between 3Ci and GTL is
            Vertical and Cannot Support the *Per Se* Claim Alleged in the Complaint...........20

      C.     Plaintiffs Lack Antitrust Standing Because They Cannot Allege Direct
            Antitrust Injury......................................................................................22

II.     PLAINTIFFS' RICO CLAIMS FAIL AS A MATTER OF LAW...................................24

      A.     Plaintiffs' Alleged Injuries Predicated on Misrepresentations to
            Governments Are Too Indirect To Establish Proximate Cause Under
            RICO. ......................................................................................................25

      B.     Plaintiffs' RICO Claims Predicated on Misrepresentations Directed to
            Consumers on Websites and Billing Charges Fail Because Nobody Relied
            on Them. ..................................................................................................28

      C.     Plaintiffs' Claims For Conspiracy To Violate RICO Fail Because They
            Have Not Alleged a Proper RICO Enterprise. ......................................................30

III.    Plaintiffs Fail To State a Claim as to Defendant 3Ci. ........................................................ 31

    A.    Plaintiffs do not adequately allege 3Ci's involvement in an antitrust conspiracy. ............................................................................................. 31

    B.    Plaintiffs have not adequately alleged that 3Ci committed a RICO predicate act. ............................................................................................. 34

Conclusion ...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actimmune Marketing Litig.*,
614 F. Supp. 2d 1037 (N.D. Cal. 2009) ................................................................29

*Akers v. Maryland State Educ. Ass'n*,
376 F. Supp. 3d 563 (D. Md. 2019) ......................................................................31

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) .........................................................................11, 18

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ............................................................................18

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).........................................................................................25, 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................9

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983)..........................................................................................2, 22

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)..................................................................................19

*Balt. Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) ................................................................................13

*Barr Labs. v. Quantum Pharmics, Inc.*,
No. 90 Civ. 4406, 1994 WL 1743983 (E.D.N.Y. Feb. 7, 1994)............................26

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007)...................................................................................... *passim*

*Bendfeldt v. Window World, Inc.*,
No. 5:17-C-39-GCM, 2017 WL 4274191 (W.D.N.C. Sept. 26, 2017) ..................24

*Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*,
No. 6:14-CV-6002-ORL-31TBS, 2016 WL 866582 (M.D. Fla. Mar. 7, 2016) .....19

*Brookhaven Town Conservative Comm. v. Walsh*,
No. 14-CV-6097 (JFB)(ARL), 2016 WL 1171583 (E.D.N.Y. Mar. 23, 2016)......24

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ............................................................................11

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) ........................................................................................21

*Continental Airlines, Inc. v. United Airlines, Inc.*,
   277 F.3d 499 (4th Cir. 2002) ...........................................................................20

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ..........................................................................................20

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ........................................................................................20

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ......................................................................22, 31

*DM Research, Inc. v. Coll. of Am. Pathologists*,
   170 F.3d 53 (1st Cir. 1999) ..............................................................................12

*Donaldson v. Primary Residential Mortg., Inc.*,
   No. CV ELH-19-1175, 2020 WL 3184089 (D. Md. June 12, 2020) ..........24, 30, 31

*Donaldson v. Severn Sav. Bank, F.S.B.*,
   No. CV JKB-15-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015) ................28, 29

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ........................................................................................13

*Ficker v. Chesapeake & Potomac Tel. Co.*,
   596 F. Supp. 900 (D. Md. 1984) ......................................................................23

*Figueroa Ruiz v. Alegria*,
   896 F.2d 645 (1st Cir. 1990) ............................................................................24

*Firestone v. Galbreath*,
   976 F.2d 279 (6th Cir. 1992) ...........................................................................26

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ........................................................................17, 18

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   No. 16 CIV. 5263 (AKH), 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) .............23

*G&G TIC, LLC v. Alabama Controls, Inc.*,
   No. 4:07-CV-162 (CDL), 2008 WL 4457876 (M.D. Ga. Sept. 29, 2008) ............30

*Graham v. Stewart*,
No. GJH-16-2578, 2017 WL 3995536 (D. Md. Sept. 8, 2017) ................................................5

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................16

*GSI Tech. v. United Memories, Inc.*,
No. 5:13-CV-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ............................23

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ...............................................................10

*Hemi Group, LLC v. City of N.Y.*,
559 U.S. 1 (2010) ...........................................................................25

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)..........................................................................25

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3rd Cir. 2010) .......................................................... *passim*

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
99 F. Supp. 3d 610 (D. Md. 2015)...........................................................22

*Kadow v. First Fed. Bank*,
No. 8:19-CV-00566-PWG, 2020 WL 5230560 (D. Md. Sept. 2, 2020).....................24, 30, 31

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..............................................................14

*Kimberlin v. Nat'l Bloggers Club*,
No. GJH-13-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015)............................35

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ...............................................................22

*Kotteakos v. United States*,
328 U.S. 750 (1946)..........................................................................22

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)..........................................................................21

*Lewis v. Microsoft Corp.*,
410 F. Supp. 2d 432 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007)....................29

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) ............................................................11

*Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*,
   824 F.2d 582 (8th Cir. 1987) ............................................22

*Massey v. Ojaniit*,
   759 F.3d 343 (4th Cir. 2014) ........................................6, 34

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...............................................11

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
   201 F.3d 436, No. 98-2847, 1999 WL 691840 (4th Cir. June 8, 1999)...................19

*Moore v. Boating Indus. Ass'n*,
   819 F.2d 693 (7th Cir. 1987) ..............................................18

*Muigai v. IB Prop. Holdings, LLC*,
   No. 08:09-CV-01623-AW, 2010 WL 5173313 (D. Md. Dec. 14, 2010)...............12

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
   876 F. Supp. 2d 616 (D. Md. 2012) ..........................................7

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................16, 18, 22

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)...............................................20, 21

*Painter's Mill Grille, LLC v. Brown*,
   716 F.3d 342 (4th Cir. 2013) .............................................9

*Pak v. Ridgell*,
   No. CIV. RDB-10-01421, 2011 WL 3320197 (D. Md. Aug. 1, 2011).....................6

*Peete-Bey v. Educ. Credit Mgmt. Corp.*,
   131 F. Supp. 3d 422 (D. Md. 2015)....................................6, 34

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) ..............................................10

*Rojas v. Delta Airlines, Inc.*,
   425 F. Supp. 3d 524 (D. Md. 2019)......................................... *passim*

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ............................................. *passim*

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)...............................................21

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
    884 F.3d 489 (4th Cir. 2018) ......................................................26, 27

*Somerville v. W. Town Bank & Trust*,
    No. PJM 19-0490, 2019 WL 6131288 (D. Md. Nov. 19, 2019)..............20

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911).............................................................................20

*Super. Offshore Intern., Inc. v. Bristow Group Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010) .................................................12

*In re Titanium Dioxide Antitrust Litig.*,
    959 F. Supp. 2d 799 (D. Md. 2013) .................................................17

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (4th Cir. 2015) ..........................................................12

*R.I. Laborers' Health & Welfare Fund ex rel. Trustees v. Philip Morris, Inc.*,
    99 F. Supp. 2d 174 (D.R.I. 2000) ...................................................23

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) ............................................................7

*Walters v. McMahen*,
    684 F.3d 435 (4th Cir. 2012) ..........................................................29

*Warnock v. Nat'l Football League*,
    356 F. Supp. 2d 535 (W.D. Pa. 2005)..............................................23

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)......................................................17, 19

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) .......................................................17

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ..........................................................10

**Statutes**

18 U.S.C. § 1962................................................................*passim*

18 U.S.C. § 1964(c) ......................................................................25, 28

15 U.S.C. § 1 ....................................................................*passim*

**Other Authorities**

Fed. R. of Civ. P. 9(b) ................................................................................................9

Fed. R. of Civ. P. 12(b)(6) .........................................................................................3

Fed. R. of Evid. 201(b) ...............................................................................................7

U.S. Const. Amend. I ................................................................................................13

## INTRODUCTION

GTL and Securus, using technology developed by 3Ci, provided a solution to a unique problem facing the prison industry. Most calls placed from prison are collect calls from inmates to friends and family. Those calls can be charged to an account created by the call recipient, but where the recipient has not previously created and funded an account the calls were charged as collect calls to a landline phone account. In the mid-2000s, as cell phones became more prevalent and people increasingly stopped maintaining landlines, the technology did not exist to allow collect calls to be charged to cell phones, which was necessary if the call recipient had not established an account before receiving the call. As this trend continued, inmates were unable to reach loved ones who were inaccessible through conventional collect calling programs. Inmates were losing a crucial connection to the outside world and prisons were missing out on much-needed revenue. The single-call programs, offered first by Securus and later by GTL, solved this problem by providing a way to charge collect calls to a user's cell phone carrier or a credit card.

In this putative class action, Plaintiffs claim that amounts they allegedly paid to receive collect calls through Defendants' programs from their incarcerated family members or friends were artificially inflated. The theory is that Defendant service providers committed a *per se* violation of Section 1 of the Sherman Act by conspiring to fix prices on so-called "single-call" products. Specifically, Plaintiffs allege that GTL and Securus fixed prices and charged excessive fees for their single-call products, with help from 3Ci. Compl. ¶ 2. But the Complaint provides only conclusory assertions—not well-pleaded facts—to support these allegations of a broad price-fixing conspiracy against all Defendants, and Plaintiffs therefore fail to meet their pleading obligations under *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). Plaintiffs' claims against 3Ci fail for the additional reasons that the Complaint does not adequately allege 3Ci's involvement in a conspiracy to fix prices, alleging only that 3Ci marketed and implemented call

programs on behalf of GTL and Securus. That is not enough to state a claim for a *per se* violation of the antitrust laws.

The claim Plaintiffs try to plead would fail in any event for the independent reason that the injuries they allege are too remote from the alleged violation to confer standing under the Supreme Court's decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). The Complaint is explicit that the pricing contracts challenged here result from competitive bidding among service providers (Securus or GTL) for the right to contract with state and local governments that operate prisons. Plaintiffs are not the contracting parties. They concede they have no control (or even influence) over selecting the provider to handle the calls they received, or the prices charged for those calls. The antitrust laws do not allow claims by remotely or derivatively injured plaintiffs, so the Complaint fails to state a claim because Plaintiffs lack antitrust standing.

Plaintiffs also allege four counts under the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 (c)–(d). The crux of Plaintiffs' RICO claims is that GTL, Securus, and 3Ci conspired to form an enterprise by which they engaged in a pattern of using the mail or wires to make fraudulent misrepresentations and omissions to governments and consumers to charge inflated prices for single calls. Compl. ¶ 3. As with the antitrust claim, Plaintiffs' RICO claims fail because they are predicated on alleged misrepresentations to state and local governments, not to Plaintiffs, so any supposed injury would be too indirect to establish proximate cause as a matter of law. Even accepting for this motion that Defendants made the alleged statements, that the statements were false, and that state and local governments relied on those misrepresentations to their detriment, any harm to Plaintiffs is entirely derivative of the harm they allege state and local governments to have suffered in the first instance. RICO—like the

antitrust laws—does not allow claims based on such indirect and derivative harm. To the extent Plaintiffs' RICO claims are based alternatively on purported misrepresentations to consumers, they fail for lack of materiality and causation. Statements to consumers cannot constitute material misrepresentations under RICO because Plaintiffs do not (and cannot) allege that statements made to *consumers* had any effect on the *government's* contracting decisions. Plaintiffs fail to allege that anyone relied on those statements by, for example, selecting one provider over another, or selecting one type of available plan over another, on the basis of consumer-facing statements made by Defendants. Plaintiffs cannot show but-for causation under RICO because they cannot show that someone relied to Plaintiffs' detriment on the purported misrepresentations to consumers.

These fundamental defects in the antitrust and RICO claims require dismissal of the Complaint against Defendants with prejudice.[1]

## ALLEGATIONS OF THE COMPLAINT
## AND FACTS SUBJECT TO JUDICIAL NOTICE[2]

GTL and Securus provide communication services, called inmate calling services ("ICS"), that connect inmates in correctional facilities to their friends and family throughout the United States. Compl. ¶¶ 30–33. GTL and Securus fiercely compete with one another, as well as other ICS suppliers, to win ICS contracts with the state and local governments that operate correctional facilities. *Id.* ¶¶ 30, 32, 45, 51. These contracts contain the rates that ICS providers will charge consumers for calls with inmates, as well as the government's site commissions for each ICS call. *Id.* ¶ 44. As a result, inmates and their families and friends cannot choose their ICS providers;

---

[1] Because Plaintiffs declined the Court's invitation to amend their complaint for the purpose of responding to the points raised in Defendants' September 18, 2020 pre-motion letter (ECF No. 57), dismissal of Plaintiffs' Complaint should be with prejudice.

[2] The factual summary below is based on the allegations of the Complaint, which Defendants treat as true pursuant to Rule 12 for purposes of this motion only. Should this case proceed to discovery, Defendants will demonstrate the falsity of key allegations of the Complaint.

rather, state and local governments have the sole authority to choose the ICS providers with which they contract. *Id.* ¶¶ 42, 112. State and local governments consider many factors when selecting the winning bids and negotiating the terms for ICS contracts, including their expected site commissions, the various products offered by the ICS provider, and the prices at which those servicers will be offered. *Id.* ¶ 45.

Under the traditional ICS model (per-minute ICS calls), the payor who receives an inmate's collect call establishes an account with the ICS provider, so that the inmate can easily make multiple calls to the payor in the future. *Id.* ¶ 48. To be approved as an account holder, payors must place a credit card on file and sometimes are required to pay a minimum deposit. *Id.*

Plaintiffs allege that in 2010, Securus began offering two single-call products, a type of ICS that allows collect call recipients to accept calls by paying a one-time fee through a credit card or mobile phone account, without having to establish an account with the ICS provider. *Id.* ¶ 54. Securus's single-call products consist of PayNow, which charges payors a single-call fee to their credit cards, and Text2Connect, which charges payors a single-call fee to their mobile phone accounts. *Id.* ¶ 55. PayNow provides single-calls lasting up to fifteen minutes for $14.99, and Text2Connect provides single-calls lasting up to ten minutes for $9.99, each allocated between a "call fee" and a "transaction fee." *Id.* ¶¶ 56, 57, 159. Securus contracted with 3Ci to "develop, market, implement, and operate" its single-call products, while continuing to provide government facilities the traditional, lower-cost per-minute collect call option. *Id.* ¶¶ 60, 62. In 2012, Securus bought 3Ci's patent covering technology used to charge mobile phone accounts for single-calls and awarded 3Ci an exclusive license to use the patent for a period of ten years. *Id.* ¶¶ 14, 73.

As of late-2012, GTL was "developing" a single-call product of its own, called APOC, *id.* ¶ 76, which it later released in 2014, *id.* ¶ 95. Plaintiffs do not allege that GTL was ready to launch

APOC in 2013, and do not allege that the APOC product being developed could charge cell phone accounts. *See id.* ¶ 70 (APOC "charged the credit cards of call recipients"). Instead, in early 2013, GTL entered into its own contract with 3Ci for single-call products, thereby accelerating its market entry with a competitive single-call alternative to Securus. *Id.* GTL launched its single-call products in the summer of 2013, three years after Securus had introduced its single-call products: Collect2Card, which charged payors a single-call fee to their credit cards and Collect2Phone, which charged payors a single-call fee to their mobile phone accounts, each likewise split between a "call fee" and a "transaction fee." *Id.* ¶¶ 81, 159. Securus's pricing was well-known and well-established in the market, and GTL launched its products at the same prices as Securus's. *Id.*

Plaintiffs do not recognize GTL's decision to source 3Ci's patented single-call technology as a procompetitive step to facilitate market entry, but see it as a conspiracy to reduce competition. Specifically, Plaintiffs allege that 3Ci approached GTL at Securus's direction to become a single-call provider and match Securus's pricing. *Id.* ¶ 63.

Plaintiffs allege that Securus purchased 3Ci's patent relating to charging mobile phone accounts for single calls and then licensed that patent back to 3Ci on the condition that Securus could control additional licenses that 3Ci might wish to grant. *Id.* ¶¶ 73–75. Plaintiffs further allege that as a condition of granting 3Ci permission to provide the patented technology to GTL, Securus demanded that 3Ci require GTL to charge the same prices as Securus's single-call program. *Id.* ¶ 75. Notwithstanding these allegations, however, the Court may take judicial notice of the actual terms of the referenced license agreement, attached hereto as Exhibit A,[3] which show

---

[3] "[O]n a motion to dismiss for failure to state a claim upon which relief could be granted, courts may consider documents referenced in the complaint even if those documents are not physically attached to the complaint." *Graham v. Stewart*, No. GJH-16-2578, 2017 WL 3995536, at *3 (D. Md. Sept. 8, 2017). A court is "not obligated to accept allegations that . . . 'contradict matters

that Securus had no right to dictate the pricing terms of any agreement 3Ci might reach with GTL (or anyone else). *See* Ex. A § 2.1(a) ("For the avoidance of doubt . . . the Parties agree that 3Ci may enter into agreements with any third parties selected by 3Ci for the purpose of providing such third parties TextCollect Services, Instant Pay Services and Additional Services, including third parties who may or may not be in competition with Securus in the Corrections Industry.").

Plaintiffs allege that the single-call (and broader ICS) market is inelastic, meaning that "[a]n increase in the price of single calls causes no increase, or only a relatively small increase, in the supply of single calls," and "an increase in the price of single calls causes no decrease, or only a relatively small decrease, in the demand for single calls." *Id.* ¶ 111. This is because users do not get to choose which ICS providers they use to make their calls. *Id.* ¶ 112.

In addition to the allegations regarding GTL's agreement with 3Ci to use its single-call technology, Plaintiffs premise their price-fixing claim on an allegation that executives at Securus and GTL met to discuss pricing of ICS calls in violation of the antitrust laws. *Id.* ¶ 113. The Complaint contains barebones allegations that Securus and GTL executives met with each other to discuss "what prices should be charged for ICS calls." *Id.* ¶¶ 15, 77. The Complaint does not specify when these supposed meetings took place or whether they involved discussions regarding the price of single-call products, the only products at issue in this case. Nor does the Complaint allege the involvement of any 3Ci employee in any such meeting.

---

properly subject to judicial notice or by exhibit.'" *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 433 (D. Md. 2015) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014)); *see also Pak v. Ridgell*, No. CIV. RDB-10-01421, 2011 WL 3320197, at *3 (D. Md. Aug. 1, 2011). Plaintiffs claim the license agreement is the "groundwork" of the alleged price-fixing scheme, and they refer to it repeatedly in the Complaint. *See* Compl. ¶¶ 14, 73–75.

The Court may properly take judicial notice of the fact that during the class period, Securus and GTL filed joint comments to the Federal Communications Commission ("FCC") in a rulemaking process.[4]  *See* Ex. B (Comments of Global Tel*Link Corp., et al., WC Docket No 12-375 (Sept. 15, 2014), *available at* https://ecfsapi.fcc.gov/file/7522665940.pdf).  The rulemaking concerned call rates and proposed caps on ICS call rates, and Securus and GTL proposed specific maximum rates to be established by the FCC.  *Id*. at 2 ("The parties propose flat rate caps of $0.20 per-minute for all debit and prepaid interstate and intrastate ICS calls, and $0.24 per-minute for all interstate and intrastate collect calls.").  Securus and GTL also proposed caps for fees for optional financial transaction services related to ICS calls, such as billing directly to a credit card or to a wireless phone account.  *Id.* at 6 (proposing that fees for "billing directly to credit/debit card" and "billing to an existing wireless telephone account" should be "capped based on the ICS provider's existing fee amounts for such options for a period of three (3) years").  Preparation of this joint proposal necessarily required executives of Securus and GTL to discuss "what prices should be charged for ICS calls" as alleged in the Complaint.

In connection with their RICO claims, Plaintiffs allege that, through the use of the mail and wires, the Defendants "made a series of material misrepresentations and omissions to both governments and consumers about the magnitude of the transaction fees associated with single

---

[4] *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("Under Federal Rule of Evidence 201(b), the district court may judicially notice a fact that is not subject to reasonable dispute when it is either (1) generally known within the district court's jurisdiction, or (2) can be readily determined from an indisputably accurate source.  This court and numerous others routinely take judicial notice of information contained on state and federal government websites."); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 653 n. 7 (D. Md. 2012) ("Judicial notice is appropriate of the content of S.E.C. filings, to the extent that this establishes that the statements therein were made, and the fact that these documents were filed with the agency . . . ."), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014).

calls operated by 3CI." *Id.* ¶ 18. Specifically, Defendants purportedly made misrepresentations to contracting governments regarding the transaction fees paid to third parties for single-call products during the negotiations of ICS contracts, in written bids, in the ICS contracts, in monthly commission reports, and on the public websites. *Id.* ¶¶ 18, 142.[5] Such misrepresentations allegedly included, for example, that "most of the prices charged and collected from single calls . . . were expended on necessary transaction fees paid to 3Ci . . . [when i]n truth, most of the monies collected by 3CI as 'transaction fees' from single calls were immediately kicked back to Securus and GTL as profit." *Id.* ¶ 126; *see also id.* ¶¶ 133–35.

According to Plaintiffs, had Defendants "honestly represented the value of the transaction fees" associated with single-call products, contracting governments would not have allowed Securus and GTL to charge $14.99 and $9.99 for the calls, and consumers "would have paid substantially less money" for these products. *Id.* ¶¶ 20, 138, 172. Contracting governments, informed of the actual value of the transaction fees, "would have insisted on lower-priced single call programs when selecting bids for, and negotiating the terms of, ICS contracts." *Id.* ¶ 172.

Defendants also allegedly made misrepresentations to members of the putative classes regarding the transaction fees paid to third-parties for the single-call products on public websites, credit card statements, and cell phone billing statements. *Id.* ¶¶ 18, 142. Specifically, credit card statements "falsely claimed" that $13.19 of the $14.99 call was due to transaction fees. *Id.* ¶¶ 164–65. Similarly, the public websites established and managed by 3Ci "stated that each single call charging $14.99 involves a 'Transaction Fee' of $13.19 and a 'Call Fee' of $1.80." *Id.* ¶ 159. The $9.99 charges on cell phone billing statements purportedly did not disclose the actual transaction

---

[5] As discussed below, Plaintiffs do not actually allege 3Ci made any statements of any kind to governments, only to consumers. *See* Section III, *infra.*

fee paid to 3Ci for single calls. *Id.* ¶ 169. Plaintiffs do not (and cannot) allege that these purported misrepresentations had any impact on the government entities' decisions whether to enter contracts with Defendants Securus and GTL, a decision that necessarily occurred prior to any communications to inmates or their families.

Nevertheless, according to Plaintiffs, "[t]he fraudulent misrepresentations and omissions made by Defendants regarding transaction fees caused Plaintiffs and the members of the Class and Subclasses to be overcharged for 3CI-operated single calls." *Id.* ¶ 170. "Had the fraudulent misrepresentations and omissions not been made, [the putative class members] would not have been overcharged for fabricated and artificially inflated transaction fees when purchasing [single-call products], and contracting governments would have prevented [Defendants] from charging [the putative class members] those fabricated and artificially inflated transaction fees." *Id.* ¶ 222. Plaintiffs further allege, albeit in boilerplate fashion that, "[a]s a direct and proximate result" of such "fraudulent misrepresentations," the putative class members have been injured. *Id.* ¶ 228.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint alleging violation of the antitrust laws must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted); *accord Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Like common law fraud claims, RICO claims based on mail and wire fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.*, No. CIVA DKC 2005-2882, 2006 WL 2572474, at *16 (D. Md. Sept. 5, 2006).

"[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (citation omitted); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (same).

## ARGUMENT

Plaintiffs have failed adequately to allege either an antitrust violation under Section 1 of the Sherman Act, 15 U.S.C. § 1, or a racketeering violation under RICO, 18 U.S.C. § 1962(c)–(d).

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT.

Plaintiffs' allegation that Defendants "entered into a continuing agreement, understanding, and conspiracy in restraint of trade to prevent and eliminate price competition over single-calls between Securus and GTL and to fix, inflate, maintain, and stabilize the price of 3CI-operated single calls charged to consumers in the United States," Compl. ¶ 201, fails to state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, and should be dismissed.

### A.    Plaintiffs Fail Adequately To Allege a Price-Fixing Agreement Between Securus and GTL.

While Plaintiffs accuse Securus and GTL of "enter[ing] into an agreement to eliminate price competition and fix the prices of single calls in violation of the antitrust laws," Compl. ¶ 14, Plaintiffs' barebones allegations fail to meet the pleading burden set out in *Twombly*.

A Section 1 plaintiff can state a claim by alleging either "direct" or "circumstantial" evidence that an unlawful agreement existed. *Robertson v. Sea Pines Real Estate Cos*., 679 F.3d 278, 289 (4th Cir. 2012). While the complaint purports to allege both direct and circumstantial evidence of a conspiracy, the allegations collapse under scrutiny. Plaintiffs do not come close under either method to "rais[ing] a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Plaintiffs' Complaint must be dismissed.

### 1.      Plaintiffs Do Not Allege Direct Evidence of a Conspiracy.

Direct evidence of a conspiracy is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quotation marks and citation omitted). Such evidence is "extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Id.* (citation omitted). For example, "a recorded phone call in which two competitors agreed to fix prices at a certain level" is direct evidence of a conspiracy. *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Plaintiffs' Complaint fails to allege such evidence exists.

Plaintiffs allege that executives of Securus and GTL "have close personal relationships," that they "communicated with each other to facilitate each other's success," and that they "shared strategic information." Compl. ¶ 113. They also allege that employees of Securus and GTL attended the same conferences, where they discussed "how to best market ICS calls to governments" and "the optimal statements to make to governments in order to secure ICS contracts." *Id.* ¶ 115. None of this is "direct evidence" of a conspiracy to fix the price of single-call ICS products, and none of these allegations identifies any "document or conversation explicitly manifesting the existence of the agreement in question." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.17 (3rd Cir. 2010)).

The closest Plaintiffs come is the barebones allegation, repeated multiple times in the Complaint, that an anonymous "former manager of GTL" was told that "the CEOs of GTL and Securus held private, in-person dinners during which they 'shared strategic information' and discussed 'what prices should be charged for ICS calls.'" Compl. ¶ 185; *see also* Compl. ¶¶ 15, 77, 113 (same). Repeating the same allegation four times in the Complaint does not create direct evidence of a conspiracy to fix the prices of single-call ICS products. *See Llacua v. W. Range*

*Ass'n*, 930 F.3d 1161, 1178 (10th Cir. 2019) (affirming dismissal where plaintiffs alleged "no reports, memoranda, or tapes of meetings," or other allegations "that explicitly establish, without the need for inferences, the existence of an agreement to fix . . . wages").

An allegation that executives "discussed 'what prices should be charged for ICS calls'" is not even an express allegation that Securus and GTL agreed on the prices that each would charge, though even that type of boilerplate allegation of agreement would not be enough. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (pleadings cannot rely on "'indeterminate assertions'" (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (4th Cir. 2015)); *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) ("a court is not required to accept" terms like "'conspiracy,' or even 'agreement' . . . as a sufficient basis for a complaint"); *Muigai v. IB Prop. Holdings, LLC*, No. 08:09-CV-01623-AW, 2010 WL 5173313, at *4 (D. Md. Dec. 14, 2010) (dismissing complaint that included "no specific facts as to how or when [the defendant] conspired," and in which "Plaintiff ma[de] mere legal conclusions . . . based on ambiguous behavior").

Notably, even beyond failing to expressly allege an agreement to fix prices, the Complaint conspicuously *does not* allege that there was any discussion of prices for ICS single-call products—the only ICS products at issue in this litigation. Nor does the Complaint allege that these discussions occurred before Securus or GTL launched their ICS single-call products. Finding a plausible allegation of a price-fixing conspiracy covering single-call ICS products would require "multiple speculative inferences" beyond the specific facts alleged in the Complaint, belying any argument that the Complaint alleges direct evidence of the challenged price-fixing conspiracy. *See Super. Offshore Intern., Inc. v. Bristow Group Inc.*, 738 F. Supp. 2d 505, 512–13 (D. Del. 2010) (granting motion to dismiss, and noting that "[p]laintiff is mistaken that the

statement reportedly made by an unidentified 'operator' that 'everyone more or less agreed to the necessity of a more or less equal rate hike for everyone,' confirms an agreement among Defendants" where "the operator's statement . . . requires multiple speculative inferences," and "ha[d] not been verified.").

Finally, a claim that GTL and Securus discussed "what prices should be charged for ICS calls" is entirely consistent with lawful conduct, and thus fails to pass muster under *Twombly*. *See* 550 U.S. at 554. During the class period, the FCC was engaged in rulemaking activity about call rates in which Securus and GTL filed joint comments regarding proposed caps on ICS call rates and fees for optional financial transaction services related to ICS calls, such as billing directly to a credit card or to a wireless phone account. *See* Ex. B. Preparation of this joint proposal necessarily required discussion of "what prices should be charged for ICS calls." These comments to the FCC are petitioning conduct protected by the First Amendment and cannot form the basis of an antitrust claim under the *Noerr-Pennington* Doctrine, pursuant to which citizens have a "right to petition the government for redress without fear of antitrust liability." *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001). As the Supreme Court has recognized, "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the [government] to take particular action with respect to a law that would produce a restraint or a monopoly." *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).

> ### 2. Plaintiffs Fail Adequately To Allege Circumstantial Evidence of a Conspiracy Based on Parallel Conduct.

Absent direct evidence of a conspiracy, Plaintiffs must rely on allegations based on circumstantial evidence to survive a motion to dismiss. The allegations of the Complaint are insufficient under the Supreme Court's clear guidance in *Twombly*.

The heart of Plaintiffs' claim is that GTL launched its ICS single-call products at the same price as the Securus products already on the market, and that this is evidence of a conspiracy to fix the prices of single-call products. This is exactly the kind of barebones allegation of parallel pricing that the Supreme Court found insufficient in *Twombly* to state a claim for a price-fixing conspiracy. To survive, a complaint must plead parallel conduct and something "more." *Twombly*, 550 U.S. at 557. And to allege "more," a plaintiff must allege "the particular time, place, and manner in which the [agreement] initially formed." *Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 543 (D. Md. 2019); *accord Twombly*, 550 U.S. at 565 n.10 (dismissing complaint that "mentioned no specific time, place, or person involved in the alleged conspiracies."); *SD3, LLC*, 801 F.3d at 431 ("[T]he who, what, when, and where." (internal quotation marks and citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("[T]he complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?").

As noted above, there is no specific allegation of the "who, what, when, where" of a conspiracy to fix the prices of single-call ICS products beyond vague allegations that executives of Securus and GTL had dinners at various times (that may not have been before GTL launched a single-call product at an alleged conspiratorially-fixed price) and that executives "discussed 'what prices should be charged for ICS calls'" at those dinners. Compl. ¶ 77. Even if this allegation supplies the "who" and "where," it is fatally defective because it fails to provide critical information regarding the "what" (did it include single-call products?) and the "when" (was it even before GTL launched single-call products?).

Under *Twombly*, a plaintiff must plead "enough factual matter (taken as true) to suggest that [the requisite] agreement was made[,]" and "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that

could just as well be independent action." 550 U.S. at 556–57. Thus, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 557; *see also SD3, LLC*, 801 F.3d at 424 ("At bottom, *Twombly* applies a long-held principle in antitrust law to the pleading stage: parallel conduct, standing alone, does not establish the required agreement because it is equally consistent with lawful conduct."). Critically, *Twombly* teaches that a complaint fails to state a claim where it rests on "descriptions of parallel conduct" that can be explained by "natural, unilateral reaction[s]." *Twombly*, 550 U.S. at 564, 556; *id*. at 556 n.4 (stating that to survive a motion to dismiss, plaintiff must allege that parallel behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" (citing 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425, p. 167–85 (2d ed. 2003)).

> a. **Plaintiffs' own Complaint explains why it would have been irrational for GTL to launch its single-call product at a price below Securus's.**

Central to Plaintiffs' claim is that GTL launched its ICS single-call products at the same price as the Securus products already on the market. *Twombly* makes clear that parallel conduct like that alleged is not enough. "Parallel conduct or interdependence" is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Here Plaintiffs' own Complaint explains why it was a "rational and competitive business strategy" for GTL to launch its single-call products at the same price as the Securus. *Id.*

The Complaint alleges that supply and demand for ICS is inelastic, so charging a high price for ICS "causes no decrease, or only a relatively small decrease, in the demand for single calls." Compl. ¶ 111. In other words, charging a lower price would not lead to more calls and more revenue. *Id*. Nothing in the Complaint suggests why it would be a rational business decision for

15

GTL to undercut Securus's pricing if it would not lead to more calls, greater revenue, or greater profits. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015) ("[P]laintiffs' plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market.").

> **b.** **Plaintiffs' purported "plus factors" do not plausibly suggest a conspiracy to fix prices.**

Plaintiffs allege a variety of other facts that they claim constitute "plus factors," but even taken together, they do not move their allegations of an unlawful agreement "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

*Twombly* suggests that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and for no other discernible reason" might suffice to take a claim based on parallel pricing beyond a motion to dismiss. 550 U.S. at 556 n.4. But there were no changes made by "multiple competitors" in this case—only GTL's launch pricing—and there were no "complex" price changes here—only the same pricing throughout the class period. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1021–22 (N.D. Cal. 2007) (even an allegation that competitors announced products within a few weeks of each other at the same price was insufficient under *Twombly*; "[w]e must remember that competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.").

Plaintiffs allege that "industry concentration," "high barriers to entry," and "inelastic supply and demand" are "plus factors," but these factors are insufficient to carry a Complaint past a motion to dismiss. They suggest only that a conspiracy might be possible, not that plaintiffs have plausibly alleged a conspiracy. Nothing about industry concentration or barriers to entry

"point[s] toward" the required "meeting of the minds."  *See SD3, LLC*, 801 F.3d at 425 ("That 'more' must consist of 'further circumstance[s] pointing toward a meeting of the minds.' (citation omitted)); *see also White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("High barriers to entry and inelastic demand are two hallmarks of oligopolistic markets susceptible to successful parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices."); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003) (rejecting allegations of high barriers to entry and industry structure as plus factors because they "are simply indicia that the . . . industry is an oligopoly, which is perfectly legal.").   The telecommunications markets in *Twombly* were likewise concentrated and had high barriers to entry, but the Court had no difficulty concluding that the complaint should be dismissed because the plaintiff had not alleged the required "something more" than parallel conduct.  550 U.S. at 570.

Indeed, the market conditions alleged in the Complaint are fully consistent with GTL's decision to launch its single-call products at the same price as Securus's.  As this Court has recognized, "[b]ecause this case involves a market dominated by a few firms, making it highly concentrated, 'any single firm's price and output decisions will have a noticeable impact on the market and on its rivals.'"  *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 821 (D. Md. 2013) (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358–59 (3d Cir. 2004)).  Thus, "'when a firm in a concentrated market (*i.e.*, an 'oligopolist') is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firms.'"  *Id*.  Because GTL had no reason to believe that it could gain sales if it launched at a lower price (because Securus could match that price), the Complaint itself provides a non-conspiratorial reason for GTL's parallel launch pricing.

Plaintiffs likewise point to "personal relationships between executives at competing ICS providers" and "opportunities to collude" at trade association meetings and the like. Compl. ¶¶ 107, 115. But again, courts have rejected claims that a mere opportunity to collude suffices to make an allegation of conspiracy plausible. *See Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 226–27 (4th Cir. 2004) (finding mere contacts and communications at an advisory panel meeting insufficient to support inference of anticompetitive conspiracy); *In re Musical Instruments*, 798 F.3d at 1196 ("[P]articipation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("It was well-settled [even] before *Twombly* that participation in trade organizations provides no indications of conspiracy." (citations omitted)); *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987) ("[M]ere memberships in a trade association [and] attendance at trade association meetings . . . are not, in and of themselves, condemned or even discouraged by the antitrust laws." (internal quotation marks and citation omitted)). Indeed, Plaintiffs do not actually allege that GTL and Securus reached any price-fixing agreement at these meetings, alleging only that they shared information on subjects like "how to best market ICS calls to governments." Compl. ¶ 115.

Plaintiffs allege "extraordinary profits" as a plus factor. Compl. ¶¶ 107, 119. They cite to no authority supporting the proposition that the defendants' profit levels qualify as a plus factor, and we are aware of none. To the contrary, high profits are entirely consistent with the market structure alleged in the Complaint. *See In re Flat Glass Antitrust Litig.*, 385 F.3d at 359 ("[F]irms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action.").

Neither is a "strong financial motive to conspire" a plus factor, where Plaintiffs allege only that GTL and Securus would make more money by fixing prices than not. Compl. ¶ 107.

> [A]dopting "profit motive" as a plus factor would effectively eliminate any pleading requirements regarding such agreements. If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss.

*Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-CV-6002-ORL-31TBS, 2016 WL 866582, at *6 (M.D. Fla. Mar. 7, 2016); *see also generally White*, 635 F.3d at 582 (rejecting "motive to conspire" to "earn supracompetitive profits" as a plus factor); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134–35 (3d Cir. 1999) ("Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act.").

Instead, the relevant plus factor broadly accepted by the courts is evidence that the challenged conduct would have been contrary to the parties' economic self-interest unless undertaken pursuant to a conspiracy. This is "perhaps the strongest plus factor indicative of a conspiracy." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (Table), No. 98-2847, 1999 WL 691840, *10 (4th Cir. June 8, 1999) (unpublished). This is the principle applied in *Rojas v. Delta Airlines* when this Court granted defendant's motion to dismiss: "Plaintiffs have not alleged sufficient facts to suggest that Defendants' actions were so against their self-interest that they 'rule out the possibility that the defendants were acting independently' and can only be explained by concerted action." 425 F. Supp. 3d at 543 (quoting *Twombly*, 550 U.S. at 554).

Notably, the Complaint contains no allegation that GTL's decision to launch single-call services at the same price as Securus was contrary to its economic self-interest. Indeed, for the reasons described above, given the market structure and inelastic demand, GTL's decision was entirely rational. As in *Rojas*, Plaintiffs' inability to plead such facts requires dismissal.

**B.    Any Agreement Between Securus and 3Ci or Between 3Ci and GTL Is Vertical and Cannot Support the *Per Se* Claim Alleged in the Complaint.**

Because almost every agreement restrains trade in some ways, courts have long recognized that Section 1 of Sherman Act prohibits only unreasonable restraints of trade. *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911)). A plaintiff alleging a violation of Section 1 usually must establish that the challenged restraint of trade is unreasonable by showing an actual adverse effect on competition, an application of the "rule of reason." *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977) (rule of reason is "prevailing standard" (citation omitted)); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (rule of reason requires courts to conduct fact-specific assessment of "market power and market structure . . . to assess the [restraint]'s actual effect" on competition).

However, a "small group of restraints" has been deemed "unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (internal citation and quotation marks omitted). Agreements that are illegal *per se* are deemed unlawful without any analysis of their actual effect on competition. As this Court has held, "[p]leading 'per se violations can lighten a plaintiff's litigation burdens' but 'it is not a riskless strategy' because if the court 'determines that the restraint at issue is sufficiently different from the per se archetypes . . . plaintiff's claims will be dismissed.'" *Somerville v. W. Town Bank & Trust*, No. PJM 19-0490, 2019 WL 6131288, at *6 (D. Md. Nov. 19, 2019) (quoting *Ins. Brokerage*, 618 F.3d at 317). Here, Plaintiffs allege only a *per se* violation of Section 1 of the Sherman Act. Compl. ¶ 203. As such, failure adequately to allege conduct that fits within "the *per se* archetypes" requires dismissal.

Antitrust law draws a fundamental distinction between agreements among competitors and agreements between a supplier and a customer. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). The most fundamental "per se archetype" is that "[t]ypically only horizontal restraints—restraints imposed by agreement between competitors— qualify as unreasonable *per se*." *Am. Express*, 138 S. Ct. at 2283–84 (internal quotation and citation omitted).[6] In contrast, "[v]ertical price restraints are to be judged according to the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).

The Complaint does not and cannot allege that 3Ci competes with Securus or with GTL. Instead, Plaintiffs allege only that "Securus contracted with 3CI to develop, market, implement, and operate the PayNow and Text2Connect single call programs," Compl. ¶ 62, and that 3Ci entered into a service contract with GTL to "market and implement single calls on GTL's behalf," Compl. ¶ 16. Because 3Ci is not alleged to have (and did not) bid to provide ICS to governments or otherwise compete with Securus or GTL, any agreement involving 3Ci (whether between Securus and 3Ci or between 3Ci and GTL) is vertical, must be analyzed under the rule of reason, and is irrelevant in this case, which alleges only a *per se* violation of the antitrust laws.

Plaintiffs may try to avoid this result by claiming that 3Ci is the "hub" of a "hub-and-spoke conspiracy." A true hub-and-spoke conspiracy can be condemned as illegal *per se*, but a plaintiff must prove (and at the pleading stage must allege) an actual agreement among the spokes, not just

---

[6] The one exception is that some tying arrangements—the sale of one product conditioned on the customer's purchase of a second product—remain nominally illegal *per se*. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984) ("[C]ertain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'"), *abrogated in part by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). No tying arrangement is alleged in this case.

agreements between the spokes and the hub. Absent such an agreement among horizontal competitors, there is only a "rimless" hub-and-spoke conspiracy. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002) ("a wheel without a rim is not a single conspiracy") (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946))). And absent an allegation of the required horizontal agreement between GTL and Securus that satisfies *Twombly*, Plaintiffs are left with a complaint that alleges only vertical agreements between Securus and 3Ci and GTL and 3Ci that are not subject to the *per se* rule. *Id.* at 205 (applying rule of reason to rimless hub-and-spoke conspiracy allegation); *accord In re Musical Instruments*, 798 F.3d at 1192–93; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987).

### C. Plaintiffs Lack Antitrust Standing Because They Cannot Allege Direct Antitrust Injury.

The Court should dismiss Plaintiffs' antitrust claims for the additional reason that plaintiffs lack antitrust standing. A plaintiff bringing antitrust claims faces a heightened standing bar, and must do more than satisfy Article III's actual injury requirement. "[T]he concept of antitrust standing is narrower than constitutional standing." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 629 (D. Md. 2015) (quotation marks and citation omitted). To establish antitrust standing, the plaintiff must allege a "*direct* antitrust-type injury, not simply any injury that was caused by an antitrust violation." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006) (quoting *AGC*, 459 U.S. at 535) (emphasis added). Plaintiffs here have not alleged, and cannot allege, direct antitrust injury, because the decisions of government facilities to contract with Defendants Securus and GTL and negotiate the prices that Securus and GTL charge are independent, intervening causes of Plaintiffs' alleged injuries. *See AGC*, 459 U.S. at 530–34 (plaintiffs' injuries too indirect to establish standing because they were contingent on independent causes).

Courts in this Circuit and elsewhere have repeatedly recognized—across a variety of factual contexts—that to establish antitrust standing, an alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Warnock v. Nat'l Football League*, 356 F. Supp. 2d 535, 539 (W.D. Pa. 2005) (quotation marks and citation omitted); *see also FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2018 WL 4830087, at *6 (S.D.N.Y. Oct. 4, 2018) ("independent decision" made by non-defendant breaks "the chain of causation between defendants' actions and a plaintiff's injury."); *GSI Tech. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG, 2014 WL 1572358, at *4 (N.D. Cal. Apr. 18, 2014) (granting motion to dismiss on antitrust standing grounds based on third party's "intervening, independent decision to award [a] contract"); *R.I. Laborers' Health & Welfare Fund ex rel. Trustees v. Philip Morris, Inc.*, 99 F. Supp. 2d 174, 185 (D.R.I. 2000) ("It is clear that whatever injury the Fund may have suffered, it was contingent upon the actions and injury of others . . . . [T]he most that can be said about that injury is that it is indirect."); *Ficker v. Chesapeake & Potomac Tel. Co.*, 596 F. Supp. 900, 905–06 (D. Md. 1984) ("[T]he indirectness of the alleged harm and the presence of independent factors are fatal to the plaintiff's claim for damages.").

In this case, Plaintiffs are able to allege only indirect injury. The ICS market is not an ordinary consumer service market in which purchasers select among competing providers. As the Complaint concedes, inmates "cannot choose their ICS providers." Compl. ¶ 42. Instead, local and state governments that operate jails and prisons ("government facilities") alone decide "which ICS providers will provide ICS calls to inmates in each prison and jail." *Id.*

Securus, GTL, and other ICS providers submit bids for contracts with government facilities and allegedly compete with each other based on "lower ICS call rates and higher site commission

percentages." *Id*. ¶ 45.  A government facility then awards an exclusive contract to the provider of its choosing; that contract in turn "specif[ies] the rates that ICS providers must charge consumers for calls with inmates" and the "percentage of the revenue . . . collected by the ICS provider" to pay site commissions.  *Id.* ¶¶ 43–44.  It is therefore the government facilities, not the end users, who play a direct role in setting the prices that ICS providers charge.  Plaintiffs' alleged harm is contingent on the choices of government facilities regarding the ICS provider with whom they contract and the prices for services under those contracts.  Because Plaintiffs' alleged harm is contingent on the independent choices of third parties, it is too indirect to confer antitrust standing.

## II. PLAINTIFFS' RICO CLAIMS FAIL AS A MATTER OF LAW.

"Courts have expressed skepticism toward civil RICO claims" for good reason.  *Bendfeldt v. Window World, Inc.*, No. 5:17-C-39-GCM, 2017 WL 4274191, at *6 (W.D.N.C. Sept. 26, 2017) (quotation marks and citation omitted).  "The mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants[,]" which means that "courts should strive to flush out" defective RICO allegations "at an early stage of the litigation."  *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).  Because of the difficulties associated with alleging a viable RICO claim, "plaintiffs wielding RICO almost always miss the mark," resulting in dismissal at the pleading stage.  *Brookhaven Town Conservative Comm. v. Walsh*, No. 14-CV-6097 (JFB)(ARL), 2016 WL 1171583, at *5 (E.D.N.Y. Mar. 23, 2016).

Plaintiffs' RICO claims here should suffer the same fate.  *First*, to the extent their RICO claims are based on alleged misrepresentations to governments, Plaintiffs have not plausibly alleged proximate cause because their alleged injuries are too indirect.  *Second*, insofar as their RICO claims are predicated on alleged misrepresentations to consumers on websites or billing statements, Plaintiffs have failed to allege materiality or reliance and thus cannot establish but-for causation as RICO requires.  *Third*, Plaintiffs' claim for conspiracy to violate RICO fails to allege

the necessary "enterprise" because, as noted above, their allegations at most suggest nothing more than a "rimless wheel."

A. **Plaintiffs' Alleged Injuries Predicated on Misrepresentations to Governments Are Too Indirect To Establish Proximate Cause Under RICO.**

Plaintiffs' RICO claims based on misrepresentations to governments "during negotiations," in "bids and contracts," and in "monthly commission reports" (*e.g.*, Compl. ¶ 44) fail because their alleged injuries derive entirely from supposed injuries to someone else—the various governments that contracted directly with Securus and GTL—and thus are too indirect to establish proximate causation. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) (affirming 12(b)(6) dismissal and holding that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.").

The RICO statute provides, in relevant part, that it is unlawful "for any person employed by . . . any enterprise engaged in . . . [interstate commerce] to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity[,]" 18 U.S.C. § 1962(c), or to conspire to do the same, *id.* § 1962(d). RICO provides a private right of action to "[a]ny person injured in his business or property *by reason of* a violation" of RICO's substantive restrictions. 18 U.S.C. § 1964(c) (emphasis added); *see also Anza*, 547 U.S. at 453. The "by reason of" requirement in Section 1964(c) requires a RICO plaintiff to demonstrate that the predicate act was "not only the 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 6 (2010). This showing "requires some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC*, 559 U.S. at 6 (internal quotation marks and citation omitted). "[R]egardless of how foreseeable a plaintiff's claimed injury might be . . . the injury for which a plaintiff may seek damages under RICO cannot be *contingent on or derivative*

*of* harm suffered by a different party." *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493–95 (4th Cir. 2018) (emphasis added); *see also Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (affirming dismissal for lack of standing where plaintiffs suffered "indirect" injury and observing that "actual monetary loss" does not equate to "direct injury").

Courts routinely dismiss RICO claims premised on indirect injuries, particularly where government action (or inaction) is an intervening cause. *See, e.g.*, *Anza*, 547 U.S. at 458 (affirming dismissal); *Barr Labs. v. Quantum Pharmics, Inc.*, No. 90 Civ. 4406, 1994 WL 1743983, at *7 (E.D.N.Y. Feb. 7, 1994) ("In this case the injured party is the FDA and though [plaintiff] was injured because of the injury done to the FDA, its injuries are indirect and remote."). For example, in *Anza*, the plaintiff alleged that the defendants engaged in tax fraud, which allegedly allowed the defendants to offer lower prices and gain market share at the plaintiffs' expense. *See Anza*, 547 U.S. at 453–54, 457–58 ("Ideal's theory is that Joseph and Vincent Anza harmed it by defrauding New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers."). The direct victim of that conduct, however, was the State of New York, not the plaintiff. *See id.* at 458 ("It was the State that was being defrauded and the State that lost tax revenue as a result."). As the Supreme Court explained, "[t]he cause of [plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.*

Likewise here, Plaintiffs allege a set of actions that purportedly harmed them (GTL and Securus offering higher prices to plaintiffs, *e.g.*, Compl. ¶ 125) that is distinct from the alleged RICO violations (allegedly defrauding the contracting governments in bid documents, contracts, and commission reports). *See, e.g.*, Compl. ¶¶ 138–158 (alleging purported misrepresentations to "contracting governments"). According to Plaintiffs, had Defendants disclosed in such documents

the "actual transaction fees" for single calls, "the contracting governments would have required a reduction of those single call prices." *Id.* ¶ 173. Specifically, the Complaint alleges:

> Had Defendants disclosed the value of the transaction fees to contracting governments and consumers, Plaintiffs and members of the Class and Subclasses would have paid substantially less money for 3CI-operated single calls. Informed of the actual value of the transaction fees, a sufficient number of contracting governments would have insisted on lower-priced single call programs when selecting bids for, and negotiating the terms of, ICS contracts that the $9.99 and $14.99 prices charged nationwide would have been revised substantially lower.

*Id.* ¶ 172.

Plaintiffs can only speculate about such a hypothesis, however, because they were never a party to the communications and negotiations that led to the various contracts between the contracting governments and Defendants. *See id.* ¶ 112 (conceding plaintiffs had no control over the ICS provider that carried their calls or the prices paid). Consequently, the injuries that Plaintiffs allegedly suffered, even if foreseeable, can be nothing other than "contingent on or derivative of" harm from misrepresentations Defendants allegedly made to the third-party contracting governments—harm that is legally insufficient to state a claim under RICO. *See Slay's Restoration, LLC*, 884 F.3d at 494 ("[R]egardless of how foreseeable a plaintiff's claimed injury might be or even what motive underlaid the conduct that caused the harm, the injury for which a plaintiff may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party."). Stated otherwise, the fact that Plaintiffs' claim turns on a prediction about how non-party governments would or may have behaved had they—the non-parties—been told other or different facts demonstrates that Plaintiffs themselves are not the ones directly impacted by the challenged statements. In this regard, Plaintiffs' RICO claims closely resemble those dismissed by this Court in *Rojas v. Delta Airlines*, in which plaintiff's injury was premised on the theory that a government entity would have acted differently "had it known the truth":

> [T]o the extent that Plaintiffs attempt to rely on misrepresentations that Defendants allegedly made to [government representatives], there is no 'sufficiently direct relationship' between these statements and the harm to Plaintiffs . . . . '[The] theory of liability rests on the independent actions of third-parties' by assuming that the . . . government would have taken those steps had it known the truth, so the causal link is too attenuated for those alleged misrepresentations to serve as the basis for Plaintiffs' RICO claim.

425 F. Supp. 3d at 542 (dismissing RICO claim) (quotations omitted). The same reasoning requires dismissal of Plaintiffs' RICO claims. Because the cost of the single-call products is the result of the independent action of a third party not before the court, *i.e.*, a price agreed upon by the contracting governments, Plaintiffs simply cannot satisfy the proximate cause standard in 18 U.S.C. § 1964(c). Nor can Plaintiffs salvage their claims by suggesting that the contracting governments would have taken different actions had they "known the truth" of the alleged misrepresentations. *Rojas*, 425 F. Supp. 3d at 542. Accordingly, to the extent Plaintiffs' RICO claims are based on alleged misrepresentations to governments, those claims should be dismissed with prejudice.

**B.** **Plaintiffs' RICO Claims Predicated on Misrepresentations Directed to Consumers on Websites and Billing Charges Fail Because They Could Not Constitute Material Misrepresentations, and Because Nobody Relied on Them.**

Besides alleging RICO claims based on alleged misstatements to governments, Plaintiffs assert claims predicated on misrepresentations to consumers "through websites" and "through billing charges." *E.g.*, Compl. ¶ 244. Even assuming these communications are factual misrepresentations, these claims fail as a matter of law because the communications are not misrepresentations of *material* facts. The materiality requirement of common-law fraud "is an incorporated element of the mail fraud, wire fraud, and bank fraud statutes." *Donaldson v. Severn Sav. Bank, F.S.B.*, No. CV JKB-15-901, 2015 WL 7294362, at *3 (D. Md. Nov. 18, 2015) (citation omitted). "Materiality is defined as having a natural tendency to influence, or is capable of

influencing, the decision of the decisionmaking body to which it was addressed." *Id.* (internal quotation marks and citation omitted). The alleged communications to consumers are not material misrepresentations, because by Plaintiffs' own admission, they are not addressed to any pertinent "decisionmaking body": purchasers did not choose, and had no ability to choose, the ICS provider. Whatever communications Defendants made to consumers would not have any effect on the government's contracting decisions, which necessarily would have occurred prior to any communications to consumers. *Lewis v. Microsoft Corp.*, 410 F. Supp. 2d 432, 439 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007) (dismissing Civil RICO claim predicated on mail fraud where alleged misrepresentation was "not material, and therefore not fraudulent"). Because Plaintiffs have failed to allege the element of materiality required for mail and wire fraud, the predicate acts for their Civil RICO claims, those claims must be dismissed.

Claims based on alleged misrepresentations to consumers fail for the additional reason that Plaintiffs allege no facts suggesting that anyone relied on those allegedly fraudulent statements. They are therefore incapable of establishing but-for causation, which is a separate but equally necessary element of any RICO claim. *See Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) ("Thus, the RICO predicate acts must not only be a 'but for' cause of a plaintiff's injury, but the proximate cause of that injury as well.") (citation omitted). The Supreme Court decision in *Bridge v. Phoenix Bond & Indem. Co.*, held that allegations of first-party reliance are unnecessary to state a claim based on mail or wire fraud, but made clear that "the plaintiff will not be able to establish even but-for causation if *no one* relied on the misrepresentation." 553 U.S. 639, 658–59 (2008) (emphasis added). District courts following *Bridge* have dismissed cases for lack of causation where the plaintiffs failed to allege at least reliance by a third party. *See In re Actimmune Marketing Litig.*, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009) (dismissing claims because

"Plaintiffs have not put forth any specific allegations that *anyone* . . . relied on defendants' purportedly fraudulent misrepresentations to cause the injury." (citing *Bridge*, 553 U.S. at 658–59) (emphasis in original)); *see also G&G TIC, LLC v. Alabama Controls, Inc.*, No. 4:07-CV-162 (CDL), 2008 WL 4457876, at *4 (M.D. Ga. Sept. 29, 2008) (plaintiff must allege that "someone relied upon a misrepresentation made by the defendants and that the reliance directly caused harm to the plaintiff." (citing *Bridge*, 553 U.S. at 658–59)).

Plaintiffs here do not plausibly allege facts suggesting that *anyone*—either consumers or the government—relied on the alleged statements by Defendants on their websites or in billing charges. As such, Plaintiffs' RICO claims to the extent they are predicated on alleged fraudulent statements on Defendants' websites and in billing charges fail for lack of but-for causation.

**C.      Plaintiffs' Claims for Conspiracy To Violate RICO Fail Because They Have Not Alleged a Proper RICO Enterprise.**

As noted above, Plaintiffs have failed to allege facts connecting the "spokes" of their hub-and-spoke conspiracy. *See supra* at I.B. Not only is this pleading failure fatal to their antitrust claims, but it dooms the RICO conspiracy claims as well because absent such allegations Plaintiffs cannot establish a RICO enterprise. *See, e.g.*, *Donaldson v. Primary Residential Mortg., Inc.*, No. CV ELH-19-1175, 2020 WL 3184089, at *25-26 (D. Md. June 12, 2020) (finding plaintiffs failed to plausibly allege a RICO enterprise because plaintiffs do not adequately allege the "rim" of a "hub and spoke" structure); *Kadow v. First Fed. Bank*, No. 8:19-CV-00566-PWG, 2020 WL 5230560, at *10 (D. Md. Sept. 2, 2020) (Grimm, J.) (finding a "'rimless' hub and spoke [RICO] conspiracy fail[s]" (citing *Donaldson*, 2020 WL 3184089 at *26; *Ins. Brokerage*, 618 F.3d at 374)); *Rojas*, 425 F. Supp. 3d at 543 (concluding "[i]ndeed, Section 1's agreement element is 'a close analogue' of the enterprise element of a RICO claim." (citing *Ins. Brokerage*, 618 F.3d at 370)). For example, in *In re Insurance Brokerage Antitrust Litigation*, the Third Circuit held that

"[i]n the absence of a plausible 'rim' or 'wheel' connecting the alleged [] 'spokes,' . . . [plaintiffs] failed to plead 'broker-centered enterprises'. . . [and b]ecause plaintiffs' factual allegations do not plausibly imply anything more than parallel conduct by the insurers, they cannot support the inference that the insurers 'associated together for a common purpose of engaging in a course of conduct.'" 618 F.3d at 374 (internal citations omitted).

Here, both counts of RICO conspiracy under 18 U.S.C. § 1962(d) allege merely parallel conduct of two entities entering into contracts with 3Ci to provide single-call services to contracting governments. *See supra* at I.B; *Dickson*, 309 F.3d at 203 ("[a] rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." (citation omitted)). Because Plaintiffs do not adequately allege a rim connecting the spokes of the alleged conspiracy, they cannot establish an actionable RICO enterprise for their claims arising under 18 U.S.C. § 1962(d). *See supra* at I.B; *see also Donaldson*, 2020 WL 3184089, at *25–26; *Kadow*, 2020 WL 5230560 at *10.

## III. PLAINTIFFS FAIL TO STATE A CLAIM AS TO DEFENDANT 3CI.

Defendant 3Ci joins in all of the foregoing arguments and also seeks dismissal of the claims asserted against it on the following additional grounds.

### A. Plaintiffs Do Not Adequately Allege 3Ci's Involvement in an Antitrust Conspiracy.

Even if Plaintiffs had plausibly alleged a price-fixing conspiracy (which all Defendants dispute), the antitrust claim (Count I) would still fail as to 3Ci, because Plaintiffs have not adequately pleaded 3Ci's participation in the alleged scheme. To plausibly allege an antitrust claim, "the complaint must contain sufficient factual allegations regarding *each* defendant." *Akers v. Maryland State Educ. Ass'n*, 376 F. Supp. 3d 563, 573 (D. Md. 2019) (emphasis added); *see*

*also SD3, LLC*, 801 F.3d at 422 (holding that if a complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed").

As to 3Ci, Plaintiffs offer no more than the type of vague, generalized allegations that the Fourth Circuit has rejected. These deficiencies are especially striking given that Plaintiffs had years to develop their case against 3Ci—and, by their own admission, hired a private investigator to do so, including by interviewing former 3Ci employees—yet failed uncover any facts sufficient to support an antitrust claim against 3Ci. Instead, Plaintiffs resort to pure speculation from a "former 3CI executive" who Plaintiffs admit "was not directly involved in 3CI's relationship with Securus or GTL . . . ." Compl. ¶ 78. Lacking any firsthand knowledge, this former executive simply imagines that a conspiracy must have existed because "he could think of no plausible explanation . . . for Securus and GTL to be identically pricing their single call programs . . . ." *Id.* That is precisely what a plaintiff cannot do—assuming conspiracy on the basis of parallel conduct. *Twombly*, 550 U.S. at 554–57, 564. With these allegations, Plaintiffs concede they have no way to allege, consistent with *Twombly*'s plausibility requirement, that 3Ci participated in any sort of price-fixing conspiracy.

Plaintiffs do not allege 3Ci competes with Securus or GTL, or that 3Ci provides the ICS products as to which prices allegedly were fixed. Instead, according to the Complaint, 3Ci merely "markets and implements" the single call programs offered by Securus and GTL. Compl. ¶¶ 11, 16, 62–66. Nothing in the Complaint plausibly suggests 3Ci had any ability to determine or even influence the prices that Securus and GTL charged for their services. And critically, Plaintiffs do not claim 3Ci was present for any of the "in-person dinners," meetings, or other communications through which the conspiracy allegedly was effected. *See, e.g.*, *id.* ¶¶ 15, 77.

The handful of allegations purporting to connect 3Ci to the alleged price-fixing scheme lack the factual detail necessary to meet the pleading standard under *Twombly*. Plaintiffs contend that "in early 2013," at the direction of Securus, 3Ci approached GTL with an offer that GTL rejected. Compl. ¶¶ 15, 76. Some unspecified time later, "Securus and 3CI persuaded GTL to forego price competition over single calls and, instead, contract with 3CI to provide a single call program that was indistinguishable from, and charged the exact same prices as, Securus's PayNow and Text2Connect programs." *Id.* ¶ 72; *see also id.* ¶ 76 ("Securus and 3CI ultimately persuaded GTL to contract with 3CI to provide a single call program that was indistinguishable in every material way, including price, from Securus's single call program . . . Specifically, Securus and 3CI persuaded GTL to contract with 3CI so that GTL and Securus could both charge the exact same inflated price for single calls and pay the exact same low site commission from those calls.").

These allegations are insufficient. The Fourth Circuit has held that "[u]nadorned conclusory allegations like these are akin to no allegations at all." *SD3, LLC*, 801 F.3d at 423 (internal quotations marks and citation omitted). To survive dismissal, "the complaint must specify how these defendants were involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants." *Id.* at 422 (internal quotation marks, alterations, and citation omitted). In particular, as to *each* Defendant, the Complaint must "identify the particular time, place, and manner in which the antitrust conspiracy initially formed." *Rojas*, 425 F. Supp. 3d at 543 (internal quotations and alterations omitted). A "conclusory allegation of an agreement at some unidentified point…does not supply facts adequate to show illegality." *SD3, LLC*, 801 F.3d at 424 (quotation marks and citation omitted). Plaintiffs' allegations against 3Ci do not include any of the facts necessary to meet the requisite level of specificity. *Rojas*, 425 F. Supp. 3d at 543; *SD3, LLC*, 801 F.3d at 422.

The closest Plaintiffs come to linking 3Ci to the purported conspiracy is their assertion that 3Ci facilitated the price-fixing scheme by selling its patent to Securus and then licensing it back, supposedly on conditions that allowed Securus to control the pricing terms of 3Ci's deal with GTL. Compl. ¶¶ 14, 73–75. That allegation, however, lacks any specificity as to 3Ci's supposed involvement in the alleged scheme. In any event, based upon facts of which the Court can and should take judicial notice, the allegation cannot stand, even at the motion-to-dismiss stage. The licensing agreement Plaintiffs reference in their Complaint, attached hereto as Exhibit A, shows that Securus had no right to dictate or disapprove of the pricing terms of any agreement 3Ci might reach with GTL (or anyone else). *See* Ex. A § 2.1(a) ("For the avoidance of doubt . . . the Parties agree that 3Ci may enter into agreements with any third parties selected by 3Ci for the purpose of providing such third parties TextCollect Services, Instant Pay Services and Additional Services, including third parties who may or may not be in competition with Securus in the Corrections Industry."). Plaintiffs' allegations simply cannot be squared with the documents they rely upon and incorporate by reference, and the Court should not "accept allegations that . . . 'contradict matters properly subject to judicial notice or by exhibit.'" *Peete-Bey*, 131 F. Supp. 3d at 433 (D. Md. 2015) (quoting *Massey*, 759 F.3d at 353). This claim should be dismissed as to 3Ci with prejudice.

## B. Plaintiffs Do Not Adequately Allege 3Ci Committed a RICO Predicate Act.

In addition to the reasons explained above why Plaintiffs' RICO claims fail as to all Defendants, the RICO claims directed at 3Ci (Counts III, V, and VII)[7] should be dismissed as to 3Ci for an additional reason: Plaintiffs do not adequately plead that 3Ci committed the predicate

---

[7] Plaintiffs caption Count VII as "Conspiracy To Violate RICO" under § 1962(d). Except that Count VII is directed against all Defendants, Plaintiffs' allegations here are substantively indistinguishable from Counts III and V and should be dismissed as to 3Ci for the same reasons.

acts of mail or wire fraud. Plaintiffs may not rely on allegations of misrepresentations by other Defendants to proceed with civil RICO claims against 3Ci; they must identify "each individual defendant's participation in the alleged fraud." *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *4 (D. Md. Mar. 17, 2015) (quotation marks and citation omitted).

Of the six categories of purported misrepresentations Plaintiffs allege as RICO predicate acts, three involve statements to government facilities and include no allegation whatsoever that 3Ci had any participation or involvement. Compl. ¶¶ 142–58, 244, 293, 337. Those categories of purported statements obviously could not support a claim against 3Ci. *Kimberlin*, 2015 WL 1242763, at *4. As to the three remaining categories of purported misrepresentations—(1) the maintenance or "public websites"; (2) "billing charges to consumer credit cards"; and (3) "billing charges made to consumers' mobile phone accounts"—Plaintiffs do allege some involvement on 3Ci's part. Compl. ¶¶ 159–69, 244, 293, 337. But these categories of statements are alleged to have been made to consumers, not the government facilities that alone contracted with Securus and GTL and determined the prices that would be charged for the services at issue in this lawsuit.[8] *See supra* Part II.B. (government facilities, not Plaintiffs, chose ICS provider for particular jails or prisons and negotiated prices that would be charged for collect calls).

For the reasons stated above, the purported misrepresentations directed at consumers, rather than the entities that contracted for the services at issue, fail to support RICO claims because those alleged statements could not have constituted material misrepresentations, nor could they have been relied upon by anyone. *See supra* Section II.B.

---

[8] Perhaps in recognition of this problem, Plaintiffs state in a conclusory fashion that the websites were "directed to" and "accessible to" the government facilities. Compl. ¶¶ 142, 159. But there are no allegations that any government entity ever accessed these websites, or had any reason to.

# **CONCLUSION**

Plaintiffs have failed to meet their burden of plausibly alleging violations of Section 1 of

the Sherman Act, 15 U.S.C. § 1, and RICO, 18 U.S.C. § 1962(c)–(d). Accordingly, and for all of

the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Dismiss

and dismiss Plaintiffs' Complaint with prejudice.

Dated: October 30, 2020

Respectfully submitted,

/s/ Jason R. Scherr
Jason R. Scherr, Bar No. 25633
MORGAN LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.6000
F: 202.373.6001
jr.scherr@morganlewis.com

Elizabeth Herrington*
MORGAN LEWIS & BOCKIUS, LLP
77 W. Wacker Drive
Chicago, IL 60601
T: 312.324.1000
F: 312.324.1001
beth.herrington@morganlewis.com

R. Brendan Fee*
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5000
F: 215.963.5001
brendan.fee@morganlewis.com

COUNSEL FOR DEFENDANT SECURUS
TECHNOLOGIES, LLC

/s/  Jonathan I. Gleklen
Jonathan I. Gleklen, Bar No. 21350
Katherine Clemons*
Monique Boyce*
ARNOLD AND PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
T: (202) 942-5000
F: (202) 942-5999
jonathan.gleklen@arnoldporter.com
katherine.clemmons@arnoldporter.com
monique.boyce@arnoldporter.com
(Signed by Jason R. Scherr with permission of
Jonathan I. Gleklen)

Charles Scott Lent*
Javier Ortega*
ARNOLD AND PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
T: (212) 836-8000
F: (212) 836-8689
scott.lent@arnoldporter.com
javier.ortega@arnoldporter.com

COUNSEL FOR DEFENDANT GLOBAL
TEL*LINK CORP.

/s/ Jonathan Pitt
WILLIAMS & CONNOLLY LLP
Jonathan B. Pitt, Bar No. 16086
Colette T. Connor*
725 Twelfth Street, NW
Washington, DC 20005
T: 202.434.5000
F: 202.434.5029
jpitt@wc.com
cconnor@wc.com
(Signed by Jason R. Scherr with permission of
Jonathan Pitt)

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Jay B. Shapiro*
150 West Flagler Street, Suite 2200
Miami, FL 33130
T: 305.789.3229
F: 305.789.2664
jshapiro@stearnsweaver.com

COUNSEL FOR DEFENDANT 3CINTERACTIVE
CORP.


* admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on October 30, 2020, Defendants' Motion to Dismiss, Defendants' Memorandum in Support of Motion to Dismiss, and a proposed order were served via the Court's CM/ECF system on all counsel of record in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland.

Exhibit A to the Memorandum in Support of Motion to Dismiss, which has been filed under seal, has been served upon all parties by electronic mail, by agreement to hold on a "highly confidential" basis pending further order of this Court.

/s/ Jason R. Scherr
Jason R. Scherr