**UNITED STATES DISTRICT COURT**

**DISTRICT OF MARYLAND**

ASHLEY ALBERT, et al.,

        Plaintiffs,

    v.

GLOBAL TEL*LINK CORP., et al.,

        Defendants.

Civil Action No. 8:20-cv-01936

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 1

I.  IN THE ABSENCE OF COLLUSION, ICS PROVIDERS COMPETE
    ON PRICE. ............................................................................................................ 1

II.  SECURUS AND GTL DOMINATE THE MARKET FOR ICS CALLS. ............................. 2

III.  SECURUS AND GTL EXECUTIVES REGULARLY AND SECRETLY
     COMMUNICATED TO ELIMINATE COMPETITION. ........................................... 3

IV.  SECURUS LAUNCHED SINGLE CALLS THAT CHARGED HIGHER
     PRICES AND PAID LOWER SITE COMMISSIONS THAN PER-MINUTE
     CALLS. ................................................................................................................... 3

V.  3CI MARKETED AND IMPLEMENTED SINGLE CALLS FOR,
    AND WAS TOTALLY DEPENDENT ON, SECURUS. ........................................... 4

VI.  GTL DEVELOPED A RIVAL SINGLE CALL PRODUCT TO COMPETE
     WITH SECURUS. .................................................................................................... 5

VII. SECURUS AND GTL AGREED TO FIX SINGLE CALL PRICES. ................................... 5

VIII. SECURUS AND GTL CHARGED IDENTICAL SINGLE CALL PRICES. ...................... 7

IX.  DEFENDANTS MADE MISREPRESENTATIONS AND OMISSIONS TO
     LOCAL GOVERNMENTS AND CONSUMERS ABOUT THE COSTS OF
     SINGLE CALLS. ..................................................................................................... 7

X.  ABSENT DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS,
    SINGLE CALL PRICES WOULD HAVE BEEN LOWER. ................................... 9

LEGAL STANDARDS ............................................................................................... 10

ARGUMENT ............................................................................................................... 10

I.  PLAINTIFFS' ALLEGATIONS STATE A PLAUSIBLE CLAIM UNDER THE
    SHERMAN ACT. ................................................................................................... 10

    A.  Plaintiffs Plausibly Allege A Horizontal Agreement to Fix the Prices of
        Single Calls. ..................................................................................................... 11

        1.  Plaintiffs plausibly plead direct evidence of an agreement. ......................... 11

        a.   Plaintiffs' allegations include admissions by executives at both GTL and 3CI that Defendants conspired to set prices. ................................. 12

        b.   Defendants' efforts to undermine these admissions fail. .................... 13

    2.  Plaintiffs also plausibly allege an agreement through circumstantial evidence. ........................................................................................... 16

        a.   The Complaint includes extensive allegations of parallel conduct. .................... 17

        b.   Plaintiffs have alleged multiple compelling "plus factors" supporting the inference of a conspiracy. ............................................................. 18

        c.   Defendants' attacks on Plaintiffs' "plus factors" have been widely rejected. ...................................................................................... 23

  B.   The *Per Se* Rule Applies to 3CI's Role in the Conspiracy. .......................................... 25

  C.   As Direct Purchasers Who Paid Overcharges Directly to Defendants, Plaintiffs Were Directly Injured by the Conspiracy. ..................................... 26

II.   PLAINTIFFS' RICO CLAIMS ARE SUFFICIENTLY PLED. .......................................... 29

  A.   Plaintiffs' Injuries Were Directly Caused by Defendants' Misrepresentations and Omissions to State and Local Governments. .......................... 30

    1.  Plaintiffs' injuries were not "contingent on" or "derivative of" another party's harms. ..................................................................................... 31

    2.  Plaintiffs' injuries are not speculative. ...................................................... 35

  B.   Plaintiffs' RICO Claims Predicated on Misrepresentations Directed to Consumers Are Adequately Pled. .................................................................. 37

    1.  Plaintiffs need not plead materiality as to each individual predicate act. .................. 38

    2.  Plaintiffs need not plead reliance as to each individual predicate act. ...................... 40

    3.  The misrepresentations to consumers were material and relied upon. ...................... 42

  C.   Plaintiffs' Claims for Conspiracy to Violate RICO Properly Allege a RICO Enterprise. ....................................................................................... 43

III.  PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS AGAINST 3CI. ...................................... 46

  A.   The Complaint Adequately Alleges 3CI's Participation in the Antitrust Conspiracy. ............................................................................................. 46

B.   The Complaint Properly Alleges that 3CI Conducted Predicate Acts
Incident to the RICO Scheme. ........................................................................ 49

CONCLUSION................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ........................................................................11, 24

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ......................................................................................31, 33

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) .......................................................................................29

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ...............................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................10, 13, 24

*Bias v. Wells Fargo & Co.*,
  312 F.R.D. 528 (N.D. Cal. 2015) ........................................................................43

*Biggs v. Eaglewood Mortg., LLC*,
  353 F. App'x 864 (4th Cir. 2009) ...................................................................39, 40

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ......................................................................................27, 28

*Bowe v. Pub. Storage*,
  318 F.R.D. 160 (S.D. Fla. 2015) .........................................................................43

*Boyle v. United States*,
  556 U.S. 938 (2009) ............................................................................................44

*Bridge v. Phx. Bond & Indem. Co.*,
  553 U.S. 639 (2008) ..................................................................................... *passim*

*Carlin v. DairyAmerica, Inc.*,
  No. 1:09-cv-0430, 2016 WL 232315 (E.D. Cal. Jan. 19, 2016) ............................33

*Catholic Health Care W. v. US Foodserv., Inc.*,
  729 F.3d 108 (2d Cir. 2013) ...............................................................................43

*Chambers v. King Buick GMC, LLC*,
  43 F. Supp. 3d 575 (D. Md. 2014) .......................................................................38

iv

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ........................................................................43

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) ........................................................................23

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ...............................................................12

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ..........................................................................26

*Dolan v. Jetblue Airways Corp.*,
   385 F. Supp. 3d 1338 (S.D. Fla. 2019) ...........................................................40

*Donaldson v. Primary Residential Mortg., Inc.*,
   No. 19-cv-1175, 2020 WL 3184089 (D. Md. June 12, 2020)..........................45

*Donaldson v. Severn Savings Bank, F.S.B.*,
   No. 15-cv-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015)............................39

*Ekstrom v. Cong. Bank*,
   No. 20-cv-1501, 2020 WL 6565251 (D. Md. Nov. 6, 2020).............38, 42, 44

*Firestone v. Galbreath*,
   976 F.2d 279 (6th Cir. 1992) ..........................................................................34

*In re Flonase Antitrust Litig.*,
   798 F. Supp. 2d 619 (E.D. Pa. 2011) ..............................................................29

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   No. 16-cv-5263, 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018)..........................28

*Gerner v. Cty. of Chesterfield*,
   674 F.3d 264 (4th Cir. 2012) .....................................................................16, 19

*Harmoni Int'l Spice, Inc. v. Hume*,
   914 F.3d 648 (9th Cir. 2019) .....................................................................33, 35

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010).............................................................................................34

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992).....................................................................................30, 31

*Houck v. Substitute Tr. Servs., Inc.*,
   791 F.3d 473 (4th Cir. 2015) ..........................................................................10

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..................................................................................45

*In re Interior Molded Doors Antitrust Litig.*,
  No. 3:18- cv-00718, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019) .............................. *passim*

*Jien v. Perdue Farms, Inc.*,
  No. 1:19-cv-2521, 2020 WL 5544183 (D. Md. Sept. 16, 2020)....................................*passim*

*Kadow v. First Fed. Bank*,
  No. 8:19-cv-00566-PWG, 2020 WL 5230560 (D. Md. Sept. 2, 2020) .................................45

*Kravco Co. v. Valley Forge Ctr. Assoc.*,
  No. 91-cv-4932, 1992 U.S. Dist. LEXIS 375 (E.D. Pa. Jan. 13, 1992)..................................46

*Lewis v. Microsoft Corp.*,
  410 F. Supp. 2d 432 (E.D.N.C. 2006)........................................................................39

*Nemet v. Volkswagen Grp. of Am., Inc.*,
  349 F. Supp. 3d 881 (N.D. Cal. 2018) .....................................................................33

*Novell, Inc. v. Microsoft Corp.*,
  505 F.3d 302 (4th Cir. 2007) ...........................................................................27, 28

*O'Shea v. Harding*,
  No. 4:16-cv-15, 2017 WL 1347044 (N.D. Ind. Feb. 10, 2017) ................................35

*Pereira v. United States*,
  347 U.S. 1 (1954)..........................................................................................39

*Proctor v. Metro. Money Store Corp*,
  645 F. Supp. 2d 464 (D. Md. 2009) ........................................................................31

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012).................................................................................49

*Robertson v. Sea Pines Real Estate Cos.*,
  679 F.3d 278 (4th Cir. 2012) ..................................................................11, 14, 16

*Robinson v. Fountainhead Title Grp. Corp.*,
  252 F.R.D. 275 (D. Md. 2008).............................................................................41

*Robinson v. Fountainhead Title Grp. Corp.*,
  257 F.R.D. 92 (D. Md. 2009)............................................................................41, 43

*Robinson v. Fountainhead Title Grp. Corp.*,
  No. 03-cv-3106, 2009 WL 539882 (D. Md. Mar. 3, 2009) .....................................41

*Rojas v. Delta Airlines, Inc.*,
  425 F. Supp. 3d 524 (D. Md. 2019) ........................................................36, 37, 46

*Saint Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*,
  967 F.3d 295 (3d Cir. 2020)..................................................................................33

*Schmuck v. United States*,
  489 U.S. 705 (1989)..............................................................................................38

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ..................................................................... *passim*

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985)..............................................................................................31

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
  884 F.3d 489 (4th Cir. 2018)................................................................................34

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
  No. 6:12-cv-739, 2015 WL 11121531 (E.D. Tex. Mar. 13, 2015)........................46

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)...........................................................................22, 24

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006).................................................................................................11

*In re Titanium Dioxide Antitrust Litig.*,
  959 F. Supp. 2d 799 (D. Md. 2013) ............................................................ *passim*

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008).................................................................................15

*Tondas v. Amateur Hockey Ass'n*,
  438 F. Supp. 310 (W.D.N.Y. 1977) ......................................................................46

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*,
  156 F.3d 535 (4th Cir. 1998) .........................................................................47, 48

*Warnock v. National Football League*,
  356 F. Supp. 2d 535 (W.D. Pa. 2005)..................................................................28

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011)................................................................................24

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  752 F.3d 728 (8th Cir. 2014) ...............................................................................47

*Walters v. McMahen*,
　　684 F.3d 435 (4th Cir. 2012) ..............................................................42

*Williamson Oil Co. v. Philip Morris USA*,
　　346 F.3d 1287 (11th Cir. 2003) ...........................................................24

*WW, LLC v. Coffee Beanery, Ltd.*,
　　No. 05-cv-3360, 2012 WL 3728184 (D. Md. Aug. 27, 2012) ................44

*In re Zetia Ezetimibe Antitrust Litig.*,
　　No. 2:18-md-2836, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019) ............46, 47, 48

*Zito v. Leasecomm Corp.*,
　　No. 02-cv-8074, 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004) ............40

**Statutes**

15 U.S.C. § 15 ..............................................................................................26

18 U.S.C. § 1961(4) .....................................................................................44

18 U.S.C. § 1964(c) .....................................................................................30

**Rules**

Fed. R. Civ. P. 15(a)(2) ...............................................................................50

**Other Authorities**

Richard A. Posner, *Antitrust Law* 90 (2d ed. 2001) ....................................23

William E. Kovacic et. al., *Plus Factors and Agreement in Antitrust Law*,
　　110 Mich. L. Rev. 393 (2011) .............................................................23

## INTRODUCTION

Plaintiffs have filed a blockbuster Complaint with far more detail than typically seen pre-discovery in a conspiracy case. The Complaint painstakingly reveals how two ostensibly competing industry giants, Securus and GTL, were secretly conspiring with each other and 3CI not only to charge uniform and inflated prices but also to jointly present a series of lies to consumers and governments in order to conceal an audacious kickback scheme from which they both reaped illegal profits. These allegations are supported by shocking admissions from numerous former employees of Defendants. Plaintiffs and the putative class are the direct victims of the conspiracy. Defendants' scheme was not only *intended* to reap ill-gotten profits from Plaintiffs by inflating the prices they paid Defendants, it *succeeded* in doing so for years. Accordingly, the Complaint implicates paradigmatic violations of both the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Defendants' brief incorrectly argues that the Complaint is devoid of specifics, fails to allege elements of its claims, and implicates only indirect injuries. By willfully ignoring the allegations that undermine each of their arguments, Defendants tilt against windmills, addressing a complaint they wish had been filed instead of the detailed and carefully-pled one they must actually face.

## STATEMENT OF FACTS

The Complaint alleges that Defendants conspired to fix inflated prices for single calls between inmates and their family members, friends, attorneys, and others, while also repeatedly lying to these same customers, as well as state and local governments, about the costs and profits they reaped from those single calls.

## I.      IN THE ABSENCE OF COLLUSION, ICS PROVIDERS COMPETE ON PRICE.

To place phone calls from correctional facilities, inmates must use special inmate calling

services ("ICS"). ¶ 4.[1] Inmates and call recipients cannot choose their ICS provider. ¶ 42. Instead, each local and state government that operates correctional facilities enters into an exclusive contract with a single ICS provider to provide ICS for those facilities. ¶ 43.

ICS contracts identify the rates to be charged to consumers for ICS calls. ¶ 44. The contracts also promise to provide contracting governments a percentage of the revenue—called a "site commission"—that is earned from each ICS call. *Id.* Site commissions average about 50%. *Id.*

When the ICS market is competitive, ICS providers compete with each other for contracts with local and state governments by submitting bids. ¶ 45. In competitive circumstances, ICS providers attempt to secure those contracts by making bids that offer *lower* ICS call rates for customers and *higher* site commission percentages for governments. *Id.*

## II.   SECURUS AND GTL DOMINATE THE MARKET FOR ICS CALLS.

For the past decade, Securus and GTL have dominated the market for the provision of ICS. ¶ 51. Those two companies provide approximately 80% of all the ICS calls in the United States. *Id.* An analyst from Moody's characterized the ICS market as "largely duopolistic." ¶ 108.

It is exceptionally difficult for new ICS providers to emerge and compete with Securus and GTL. ¶ 109. The high barriers to entry in the ICS industry include the multimillion-dollar cost of building a viable and controllable telecommunications system as well as securing contracts with governments that often require a substantial outlay of upfront capital. *Id.*

Securus and GTL were able to exploit their dominance to inflate prices because, after ICS contracts have been awarded, the consumer market for ICS calls is characterized by inelastic demand. ¶ 111. An increase in the price of ICS calls causes no decrease, or only a minor decrease,

---

[1] Throughout this brief, paragraph numbers refer to paragraphs in the Complaint.

in consumer demand, because consumers must often accept these important calls from incarcerated loved ones and, further, are unable to select their own, more affordable ICS providers. *Id.*

## III.   SECURUS AND GTL EXECUTIVES REGULARLY AND SECRETLY COMMUNICATED TO ELIMINATE COMPETITION.

A former manager of GTL, who was employed at the company from 2011 through 2016, stated that although "Securus and GTL publicly identified themselves as fierce competitors in the ICS industry," in reality, "behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success." ¶ 77. According to the former GTL manager, then CEO of GTL, Brian Oliver, boasted that he and GTL's President, Jeff Haidinger, met regularly with then CEO of Securus, Richard Smith, for drinks and dinners and that the three executives "shared strategic information" and discussed "what prices should be charged for ICS calls" during those private meetings. *Id.*

Securus and GTL employees also collaborated at trade association conferences, such as those hosted by the American Jail Association, to facilitate both companies' success. ¶ 115. A former GTL manager explained that, at these conferences, employees of GTL and Securus "regularly shared with one another considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments." *Id.*

## IV.   SECURUS LAUNCHED SINGLE CALLS THAT CHARGED HIGHER PRICES AND PAID LOWER SITE COMMISSIONS THAN PER-MINUTE CALLS.

The majority of collect calls made by inmates are charged at a per-minute rate. ¶ 48. In advance of receiving such calls, the recipient establishes an account with the ICS provider using a credit card, thus permitting the recipient to receive multiple calls from the inmate over time. *Id.* For each collect call made through this account, the recipient's credit card is charged the per-

3

minute rate specified in the ICS contract between the relevant government entity and the ICS provider. *Id.* In 2017, the average cost of a collect call from a state prison in the United States that charged a per-minute rate and lasted a total of 15 minutes was approximately $1.87. ¶ 50.

In 2010, Securus launched a new kind of collect call option for inmates: the "single call." ¶ 9. To accept a single call, the call recipient did not need to establish an account and did not pay a per-minute rate. *Id.* Instead, Securus charged those call recipients a steep flat price to accept a single call, regardless of the duration of the call. *Id.*

Specifically, Securus offered two single call products that effectively charged recipients at least one dollar per minute: PayNow, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Text2Connect, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes. *Id.* In 2010, Securus began inserting the PayNow and Text2Connect programs in its ICS contracts with governments (in addition to continuing to offer collect calls that charge a much lower per-minute rate to consumers who set up an account). *Id.*

When Securus included single calls in ICS contracts with state and local governments, it paid especially low site commissions from them. ¶ 10. Securus paid site commissions of only $1.60 from each $14.99 PayNow call and only $0.30 from each $9.99 Text2Connect call. *Id.*

## V.     3CI MARKETED AND IMPLEMENTED SINGLE CALLS FOR, AND WAS TOTALLY DEPENDENT ON, SECURUS.

The single calls provided by Securus were marketed and implemented by and through 3CI. ¶ 62. In particular, 3CI offered collect call recipients the PayNow and Text2Connect options through automated systems, processed the $14.99 and $9.99 charges, and managed the products' websites. ¶ 63. In exchange for marketing and implementing PayNow and Text2Connect, 3CI retained a transaction fee from the $14.99 or $9.99 charged for each single call. ¶ 66.

4

Securus was, by far, the largest and most important client of 3CI, then accounting for approximately 80% of 3CI's revenue. ¶ 67. A former employee of 3CI explained that Securus "paid their paychecks" and that 3CI "would be fucked if we lost Securus." ¶ 68. Another former employee of 3CI called Securus a "cash cow" that was "keeping us afloat." *Id.* Thus, it was of paramount importance for 3CI to serve the interests of and satisfy Securus, including by facilitating a price-fixing agreement with GTL that eliminated competition over single calls. ¶ 69.

## VI.  GTL DEVELOPED A RIVAL SINGLE CALL PRODUCT TO COMPETE WITH SECURUS.

Soon after Securus launched PayNow and Text2Connect in 2010, GTL began developing its own single call product called AdvancePay OneCall ("APOC"). ¶ 70. APOC offered recipients of collect calls from inmates the ability to pay for the calls without establishing an account. *Id.* For each single call, APOC only charged call recipients a transaction fee of up to $3 plus a per-minute rate equal to the per-minute rate that recipients with accounts paid. *Id.* Based on the approximately 12.47-cent per-minute average rate in 2017 for a call lasting 15 minutes, the average APOC single call from a state prison *lasting a full 15 minutes* would cost no more than $4.88 in 2017—less than one-third the cost of Securus's $14.99 PayNow call. *Id.*

Additionally, APOC paid site commissions to contracting governments at the same percentage that GTL paid for traditional per-minute calls. ¶ 71. In other words, GTL's APOC would not only charge call recipients significantly less for single calls than Securus's PayNow and Text2Connect, but it would also share a greater percentage of the resulting revenue with state and local governments than Securus's PayNow and Text2Connect. *Id.*

## VII.  SECURUS AND GTL AGREED TO FIX SINGLE CALL PRICES.

If, as it had planned prior to the conspiracy, GTL had competed with Securus for ICS contracts by aggressively marketing and offering single call products, such as APOC, that were

more affordable for consumers, Securus would have been forced to lower its single call rates in order to remain competitive. ¶ 13. Instead, Securus and GTL entered into an agreement to eliminate price competition and fix the prices of single calls in violation of the antitrust laws. ¶ 14.

The groundwork for the price-fixing agreement was laid when, in November 2012, Securus purchased 3CI's patent that covers technology used to charge mobile phone accounts for single calls. ¶ 73. According to a former 3CI executive, 3CI was prohibited from providing services involving the licensed patent to GTL without Securus's approval of the contract terms. *Id.* As a condition of providing that approval, Securus insisted that any agreement between 3CI and GTL contain terms that require GTL's single call program to charge the same prices as Securus's single call program. ¶ 75. The former 3CI executive explained that, because 3CI could not contract with GTL absent Securus's express approval, all three companies had "more room for overcharging on the single call model based on their interests." *Id.*

In early 2013, at Securus's direction, 3CI approached GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced as those provided by 3CI for Securus. ¶ 76. Initially, GTL rejected 3CI's offer, noting that GTL was developing its own single call product, APOC. *Id.* Yet, prior to the launch of APOC, Securus and 3CI successfully persuaded GTL to avert price competition and to, instead, agree to provide indistinguishable single call products through 3CI that were priced at the same rates. *Id.* According to a former GTL manager, the CEOs of GTL and Securus met regularly during that time period for private dinners and drinks at which they "shared strategic information" and discussed "what prices should be charged for ICS calls." ¶ 77. Relatedly, a former 3CI executive said he could "think of no plausible explanation" for Securus and GTL to identically price their single call products in the absence of a price-fixing agreement, and he suspected there was such an agreement between Defendants. ¶ 78.

## VIII.   SECURUS AND GTL CHARGED IDENTICAL SINGLE CALL PRICES.

In early 2013, as a result of Defendants' agreement to fix single call prices, GTL entered into a contract with 3CI that directed 3CI to market and implement GTL's single calls. ¶ 79. GTL subsequently amended ICS contracts with state and local governments to offer two single call products through 3CI: Collect2Card, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Collect2Phone, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes. ¶ 94.

The single call programs offered by Securus and GTL through 3CI were identical. ¶ 17. Both Securus's PayNow and GTL's Collect2Card charged credit cards the same price of $14.99 per call lasting up to 15 minutes and also provided governments with site commissions of exactly $1.60 per such call. ¶ 82. Similarly, both Securus's Text2Connect and GTL's Collect2Phone charged mobile phone accounts the same price of $9.99 per call lasting up to 10 minutes and also provided governments with site commissions of exactly $0.30 per such call. ¶ 84.

## IX.   DEFENDANTS MADE MISREPRESENTATIONS AND OMISSIONS TO LOCAL GOVERNMENTS AND CONSUMERS ABOUT THE COSTS OF SINGLE CALLS.

To justify charging consumers excessive rates, Defendants made a series of material misrepresentations and omissions to both local governments and consumers about the magnitude of the transaction fees associated with single calls operated by 3CI. ¶ 18. Specifically, Defendants repeatedly and falsely represented that *most* of the revenue from each such single call went to pay transaction fees to 3CI to implement those calls. *Id.* In actuality, the transaction fees paid by Securus and GTL to 3CI to operate single calls comprised *less than half* of the $14.99 or $9.99 charged for those calls. *Id.* Although the actual value of those transaction fees was, according to a former GTL employee, a "well-kept industry secret," several former executives of Defendants conceded to Plaintiffs' counsel that the *majority* of each $14.99 or $9.99 charge for a 3CI-operated

7

single call was ultimately retained by Securus or GTL. ¶¶ 131-37.

For example, both Securus and GTL specifically marketed that $13.19 of the $14.99 charged for each PayNow and Collect2Card call was paid to 3CI as a required transaction fee. ¶ 140. In reality, both Securus and GTL only paid approximately $4.35 as a transaction fee to 3CI from each PayNow or Collect2Card call. ¶ 133. The remainder of the $14.99 (*i.e.* $10.64) was transmitted by 3CI to Securus or GTL as income. *Id.* A former 3CI executive explained that a substantial majority of the $13.19 charged to consumers as a transaction fee for PayNow and Collect2Card calls was, in fact, kicked back to and retained by Securus and GTL. ¶ 134.

Defendants made the misrepresentations and omissions to contracting governments and consumers in at least six ways:

- During negotiations over ICS contracts with state and local governments, Securus and GTL routinely asserted that most of the charges for single calls was comprised of necessary transaction fees paid to 3CI. ¶¶ 219, 244, 268, 293. A former Securus executive said that, during negotiations, his team would routinely inform governments that (1) the "vast majority" of the $14.99 and $9.99 collected from PayNow and Text2Connect calls was paid to 3CI to cover transaction fees and (2) as a result, "the contracting governments received more in revenue from each PayNow and Text2Connect call than Securus received." ¶ 145. Similarly, a former GTL employee explained that "both Securus and GTL informed governments that the high price of single calls" was "a direct consequence of sizable transaction fees that were an unavoidable part of the cost of implementing those calls." ¶ 148.

- The ICS contracts entered into by Securus and GTL with those governments misrepresented and/or omitted how much would actually be paid from single calls to 3CI in the form of transaction fees and how much Securus and GTL would actually receive from such calls in revenue. ¶¶ 219, 244, 268, 293.

- In monthly commission reports provided to contracting governments, Securus and GTL misrepresented and/or omitted the true value of the transaction fees paid to 3CI from single calls and the actual revenue that Securus and GTL retained from those calls. *Id.*

- The public websites for Securus's PayNow and GTL's Collect2Card, which are directed at both consumers and governments, both falsely state that the $14.99 charge "is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee." *Id.*

- When consumers paid $14.99 for Securus's PayNow or GTL's Collect2Card, their credit cards were billed and charged twice—once for a $1.80 "Call Fee" and a second time for a fabricated $13.19 "Transaction Fee." *Id.*

- When consumers paid $9.99 for Securus's Text2Collect or GTL's Collect2Phone, Defendants failed to disclose the actual transaction fees paid to 3CI from those calls and, instead, charged a rate inclusive of a fabricated transaction fee. *Id.*

## X.   ABSENT DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS, SINGLE CALL PRICES WOULD HAVE BEEN LOWER.

Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for them. ¶ 138. When selecting bids for and negotiating ICS contracts, state and local governments would *not* have permitted Securus and GTL to charge such high prices for single calls in light of the true costs of implementing them. *Id.* Indeed, after the deduction of all actual transaction fees, the amounts that Securus and GTL charged and retained for each single call were *several times higher* than what consumers would have paid for the same call had those consumers been charged the per-minute rate that had been negotiated and expressly agreed to by contracting governments. ¶¶ 138, 173.

A former Securus executive explained that "the vast majority of governments that contracted with Securus raised concerns about the high prices charged to consumers for Securus's single calls" and that Securus's misrepresentations regarding the enormity of transaction fees "were effective in persuading" those governments to accept the steep single call rates. ¶¶ 146-47. The former Securus executive stated that if contracting governments "had been informed that the transaction fees associated with PayNow and Text2Connect comprised less than half of the prices of those calls," those governments "would have insisted on lowering the price of single calls to consumers." ¶ 172. Similarly, a former GTL manager explained that had contracting governments learned "that the actual value of transaction fees paid to a third-party vendor to implement single

calls was less than half of the price charged to consumers," then "the majority of those governments would have insisted on lowering the price of single calls to consumers." *Id.*

Because PayNow, Text2Connect, Collect2Card, and Collect2Phone are national programs with nationwide websites that charge uniform rates across the country, pressure from multiple state and local governments opposing unjustified and excessive single call prices would have resulted in Securus and GTL making nationwide reductions to those prices. ¶174.

## LEGAL STANDARDS

A complaint will survive a motion to dismiss as long as it contains facts sufficient to "nudge[]. . . claims across the line from conceivable to plausible[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "standard requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). A complaint can be plausible "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Indeed, the Fourth Circuit has urged courts to "be careful" at the motion to dismiss stage "not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). When assessing plausibility, courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [plaintiffs]." *Id.* at 422 (citation omitted).

## ARGUMENT

## I.   PLAINTIFFS' ALLEGATIONS STATE A PLAUSIBLE CLAIM UNDER THE SHERMAN ACT.

Defendants offer three flawed arguments for dismissing Plaintiffs' antitrust claim. First, Defendants urge that the Complaint rests on "barebones allegations" of a conspiracy. MTD at 10.

That contention ignores both the Complaint's detailed allegations of a price-fixing agreement and the Fourth Circuit's instructions regarding the modest pleading burden in an antitrust conspiracy case like this one. *See* Part I(A), *infra*. Defendants next maintain that Plaintiffs bring a *per se* claim but purportedly fail to allege a *horizontal* agreement between GTL and Securus. MTD at 22. That argument fails because the Complaint plausibly alleges an agreement *between competitors* Securus and GTL to fix single call prices. *See* Part I(B), *infra*. Defendants' final argument is that Plaintiffs' alleged antitrust injury is insufficiently direct because state and local governments caused that injury when they accepted Defendants' price-fixed bids. MTD at 22–25. But Plaintiffs allege they purchased single calls *directly from Defendants* at artificially inflated prices because of a price-fixing agreement *between Defendants* that was designed to extract supracompetitive payments *directly from Plaintiffs*—those allegations confer standing on Plaintiffs. *See* Part I(C), *infra*.

## A. Plaintiffs Plausibly Allege A Horizontal Agreement to Fix the Prices of Single Calls.

Plaintiffs allege that Defendants entered into a horizontal agreement to fix single call prices. *See, e.g.*, ¶¶ 1, 2, 14. Such a conspiracy "fall[s] into the category of arrangements that are *per se* unlawful," *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006), and can be proven with either "direct" or "circumstantial" evidence of an unlawful agreement, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012). Here, the Complaint includes more than sufficient "factual allegations" of *both* direct and circumstantial evidence "'to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true.'" *Id.* at 288 (quoting *Twombly*, 550 U.S. at 555).

### 1. Plaintiffs plausibly plead direct evidence of an agreement.

Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226

(4th Cir. 2004). "Examples of direct evidence include," among other things, "admissions by employees . . . of the conspirators." *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-2521, 2020 WL 5544183, at *5 (D. Md. Sept. 16, 2020) (collecting cases) (citations omitted). In fact, courts regard "admissions by employees . . . of the conspirators" as "textbook examples of adequate direct-evidence allegations" to defeat a motion to dismiss. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) (quotation marks omitted). Another court in this District recently found, in a wage-fixing conspiracy, that such "admissions" include statements by a "former human resource manager" that the defendants "would collaborate" and "would talk among each other to see what they were doing for pay." *Jien*, 2020 WL 5544183, at *5.

      a. <u>Plaintiffs' allegations include admissions by executives at both GTL and 3CI that Defendants conspired to set prices.</u>

The Complaint includes precisely the kinds of allegations of high-level conspiratorial meetings about pricing that courts regularly credit as "direct evidence." *Id*. The Complaint quotes "a former manager at GTL" that during a dinner with three senior GTL executives, both GTL's CEO and GTL's President "boasted about how they regularly met with Rick Smith, then [CEO] of Securus, for dinner and drinks and about how they shared strategic information with Rick Smith during those dinners and drinks." ¶ 77. More pointedly, GTL's then CEO told this former manager that when he and GTL's President met with Securus's CEO for dinners and drinks, "the three of them would discuss what prices should be charged for ICS calls and which companies were securing which ICS contracts, among other industry issues." *Id.* The former GTL manager explained that "behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success.'" *Id*. Notably, this former manager was employed at GTL from 2011 through 2016—which is when the conspiracy alleged in the Complaint was formed. *Id*.

The Complaint includes additional, direct allegations of anticompetitive behavior from former 3CI executives. For example, a former senior 3CI executive explained that, because 3CI was prohibited from contracting with GTL without Securus's express approval of the contract terms, all three companies had "more room for overcharging on the single call model based on their interests" when 3CI solicited GTL in late 2012. ¶ 75. That same executive could think of "no plausible explanation, in the absence of a conspiracy, for Securus and GTL to be identically pricing their single call programs," and he "suspected that there was an agreement between Securus, 3CI, and GTL to charge artificially high prices for single calls." ¶ 78.

Such statements are "precisely the sort of 'smoking gun' that makes Plaintiffs' *per se* antitrust claim plausible." *Jien*, 2020 WL 5544183, at *5. When the highest levels of GTL's management "boast[]" about discussions with Securus's CEO regarding "what prices should be charged for ICS calls," ¶ 77, "there is no inferential leap required to find a [price] fixing conspiracy plausible," *Jien*, 2020 WL 5544183, at *5. Such meetings constitute more than enough "factual matter (taken as true) to suggest that the requisite agreement was made." *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 556) (alterations omitted). And statements that "behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success," ¶ 77, "connot[e] a cozy relationship in which the ostensible competitors worked together to share" pricing information and facilitate a price-fixing conspiracy. *Jien*, 2020 WL 5544183, at *6. Plaintiffs' allegations of direct evidence are therefore sufficient to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570.

### b. Defendants' efforts to undermine these admissions fail.

Defendants object that the Complaint does not specify the dates on which the admitted discussions between GTL's and Securus's senior-level executives took place, and whether ICS

single calls were specifically discussed. *See* MTD at 12–13. This argument is unavailing for two reasons. First, the Complaint *does* plead facts regarding the time period and substance of those anticompetitive communications. The Complaint indicates that these conversations were not a solitary event, but rather ongoing communications over multiple dinners and drinks held during the GTL manager witness's time of employment, *i.e.* 2011 through 2016, which directly overlaps with the "late 2012" timeframe alleged for the formation of the conspiracy. ¶ 77. And single calls were Securus's and GTL's most profitable and newest ICS call products and would have been part of conversations about "what prices should be charged for ICS calls." ¶¶ 91, 117-119. Second, "such details are not required at this early stage in proceedings." *Jien*, 2020 WL 5544183, at *6 (citing *Twombly*, 550 U.S. at 555). "*Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint," and so "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset." *Robertson*, 679 F.3d at 291.

In fact, another Judge in this District recently rejected a nearly identical argument by defendants targeting less detailed direct evidence. In *Jien*, the defendants "point[ed] out that Plaintiffs' direct evidence [wa]s light on specifics," particularly with respect to "the date of the supposed agreement to fix wages, the participants in the original agreement," and "what 'collaboration' specifically occurred." 2020 WL 5544183, at *6. That lack of specificity did not warrant categorizing those allegations as circumstantial, however, because "[t]he direct evidence offered need only make *plausible* a conclusion that the . . . secret meetings involved an agreement to fix wages[.]" *Id.* The court further clarified that "[i]t is not Plaintiffs' burden at this stage to articulate the finer points of the alleged scheme[.]" *Id.* Here, the direct evidence obtained from former GTL and 3CI employees is more detailed and specific, establishing the time period of the

14

conspiracy formation (*i.e.* late 2012), the participants in the agreement (*i.e.* Securus, GTL, and 3CI), and what collaboration occurred (*i.e.* private discussions between CEOs of Securus and GTL about optimal ICS call pricing). *See Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220 (3d Cir. 2008) (holding that statements reflecting an agreement not to compete were direct evidence of a conspiracy even where (i) "the record does not reveal the exact extent of any such agreements" and (ii) the conversations referenced were not dated).

Defendants next boldly insist that, even if their executives did meet, and even if they did discuss ICS pricing, that behavior is "entirely consistent with lawful conduct." MTD at 13. According to Defendants, Securus and GTL filed a joint comment letter with the FCC, and "[p]reparation of this joint proposal necessarily required discussion of 'what prices should be charged for ICS calls.'" *Id.* Yet, in *Jien,* the court recently held that "[i]t is not Plaintiffs' burden at this stage to . . . disprove alternative explanations for the direct evidence they provide[.]" 2020 WL 5544183, at *6 (citing *Houck*, 791 F.3d at 484 (the district court improperly "undertook to determine whether a lawful alternative explanation appeared more likely")).

Moreover, crediting Defendants' argument would require the Court to contravene the most basic legal standards governing motions to dismiss. Defendants' purported "lawful" rationale for high-level discussions of prices requires *unreasonable* inferences in favor of *Defendants* when the opposite is required at this stage. *See, e.g.*, *SD3*, 801 F.3d at 418 (courts must "draw all reasonable inferences in [the Plaintiffs'] favor" under Rule 12(b)(6)). For instance, it is wildly improbable that the alleged high-level meetings were "regularly" required in order to facilitate a joint FCC comment letter; that such meetings regarding a regulatory submission would have taken place "over dinner and drinks" (rather than in a formal business setting with attorneys present); or that GTL executives would have felt the need to "boast[]" to colleagues about meetings convened to

15

discuss an FCC submission. ¶ 77. Nor do Defendants explain why, if those "dinner and drinks" discussions merely concerned a joint FCC submission, they would not have included that submission's third signatory—Telmate's Kevin O'Neil—or why they involved suspect discussions regarding "which companies were securing which ICS contracts." *Id.*; *cf. Gerner v. Cty. of Chesterfield*, 674 F.3d 264, 268 (4th Cir. 2012) (reversing dismissal of complaint where the district court "ignore[d] the well-pleaded factual allegations in [plaintiff's] complaint").[2]

### 2. Plaintiffs also plausibly allege an agreement through circumstantial evidence.

In addition to the direct allegations described above, Plaintiffs also plead extensive circumstantial facts that plausibly support the existence of a price-fixing agreement. "[M]ost [antitrust] cases are constructed out of a tissue of ambiguous statements and other circumstantial evidence . . . ." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 823 (D. Md. 2013) (citation omitted). This is because "[c]onspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." *Robertson*, 679 F.3d at 289-90. Where a plaintiff relies on circumstantial evidence "to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the *sole* inference." *Titanium Dioxide*, 959 F. Supp. 2d at 821 (citation omitted). "[T]he interpretation and weighing of conflicting circumstantial evidence is a role assigned to the jury at trial." *Id.* at 823.

To plausibly allege circumstantial evidence of an antitrust conspiracy, "Plaintiffs must

---

[2] Defendants' attempt to discredit Plaintiffs' direct allegations of collusion via a passing reference to the *Noerr-Pennington* doctrine is a red herring. MTD at 13. Regardless of whether Defendants' public "comments to the FCC are petitioning conduct protected by the First Amendment," *id.*, those comments plainly do not form the basis for Plaintiffs' claims, which rest on secretive price-fixing discussions between Securus's and GTL's CEOs at private "dinner and drinks."

allege both 1) parallel conduct by the Defendants, and 2) 'plus factors' suggesting that the parallel conduct resulted from concerted action." *Jien*, 2020 WL 5544183, at \*7 (citing *SD3*, 801 F.3d at 424). Alleged plus factors "must be evaluated holistically." *SD3*, 801 F.3d at 424-25. The Fourth Circuit has warned against antitrust defendants' common tactic of "pars[ing] each 'plus factor' individually and ask[ing] whether that factor, standing along, would be sufficient to provide the 'more.'" *Id.* Here, Plaintiffs adequately allege a Section 1 agreement because they plead both: (i) parallel conduct and (ii) "plus" factors that together support the inference of an agreement.

> a.  <u>The Complaint includes extensive allegations of parallel conduct.</u>

Defendants concede that Plaintiffs adequately plead parallel conduct. MTD at 15. This is no surprise: the parallel conduct in this case is remarkable. Plaintiffs allege that, despite GTL's original plans to pursue a more competitive single call product, GTL ultimately introduced a pair of single call products that were "in all material ways, identical and indistinguishable" from Securus's products. ¶ 82. For example:

- Both Securus's PayNow and GTL's Collect2Card charged the credit cards of call recipients the same price of $14.99 per call lasting up to 15 minutes.

- Both Securus's PayNow and GTL's Collect2Card provided contracting governments with site commissions of only $1.60 from each $14.99 charge.

- Both Securus's Text2Connect and GTL's Collect2Phone charged the mobile phone accounts of call recipients the same price of $9.99 per call lasting up to 10 minutes.

- Both Securus's Text2Connect and GTL's Collect2Phone provided contracting governments with site commissions of only $0.30 from each $9.99 charge.

- The websites for Securus's and GTL's single call products "contain virtually identical language," are "owned by 3CI," and "direct consumers to addresses in Boca Raton, Florida, where 3CI is headquartered."

¶¶ 82, 84. These allegations easily suffice to show parallel conduct. *Cf. SD3*, 801 F.3d at 427–28 (allegations of parallel conduct in a refusal-to-deal claim sufficed even though defendants ceased

licensing negotiations at different times and for different stated reasons).

      b.   Plaintiffs have alleged multiple compelling "plus factors" supporting the inference of a conspiracy.

Plus factors "consist of circumstantial or contextual evidence that substantiates an otherwise speculative conspiracy claim." *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718, 2019 WL 4478734, at *4 (E.D. Va. Sept. 18, 2019). "Courts evaluate plus factors holistically and weigh them together with the allegations of parallel conduct." *Id*. "Allegations that alone seem neutral 'can take on a different shape when considered in conjunction with other surrounding circumstances.'" *Id*. (citation omitted). Importantly, plus factors "need not 'compel an inference of conspiracy,' but need only render the allegations plausible." *Id*. (citation omitted).

In addition to pleading parallel conduct, Plaintiffs allege multiple plus factors—each recognized by courts in this Circuit—that together overwhelmingly support an inference of conspiracy. These include: (i) competitor communications and opportunities to collude; (ii) industry concentration; (iii) high entry barriers; (iv) inelastic demand; (v) motive to conspire; (vi) extraordinary profits; (vii) false pricing justifications; and (viii) actions against self-interest.[3]

**Suspicious Communications and Opportunities to Collude**: "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432. "[M]eetings, industry

---

[3] Defendants selectively cite out-of-circuit cases to argue the Court ought to reject all but one of Plaintiffs' proffered plus factors. MTD at 16-19. But these plus factors have been endorsed by the Fourth Circuit and repeatedly relied upon by its trial courts. *See, e.g.*, *SD3*, 801 F.3d at 429–32 (plus factors include "communications among the defendants," "[m]otivation for common action," "concentrated market," and defendants' concealment of misconduct); *Interior Molded Doors*, 2019 WL 4478734, at *5-8 (plus factors include opportunities to collude, "highly concentrated" market, "high barriers to entry," and "false statements" by defendants); *Titanium Dioxide*, 959 F. Supp. 2d at 826-30 (plus factors include "motive," "highly concentrated" market, "high barriers to entry," "actions against self-interest," and "communications between competitors").

conferences, and informal contacts" among defendants constitute "non-economic evidence that suggests a traditional conspiracy," which is "the most important plus factor." *Titanium Dioxide*, 959 F. Supp. 2d at 823, 829–30; *see also id.* at 829 (even "[a]mbiguous statements by competitors, taken as a whole, may support the inference of a price-fixing conspiracy").

Plaintiffs plead that Defendants not only had numerous *opportunities* to collude—but that they took advantage of those opportunities to benefit their respective businesses by exchanging sensitive pricing information. As described above, Plaintiffs allege that two GTL executives— Brian Oliver, then CEO, and Jeffrey Haidinger, then President and COO—frequently met with Rick Smith, then CEO of Securus, over private "dinner and drinks" to discuss "what prices should be charged for ICS calls." ¶ 77. Having argued that these allegations are insufficiently specific to be deemed "direct," Defendants improperly ignore them when discussing Plaintiffs' indirect conspiracy allegations. *Cf. Gerner*, 674 F.3d at 268 (courts may not "ignore[] the well-pleaded factual allegations in [plaintiff's] complaint"). But Plaintiffs' allegations that Defendants' senior executives repeatedly met privately to discuss pricing for ICS calls do not disappear into the ether.

Plaintiffs further allege that "[e]xecutives from Securus and GTL regularly attended conferences of professionals in charge of correctional facilities," and that, according to a former GTL manager, at these conferences, GTL and Securus employees "regularly shared with one another considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments." ¶ 115. In addition, a former Securus executive said that the "industry was very incestual," with the two companies hiring each other's executives and managerial employees. ¶ 113. *See Interior Molded Doors*, 2019 WL 4478734, at *5 ("[T]he defendants' mutual attendance of at least eight separate annual trade

19

association meetings and their history of swapping executives—make it more plausible that the alleged conspiracy spawned from meetings at trade shows or conventions."). Here, "Plaintiffs have presented evidence, not only of the large number of contacts, but also of the content of these communications, that suggests cartel behavior." *Titanium Dioxide*, 959 F. Supp. 2d at 830.

**Industry Concentration**: The Fourth Circuit has held that "[a] market in which sales power is concentrated in the hands of the few can also facilitate coercion." *SD3*, 801 F.3d at 432. This is because "[f]ewer 'minds' must 'meet' in a concentrated market." *Id*. In addition, "[c]oncentrated markets enable firms to agree on prices and to be able to detect 'cheating' (underselling the agreed price by a member of the group) without having to create elaborate mechanisms[.]" *Interior Molded Doors*, 2019 WL 4478734, at *6 (quotation marks and citation omitted). Plaintiffs here allege that "Securus and GTL have dominated the market for the provision of ICS," connecting "approximately 80% of all the ICS calls in the United States." ¶ 108. Indeed, an analyst from Moody's characterized the ICS market as "largely duopolistic." *Id.*

**High Entry Barriers**: "High barriers to entry make a market more susceptible to collusion." *Titanium Dioxide*, 959 F. Supp. 2d at 826. Plaintiffs here explain that the ICS industry has "high entry barriers," including "the high cost of building a viable telecommunications system that can provide ICS to prisons and jails; bidding for and prevailing on contracts with state and local governments, which often require a substantial outlay of upfront capital; and complying with various regulations imposed by federal and state governments." ¶ 109. These high entry "barriers allow[ed Securus and GTL] to ignore the threat of emerging competitors" undercutting their supracompetitive pricing. *Interior Molded Doors*, 2019 WL 4478734, at *2.

**Inelastic Demand**: The Complaint explains that, with respect to the consumer market, "an increase in the price of single calls causes no decrease, or only a relatively small decrease, in the

demand for single calls, because family members, friends and lawyers must often accept these important calls from inmates despite the excessive price and, further, those call recipients are unable to select their own, more affordable ICS providers." ¶ 111. As a result, GTL and Securus could agree to fix and charge supracompetitive prices without worrying that doing so would materially decrease consumer demand. *Interior Molded Doors*, 2019 WL 4478734, at *2.

**Motive**: The Complaint details Securus's and GTL's strong motives to fix single call prices. ¶¶ 116–19. Single calls were extremely profitable for Securus, comprising the majority of its income from some of its contracts. ¶¶ 117–18. Single call programs allowed Securus, and later GTL, "to simultaneously charge consumers exorbitantly high prices and pay contracting governments abnormally low site commissions." ¶ 116. For this reason, "Securus was eager to prevent GTL from disrupting the extraordinary profitability of that program" by launching competing, less expensive alternatives that greatly appealed to contracting governments. *Id*. These allegations establish the "motivation for common action" which "is a key circumstantial fact." *SD3*, 801 F.3d at 431 (quotation marks, alterations, and citation omitted).[4]

**Actions Against Self-Interest**: "In the antitrust context, behavior contrary to self-interest means actions that are 'inconsistent with competition in the industry.'" *Titanium Dioxide*, 959 F. Supp. 2d at 827 (quoting *In re Flat Glass Antitrust Litig*., 385 F.3d 350, 361 (3d Cir. 2004)). Here, the Complaint explains that, "[s]oon after Securus launched the PayNow and Text2Connect programs in 2010, GTL began developing its own single call program" that was a fraction of the

---

[4] Defendants' categorical rejection of "financial motive to conspire" as a plus factor is contrary to binding Fourth Circuit precedent. Moreover, Plaintiffs do more than merely allege the maxim that "companies are motivated by profit," as Defendants' suggest. MTD at 29. As summarized above, the Complaint identifies specific anticompetitive actions taken by Defendants to maximize their profits, including GTL's scuttling of a less expensive alternative to Securus's single calls programs in order to reap supracompetitive profits. ¶¶ 70-72.

21

price of Securus's. ¶ 70. However, "[r]ather than compete with Securus for ICS contracts with state and local governments by offering a single call program—APOC—that would simultaneously lower consumer charges and increase site commissions, GTL entered into an agreement with Securus and 3CI to restrain such competition and fix single call prices." ¶ 72. "In a competitive industry," GTL would have moved forward aggressively with its planned lower-price alternative to Securus's single calls programs "with the hope of increasing its market share . . . ." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010).[5]

**False or "Pretextual" Explanations for Pricing**: "False explanations" by defendants, wherein they "conceal their true motives" for supracompetitive pricing, are another indicator of an anticompetitive agreement. *Interior Molded Doors*, 2019 WL 4478734, at *6. The Complaint includes voluminous, highly detailed allegations reflecting that "[a]fter agreeing to fix the prices of single calls, Securus and GTL simultaneously made, and directed [3CI] to make," a series of fraudulent "misrepresentations and omissions to contracting governments and consumers" about the costs of implementing single calls "in order to charge those artificially inflated, fixed prices." ¶ 314. Specifically, the Complaint describes six distinct categories of misrepresentations and omissions made by Defendants to contracting governments and consumers about the transaction fees associated with their single call products. ¶ 142; *see also* ¶¶ 125–74. This factor is especially

---

[5] Defendants misrepresent both the Complaint and the ICS industry when they suggest that consumer demand inelasticity prevented GTL from increasing its profits by introducing APOC or otherwise charging less than Securus. MTD at 15–16. Although ICS call recipients are unable to negotiate prices or select their providers, contracting governments strongly favor ICS providers that charge lower prices to consumers. ¶¶ 46–47. Had GTL pursued its APOC product—which boasted lower prices and higher site commissions—more state and local governments would have selected GTL, offering GTL a larger market share. Indeed, following the dissolution of the conspiracy and the subsequent promotion of GTL's APOC, "contracting governments . . . predictably and overwhelmingly favored APOC over Collect2Card and Collective2Phone." ¶ 99.

probative here where the Complaint reflects a statement from a former GTL manager that GTL and Securus coordinated "how to persuade governments to accept the terms of an ICS contract, and how best to market ICS calls to governments." ¶ 115. This is not behavior that would normally be expected in a competitive market.

**Extraordinary Profits**: Abnormally high profits are an additional plus factor supporting an inference that Defendants conspired. *See, e.g.*, *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572-73 (11th Cir. 1998) ("high profits" were a "plus factor" because they "would not be likely to occur if the defendants either were vigorously competing with each other or engaging in competitive price leadership"); *see also* William E. Kovacic et. al., *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 405–06 (2011) ("The chief plus factors have included: . . . Industry performance data, such as extraordinary profits, that suggest successful coordination."); Richard A. Posner, *Antitrust Law* 90 (2d ed. 2001) ("[I]t may be possible to infer collusion from the presence or pattern of abnormally high rates of return."). Here, the Complaint explains how "Defendants' conspiracy to restrain competition over, and fix the prices of, single calls generated extraordinary profits for Securus and GTL." ¶ 119. As an example, the Complaint charts Securus's "steady increase in gross profit margin"—which climbed from 32% in 2009 before the launch of single calls to 57% in 2017—"in large part, due to the growth of Securus's single call program." *Id.* Crucially, "due to Defendants' price-fixing agreement, Securus's profit margins continued to grow even after GTL's entry in the single call market in 2013." *Id.*

c.  <u>Defendants' attacks on Plaintiffs' "plus factors" have been widely rejected.</u>

To minimize the effective pleading of "plus factors," Defendants employ two tactics that have both been rejected by the Fourth Circuit and other courts. First, Defendants take precisely the divide-and-conquer approach that the Fourth Circuit has condemned (MTD at 16–19)—"pars[ing]

each 'plus factor' individually and ask[ing] whether that factor, standing alone, would be sufficient to provide the 'more.'" *SD3*, 801 F.3d at 425. The question is not whether any one of the factors suffices *on its own* to show a horizontal agreement. It is whether those factors, when taken together and in combination with Plaintiffs' allegations of parallel pricing, "'plausibly suggest[]' such an agreement." *SD3*, 801 F.3d at 426 (quoting *Twombly*, 550 U.S. at 557) (alterations omitted). Plaintiffs have easily cleared that bar, which is all that is required at the pleading stage.

Second, Defendants attempt to impose on the Complaint heightened pleading standards inconsistent with Rule 8. MTD at 17-19. They extensively rely on summary judgment decisions, issued after discovery, applying more exacting standards than the "plausibility" standard that Plaintiffs must satisfy at the pleading stage.[6] Yet, the Supreme Court cautioned in *Twombly*: "we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9." 550 U.S. at 569 n.14.[7]

In *SD3*, the Fourth Circuit observed that plaintiffs *had* pled the "who, what, where, when, and why" of the antitrust conspiracy—but, contrary to Defendants' claims, that court did not hold that a complaint *must* plead with specificity each of these factors in order to satisfy Rule 8's plausibility standard. 801 F.3d at 432. Rather, the Fourth Circuit admonished that "courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage." *Id.* at 425.

---

[6] *See, e.g.*, *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (summary judgment); *White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011) (summary judgment); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) (summary judgment); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004) (summary judgment).

[7] Defendants miscite *Twombly* as requiring Plaintiffs to identify "the specific time, place, or person" involved in the conspiracy. MTD at 14. As the Second Circuit has explained, in *Twombly*, the Supreme Court actually stated the converse: in cases pleading parallel conduct, plaintiffs need *not* identify these specifics. *Starr*, 592 F.3d at 325 ("In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.").

This is because "the 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment." *Id*.

Even so, the Complaint here details the "who, what, where, when, and why" of the alleged price-fixing conspiracy:

- **The who:** The Complaint identifies exactly which entities participated in the price-fixing conspiracy: Securus, GTL, and 3CI. ¶¶ 72-80. It even identifies key executives who formed the price-fixing agreement: Rick Smith, Brian Oliver, and Jeffrey Haidinger. ¶ 77.

- **The what:** The Complaint alleges that Defendants conspired to fix and artificially inflate the prices of single calls in the United States. ¶¶ 96-98.

- **The when:** The Complaint alleges that Defendants formed the price-fixing agreement in "late 2012" (after Securus's acquisition of a patent in November 2012) and that Defendants phased out the conspiracy in 2018. ¶¶ 73, 76, 103-06.

- **The where:** The Complaint alleges that the conspiracy was formed during "private, in-person dinners" and "drinks" between the CEOs of Securus and GTL and was effectuated in simultaneous contracts with 3CI. ¶¶ 77, 79.

- **The why:** The Complaint alleges that Defendants entered into the price-fixing conspiracy to "reap profits above and beyond what they would have earned in a competitive market" by charging "consumers exorbitantly high prices." ¶¶ 76, 116.

Complaints that include such detailed "allegations as to the 'who, what, when and where' of the claimed antitrust misconduct not surprisingly survive dismissal." *SD3*, 801 F.3d at 430.

## B. The *Per Se* Rule Applies to 3CI's Role in the Conspiracy.

Defendants argue that the anticompetitive agreements between (i) Securus and 3CI and (ii) GTL and 3CI are not governed by the *per se* rule because 3CI does not horizontally compete with Securus or GTL. Yet, this argument fails for reasons that Defendants themselves explain. Defendants acknowledge that as long as Plaintiffs plead "an agreement between GTL and Securus" (which Defendants concede are "horizontal competitors"), both the vertical and horizontal components of Defendants' conspiracy are evaluated under the *per se* rule. MTD at 22. As

described above, Plaintiffs sufficiently allege a horizontal agreement between the "spokes," GTL and Securus. *See* Part I(A), *supra*. This is therefore *not* "[a] rimless wheel conspiracy . . . in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). Accordingly, both the horizontal component of the conspiracy (Securus-GTL) and the vertical components (Securus-3CI and GTL-3CI) are subject to *per se* scrutiny.

### C. As Direct Purchasers Who Paid Overcharges Directly to Defendants, Plaintiffs Were Directly Injured by the Conspiracy.

Defendants wrongly claim that Plaintiffs lack antitrust standing because they were not directly injured by Defendants' actions. MTD at 22–24. According to Defendants' invented theory, because Defendants had to first win government contracts in order to transact with Plaintiffs, Plaintiffs have no antitrust remedy. *Id.* at 2. Defendants misstate the requirement for direct injury under federal antitrust law. The Complaint does all that is required to plead a direct injury: it alleges a scheme that was designed to, and successfully did, *directly* charge Plaintiffs artificially inflated prices for single call services.

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . ." 15 U.S.C. § 15. In evaluating antitrust standing (of which antitrust injury is a component), the Fourth Circuit relies on the Supreme Court's so-called "*AGC*" factors, which it has distilled as follows:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

26

*Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 529–30 (1983)). All of these factors are met in this case.

**Antitrust Injury**: "Antitrust injury has been defined as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Novell*, 505 F.3d at 311 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Supreme Court has long held that "an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which" the antitrust laws offer a remedy. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982). That is precisely what Plaintiffs allege here. ¶¶ 120, 122.

**Causal Connection and Intended Harm**: The causal connection between Defendants' conspiratorial actions and Plaintiffs' injuries is straightforward. Plaintiffs were the intended victims of Defendants' conspiracy. The sole purpose of Defendants' conspiracy was "to fix, inflate, maintain, and stabilize the price of 3CI-operated single calls charged to" Plaintiffs and other consumers in the United States, and as "a direct and foreseeable result of that conspiratorial conduct, Plaintiffs . . . paid artificially inflated rates for 3CI-operated single calls." ¶¶ 121, 201. *See Novell,* 505 F.3d at 316 (recognizing that defendants' anticompetitive intent can "adequately support a plaintiff's claim under § 4" (quoting *AGC*, 459 U.S. at 537 & n.35)).

**Injury Directness**: "Antitrust law favors granting standing to the most direct victims of defendants' anticompetitive conduct and denying standing to more remote victims on the theory that the direct victims have the greatest motivation to act as 'private attorneys general' and 'to vindicate the public interest in antitrust enforcement.'" *Novell*, 505 F.3d at 317-18 (quoting *AGC*, 459 U.S. at 542). Where "there [i]s no more direct victim of the defendants' anticompetitive acts

27

than the plaintiff-consumer," the concerns that motivate this analysis—the "risk of duplicative recoveries" or the "danger of complex apportionment of damages"—are "mitigated." *Id.* (quotation marks and citation omitted) (discussing *AGC* and *McCready*).[8]

Here, the "most direct victim[s]" of Defendants' price-fixing conspiracy are plainly Plaintiffs, the consumers who paid Defendants for their ICS single calls. ¶ 122. Plaintiffs purchased single calls directly from Defendants, and Defendants fixed and inflated the prices Plaintiffs paid. The losses incurred due to inflated prices are recoverable by Plaintiffs alone—thus eliminating any concerns regarding "duplicative recoveries" or the "complex apportionment of damages." *Novell*, 505 F.3d at 318. It is no surprise, then, that Defendants are unable to cite a single decision in which a direct purchaser from an antitrust defendant was deemed to lack standing to sue that defendant over price-fixed purchases.[9]

Defendants nevertheless contend that Plaintiffs are "able to allege only indirect injury" because government facilities play a role in setting the prices that ICS providers charge. MTD at 23-24. But the structure of this case is simple—direct victims of price-fixing are suing the price fixers. Accordingly, there is no intervening cause. *See, e.g.*, *McCready*, 457 U.S. at 481 n.17

---

[8] These considerations—"the existence of more direct victims of the alleged antitrust injury; and . . . problems of identifying damages and apportioning them"—encompass the fourth and fifth factors inherent in the antitrust standing analysis. *Novell*, 505 F.3d at 317. Because the Fourth Circuit often discusses these factors in connection with the third factor (directness), Plaintiffs do the same here. *See id.* at 317–19.

[9] This case is therefore worlds away from the case law on which Defendants rely. MTD at 23. For instance, in *Warnock v. National Football League*, 356 F. Supp. 2d 535, 537 (W.D. Pa. 2005), "a municipal taxpayer purporting to sue 'on behalf of Allegheny County'" claimed that the NFL and its franchises violated the Sherman Act "by acting in concert to force NFL host cities and counties to build new football stadiums . . . and lease the stadiums to NFL clubs under favorable lease terms." Causation there was attenuated, and the plaintiff was never billed by, nor did he pay any money directly to, the defendants. *See also FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263, 2018 WL 4830087, at *6 (S.D.N.Y. Oct. 4, 2018) (holding that purchasers from *non-defendants* who were not participants in the alleged conspiracy lacked standing).

("employer's decision" to contract with defendant insurer was not "an intervening cause" depriving consumer of standing to sue for insurer's refusal to reimburse for mental health services—even though the employer's contracting decisions were "in some sense a factor that contributed independently to" plaintiff's injury). The fact that the prices charged *to* Plaintiffs are reflected in Defendants' contracts with governments does not deprive Plaintiffs—who purchased single calls *directly* from and paid overcharges *directly* to Defendants—of their standing as direct purchasers. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519, 1522 (2019) (holding that iPhone owners were direct purchasers who could sue Apple for monopolistic overcharges even though "app developers, not Apple, set the consumers' purchase price"). Moreover, even *were* Defendants' government contracts an intervening cause (they are not), Plaintiffs would *still* have antitrust standing because the supracompetitive prices reflected in those contracts (and paid by Plaintiffs) were a "foreseeable consequence of the original antitrust violation": Defendants' price-fixing agreement. *In re Flonase Antitrust Litig*., 798 F. Supp. 2d 619, 628 (E.D. Pa. 2011) (holding that foreseeable intervening causes do not sever the causal chain).

## II.   PLAINTIFFS' RICO CLAIMS ARE SUFFICIENTLY PLED.

The Complaint alleges that Defendants violated RICO by conspiring to engage in a pattern of fraudulent misrepresentations and omissions, via interstate mail and wires, to contracting governments and consumers regarding the enormity of transaction fees paid to implement single calls. ¶ 139. The purpose of this conspiracy was to overcharge consumers for those calls. *Id.* Defendants made the misrepresentations and omissions about the transaction fees in at least six distinct forms: (1) during direct communications and negotiations with contracting governments; (2) in written bids submitted to, and written contracts entered into with, contracting governments; (3) in monthly written commission reports provided to contracting governments; (4) on public

websites directed at both consumers and governments; (5) in billing charges made to consumers' credit cards; and (6) in billing charges made to consumers' mobile phone accounts. ¶ 142.

Defendants have offered three arguments to dismiss Plaintiffs' RICO claims. *First*, Defendants argue there is no proximate cause between Defendants' misstatements to governments about the false transaction fee, and the injury Plaintiffs suffered by paying this fee. MTD at 24. This argument fails because Plaintiffs' injuries are *not* derivative of any injury to any government and—according to Defendants' own former executives—stem directly from Defendants' misstatements. *Second*, Defendants argue that, insofar as Plaintiffs' RICO claims are predicated on misstatements to consumers, Plaintiffs "failed to allege materiality or reliance." *Id.* Yet, Plaintiffs are not required to plead materiality or reliance as to each individual predicate act of mail or wire fraud. Rather, Plaintiffs must simply show—and do show—that misstatements to consumers were "incident to" the fraudulent scheme. *Third*, Defendants argue that the conspiracy to violate RICO claims must be dismissed for failure to allege an adequate association-in-fact enterprise. *Id.* at 24-25. However, the Complaint properly alleges that 3CI alone constitutes an enterprise in the first conspiracy to violate RICO count and, further, properly alleges an association-in-fact enterprise comprised of a "hub and spoke" with a "rim" in the alternatively-pleaded conspiracy to violate RICO count.

**A. Plaintiffs' Injuries Were Directly Caused by Defendants' Misrepresentations and Omissions to State and Local Governments.**

RICO provides a private right of action to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions, 18 U.S.C. § 1964(c), and courts have interpreted RICO's "by reason of" requirement to include a showing of both "but-for" causation and proximate cause. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). Proximate cause

30

requires a "direct relation between the injury asserted and the injurious conduct alleged." *Id.* In other words, proximate causation requires assessing whether Plaintiffs are "direct victim[s] of the illegal activity." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). Notably, RICO must be "liberally interpreted" to effectuate the statute's remedial purposes. *Proctor v. Metro. Money Store Corp*, 645 F. Supp. 2d 464, 484 (D. Md. 2009); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 n.10 (1985) ("if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964").

The Complaint reflects clear and compelling allegations that Plaintiffs are the direct victims of Defendants' pattern of racketeering activity. Plaintiffs' injuries are neither derivative of any injuries to any governments, nor are Plaintiffs' injuries speculative.

### 1. Plaintiffs' injuries were not "contingent on" or "derivative of" another party's harms.

Defendants first argue that to the extent Plaintiffs' harm was based on "misrepresentations to governments 'during negotiations,' in 'bids and contracts,' and in 'monthly commission reports,'" the RICO claims "fail because their alleged injuries derive entirely from supposed injuries to someone else—the various governments that contracted directly with Securus and GTL." MTD at 25. This argument is not only factually incorrect but also logically incoherent.

The RICO scheme alleged here is straightforward: Defendants prevailed in charging artificially inflated prices (i.e. $14.99 and $9.99) to consumers for single calls by falsely claiming to governments and consumers that provision of those calls necessitated payment of fabricated "transaction fees." ¶¶ 169, 182. Accordingly, whoever paid those fabricated transaction fees and inflated single call prices are the directly injured parties. The only ones who made such payments are Plaintiffs and the consumer classes they seek to represent. The single calls and associated

transaction fees were exclusively charged to the credit cards and mobile phone accounts of consumers; contracting governments did *not* pay for any of them. Indeed, Defendants made misrepresentations and omissions to contracting governments merely because consumers lack the power to select their ICS provider—*not* because those governments purchased any single calls.

Defendants assert that "the fact that Plaintiffs' claim turns on a prediction about how non-party governments would or may have behaved had they—the non-parties—been told other or different facts demonstrates that Plaintiffs themselves are not the ones directly impacted by the challenged statements." MTD at 27. Yet, Defendants improperly conflate the identity of the *recipient of the misrepresentations* with the identity of the *directly injured party*. The Supreme Court has made clear that an injured party "may recover through RICO whether or not it is the direct recipient of the false statements." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 646 (2008) (citing and affirming *Phx. Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007)).

In *Bridge*, defendants were accused of making misrepresentations to non-party county governments in auction bids to purchase tax liens, and plaintiffs argued that those non-party county governments would have sold liens to them in the absence of such misrepresentations. Rejecting defendants' protestations that Plaintiffs' injuries were insufficiently direct, the Court held that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649, 658. The Court explained that "first-party reliance" is *not* necessary to "ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza.*" *Id.* at 657-658. The Court's holding in *Bridge* was part of a "long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's

32

misrepresentation." *Id.* at 656. Since *Bridge*, that line of cases has grown longer still, including where representations were made to government entities that subsequently made determinations causally related to Plaintiffs' injuries.[10]

To bolster their failed argument, Defendants cite a handful of inapplicable cases where the facts reflected that a government entity was the more "direct" victim of a RICO scheme. In those cases, the plaintiffs' injuries were truly derivative of the governments' injuries because, absent the reduction in revenue to the governments, plaintiffs' injuries would not exist. In *Anza*, for example, plaintiffs were corporate competitors who alleged that defendants avoided paying state taxes, which allowed defendants to lower their prices, which had the effect of reducing plaintiffs' market share. 547 U.S. at 458. In other words, if the government had received all the taxes owed by defendants, there would have been *no injury* to plaintiffs. Predictably, the Supreme Court held that proximate cause was not adequately pled because the "direct victim" of such a scheme was the government deprived of taxes. *Id.*

The facts in the instant matter are readily distinguishable. Unlike the plaintiff in *Anza*, Plaintiffs are the intended and direct victims of the RICO scheme to inflate single call prices, rather

---

[10] *See, e.g.*, *Carlin v. DairyAmerica, Inc.*, No. 1:09-cv-0430, 2016 WL 232315, at *12 (E.D. Cal. Jan. 19, 2016) (holding that defendant's misrepresentations to a federal agency proximately caused the depression of plaintiffs' compensation under RICO, even though the agency established the compensation schedules); *Saint Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295 (3d Cir. 2020) (holding defendant's false statements to state government proximately caused injury to private plaintiff under RICO, even though the state government allocated funding of which plaintiff was deprived); *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 652 (9th Cir. 2019) (holding defendant's sham-filings with a government agency proximately caused plaintiff to be excessively audited, even though the agency acted upon the false statements to initiate the audits); *Nemet v. Volkswagen Grp. of Am., Inc.*, 349 F. Supp. 3d 881, 906 (N.D. Cal. 2018) (holding that RICO claims involving false statements to regulators harmed consumers and not regulators, as "regulators were more like gatekeepers than victims of the fraud: they did not lose money from the fraud like consumers did").

than state and local governments, which never even purchased those calls. Unlike the plaintiffs'

injury in *Anza*, the overcharges paid by Plaintiffs for single calls are the direct result of the alleged

fraud: Defendants here lied to contracting governments about the very overcharges they extracted

from Plaintiffs. And unlike the plaintiffs' injury in *Anza*, no reduction in government revenue

stemming from Defendants' RICO scheme had any bearing on the injury caused to Plaintiffs; if

Defendants had paid contracting governments higher site commissions from single call charges,

Plaintiffs' injury would be unchanged.[11]

Remarkably, even while arguing that Plaintiffs' injuries are derivative of injuries to

contracting governments, Defendants fail to identify *any harm to contracting governments* that

resulted from the alleged RICO violations, let alone how Plaintiffs' injuries are "derivative" of

that harm.[12] The reason for this glaring omission is evident: Plaintiffs' injuries caused by

Defendants' RICO violations are not plausibly derivative of any injury to state and local

---

[11] Defendants' other authority fails to advance their cause for the same reason: in each case, the alleged RICO injury was entirely derivative of a third party's injury. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 6 (2010) (rejecting RICO claim by New York City based on alleged failure of out-of-state vendor to submit federally required tax information to New York State); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 490–91 (4th Cir. 2018) (rejecting RICO claim by subcontractor based on alleged scheme by property owner's insurance company to underpay general contractor); *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (rejecting, for lack of standing, RICO claim by grandchildren that defendants injured their grandmother's estate "because any harm to the [g]randchildren flows merely from the misfortunes allegedly visited upon [the grandmother] by the defendants").

[12] To the extent Defendants argue (for the first time in their reply brief) that Plaintiffs' injuries are somehow derivative of reductions in site commissions paid to contracting governments, that argument would be both counterfactual and illogical. Securus and GTL made site commission payments to governments from single calls only *after* charging consumers for those single calls. ¶¶ 44, 58. Thus, the determination of how revenue from single calls purchased by consumers was allocated between Defendants and contracting governments had no bearing whatsoever on Plaintiffs' injuries. Indeed, Plaintiffs' injury would be unaffected if Defendants had paid contracting governments higher site commissions.

governments. In sum, Plaintiffs' injuries are *not* derivative of another party's harm, and no "better situated" party exists to remedy the alleged RICO scheme. *Bridge*, 553 U.S. at 658.[13]

### 2. Plaintiffs' injuries are not speculative.

Defendants' second argument is that Plaintiffs' harms are too uncertain to establish causation. Defendants assert that, because Plaintiffs "were never a party to the communications and negotiations that led to the various contracts between the contracting governments and Defendants," Plaintiffs can only speculate that, "had Defendants disclosed in such documents the 'actual transaction fees' for single calls, 'the contracting governments would have required a reduction of those single call prices.'" MTD at 26-27.

Plaintiffs' allegations are well-supported and not based on speculation. Defendants ignore that the Complaint contains compelling allegations of causation obtained *directly from former employees of Securus and GTL* who were, in fact, *parties to the negotiations* that resulted in ICS contracts between governments and Defendants. These employees, thus, have firsthand knowledge of the purposes and effects of their and their colleagues' misrepresentations and omissions regarding the size of the transaction fees.

The Complaint contains statements from Defendants' former employees that establish contracting governments' reliance on Defendants' misrepresentations and omissions regarding transaction fees. For example, a former Securus executive explained that "the vast majority of

---

[13] To the extent Defendants argue that proximate causation is not met because governments may *also* be a victim of their alleged scheme through reduced site commission payments, that would not make Plaintiffs' injuries any less direct. Indeed, courts have recognized that "there can be more than one direct victim of RICO violations." *O'Shea v. Harding*, No. 4:16-cv-15, 2017 WL 1347044, at *5 (N.D. Ind. Feb. 10, 2017); *see also Hume*, 914 F.3d at 652 (noting government agency receiving fraudulent communications could assert RICO claims, which would not preclude plaintiff from also doing so and stating, "[t]he defendants assume there can be only one direct victim entitled to recover damages under RICO, but that is not always the case").

governments that contracted with Securus raised concerns about the high prices charged to consumers for Securus's single calls" and that Securus's misrepresentations regarding the enormity of transaction fees paid to 3CI "were effective in persuading" those governments to accept the steep single call rates. ¶¶ 146-47.

Moreover, the Complaint contains unambiguous statements from Defendants' former executives establishing that, in the absence of the misrepresentations and omissions, contracting governments would have required Securus and GTL to lower the prices of single calls. The Complaint alleges, "a former GTL manager explained that had contracting governments learned 'that the actual value of transaction fees paid to a third-party vendor to implement single calls was less than half of the price charged to consumers for those single calls,' then 'the majority of those governments would have insisted on lowering the price of single calls to consumers.'" ¶ 172 (also quoting a former Securus executive who made a similar statement). Indeed, another former GTL employee explained that contracting governments overwhelmingly favored GTL's lower-priced APOC product once it came onto the market and contracting governments learned about it. ¶ 99.

Comparing Defendants' single call prices and the per-minute rates that contracting government negotiated and included in ICS contracts supports these assertions. *Even after the deduction of all actual transaction fees*, the amounts that Securus and GTL charged for each single call were *several times higher* than what consumers would have paid for the same call had those consumers been charged the per-minute rate to which contracting governments agreed. ¶¶ 138, 173. This is also not speculation; it is math.

In arguing that Plaintiffs' injuries are too speculative, Defendants rely heavily on *Rojas v. Delta Airlines, Inc*, a case that is readily distinguishable. MTD at 27-28. In *Rojas*, plaintiffs were Mexican citizens who purchased airfare from one of eight American-based airline defendants. 425

F. Supp. 3d 524, 531 (D. Md. 2019). These eight airlines allegedly coordinated in a conspiracy to improperly collect a "Mexican tourism" tax from these plaintiffs, who should have been exempt from the tax. *Id.* The court in *Rojas* dismissed the RICO claims on multiple grounds unrelated to causation: "[a]s a preliminary matter," the pleading failed to provide the required level of particularity as to the alleged fraud, and the court held there was no factual support for the allegation that the eight airlines operated as an enterprise. *Id.* at 540. Thus, the court's sparse causation analysis was dicta. Furthermore, that court expressed disbelief about the "attenuated," vague, and highly speculative theory of causation alleged: that, in the absence of defendants' misrepresentations, the Mexican government would—and could—somehow intervene to "dismantle[] Defendants' alleged scheme" and change how these eight commercial airlines charged tourism taxes in the American marketplace. *Id.* at 542.

Plaintiffs' allegations here are categorically different from those in *Rojas*: they meet the particularity standard and are bolstered by witness testimony directly linking the alleged fraud and Plaintiffs' injury. Unlike the undefined and "attenuated" steps the Mexican government may or may not have taken to "dismantle" activity on the open American market in *Rojas*, here Defendants' own former employees have asserted that contracting governments would have insisted on lowering single call prices in the absence of Defendants' misstatements.

**B. Plaintiffs' RICO Claims Predicated on Misrepresentations Directed to Consumers Are Adequately Pled.**

Defendants argue that their alleged misrepresentations and omissions *to consumers* cannot serve as predicate acts to the RICO scheme because those misrepresentations and omissions were not material, and further, no one relied on them. MTD at 28. In so arguing, however, Defendants misconstrue the law. Mail and wire transmissions must simply be "incident to"—not "material"

37

to—a scheme to defraud in order to constitute acts of mail and wire fraud, and reliance on those mail and wire transmissions is not required so long as *someone* relied on the overall scheme to plaintiff's detriment. *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989); *Bridge*, 553 U.S. at 658. Here, the alleged mail and wire transmissions to Plaintiffs and other consumers were, at a bare minimum, "incident to" a scheme to defraud them, and contracting governments relied on the overall RICO scheme to the detriment of consumers.

### 1.   Plaintiffs need not plead materiality as to each individual predicate act.

Contrary to Defendants' suggestion, there is no requirement to plead materiality *as to each* mail or wire transmission that constitutes a predicate RICO act. While materiality is a requirement of pleading statutory mail and wire fraud violations, that requirement applies to the *overall fraudulent scheme*—not to individual wire transmissions or mailings. The law is clear that individual mail and wire transmissions need not even contain a misrepresentation or omission to constitute a predicate act, let alone a material one.

"[T]o show mail or wire fraud as a predicate act, a plaintiff must show (1) a scheme to defraud and, (2) use of the mails or wires in furtherance of the scheme." *Ekstrom v. Cong. Bank*, No. 20-cv-1501, 2020 WL 6565251, at *21 (D. Md. Nov. 6, 2020). "[T]he use of the mails need not be an essential element of the scheme." *Schmuck*, 489 U.S. at 710. "It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot[.]'" *Id.* at 710-11 (citations omitted). Thus, to serve as a predicate act to a RICO scheme, a mail or wire transmission "need only be a necessary step in furtherance of a scheme, and need not be fraudulent in and of itself." *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 595 (D. Md. 2014) (citation omitted).

The Fourth Circuit explained, "[m]ail fraud occurs when an individual, having devised a

plot to defraud, uses the mail in order to further their plot. 'The gravamen of the offense is the scheme to defraud, and any mailing that is *incident to* an essential part of the scheme satisfies the mailing element, *even if the mailing itself contains no false information*.'" *Biggs v. Eaglewood Mortg., LLC*, 353 F. App'x 864, 866 (4th Cir. 2009) (quoting *Bridge*, 553 U.S. at 647 (emphasis added)); *see also Pereira v. United States*, 347 U.S. 1, 8 (1954) (holding that the mere mailing of a check by defendant was sufficient to constitute mail fraud).

Defendants cite only two cases in support of their contrary argument, and neither stands for the pleading requirement they attempt to impose here—*i.e.*, that each mail and wire transmission that constitutes an alleged predicate act must itself contain material misrepresentations or omissions. The first cited decision, *Donaldson v. Severn Savings Bank, F.S.B.*, merely holds that materiality is an element of mail and wire fraud violations and does not address the contents required of individual mail or wire transmissions. No. 15-cv-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015). The second cited case, *Lewis v. Microsoft Corp.*, stands only for the proposition that wire fraud cannot be shown when the misstatement at the heart of the overall scheme to defraud (*i.e.* an incorrect date in a trademark application) is immaterial. 410 F. Supp. 2d 432, 439 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007).

Here, Plaintiffs have pled that the alleged mail and wire transmissions to consumers were "incident to" a fraudulent scheme and thus properly constitute predicate acts under RICO. The Complaint details a scheme to defraud Plaintiffs by charging them artificially inflated and fabricated transaction fees when they accept single calls. ¶¶ 239-40. The Complaint identifies three categories of misrepresentations and omissions made to consumers through the mail or wires that were, at a bare minimum, "incident to" the overall scheme. The first involves Defendants billing and charging Plaintiffs a fabricated $13.19 transaction fee to accept a PayNow or Collect2Card

call, and the second involves Defendants charging Plaintiffs the artificially inflated price of $9.99 to accept a Text2Collect or Collect2Phone call. ¶¶ 164-67. Both charges undeniably further the scheme to defraud, as they are the vehicles by which Defendants deprive consumers of their money. *See, e.g.*, *Zito v. Leasecomm Corp.*, No. 02-cv-8074, 2004 WL 2211650, at *14 (S.D.N.Y. Sept. 30, 2004) (holding that use of wires to "deduct money from bank accounts and charge credit cards" was "sufficient to constitute predicate acts"). The third category of misrepresentations directed to consumers (and governments) are statements on the websites for PayNow and Collect2Card that falsely claim transaction fees for those calls equal $13.19. ¶¶ 159-60. Those misrepresentations further the scheme to defraud because they market and justify the pricing for single calls purchased by consumers. *See, e.g.*, *Dolan v. Jetblue Airways Corp.*, 385 F. Supp. 3d 1338, 1353 (S.D. Fla. 2019) (statements on defendants' website misrepresenting true nature of charges constitute predicate acts of wire fraud in RICO scheme).

## 2. Plaintiffs need not plead reliance as to each individual predicate act.

Defendants further insist that Plaintiffs demonstrate reliance as to *each* predicate act at the pleading stage. Yet, as discussed above, a mail or wire transmission *need not even contain* a misrepresentation or omission to constitute a predicate act, let alone contain a misrepresentation or omission on which someone relied. As the Supreme Court has held, "[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate racketeering act under RICO, even if no one relied on any misrepresentation." *Bridge*, 553 U.S. at 648 (2008) (citation omitted); *see also Biggs*, 353 F. App'x at 867 ("[U]sing the mail in furtherance of a scheme to defraud is a predicate act of racketeering under RICO, even if there is no reliance on the misrepresentation. If the defendant has engaged in a pattern of such behavior, he will be liable under RICO, without anyone actually relying on a fraudulent misrepresentation.").

The Supreme Court acknowledged that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Bridge*, 553 U.S. at 659 (emphasis added). Yet, Defendants incorrectly extrapolate from this holding that Plaintiffs must establish reliance as to *each* mail or wire transmission directed to consumers, *i.e.* each billing charge or website statement. MTD at 30. Rather, the Supreme Court's holding only requires Plaintiffs to establish that *someone* relied on the *overall* fraudulent scheme, not on each and every predicate act.

*Robinson v. Fountainhead Title Group Corp.* is instructive. No. 03-cv-3106, 2009 WL 539882, at *12 (D. Md. Mar. 3, 2009). In that case, homeowners alleged they had been charged sham fees for title work that concealed kickbacks. *Id.* The homeowners based their RICO claim on mail fraud that consisted of receiving mailings about those sham fees *after* the fees had been paid. *Id.* The court originally dismissed the RICO claim, holding that "the allegedly fraudulent scheme already was consummated by the time the title policies and attached correspondence were mailed out" and thus "'reliance' did not further the fraud-which already was complete . . ." *Robinson v. Fountainhead Title Grp. Corp.*, 252 F.R.D. 275, 282-83 (D. Md. 2008). Yet following the Supreme Court's ruling in *Bridge*, the court reversed course, granting the homeowners' motion for reconsideration. The court explained that "the *Bridge* opinion makes clear that a RICO claim predicated on mail fraud is based on the fraudulent scheme rather than on a particular fraudulent mailing." *Robinson*, 2009 WL 539882, at *2. "Based on this clarification," the defendants' "argument that [the RICO claim] fails to allege any specific misrepresentations within a particular mailing is irrelevant." *Id*. The court added in a subsequent opinion that "Plaintiff need only show reliance on the scheme, not necessarily on any particular fraudulent mailing or misrepresentation." *Robinson v. Fountainhead Title Grp. Corp.,* 257 F.R.D. 92, 95 (D. Md. 2009).

For the same reason, Defendants' argument here that no one relied upon particular misstatements directed to consumers is also "irrelevant." The Complaint alleges that contracting governments relied on many of Defendants' misrepresentations and omissions that are part and parcel of the "fraudulent scheme." *See supra* 35-37. Those misstatements made to contracting governments—*i.e.* lies about the true value of the transaction fees associated with single calls— were reproduced by Defendants in billing charges and websites directed to consumers. For those misstatements directed to consumers to constitute RICO predicate acts, Plaintiffs need show only that such statements were "incident to" the fraudulent scheme, which Plaintiffs have done. *See supra* 39-40; *see also Ekstrom*, 2020 WL 6565251, at *25 ("[P]laintiffs need not have personally relied on any specific fraudulent mailing or wire in order to assert a civil RICO claim.").[14]

### 3. The misrepresentations to consumers were material and relied upon.

Finally, even were Plaintiffs somehow required to establish materiality and reliance as to every alleged predicate act—a requirement rejected by the Supreme Court and the Fourth Circuit— Defendants' argument would still fail. Defendants' fraudulent scheme could not have succeeded had they represented to contracting governments that the transaction fees for PayNow and Collect2Card were $13.19 per call, yet simultaneously revealed on each invoice to consumers and on websites that the actual transaction fees were only $4.35. It is an obvious inference that the effectiveness of Defendants' scheme was predicated on consistent misrepresentations to both governments and consumers. Thus, misrepresentations to consumers were material to the scheme.

---

[14] The cases cited by Defendants are not to the contrary. In *Walters v. McMahen*, for example, the Fourth Circuit did *not* hold that each predicate act must be relied on. 684 F.3d 435, 444 (4th Cir. 2012). Rather, it held that the alleged scheme (filing false I-9 forms to hire illegal immigrants) was not the direct cause of the plaintiffs' alleged injury (depressed wages for other legal workers). *Id*. Indeed, the Fourth Circuit found that if the defendants had *not* engaged in the alleged fraudulent scheme or any of the associated predicate acts, the plaintiffs' wages would remain unchanged. *Id*.

Furthermore, in paying for single calls, Plaintiffs relied on Defendants' fraudulent billing charges. Multiple courts have held that the overpayment of fraudulent billing charges itself constitutes adequate reliance for RICO claims. *See, e.g.*, *Robinson*, 257 F.R.D. at 95 ("[I]t would be a reasonable inference to assume that a class member who purchased services from [defendant] relied on the legitimacy of that organization in paying the rate charged."); *Catholic Health Care W. v. US Foodserv., Inc.*, 729 F.3d 108, 120 (2d Cir. 2013) ("In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."); *Bowe v. Pub. Storage*, 318 F.R.D. 160, 178-81 (S.D. Fla. 2015) ("[C]ausation can be reasonably inferred from a showing that class members actually paid the [false charges] that were billed as a separate item on class members' account receipts."); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560 (E.D. Va. 2000) (holding that "payments themselves" constitute evidence of reliance); *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 541-42 (N.D. Cal. 2015) ("the civil RICO claim's reliance element may be established by circumstantial evidence applicable to the class as a whole—the payment of the [BPO charges]").

## C. Plaintiffs' Claims for Conspiracy to Violate RICO Properly Allege a RICO Enterprise.

Defendants argue that Plaintiffs' two claims for conspiracy to violate RICO must be dismissed for failure to allege a proper enterprise. MTD at 30-31. Specifically, Defendants argue that the enterprises pleaded in those claims do not include the "rim" of a "hub and spoke" structure. *Id*. In support of their argument, Defendants cite to cases in which courts have held that allegations of an *association-in-fact* enterprise are inadequate when the complaint alleges a "hub and spoke"

enterprise but is otherwise bereft of allegations that the spokes collaborated with each other. *Id.*

Defendants' argument is without merit for two reasons. First, Defendants mischaracterize the Complaint. The first conspiracy to violate RICO claim (Count 6) does *not* even allege an association-in-fact enterprise (let alone one involving a "hub and spoke" structure). Rather, the count states that "the corporation 3CI constituted an 'Enterprise' within the meaning of 18 U.S.C. § 1961(4)." ¶ 306. It is well-established law that a stand-alone corporation can qualify as a RICO enterprise. *See, e.g.*, *WW, LLC v. Coffee Beanery, Ltd.*, No. 05-cv-3360, 2012 WL 3728184, at *13 (D. Md. Aug. 27, 2012) ("[A]n enterprise may be a single individual or corporation . . . ."). Indeed, the RICO statute itself defines an "enterprise" as "any individual, partnership, *corporation*, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Defendants never challenge the adequacy of alleging 3CI as a RICO enterprise (which Counts 2, 4, and 6 do).[15]

Secondly, when the Complaint actually does allege an association-in-fact enterprise in the alternative conspiracy to violate RICO claim (Count 7), it properly alleges that the spokes, Securus and GTL, collaborated with each other, thus establishing the rim.[16] For example, a former GTL manager explained that employees of GTL and Securus "regularly shared with one another

---

[15] An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Ekstrom*, 2020 WL 6565251, at *18. The Complaint properly alleges all three elements when designating 3CI alone as the enterprise. *See* ¶¶ 211, 260.

[16] An association-in-fact enterprise must have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Defendants' arguments regarding the sufficiency of the "rim" implicate the second structural feature, *i.e.* "relationships among those associated with the enterprise." Defendants do not challenge whether the alleged association-in-fact enterprise in Count 7 possesses sufficient purpose or longevity, and both structural features are adequately alleged in the Complaint. ¶¶ 323, 326, 330-31, 335, 338.

considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments." ¶ 115. These "statements" and persuasion techniques go to the heart of the pattern of racketeering in the RICO counts: misrepresentations and omissions to state and local governments regarding the costs of single calls.

Moreover, the Complaint pleads that Defendants' misrepresentations and omissions to state and local governments were extensions of the price-fixing agreement reached between Securus and GTL. In Count 7, Plaintiffs allege that "Defendants made, and directed the Enterprise to make, the same fraudulent misrepresentations and omissions by design. After Securus and GTL agreed to fix the prices of single calls, Defendants simultaneously made, and directed the Enterprise to make, the material misrepresentations and omissions to contracting governments and consumers in order to charge those artificially inflated, fixed prices." ¶ 336.[17]

Such allegations plausibly establish the rim of a "hub and spoke" enterprise. In fact, in one of the cases cited by Defendants, the Third Circuit held that allegations of bid rigging between defendant insurers were sufficient to establish the rim of a hub and spoke enterprise, even though there were *no* allegations that those insurers communicated with each other regarding the bid-rigging scheme. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("[T]here are no allegations that any insurer ever horizontally disclosed to its competitors the details of its

---

[17] By contrast, in the cases cited by Defendants, there was *no evidence* that the spokes cooperated with each other. For example, in *Donaldson v. Primary Residential Mortgage, Inc.,* the court held that "the Complaint is devoid of facts connecting the spokes. In other words, the Complaint is bereft of allegations suggesting that the participating mortgage lenders were working together in furtherance of the scheme or, indeed, that they were even aware of each other's existence." No. 19-cv-1175, 2020 WL 3184089, at *26 (D. Md. June 12, 2020); *see also Kadow v. First Fed. Bank*, No. 8:19-cv-00566-PWG, 2020 WL 5230560, at *10 (D. Md. Sept. 2, 2020) ("[I]n this case there are no allegations that indicate any of the participating lenders were in agreement together.").

vertical agreement with a broker."); *see also St. Gregory Cathedral Sch. v. LG Elecs., Inc*., No. 6:12-cv-739, 2015 WL 11121531, at \*5 (E.D. Tex. Mar. 13, 2015).

## III.     PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS AGAINST 3CI.

### A. The Complaint Adequately Alleges 3CI's Participation in the Antitrust Conspiracy.

Defendants make two meritless arguments to dismiss Plaintiffs' antitrust claim against 3CI. First, Defendants argue that the Complaint does "not allege 3Ci competes with Securus or GTL, or that 3Ci provides the ICS products as to which prices allegedly were fixed." MTD at 32. Yet, it is well-established law that "noncompetitors may be held liable for antitrust liability." *Kravco Co. v. Valley Forge Ctr. Assoc*., No. 91-cv-4932, 1992 U.S. Dist. LEXIS 375, at \*6-8 (E.D. Pa. Jan. 13, 1992); *see also Tondas v. Amateur Hockey Ass'n,* 438 F. Supp. 310, 315 (W.D.N.Y. 1977) ("A non-competitor who agrees, contracts or conspires with another to restrain trade or commerce is subject to the anti-trust laws.").

Second, citing *Rojas*, 425 F. Supp. 3d at 543, Defendants contend that "as to *each* Defendant, the Complaint must 'identify the particular time, place, and manner in which the antitrust conspiracy initially formed.'" MTD at 33. This assertion misrepresents the law. *Rojas* addresses only the requisite standard to establish the *existence* of an antitrust conspiracy—not what allegations are required to establish liability for a particular co-conspirator. *Rojas*, 425 F. Supp. 3d at 543. And *Twombly* does not subject Plaintiffs to a heightened pleading standard. *See supra* 24.

Rather, this Court has explained that to attach liability to a particular defendant, an antitrust claim need only "be linked to" that defendant so as "to place it on notice as to what it is alleged to have done." *Jien*, 2020 WL 5544183, at \*6. Indeed, "[a]ntitrust law takes a broader view of the sorts of activities that can make a party a co-conspirator under the Sherman Act." *In re Zetia Ezetimibe Antitrust Litig*., No. 2:18-md-2836, 2019 WL 6977405, at \*4 (E.D. Va. Dec. 20, 2019).

For example, "[a]n antitrust conspirator need not be involved in all aspects of the conspiracy," and "a party can still be a proper antitrust defendant even if it joined the conspiracy later than its co-conspirators." *Id*. In fact, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Va. Vermiculite, Ltd. v. W.R. Grace & Co*., 156 F.3d 535, 541 (4th Cir. 1998) (citation omitted).

Here, the Complaint "links" the antitrust claim to 3CI by placing the company on notice that it engaged in two specific forms of misconduct in furtherance of the conspiracy: (i) facilitating formation of the anticompetitive agreement and (ii) implementing that anticompetitive agreement. The Complaint contains substantial allegations that 3CI facilitated the formation of the anticompetitive agreement, including:

- The "horizontal agreement between ostensible competitors Securus and GTL to fix single call prices" was "reached with the direct assistance and active participation of 3CI." ¶ 78.

- In November 2012, Securus purchased 3CI's patent covering technology used to charge mobile phone accounts for single calls and, simultaneously, awarded 3CI an exclusive license to use the patent for a period of 10 years. ¶ 73.

- As part of that agreement, "3CI was not able to provide the technology it patented for charging mobile phone accounts to GTL without Securus's express permission."[18] ¶ 75.

---

[18] To rebut this allegation, Defendants attach an exhibit to their motion which they claim constitutes a licensing agreement between 3CI and Securus. ECF No. 73 [filed under seal]. Yet, the exhibit and related counterargument are not appropriately considered at the pleading stage. As a preliminary matter, the exhibit is *unsigned*. Accordingly, there is no evidence that it is a final version of a licensing agreement or even legally enforceable. Moreover, the exhibit does not contradict any of the Complaint's allegations. Nowhere does the Complaint allege that Securus's veto power over any contract between 3CI and GTL was contained in the *primary written licensing agreement*. That requirement, which was disclosed to Plaintiffs' counsel by a confidential witness, may stem from an oral agreement or written side agreement; indeed, it is commonplace for antitrust conspirators to avoid memorializing anticompetitive agreements in writing. *See, e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) (noting "most would-be monopolists" would not "reduce their entire anticompetitive agreement to writing"). At most, the unsigned exhibit introduces a disputed issue that must be resolved by a trier of fact, as this Court must "accept as true all well-pled facts in the complaint and construe them in the light most favorable to" Plaintiffs. *SD3*, 801 F.3d at 422.

- As "a condition of providing" permission to 3CI to contract with GTL, "Securus insisted that any agreement between 3CI and GTL contain terms that require GTL's single call program to charge the same prices as Securus's single call program." *Id.*

- "In late 2012, at the direction of Securus, 3CI approached GTL to persuade GTL to enter into a contract for 3CI to provide a single call program," but "GTL initially declined 3CI's offer" because GTL was developing "its own single call platform." ¶ 76.

- In the end, "Securus and 3CI ultimately persuaded GTL" not to launch APOC, and instead "to contract with 3CI so that GTL and Securus could both charge the exact same inflated price for single calls and pay the exact same low site commissions." *Id.*

These allegations plausibly plead 3CI's key role in establishing the price-fixing agreement. *See, e.g.*, *Zetia*, 2019 WL 6977405, at *3 (denying motion to dismiss where the defendant was allegedly involved in negotiating the anticompetitive agreement with coconspirators).

Furthermore, the Complaint details how 3CI implemented the price-fixing agreement. Specifically, the Complaint alleges that 3CI: deployed an automated system to offer Securus's and GTL's single call products to consumers; charged consumers' credit cards the same price of $14.99 for single calls offered by Securus and GTL; charged consumers' mobile phone accounts the same price of $9.99 for single calls offered by Securus and GTL; after retaining a portion of the revenue from those calls as a transaction fee, transmitted the remainder to Securus and GTL as profit; operated and maintained websites for the single call products that contained identical, false language; and operated a call center to address concerns raised by purchasers of Securus's and GTL's single calls. ¶¶ 62-66, 78-86. These allegations show that 3CI was central to implementing the price-fixing agreement and, thus, is properly named a defendant in the antitrust claim.[19] *See,*

---

[19] *SD3* does not hold otherwise. 801 F.3d at 422-23. In that case, the plaintiff failed to allege *any* facts pertaining to some of the defendants. *Id.* For that reason, the Fourth Circuit ruled that the complaint must "'specify how these defendants [were] involved in the alleged conspiracy,' without relying on 'indeterminate assertions' against all 'defendants.'" *Id.* (citation omitted). The Complaint here does exactly that with respect to 3CI's participation in the conspiracy.

*e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 69 n.12 (2d Cir. 2012) (holding that "seriously implement[ing]" a price-fixing conspiracy is a critical component of the conspiracy).

**B. The Complaint Properly Alleges that 3CI Conducted Predicate Acts Incident to the RICO Scheme.**

Plaintiffs allege six RICO counts. Three of those counts (*i.e.* 2, 4, and 6) do not name 3CI as a defendant. The three other RICO counts (*i.e.* 3, 5, and 7) are pled in the alternative and do name 3CI as a defendant. Defendants argue, without merit, that Plaintiffs have failed to properly name 3CI as a defendant in those three alternative counts because the Complaint does "not adequately plead that 3Ci committed the predicate acts of mail or wire fraud." MTD at 34-35.

Defendants first argue that 3CI had no "participation or involvement" in any alleged misrepresentations to contracting government. This is inaccurate. The Complaint alleges that 3CI created, updated, and maintained public websites for Securus's PayNow and GTL's Collect2Card and that 3CI made misrepresentations to both *contracting governments* and consumers through those websites. ¶¶ 219, 268. The Complaint specifically alleges that the websites were "accessible to consumers and governments" and "directed toward consumers and governments." ¶¶ 142, 159. Indeed, the title of the relevant Complaint subsection is: "Misrepresentations and Omissions in Public Websites to Contracting Governments and Consumers." ¶159.

The Complaint explains that those websites falsely "stated that each single call charging $14.99 involves a 'Transaction Fee' of $13.19 and a 'Call Fee' of $1.80" and also "fail[ed] to disclose to consumers and contracting governments that a substantial majority of the so-called 'Transaction Fee' charged for the $14.99 single calls is kicked back to Securus and GTL as profit." ¶¶ 159, 161. The Complaint also alleges that when "establishing and updating the websites, 3CI knew of the misrepresentations that Securus and GTL were making to contracting governments

and, at their direction, intentionally aligned the false pricing information on its website to be consistent with Securus's and GTL's misrepresentations to contracting governments." ¶ 162. Accordingly, 3CI committed wire fraud by making misrepresentations *to contracting governments* about the enormity of transaction fees in websites directed to them.

Defendants' second argument acknowledges 3CI's involvement in alleged misrepresentations to consumers in the form of billing charges and public websites. Yet, Defendants argue that those misrepresentations "fail to support RICO claims because those alleged statements could not have constituted material misrepresentations, nor could they have been relied upon by anyone." MTD at 35. As discussed in above, contrary to Defendants' suggestion, there is no requirement to plead materiality or reliance as to each predicate act. *See supra* 38-42. Rather, for those misrepresentations directed toward consumers to be deemed predicate acts, Plaintiffs need only allege the existence of a fraudulent scheme and that those misrepresentations were made "incident to" that scheme, which Plaintiffs have done. *See supra* 39-40. Finally, as also discussed above, though reliance and materiality are not required to establish that billing charges directed to consumers constitute predict acts, those charges were material to the RICO scheme and payment of them constituted reliance. *See supra* 42-43.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.[20]

---

[20] Contrary to Defendants' suggestion, Plaintiffs' decision not to amend their well-pleaded complaint *prior* to a decision on the dismissal motion does not disturb the liberal standard that courts must "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

Dated: December 18, 2020

Respectfully submitted,

*/s/ Matthew K. Handley*
Matthew K. Handley (D. Md. Bar # 18636)
Rachel Nadas (*pro hac vice* forthcoming)
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW, Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com

George F. Farah (admitted *pro hac vice*)
Rebecca Chang (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com

William A. Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Benjamin D. Brown (admitted *pro hac vice*)
Brent W. Johnson (admitted *pro hac vice*)
Robert A. Braun (admitted *pro hac vice*)
Christopher J. Bateman (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW
5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
rbraun@cohenmilstein.com
cbateman@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

51

Benjamin D. Elga (admitted *pro hac vice*)
Alice Buttrick (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.
81 Prospect Street
Brooklyn, NY 11201
Telephone: 518-732-6703
belga@justicecatalyst.org
abuttrick@justicecatalyst.org

Brian J. Shearer (admitted *pro hac vice*)
Craig L. Briskin (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.
718 7th St. NW
Washington, DC 20001
Telephone: 518-732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Daniel Marshall (*pro hac vice* forthcoming)
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
dmarshall@hrdc-law.org

Hannah E.M. Lieberman (D. Md. Bar #05456)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Ste 400
Washington, DC 20005
Telephone: (202) 319-1040
Hannah_Lieberman@washlaw.org

*Counsel for Plaintiffs*