## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| ASHLEY ALBERT, et al., | Civil Action No. 8:20-CV-1936 |
| Plaintiffs, | |
| v. | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| GLOBAL TEL*LINK CORP., et al., | |
| Defendants. | |

MORGAN LEWIS & BOCKIUS, LLP
Jason R. Scherr, Esquire, Bar No. 25633
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.6000
F: 202.373.6001
jr.scherr@morganlewis.com

Elizabeth Herrington*
77 W. Wacker Drive
Chicago, IL 60601
T: 312.324.1000
F: 312.324.1001
beth.herrington@morganlewis.com

R. Brendan Fee*
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5000
F: 215.963.5001
brendan.fee@morganlewis.com

COUNSEL FOR DEFENDANT SECURUS
TECHNOLOGIES, LLC

ARNOLD AND PORTER KAYE SCHOLER LLP
Jonathan I. Gleklen, Esquire, Bar No. 21350
Katherine Clemons*
Monique Boyce*
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
T: (202) 942-5000
F: (202) 942-5999
jonathan.gleken@arnoldporter.com
katherine.clemmons@arnoldporter.com
monique.boyce@arnoldporter.com

Charles Scott Lent*
Javier Ortega*
250 West 55th Street
New York, NY 10019-9710
T: (212) 836-8000
F: (212) 836-8689
scott.lent@arnoldporter.com
javier.ortega@arnoldporter.com

COUNSEL FOR DEFENDANT GLOBAL
TEL*LINK CORP.

WILLIAMS & CONNOLLY LLP
Jonathan B. Pitt, Bar No. 16086
Colette T. Connor*
725 Twelfth Street, NW
Washington, DC 20005
T: 202.434.5000
F: 202.434.5029
jpitt@wc.com
cconnor@wc.com

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Jay B. Shapiro*
150 West Flagler Street, Suite 2200
Miami, FL 33130
T: 305.789.3229
F: 305.789.2664
jshapiro@stearnsweaver.com

COUNSEL FOR DEFENDANT
3CINTERACTIVE CORP.

* admitted *pro hac vice*

# TABLE OF CONTENTS

                                                                                                    **Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT..................2

        A.      Plaintiffs Fail to Allege a Price-Fixing Agreement Among Defendants. ...............2

                1.      Plaintiffs Do Not Allege Direct Evidence of a Price-Fixing
                        Agreement. ................................................................................................2

                2.      Plaintiffs Fail to Allege Adequate Circumstantial Evidence of a
                        Conspiracy. ...............................................................................................5

                        a.      GTL's Decision to Launch Its Single-Call Products at the
                                Same Price as Securus's Does Not Suggest a Conspiracy..............6

                        b.      Plaintiffs' Alleged "Plus Factors" Do Not Plausibly
                                Suggest a Conspiracy to Fix Prices.................................................7

        B.      Plaintiffs Cannot Base Their Antitrust Claims on Securus's and GTL's
                Respective Agreements with 3Ci Alone. ................................................................12

        C.      Plaintiffs' Allegations Fail to Establish Antitrust Standing..................................13

II.     PLAINTIFFS' RICO CLAIMS Should be Dismissed........................................................16

        A.      Plaintiffs Have Not, and Cannot, Satisfy Their Burden to Plausibly Allege
                Proximate Causation Under the RICO Statute.......................................................16

        B.      Plaintiffs' RICO Claims Cannot Be Predicated on Misrepresentations
                Directed to Consumers on Websites and Billing Charges. ....................................21

        C.      Plaintiffs' RICO Conspiracy Claims Fail. ............................................................23

III.    DEFENDANTS FAIL TO STATE A CLAIM AS TO 3Ci..............................................24

        A.      Plaintiffs Fail Adequately to Allege 3Ci's Involvement in a Price-Fixing
                Scheme. ..................................................................................................................24

        B.      Plaintiffs Do Not Adequately Allege 3Ci Committed a RICO Predicate
                Act. .........................................................................................................................28

IV.     DISMISSAL OF PLAINTIFFS' CLAIMS SHOULD BE WITH PREJUDICE...............30

CONCLUSION.......................................................................................................................30

i

**Cases**

*In re Actimmune Mktg. Litig.*,
  614 F. Supp. 2d 1037 (N.D. Cal. 2009) ...............................................................22

*Akers v. Md. State Educ. Ass'n*,
  376 F. Supp. 3d 563 (D. Md. 2019) ....................................................................25

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) .....................................................................2, 3, 5, 9

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ..........................................................................17, 19, 20

*Associated General Contractors of California, Inc. v. California State Council of*
  *Carpenters*, 459 U.S. 519 (1983) .........................................................................1

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) .................................................................................11

*Baehr v. Creig Northrop Team, P.C.*,
  953 F.3d 244 (4th Cir. 2020) ...............................................................................20

*Barr Labs. v. Quantum Pharmics, Inc.*,
  No. 90 Civ. 4406, 1994 WL 1743983 (E.D.N.Y. Feb. 7, 1994) ............................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 554 (2007) .................................................................................. *passim*

*Brandenburg v. Seidel*,
  859 F.2d 1179 (4th Cir. 1988) .............................................................................20

*Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*,
  No. 6:14-CV-6002-ORL-31TBS, 2016 WL 866582 (M.D. Fla. Mar. 7, 2016) .....................11

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ..................................................................................21, 28

*Chisolm v. TranSouth Fin. Corp.*,
  194 F.R.D. 538 (E.D. Va. 2000) ..........................................................................21

*City of Tuscaloosa v. Harcros Chems., Inc.*,
  158 F.3d 548 (11th Cir. 1998) .............................................................................12

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ........................................................13

*Dolan v. JetBlue Airways Corp.*,
    385 F. Supp. 3d 1338 (S.D. Fla. 2019) ..........................................22

*Donaldson v. Primary Residential Mortg., Inc.*,
    No. CV ELH-19-1175, 2020 WL 3184089 (D. Md. June 12, 2020) ......................24

*Donaldson v. Severn Sav. Bank, F.S.B.*,
    No. CV JKB-15-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015) ................23, 29

*Figueroa Ruiz v. Alegria*,
    896 F.2d 645 (1st Cir. 1990) ........................................................16

*Finley Alexander Wealth Mgmt., LLC v. M&O Mktg.*,
    No. GJH-19-1312, 2020 U.S. Dist. LEXIS 48678 (D. Md. Mar. 20, 2020) ..............29

*Firestone v. Galbreath*,
    976 F.2d 279 (6th Cir. 1992) ........................................................19

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..........................................................12

*G&G TIC, LLC v. Ala. Controls, Inc.*,
    No. 4:07-CV-162 (CDL), 2008 WL 4457876 (M.D. Ga. Sept. 29, 2008)..............22

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..............................................6

*GSI Tech. v. United Memories, Inc.*,
    No. 5:13-cv-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ..............14

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)................................................................16

*In re Interior Molded Doors Antitrust Litig. ("IMD")*,
    No. 3:18-cv-00718, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ............6, 10, 11

*Jien v. Perdue Farms, Inc.*,
    No. 1:19-cv-2521, 2020 WL 5544183 (D. Md. Sept. 16, 2020).................... *passim*

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ........................................................5

*Koger v. Robert Half Int'l*,
    2007 WL 712225 (W.D. Pa. Mar. 7, 2007) ..........................................28

*Lewis v. Casey*,
    518 U.S. 343 (1996)......................................................................................20

*Lewis v. Microsoft Corp.*,
    410 F. Supp. 2d 432 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007)....................23

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
    201 F.3d 436, No. 98-2847, 1999 WL 691840 (4th Cir. June 8, 1999)
    (unpublished) ..................................................................................................7

*Moore v. Hartman*,
    102 F.Supp.3d 35 (D.D.C. 2015) ..............................................................28

*Neder v. United States*,
    527 U.S. 1 (1999)...................................................................................23, 28

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) ......................................................................14

*SD3, LLC v. Black & Decker, Inc.*,
    801 F.3d 412 (4th Cir. 2015) ..............................................................9, 11, 25

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
    873 F.3d 574 (7th Cir. 2017) ......................................................................22

*Somerville v. W. Town Bank & Trust*,
    No. PJM 19-0490, 2019 WL 6131288 (D. Md. Nov. 19, 2019)...............................13

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)......................................................................6, 8

*Superior Offshore International, Inc. v. Bristow Group Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010)...............................................................3

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) (Posner, J.) ................................................8

*In re Titanium Dioxide Antitrust Litig.*,
    959 F. Supp. 2d 799 (D. Md. 2013)...................................................8, 9, 10, 11

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008)........................................................................4

*United States v. Kimble*,
    No. WDQ-13-035, 2015 WL 4164820 (D. Md. July 8, 2015) ..............................28

*United States v. Maynes*,
    880 F.3d 110 (4th Cir. 2018) ...............................................................28, 29

*United States v. Raza,*
    876 F.3d 604 (4th Cir. 2017) ...................................................................23

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,*
    156 F.3d 535 (4th Cir. 1998) ...................................................................26

*Walters v. McMahen,*
    684 F.3d 435 (4th Cir. 2012) ...................................................................21

*Warnock v. Nat'l Football League,*
    356 F. Supp. 2d 535 (W.D. Pa. 2005)......................................................16

*White v. R.M. Packer Co.,*
    635 F.3d 571 (1st Cir. 2011) ....................................................................10

*Williamson Oil Co. v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) ................................................................10

*In re Zetia (Ezetimibe) Antitrust Litig.,*
    No. 2:18MD2836, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019)............25

**Statutes**

18 U.S.C. § 1962(c)-(d) ...............................................................................30

## INTRODUCTION

As explained in Defendants' opening brief (ECF No. 72-1) ("Mem."), Plaintiffs' Complaint fails adequately to allege either a price-fixing conspiracy under Section 1 of the Sherman Act or a violation of the Racketeering Influenced and Corrupt Organization Act ("RICO"). Plaintiffs' conclusory allegations of conspiracy fail to meet the pleading requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), and their alleged injuries are too remote to give rise to a claim under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). Likewise, the RICO claims fail for lack of proximate causation because Plaintiffs' alleged injury is indirect and derivative of harm suffered by the contracting governments. The RICO claims, based on purported misrepresentations on websites and bills, also fail because nobody relied on those alleged but immaterial statements.

Nothing in Plaintiffs' Opposition (ECF No. 75) cures these fatal defects or undermines Defendants' showing that Plaintiffs' claims should be dismissed with prejudice. The Opposition fails to address key cases cited in the Motion, misconstrues other cases, and fails to point to even a single case involving a fact pattern analogous to the allegations in the Complaint.

- Plaintiffs cite no case in which a claim based on little more than launching a product at the same price as an existing competitor survived a motion to dismiss. Not relevant here are cases involving years of parallel price moves among competitors or expressly acknowledging joining an unlawful agreement.

- Plaintiffs do not seriously address that the agreements between governments and Securus/GTL are an intervening cause of their alleged harm, and cite no case in which purchasing a product at a price determined by a defendant's contract with a third party constituted direct injury.

- Plaintiffs cite no case in which a plaintiff could establish the direct injury required to state a RICO claim based on allegations that the government either was a contracting party or would have acted differently absent alleged misrepresentations and that the plaintiff was harmed as a result of the government's decisions.

- Plaintiffs cite no case in which a RICO claim survived a motion to dismiss without an allegation that somebody relied upon a misrepresentation.

- Plaintiffs cite no case in which a party like 3Ci that did nothing more than provide back-office support for the operations of other alleged conspirators was found liable under the antitrust laws or RICO.

For all of these reasons, Plaintiffs' claims should be dismissed with prejudice.

## ARGUMENT

## I. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SHERMAN ACT

### A. Plaintiffs Fail to Allege a Price-Fixing Agreement Among Defendants.

Plaintiffs have alleged neither "direct" nor "circumstantial" evidence of an unlawful agreement. Plaintiffs raise no argument in their Opposition that can cure these pleading deficiencies.

#### 1. Plaintiffs Do Not Allege Direct Evidence of a Price-Fixing Agreement.

"Direct evidence . . . is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (citation and internal quotation marks omitted). "[A]dmissions by employees . . . of the conspirators" would constitute direct evidence. *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-2521, 2020 WL 5544183, at *5 (D. Md. Sept. 16, 2020) (citation omitted). But while the Complaint alleges that GTL's CEO and President "boasted about" meeting with Securus's CEO and how they "would discuss what prices should be charged for ICS calls," Compl. ¶ 77, it does *not* allege that Securus and GTL *agreed* on prices to be charged for *single call products*—the only products at issue. Given that Plaintiffs allege having an "anonymous source" within GTL, if that source knew of an agreement to fix prices of single call products before GTL launched its products in 2013, they could have so alleged in a simple declarative sentence. They did not, presumably because they cannot, and thus they have failed to allege direct evidence of a conspiracy.

The best Plaintiffs can do is argue that single call products "would have been part of conversations about 'what prices should be charged for ICS calls.'" Opp'n 14. The Complaint

does not allege that the discussions covered "what prices should be charged" for single call products, so the Court should not suppose that they would have done so based on Plaintiffs' general allegations. Plaintiffs' arguments about what "would have been" part of those conversations require "inferences" and are not direct evidence. *Am. Chiropractic Ass'n*, 367 F.3d at 226.

Even if the Complaint adequately alleged that prices for single call products were "discussed"—and it does not—there is no allegation that Securus and GTL *agreed* on prices to be charged, or even that the alleged discussions were to reach such an agreement. Plaintiffs do not distinguish *Superior Offshore International, Inc. v. Bristow Group Inc*., 738 F. Supp. 2d 505, 512– 13 (D. Del. 2010) (*see* Mem. 12), in which the court found the allegation that "everyone more or less agreed to the necessity of a more or less equal rate hike for everyone" was not direct evidence of a conspiracy. Plaintiffs here do not even allege that Securus and GTL "more or less agreed," only that they "discussed." They do not come close to alleging direct evidence of a conspiracy.

Unlike here, the cases Plaintiffs cite involve allegations of express statements of agreement that require no further inference. In *Jien*, 2020 WL 5544183, at \*5 (*see* Opp'n 14), the court found direct evidence where an employee of one of the defendants said, "[w]e would collaborate," noting that "[t]he word 'collaborate' is particularly damning," and placed substantial weight on the "discomfort at impropriety articulated in the [defendant] executive's statement, culminating in a suggestion that the company would no longer even attend the secret wage meetings . . . ." *Id*. at \*5-6. Here, there is no allegation of any "collaboration" on prices, or even any discussion of collaboration, or that anyone at GTL or Securus believed the discussions were improper.

Plaintiffs' reliance on *In re Dealer Management Systems Antitrust Litigation*, (*see* Opp'n 12), is likewise misplaced. The plaintiffs there alleged that a defendant's executive told an employee that "he was 'in communications' with other . . . providers to join 'in the agreement to

block independent data integrators . . . .'" 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018). An express statement regarding joining an agreement to engage in an illegal group boycott is direct evidence. Plaintiffs' allegations are not. Similarly, *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008) (*see* Opp'n 15) involved express statements that "dealers 'did not compete on price'" and that "there was a 'gentleman's agreement' among Mack truck dealers . . . ." *Id.* at 220. Such direct admissions of an agreement are a far cry from the allegations here.

Plaintiffs' arguments suffer from an even more fundamental flaw: the statements they tout bear no connection to the alleged mechanism of conspiracy. Plaintiffs' theory of liability does not rest on a price fixing conspiracy hatched over drinks between executives. Rather, "[i]n early 2013, at the direction of Securus, 3CI approached GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced as those provided by 3CI for Securus." Compl. ¶ 15. The allegation that Securus and GTL executives "discussed what prices should be charged" is not "direct evidence" of the alleged 3Ci-driven conspiracy. There is no allegation that executives of Securus and GTL even discussed 3Ci. If Plaintiffs had evidence from their "confidential source" of an agreement to use 3Ci to coordinate a price fixing agreement—which is the theory of liability they posit in the Complaint—they could have alleged it. They did not.

This fatal inconsistency between Plaintiffs' "direct evidence" and the actual mechanism of collusion underlying their claims is magnified by Plaintiffs' failure to allege *when* these alleged conversations between Securus and GTL executives occurred. Under Plaintiffs' theory, such discussions could be relevant only if they occurred before GTL launched its single-call products in 2013. *See also* Compl. ¶ 77 (alleging that the conspiracy was formed in "late 2012"). The Complaint conspicuously fails to identify the timing of these alleged conversations between Securus and GTL executives. That Plaintiffs' confidential source was allegedly employed at GTL

between 2011 and 2016, *id.*, says nothing about the timing of those conversations, other than they likely would have predated his departure in 2016. Only through impermissible "inferences," *Am. Chiropractic Ass'n*, 367 F.3d at 226, might one conclude that these conversations involved the conspiracy challenged in the Complaint; they are therefore not direct evidence. Again, if Plaintiffs had evidence from their "confidential source" that these conversations occurred before the launch of GTL single-call products, they could have alleged it. Their failure to do so undermines Plaintiffs' effort to characterize their allegations as direct evidence of a conspiracy.

2. **Plaintiffs Fail to Allege Adequate Circumstantial Evidence of a Conspiracy.**

Having failed to allege direct evidence of a conspiracy between Defendants, Plaintiffs must allege sufficient circumstantial evidence of a conspiracy to survive a motion to dismiss. Nothing in Plaintiffs' Opposition undermines the conclusion set out in Defendants' Motion: Plaintiffs have failed adequately to allege "something more" than parallel conduct as required to state a claim under *Twombly*. 550 U.S. at 556–57. The requisite "something more" consists of "plus factors" that describe the "who, did what, to whom . . . , where, and when" of the conspiracy. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Although Plaintiffs allege parallel conduct, Plaintiffs do not allege sufficient plus factors to make their claim of a conspiracy plausible.

Routine business conduct should not transform into a costly antitrust case by relabeling common features as "plus factors." Every business would make more money by fixing prices. And many firms operate in industries that a plaintiff might allege has high barriers to entry and inelastic supply and demand, and many participate in trade associations that provide "opportunities to collude." That Giant and Safeway charge $1.99 for eggs this week does not justify costly and burdensome fact discovery simply because their executives are members of the National Grocer's Association and they make more money charging $1.99 than $1.89. The same is true here.

This case looks nothing like the cases Plaintiffs cite. Because Plaintiffs have failed to allege the "something more" required by *Twombly*, Plaintiffs have not adequately alleged circumstantial evidence of a conspiracy, and their claims should be dismissed.

           a.      **GTL's Decision to Launch Its Single-Call Products at the Same Price as Securus's Does Not Suggest a Conspiracy.**

Evidence of parallel conduct by itself cannot establish a conspiracy. *See Twombly*, 550 U.S. at 557 (requiring parallel conduct to "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"). To enhance artificially the import of GTL's launch of single-call products at the same price as Securus, Plaintiffs characterize four aspects of GTL's launch pricing as "extensive allegations" of parallel conduct. Opp'n 17. But Plaintiffs cite no case in which allegations of a single instance of price matching at product launch survived a motion to dismiss. Plaintiffs fail to acknowledge, let alone distinguish, *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1021–22 (N.D. Cal. 2007), which held that an allegation that competitors announced products at the same price was insufficient under *Twombly*. *See* Mem. 16.

Nor can Plaintiffs point to a significant change in prices before and after an alleged conspiracy because there is no "before" here. The facts alleged here are distinguishable from cases in which prices charged by competitors moved in parallel over a long time in ways that made no sense given changes in costs, supply, or demand. *See, e.g.*, *Twombly*, 550 U.S. at 556 n.4 ("complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and for no other discernible reason" might suffice to take a claim based on parallel action beyond a motion to dismiss); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 320 (2d Cir. 2010) (plaintiffs' prices increased while costs were declining); *In re Interior Molded Doors Antitrust Litig. ("IMD")*, No. 3:18-cv-00718, 2019 WL 4478734, *2 (E.D. Va. Sept. 18,

2019) (nine price increases in which defendants raised prices by similar amounts); *see generally Jien*, 2020 WL 5544183, at *8 ("To find 'parallel conduct,' it is not enough to simply show that companies were acting similarly in *any* limited way.").

        b.    **Plaintiffs' Alleged "Plus Factors" Do Not Plausibly Suggest a Conspiracy to Fix Prices.**

Beyond parallel conduct, Plaintiffs must allege "plus factors" that "tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554. Plaintiffs' purported plus factors here are insufficient to push their allegations of an unlawful agreement "across the line from conceivable to plausible[.]" *Id.* at 570.

**Actions Against Self-Interest**: The most important "plus factor" is whether the defendants engaged in conduct contrary to their own economic self-interest and would be irrational absent a conspiracy. *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (Table), No. 98-2847, 1999 WL 691840, *10 (4th Cir. June 8, 1999) (unpublished). In *Rojas v. Delta Airlines, Inc.*, the court dismissed antitrust claims under Rule 12, despite the airlines' participation in a trade association and discussions of collecting taxes from passengers, because "Plaintiffs have not alleged sufficient facts to suggest that Defendants' actions were so against their self-interest that they 'rule out the possibility that the defendants were acting independently' and can only be explained by concerted action." 425 F. Supp. 3d 524, 543 (D. Md. 2019) (citing *Twombly*).

Plaintiffs' Complaint is silent in this regard. Plaintiffs do not allege, for example, that GTL would have made more money had it launched its single-call products at a price below the prices Securus was charging. Defendants' opening brief explained how the Complaint's allegations of inelastic demand demonstrate why there would be no more calls (and thus no more revenue) if GTL charged lower prices. Mem. 15–16. Plaintiffs concede that lower prices would not result in more minutes, so they instead speculate in a footnote (Opp'n 22 n.5) that GTL would have won

more government contracts by launching at a lower price. Thus, Plaintiffs argue, while the size of the pie would have remained unchanged, GTL would have won a bigger piece of that pie by charging lower prices. *Id*. The problem with that argument is that it runs headlong into the Complaint's allegation that if GTL had lowered prices, Securus would have been forced to reduce its prices in response. Compl. ¶ 98. That response would leave GTL in the same market share position, with no more government contracts and no more minutes of inmate calls. Thus, GTL would have made *less* money, not more, by undercutting Securus's price. With no plausible allegation that GTL acted contrary to its economic self-interest, the Complaint fails to state a claim and must be dismissed. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) (Posner, J.) ("We can, . . . without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it . . . .").

This case is nothing like *Starr v. Sony BMG Music Entertainment* (*see* Opp'n 22). In *Starr*, after launching their respective products "none of the defendants dramatically reduced their prices for Internet Music . . . despite the fact that all defendants experienced dramatic cost reductions in producing Internet Music." 592 F.3d at 323. It was irrational there for a firm not to cut prices when its costs went down because it could have grown overall demand and its own share. *Id*. at 324; *accord In re Titanium Dioxide Antitrust Litig.,* 959 F. Supp. 2d 799, 822 (D. Md. 2013) ("Price increases that are not correlated with principles of supply and demand may be especially probative of behavior contrary to self-interest." (citation omitted)). That fact pattern—pricing that remains static in response to changes in costs or demand—is not what is alleged in this case.

**Suspicious Communications and Opportunities to Collude**: The absence of opportunities to collude might make a conspiracy claim implausible, but alleging merely the

existence of opportunities to collude via trade association meetings and the like cannot render a conspiracy claim plausible under *Twombly*. Were the law otherwise, every allegation of parallel conduct involving firms that were members of a trade association could survive a motion to dismiss. *See, e.g.*, *Am. Chiropractic Ass'n*, (contacts and communications at advisory panel meeting do not support inference of anticompetitive conspiracy because "mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an anticompetitive conspiracy" (citation and internal quotation marks omitted) (alteration in original); *Rojas* 425 F. Supp. 3d at 543 (granting motion to dismiss despite many meetings between defendants).

Plaintiffs' reliance on the alleged meetings over drinks and discussions between Securus and GTL executives is flawed for the same reasons described above. Defendants described the legitimate reasons for meetings to "discuss what prices should be charged." Mem. 23. But regardless of those legitimate reasons, Plaintiffs do not even allege that these meetings occurred before GTL launched its single-call product. "Communications between competitors *followed by* a price increase by multiple sellers *may* indicate the prices rose pursuant to an agreement." *Titanium Dioxide*, 959 F. Supp. 2d at 830 (emphasis added). But the Complaint here does not allege that GTL and Securus communicated *before* GTL launched its single-call products, providing no basis to presume that the communications had anything to do with the conspiracy alleged. *Accord Rojas*, 425 F. Supp. 3d at 543 (granting motion to dismiss where "Plaintiffs have failed to identify the particular time, place, and manner in which the [antitrust conspiracy] initially formed." (alteration in original)); *cf. SD3, LLC v. Black & Decker, Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (reversing dismissal because plaintiff alleged "a particular meeting on a particular day with particular participants making a particular agreement that generated the conspiracy at issue").

**Industry Concentration, High Entry Barriers, Inelastic Demand**:   As with opportunities to collude, allegations of industry concentration, entry barriers, and inelastic demand may make successful collusion more likely, but they say nothing about whether the allegations of collusion here are plausible.  It is clear that highly concentrated markets do not in and of themselves lead to a plausible inference of a conspiracy.  *See White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("High barriers to entry and inelastic demand are two hallmarks of oligopolistic markets susceptible to successful parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices."); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003) (rejecting allegations of high barriers to entry and industry structure as plus factors because they "are simply indicia that the . . . industry is an oligopoly, which is perfectly legal").

Plaintiffs' cases are readily distinguishable.  In *IMD*, the court found allegations of conspiracy plausible not because of industry concentration, but because "[n]ine different times between 2012 and 2018, the defendants increased the price of [doors] in similar percentage increments[,]" prices increased despite falling input costs, and predecessors of the defendants had pled guilty to price fixing.  2019 WL 4478734, at *2.  Plaintiffs' Complaint alleges nothing like the key facts underlying *IMD* that would be necessary to render Plaintiffs' allegations of conspiracy plausible.  *Titanium Dioxide*, though not a Rule 12 case, involved "a long pattern of seemingly coordinated price increase announcements[,]" 959 F. Supp. 2d at 807, including price increases "despite declining demand[,]" *Id.* at 828, none of which Plaintiffs allege.

**Motive**:   Neither is "motive" a plus factor under *Titanium Dioxide*.  (Opp'n 18 n.3.) *Titanium Dioxide* clarifies that motive is the same as "'evidence that the industry is conducive to oligopolistic price fixing,'" including factors such as industry concentration and barriers to entry.

959 F. Supp. 2d at 822 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). For the reasons described above, industry concentration and entry barriers do not render the alleged conspiracy plausible, "motive" or not. Plaintiffs also cite *SD3*, 801 F.3d at 431 (*see* Opp'n 21), where collusion was plausible because the defendants acted against self-interest by refusing to license technology that would make their products safer. They had a "motive" to boycott the safer technology because "if one manufacturer adopted the technology, then non-adopting manufacturers could face liability exposure from their failure to employ [it]." 801 F.3d at 431. *SD3* does *not* hold that a motive to make more money, which is all that is alleged here (a motive shared by every for-profit business), is a plus factor. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134–35 (3d Cir. 1999) ("Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act."); *Brewer Body Shop, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-CV-6002-ORL-31TBS, 2016 WL 866582, at *6 (M.D. Fla. Mar. 7, 2016) ("If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss.").

**False or "Pretextual" Explanations for Pricing**: Plaintiffs cite *IMD*, 2019 WL 4478734, at *6 (cited Opp'n 22) in support of their argument that "false explanations" for prices are a plus factor. That is not what *IMD* says. The cited language refers to the "third and fourth plus factors" found by the court, which were "(3) IMD manufacturers have violated antitrust laws in the past; [and] (4) Masonite and JELD-WEN increased prices despite falling input costs." *Id*. at *5. *IMD* says nothing about alleged false explanations for pricing constituting a plus factor on their own and is of no assistance to Plaintiffs, who have not alleged that Defendants have been found guilty of violating the antitrust laws in the past or raised prices despite falling input costs.

**Extraordinary Profits**: Plaintiffs rely on an out-of-circuit case for the proposition that "extraordinary profits" are a plus factor. *See* Opp'n 23 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572–73 (11th Cir. 1998)). Plaintiffs ignore *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359 (*see* Mem. 18), which held that "firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action."

Plaintiffs' arguments based on *City of Tuscaloosa* are not supported by the holding in that case. Rather, like in *Flat Glass*, *City of Tuscaloosa* recognized that "[o]ligopolists behaving in a *legal*, consciously parallel fashion could achieve high and rising prices, even as costs remained stable, by engaging in price leadership." *Id*. at 572 (emphasis added). What the court found suspicious was that prices and profits rose while the defendants did not lose any accounts to each other. "The odds that they could achieve a price and profit increase and maintain incredibly high incumbency rates—that is, maintain the very same distribution of municipal contracts year after year—are minuscule, however, unless the oligopolists were communicating with one another." *Id*.; *see also id*. at 572–73 ("In sum, this combination of high profits and high incumbency would not be likely to occur if the defendants either were vigorously competing with each other or were engaging in competitive price leadership."). Here, in contrast, Plaintiffs have not alleged "rising prices," much less the required "combination of high profits and high incumbency" because they have not, and cannot, allege that GTL and Securus ceased losing accounts to one another.

**B.**      **Plaintiffs Cannot Base Their Antitrust Claims on Securus's and GTL's Respective Agreements with 3Ci Alone.**

Defendants explained that purely vertical agreements between Securus and 3Ci or between GTL and 3Ci cannot support the *per se* claim alleged. Mem. 20–22. Plaintiffs appear to concede this point, Opp'n 25–26, but argue that the *per se* rule still applies because they have alleged a

hub-and-spoke agreement having both vertical elements ("spokes") and a "horizontal agreement between the 'spokes,' GTL and Securus." *Id.* at 26. But because Plaintiffs have failed adequately to allege any agreement between Securus and GTL, much less an agreement to fix prices, they are left with only a "rimless" hub-and-spoke conspiracy that cannot be deemed illegal *per se*. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002). Because Plaintiffs do not allege an unreasonable restraint under the rule of reason, these vertical agreements with 3Ci cannot support the actual claims in the Complaint. *See Somerville v. W. Town Bank & Trust*, No. PJM 19-0490, 2019 WL 6131288, at *6–7 (D. Md. Nov. 19, 2019) (complaint must be dismissed where plaintiff alleges only *per se* claims if claims are instead subject to rule of reason analysis).

### C. Plaintiffs' Allegations Fail to Establish Antitrust Standing.

Because the contracting decisions of the government entities to whom Securus and GTL provided services are independent, intervening causes of Plaintiffs' alleged injuries, Plaintiffs cannot adequately allege antitrust standing. Mem. 22–24. Plaintiffs try to avoid this conclusion by portraying themselves as "direct victims of price-fixing" who are "suing the price fixers," Opp'n 28, but this argument ignores the unique structure of the ICS market alleged by Plaintiffs.

The ICS market is not one in which the seller of the service sets a price that is then paid by consumers who use the service. Rather, as alleged, an ICS provider must negotiate prices with the government entity running each facility the ICS provider services. Compl. ¶ 42. These negotiations set the prices that Securus and GTL charge for all calls, including their single-call programs, as well as the portion of those charges that goes directly to the government entities ("site commissions"). *Id.* ¶¶ 43–44. Any purported agreement between ICS providers to fix consumer prices could not cause Plaintiffs' injuries, because Defendants cannot unilaterally set a price and charge customers accordingly; instead, they must reach separate agreements with the government entities running each facility. By approving and entering into those contracts, each government

entity ultimately sets the price that Securus or GTL charges consumers. That break in the causal chain means Plaintiffs lack antitrust standing. *See GSI Tech. v. United Memories, Inc.*, No. 5:13-cv-01081-PSG, 2014 WL 1572358, at *4 (N.D. Cal. Apr. 18, 2014) (dismissing claims for lack of antitrust standing because "independent act of a third party that is also a factual cause of a plaintiff's harm breaks the chain of causation and relieves the original tortfeasor of liability").

Plaintiffs erect a strawman by refuting arguments about the "so-called *AGC* factors" that Defendants never made. *See* Opp'n 26–28 (citing *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007)). Defendants never argued, for example, that overpayment due to price fixing is not a type of injury that antitrust laws are intended to address. *Id.* at 27. The flaw in Plaintiffs' allegations is that the prices paid resulted not from an alleged agreement between Defendants, but from separate agreements GTL and Securus reached independently with government entities. Plaintiffs' reliance on *Novell* is thus misplaced because that opinion does not address the issue of intervening cause, which is dispositive here.

Plaintiffs also argue that (1) there is no intervening cause because Plaintiffs are "direct purchasers," and (2) the existence of an intervening cause would in any event be immaterial, because any harm was foreseeable. *Id*. at 27–29. Neither argument has merit. *Apple, Inc. v. Pepper*, on which Plaintiffs rely to support their "direct purchaser" argument, does not address the question of intervening cause; it addresses whether the "direct purchaser" rule under *Illinois Brick* applies when a retailer chooses to collect a commission from manufacturers rather than marking up retail prices. 139 S. Ct. 1514, 1521–24 (2019). Defendants do not dispute that Plaintiffs purchased calls directly from Securus and GTL. *Apple* concerned the defendant's relationship with an "upstream manufacturer or supplier" and whether plaintiffs were "direct purchaser[s]," neither of which is relevant to Defendants' primary standing argument. *Id*. at 1522–23. Rather,

Plaintiffs' lack of standing turns on the fact that the prices paid by Plaintiffs were caused not by any alleged agreement among Defendants, but by agreements that GTL and Securus reached separately with numerous government facilities. *Apple* does not speak to this issue.

The two cases cited by Plaintiffs that do address intervening cause fail to save their claims from dismissal. *See* Opp'n 28–29. In *Blue Shield of Virginia v. McCready*, the plaintiff sued her health insurer for refusing to pay an insurance claim. 457 U.S. 465 (1982). The Court noted in a footnote that the decision by the plaintiff's employer to provide insurance from the defendant health insurer was not an intervening cause that affected standing; in that case, however, the defendant's alleged failure to pay was an independent decision made by the defendant *after* contracting with the employer. *Id.* at 480 n.17 ("[Plaintiff's] coverage under the Blue Shield plan may, at this stage of the litigation, properly be accepted as a given, and the proper focus in evaluating her entitlement to raise a § 4 damages claim is on Blue Shield's *change in the terms of the plan* . . . ." (emphasis added)). Here, the per-call price that allegedly harmed Plaintiffs was key to Securus and GTL's separate contracts with the government entities, not an independent decision that Securus or GTL made after entering those contracts.

Plaintiffs cite *In re Flonase Antitrust Litigation*, for the proposition that a foreseeable intervening cause does not affect a plaintiff's standing. 798 F. Supp. 2d 619 (E.D. Pa. 2011); *see* Opp'n 29. This argument occupies but a single sentence in Plaintiffs' brief, *id.*, and fails to explain how the decisions of numerous government entities acting independently and negotiating separate contracts over a period of years could all be foreseeable results of Defendants' alleged agreement. It is not plausibly foreseeable that every government entity would separately agree to whatever price Securus and GTL allegedly fixed, or that absent a price-fixing agreement the government entities would insist on and obtain lower end-user prices for the single-call programs instead of,

for example, negotiating higher site commissions for themselves. In any event, this single inapposite opinion cannot be squared with the more substantial authority cited by Defendants establishing that an intervening cause negates antitrust standing. *See* Mem. 23.[1]

## II.  PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED

Plaintiffs do not dispute that "courts should strive to flush out" defective RICO allegations "at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990). That guiding principle requires dismissal of Plaintiffs' RICO claims here. Nothing in Plaintiffs' Opposition changes that their alleged harm is indirect and derivative of harm to contracting governments, and thus their allegations cannot satisfy RICO's proximate causation requirement. Nor do Plaintiffs have an answer for Defendants' argument that Plaintiffs' RICO claims, insofar as they are predicated on alleged misstatements made directly to consumers on websites and in billing charges, fail the materiality test and could not have been the but-for cause of Plaintiffs' harm. And Plaintiffs' argument that 3Ci constitutes a distinct "enterprise" for purposes of a RICO conspiracy is unavailing because Plaintiffs have failed to allege an agreement between Securus and GTL that passes muster under *Twombly*.

### A.  Plaintiffs Have Not, and Cannot, Satisfy Their Burden to Plausibly Allege Proximate Causation Under the RICO Statute.

Plaintiffs acknowledge that a RICO claim requires showing both but-for and proximate causation. *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); Opp'n 30–31. With

---

[1]    Notwithstanding their claim in a footnote that Defendants' cases are "worlds away from the present case," Plaintiffs only attempt to distinguish two of the five cases cited by Defendants, and even as to those two cases, Plaintiffs offer no more than immaterial factual differences. *See* Opp'n 28 n.9. They do not and cannot dispute that Defendants' cited cases stand for the principle that antitrust standing requires an alleged injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Warnock v. Nat'l Football League*, 356 F. Supp. 2d 535, 539 (W.D. Pa. 2005) (citation and internal quotation marks omitted).

respect to proximate causation, this Court in *Rojas* dismissed RICO claims where the alleged harm to the plaintiff was predicated on harm suffered in the first instance by the government. *Rojas*, 425 F. Supp. 3d at 542 ("Th[e] theory of liability rests on the independent actions of third-parties by assuming that the . . . government would have taken those steps had it known the truth, so the causal link is too attenuated for those alleged misrepresentations to serve as the basis for Plaintiffs' RICO claim.") (internal quotation marks and original alterations omitted); *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) ("The cause of [plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."); *Barr Labs. v. Quantum Pharmics, Inc.*, No. 90 Civ. 4406, 1994 WL 1743983, at *7 (E.D.N.Y. Feb. 7, 1994) ("In this case the injured party is the FDA and though [plaintiff] was injured because of the injury done to the FDA, its injuries are indirect and remote."). This well-established line of cases forecloses Plaintiffs' RICO claims.

Plaintiffs ignore their own allegations when contending that "Defendants fail to identify *any harm to contracting governments* that resulted from the alleged RICO violations, let alone how Plaintiffs' injuries are 'derivative' of that harm." Opp'n 34 (emphasis in original). According to Plaintiffs, the contracting governments were deprived of a competitive marketplace where each individual contracting government would have been able to negotiate more favorable contractual terms including "higher site commission percentages" without the alleged conduct:

> When the ICS market is competitive, ICS providers compete with each other for contracts with local and state governments by submitting bids. ¶ 45. In competitive circumstances, ICS providers attempt to secure those contracts by making bids that offer lower ICS call rates for customers and higher site commission percentages for governments. *Id.*

Opp'n 2. In other words, Plaintiffs alleged that Defendants deprived local and state governments of "competitive circumstances," denying them higher site commission percentages and lower call

rates, which Plaintiffs allege are important to the contracting governments as well. *See id.* at 2.[2]

Plaintiffs allege that following this initial harm to the contracting governments, Plaintiffs then paid more than they otherwise would have if the individual government contracting parties had been able to negotiate more favorable contracts in the first instance:

> Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for them. ¶ 138. When selecting bids for and negotiating ICS contracts, state and local governments would not have permitted Securus and GTL to charge such high prices for single calls in light of the true costs of implementing them. *Id.*

*Id.* at 9. Plaintiffs' contention that the contracting governments "did not pay" the transaction fees, Opp'n 32, is beside the point. Like in *Rojas*, the allegedly supracompetitive fees that Plaintiffs paid here derive from the initial harm that Plaintiffs allege the governments suffered by entering into fraudulently induced contracts with unfavorable terms. *See Rojas*, 425 F. Supp. 3d at 542 (dismissing RICO claim predicated on assumption that government would have taken different action "had it known the truth" of alleged misrepresentations).

Plaintiffs cannot avoid the *Rojas* ruling by mislabeling it as dicta. Opp'n 37. As here, the *Rojas* plaintiffs alleged that the government would have taken different action but for alleged misrepresentations and that plaintiffs were the ones harmed by overpayment. *Rojas*, 425 F. Supp. 3d at 542. It was in response to those arguments that *Rojas* held the plaintiffs' harm to be not "sufficiently direct." *Id.* Plaintiffs' fallback argument that their injury "would be unaffected if Defendants had paid contracting governments higher site commissions," Opp'n 34 n.12, simply cannot be reconciled with their allegations that prices would have been lower, and site commissions higher, absent misrepresentations in the contracting process. *See id.* at 2, 9.

---

[2]    Plaintiffs also allege that in the absence of anticompetitive conduct, GTL's APOC product would have had greater market share resulting in higher revenue to contracting governments. *See* Opp'n 5, 22 n.5.

Defendants do not "conflate" the recipient of the misrepresentations with the directly injured party." Opp'n 32 (emphasis omitted). "[D]irect injury refers to the relationship between the injury and the defendants' actions, not the plaintiffs' pocketbooks." *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992)."). The question is whether a party's purported injury was sufficiently "direct." *See Rojas*, 425 F. Supp. 3d at 542. Only the party directly injured by a defendant's conduct—here the contracting governments—may sue under RICO. *See Anza*, 547 U.S. at 458.

Not only are Plaintiffs' injuries indirect, they also are too speculative to satisfy RICO's proximate cause requirement. Plaintiffs' theory is that the various contracting governments agreed to terms that they "would not have permitted" had they negotiated in an untainted competitive marketplace. Opp'n 9.[3] Thus, to determine what, if any, harm Plaintiffs suffered as a result would require individual (and extraordinarily speculative) inquiries as to what price level and commission rates each contracting government would have negotiated "had it known the truth." *Rojas*, 425 F. Supp. 3d at 542. Plaintiffs' allegations that former executives believed "contracting governments *would have* required Securus and GTL to lower the prices of single calls" does not make their harm any less speculative. Opp'n 35–36 (emphasis added). Indeed, what Defendants' former executives allegedly believed contracting governments would have done is itself pure conjecture.

---

[3]     Plaintiffs do not cite a single case that allowed a private plaintiff to proceed under RICO where the government itself entered into a financial arrangement with the purported RICO enterprise. Plaintiffs' cases address situations where the government received misrepresentations but was *not* a contracting party harmed by the misrepresentations. *See* Opp'n 33 n.10 (citing *Carlin v. DairyAmerica, Inc.*, No. 1:09-cv-0430, 2016 WL 232315, at *12 (E.D. Cal. Jan. 19, 2016) (misrepresentations to a federal agency reduced plaintiffs' compensation); *St. Luke's Health Net., Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295 (3d Cir. 2020) (misrepresentations to government caused injury to plaintiff without injuring government); *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 652 (9th Cir. 2019) (sham filings with a government agency caused excess audits of plaintiff); *Nemet v. Volkswagen Grp. of Am., Inc.*, 349 F. Supp. 3d 881, 906 (N.D. Cal. 2018) (misrepresentations did not harm regulators because "did not lose money from the fraud")).

Plaintiffs separately acknowledge that only a "majority"—*i.e.*, perhaps 51 percent—"of those [contracting] governments would have" acted differently without the alleged misstatements, Opp'n 9–10, and even as to that subset there is no way to predict which terms might change or how. So even if one accepts the dubious proposition that Plaintiffs suffered injury-in-fact,[4] those injuries depend on a highly attenuated chain of causation that would require reconstructing the decision-making process of myriad contracting governments to ascertain if (and how), without the alleged fraudulent misrepresentations, those governments would have acted differently. *See, e.g.*, *Brandenburg v. Seidel*, 859 F.2d 1179, 1189–90 (4th Cir. 1988) (affirming dismissal for lack of proximate cause where "the causal connection was in factual terms an extremely attenuated one" and noting that "cause-in-fact connection, standing alone, does not suffice to establish liability" under RICO). Such speculative claims cannot satisfy RICO's proximate causation requirement. *See Rojas*, 425 F. Supp. 3d at 542; *see also Anza*, 547 U.S. at 458 ("'[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.'" (quoting *Holmes*, 503 U.S. at 269) (alteration in original)). Plaintiffs' RICO claims therefore should be dismissed.

---

[4] Plaintiffs do not allege that the *specific contracting governments* pursuant to whose contracts the calls were made (Complaint ¶¶ 26–29) would have acted differently in the absence of the alleged fraudulent statements. Thus, Plaintiffs have not adequately alleged fact-of-injury and they cannot overcome that defect because this case is a putative class action. *See Lewis v. Casey*, 518 U.S. 343, 356 (1996) (The fact "[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (citations and internal quotations marks omitted); *accord Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252–53 (4th Cir. 2020).

## B. Plaintiffs' RICO Claims Cannot Be Predicated on Misrepresentations Directed to Consumers on Websites and Billing Charges.

Plaintiffs' Opposition again devotes much space to rebutting an argument Defendants never made: that a RICO plaintiff must allege materiality and reliance on every RICO predicate act. Rather, Defendants correctly argued that insofar as Plaintiffs' RICO claims are based on statements made to them as consumers—as distinguished from statements made directly to the government (which fail for lack of proximate cause)—such claims are defective because there are no allegations that anyone relied on them nor could they be material. *See* Mem. 28–30.

Plaintiffs acknowledge that establishing but-for causation requires them to plausibly allege that *someone* relied on the alleged misrepresentations. Opp'n 41; *see also Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008). But the Complaint is devoid of allegations that consumers—or anyone else—relied on misrepresentations in billing statements or on public websites regarding the price and charges of single-calls when choosing to accept and pay for a single-call product. Plaintiffs implicitly concede as much (by failing to cite any) and resort to arguing that mere payment can establish a plausible inference of reliance. Opp'n 43. The cited authority is plainly inapposite. Those cases address the distinct issue whether payment may constitute common evidence of causation for class certification purposes, not whether payment can establish plausible reliance and causation under a motion to dismiss. *See* Opp'n 41-43 (citing, *inter alia*, *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560 (E.D. Va. 2000)).[5] Indeed, at the pleading stage, Plaintiffs must allege that their

---

[5] Besides being procedurally distinguishable, Plaintiffs' cases merely recognize an inference of reliance based on a payment "when it is logical to do so or when the complaint's allegations make reliance apparent." *Chisolm*, 194 F.R.D. at 561. Neither circumstance is present here. It is hardly "logical" to presume that Plaintiffs relied on the alleged misrepresentations by Defendants on websites and bills, when as the Complaint alleges, they had no ability to choose an alternative provider because the decision as to who the provider would be was made by the contracting

injuries result "by reason of" the alleged RICO conspiracy, and payment alone is insufficient to state a claim. *See, e.g.*, *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 576 (7th Cir. 2017) (affirming dismissal of RICO claim brought by health plans that paid reimbursements for products that were illegally marketed and observing that "[p]ayors part with money, to be sure, but it is not at all clear that they are the initially injured parties, let alone the sole injured parties.").

Plaintiffs not only cite off-point cases, they also fail to distinguish—or even address—the key cases cited by Defendants holding that but-for causation for RICO purposes cannot be established without specific allegations that someone relied on particular statements. *See In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009); *see also G&G TIC, LLC v. Ala. Controls, Inc.*, No. 4:07-CV-162 (CDL), 2008 WL 4457876, at *4 (M.D. Ga. Sept. 29, 2008). Even Plaintiffs' own cases require plausible allegations that at least someone relied on the alleged misstatements. *See Dolan v. JetBlue Airways Corp.*, 385 F. Supp. 3d 1338, 1354 (S.D. Fla. 2019) (denying motion to dismiss RICO claim where a website misrepresented charges because, unlike here, the plaintiff specifically alleged that she relied on the website's false statements and omissions when she chose to transact with the defendant).[6] Because Plaintiffs have not plausibly alleged that *anyone* relied upon the statements made by Defendants in consumer-facing statements on websites or bills, Plaintiffs cannot base their RICO claim on those alleged misstatements.

---

governments. Plaintiffs make no allegations pertaining to reliance at all, much less allegations that would "make reliance apparent."

[6] Plaintiffs do not point to any specific allegations suggesting that they relied on the alleged consumer-facing statements, nor do they allege that the contracting governments relied on them—or even saw any of the bills generated by Defendants to consumers. It strains credulity to suggest that contracting governments would rely on website advertising rather than information submitted by Defendants directly to them in response to requests for proposals.

Plaintiffs likewise fail to address Defendants' argument that the alleged direct-to-consumer statements were immaterial and thus cannot properly support a RICO claim. *See Lewis v. Microsoft Corp.*, 410 F. Supp. 2d 432, 439 (E.D.N.C. 2006), *aff'd*, 222 F. App'x 290 (4th Cir. 2007) (dismissing Civil RICO claim predicated on mail fraud where alleged misrepresentation was "not material, and therefore not fraudulent"). They fail to dispute that the alleged false statements made on websites or bills were not made to any decision-making body, which means, they cannot be material. *See Donaldson v. Severn Sav. Bank, F.S.B.*, No. CV JKB-15-901, 2015 WL 7294362, at *3 (D. Md. Nov. 18, 2015). Plaintiffs attempt to sidestep this flaw by asserting that the materiality "requirement applies to the *overall fraudulent scheme*—not to individual wire transmissions or mailings." Opp'n 38. Even if true, this assertion misses the point. As this Court in *Rojas* noted, a fraudulent scheme can only be comprised of misstatements that are material. 425 F. Supp. 3d at 540 ("A scheme to defraud exists where a party makes material misrepresentations, fails to disclose material information, or conceals material facts." (citation omitted)); *Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes); *United States v. Raza*, 876 F.3d 604, 615–17 (4th Cir. 2017) (discussing *Neder* and affirming jury instructions regarding the requisite materiality element of RICO fraud). Because Defendants' alleged misstatements to consumers on websites and in billing statements were not made to any decision maker—and thus cannot be material—they cannot form the proper basis of any fraudulent scheme under RICO.

## C.    Plaintiffs' RICO Conspiracy Claims Fail.

Plaintiffs' failure to connect the "spokes" of their hub-and-spoke conspiracy—*i.e.*, allege a plausible agreement between Securus and GTL, *see supra* at 12-13—is fatal both to Plaintiffs' RICO conspiracy claims and to its antitrust claims. *See, e.g.*, *Rojas*, 425 F. Supp. 3d at 543 (concluding that "[i]ndeed, Section 1's agreement element is 'a close analogue' of the enterprise

element of a RICO claim" (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010)). Plaintiffs respond that Count 6 does not allege a hub-and-spoke enterprise structure, and claim instead that 3Ci constitutes an "Enterprise." Compl. ¶¶ 304–20. But this does not exempt Plaintiffs from needing plausible allegations of a conspiracy. Count 6 alleges a RICO conspiracy between Securus and GTL, which requires an agreement between Securus and GTL. *See Rojas*, 425 F. Supp. 3d at 543. Yet Plaintiffs have not plausibly alleged that Securus and GTL entered into any agreement. *See supra* at 12-13. This same flaw—*i.e.*, the failure to allege a "rim" in a hub-and-spoke conspiracy—also dooms Count 7 (alleging a hub-and-spoke RICO enterprise between Securus, GTL, and 3Ci). *See, e.g.*, *Donaldson v. Primary Residential Mortg., Inc.*, No. CV ELH-19-1175, 2020 WL 3184089, at *25–26 (D. Md. June 12, 2020) (finding plaintiffs failed to plausibly allege a RICO enterprise because plaintiffs do not adequately allege the "rim" of a "hub and spoke" structure). Plaintiffs' RICO conspiracy claims in Counts 6 and 7 should therefore be dismissed.

## III.   DEFENDANTS FAIL TO STATE A CLAIM AS TO 3CI

Lacking actual facts tying 3Ci to a price-fixing conspiracy or a civil RICO violation, Plaintiffs attempt to substitute rhetoric for allegations, claiming to have a "smoking gun" when they offer no more than conclusions and impermissible assumptions. Opp'n 6, 13. While the arguments above warrant a complete dismissal as to all Defendants, the claims against 3Ci suffer from additional deficiencies that Plaintiffs' overheated rhetoric cannot mask.

### A.   Plaintiffs Fail Adequately to Allege 3Ci's Involvement in a Price-Fixing Scheme.

In the opening brief, Defendants demonstrated that Plaintiffs' allegations of 3Ci's involvement in the price-fixing conspiracy are bare, conclusory statements devoid of the factual specificity necessary to meet the *Twombly* standard. *See* Mem. 31–34. In response, Plaintiffs

attempt to bend the pleading standard down to the level of their allegations. Opp'n 46–49. The Court should reject that invitation.

To state an antitrust claim requires specificity. Among other things, the complaint must "identify the particular time, place, and manner in which the antitrust conspiracy initially formed." *Rojas*, 425 F. Supp. 3d at 543 (internal quotation marks and alterations omitted). This level of specificity is required as to *each* Defendant's purported participation. *See Akers v. Md. State Educ. Ass'n*, 376 F. Supp. 3d 563, 573 (D. Md. 2019). "A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3, LLC*, 801 F.3d at 422.

Plaintiffs argue that the pleading standard in *Rojas* applies only to the *existence* of an antitrust conspiracy, while pleading a party's *involvement* in that conspiracy, they suggest, requires a mere "link" (a standard on which Plaintiffs do not elaborate). Opp'n 46–47. But *Rojas* made no distinction between the existence of a conspiracy and each conspirator's involvement in it, which would conflict with well-settled law requiring specific allegations as to each alleged conspirator. Mem. 33; *Akers*, 376 F. Supp. 3d at 573; *SD3*, 801 F.3d at 422.

The other cases on which Plaintiffs rely plainly support Defendants' position. For example, the complaint in *Jien* alleged the existence of "secret compensation meetings [that] involved a wage fixing conspiracy," but failed "to link their direct evidence to *each* of the . . . Defendants." 2020 WL 5544183, at *6. The court dismissed the claims, holding that it is "not sufficient for a claim to be merely plausible in the abstract, but it must be linked to each Defendant to place it on notice as to what it is alleged to have done." *Id.* Plaintiffs failed to do so here with respect to 3Ci. Mem. 31–34; *see also In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18MD2836, 2019 WL

6977405, at *1 (E.D. Va. Dec. 20, 2019) ("[A] conclusory allegation of agreement at some unidentified point does not show an illegal agreement." (citing *Twombly*) (alteration in original)).[7]

Under the proper standard, Plaintiffs' allegations as to 3Ci fail. Plaintiffs do not allege the "particular time, place, and manner" in which 3Ci supposedly facilitated the formation of the alleged price-fixing agreement. Mem. 32–33. The Complaint states only that 3Ci and Securus "persuaded" GTL to join the alleged scheme. Compl. ¶¶ 72, 76; Opp'n 6. This bare conclusion, akin to stating Defendants "agreed to fix prices," has *no* facts backing it up; the very next line of Plaintiffs' brief omits 3Ci entirely, claiming the agreement was reached over "private dinners and drinks" between executives from Securus and GTL without any suggestion that 3Ci was a party to such alleged private meetings or discussions. Opp'n 6. Again, Plaintiffs' own cases establish the legal and factual insufficiency of such "secret meeting" allegations. *See, e.g.*, *Jien*, 2020 WL 5544183, at *6 (dismissing complaint that failed to link each defendant to alleged "secret compensation meetings [that] involved a wage fixing conspiracy").

Plaintiffs' dramatic claim (in a section heading) that it secured "admissions by executives at both GTL and 3CI that Defendants conspired to set prices" is equally hollow. Opp'n 12. The "former senior 3Ci executive" merely "suspected there was an agreement" because he could think of no other "plausible explanation" for Securus and GTL's pricing practices—precisely the type of speculative allegations that *Twombly* prohibits. 550 U.S. at 554–57, 564.

In the absence of any facts implicating 3Ci in a conspiracy, Plaintiffs attempt to rely on irrelevancies like 3Ci's role in running the operations of Securus's and GTL's collect-call

---

[7]     *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir. 1998), does not address the specificity required as to each defendant in an alleged antitrust conspiracy. That case addressed the unrelated issue whether a non-profit is exempt from the antitrust laws and concluded that a party need not share the profit motive of its co-conspirators to be implicated. *Id.* at 541.

programs—by setting up automated systems, charging customers' credit card and mobile phone accounts, and developing a website. Opp'n 48. By Plaintiffs' logic, if a factory owner were to engage in price-fixing with other factory owners, the foreman running the assembly line would be liable. Fixing prices and running normal business operations are not the same thing.[8] Here, 3Ci had no role in setting prices or negotiating prices with the facilities, Mem. 32, and thus no basis for antitrust liability. Alleged statements by another former 3Ci employee that Securus was 3Ci's "cash cow," Opp'n 4–5, hardly constitute evidence of a conspiracy.

Finally, Defendants demonstrated in their opening brief that 3Ci's licensing agreement refutes Plaintiffs' allegation that the agreement required GTL to meet Securus's prices. Mem. 34. Plaintiffs' effort to argue against the plain language of the agreement they themselves cited, however, highlights how unspecific Plaintiffs' allegations are. *See* Opp'n 47 n.18.[9] Plaintiffs now speculate that the supposed agreement between GTL and 3Ci to restrict prices might have been an oral agreement or a side written agreement. *Id.* But there are no allegations to that effect in the Complaint. It is precisely because Plaintiffs' allegations are so lacking in specificity that 3Ci cannot tell what agreement it is said to have reached with Securus or GTL.

In short, Plaintiffs' overblown rhetoric, including the promotion of supposed "smoking gun admissions" that are untethered to a single non-speculative factual allegation in the complaint, fails to convert the Complaint's deficient allegations into a sustainable cause of action against 3Ci. As stated aptly by more than one federal court: "[R]ather than produce a smoking gun," Plaintiffs'

---

[8]     Plaintiffs' lone cite on this point devotes but a footnote to the issue, and even that minimal discussion reflects its dissimilarity to the instant case. In *In re Publication Paper Antitrust Litigation*, the plaintiffs alleged that a defendant "seriously implement[ed]" a price-fixing scheme by negotiating inflated prices directly with consumers. 690 F.3d 51, 69 n.12 (2d Cir. 2012).

[9]     The unsigned copy of the Licensing Agreement previously was filed in error. The correct document is filed under seal as Exhibit A to this brief.

allegations "produce[] much hot air that [is] insufficient to sustain [their] claims."  *Moore v. Hartman,* 102 F.Supp.3d 35, 163 (D.D.C. 2015); *Koger v. Robert Half Int'l,* 2007 WL 712225 at *11 (W.D. Pa. Mar. 7, 2007) ("[T]he possible 'smoking gun' plaintiff advances . . . is in actuality nothing more than 'smoke and mirrors.'").

B.     **Plaintiffs Do Not Adequately Allege 3Ci Committed a RICO Predicate Act.**

Plaintiffs argue that 3Ci's alleged conduct constitutes predicate acts of mail and wire fraud underlying their RICO claim, Opp'n 49–50, but fail to allege—and can never allege—that any supposed 3Ci-specific misrepresentation or omission was material to a scheme to defraud consumers or contracting governments.  That is fatal to their claim.  *See United States v. Maynes,* 880 F.3d 110, 113 (4th Cir. 2018) (concluding that "only material misrepresentations could contribute to a violation" because "fraud" requires "a misrepresentation or concealment of material fact").

The predicate acts of mail and wire fraud require that the defendant (1) devise or intend to devise a scheme to defraud and (2) use mail or wire in furtherance of the scheme.  Opp'n 38–39; *Neder*, 527 U.S. at 24.  But Plaintiffs misconstrue what each of these elements entails.  The word "defraud" in the first element includes a requirement of "materiality of falsehood."  *Neder*, 527 U.S. at 21–25.  The second element, "in furtherance of the scheme," represents a separate requirement that the mail or wire be "incident to an essential part of the scheme."  *Bridge*, 553 U.S. at 647.  While the mail or wire need not carry the misrepresentations or omissions, and the plaintiff need not directly receive them, *id.* at 648–49, the alleged misrepresentations or omissions still must be material to the alleged scheme, *see United States v. Kimble*, No. WDQ-13-035, 2015 WL 4164820, at *18 (D. Md. July 8, 2015) (distinguishing element of materiality from element requiring that wire communication further the scheme).

Plaintiffs do not support their argument that "there is no requirement to plead materiality . . . as to each predicate act," and that they "need only allege the existence of a fraudulent scheme and that those misrepresentations were made 'incident to' that scheme." Opp'n 50. They can't. *Maynes*, 880 F.3d at 113. The scheme Plaintiffs allege is to "deceive contracting governments and [consumers] regarding the value of transaction fees associated with [inmate service] calls and to overcharge [consumers] for those calls." Compl. ¶¶ 232, 281; *id.* ¶ 313. Plaintiffs allege 3Ci maintained websites for Securus and GTL that were accessible to consumers and contracting government entities, and sent bills to consumers' credit cards and mobile phone accounts that allegedly misrepresented the breakdown of fees. *Id.* ¶¶ 159, 164, 168. But there are no allegations that the government entities considered 3Ci's website when making their decisions to contract with Securus or GTL.[10] Nor have Plaintiffs alleged how billing statements addressed to consumers could have affected the decisions of consumers who had no ability to choose their ICS provider, or of government entities not alleged to have seen them. Mem. 29. That makes no sense.

Because these alleged misrepresentations had no ability to influence the decisions of the government entities that contracted with Securus and GTL, they are not, and can never be, material. *Severn Sav. Bank*, 2015 WL 7294362, at *3 ("Materiality is defined as having a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." (citation, internal quotation marks, and internal alterations omitted)). Plaintiffs'

---

[10]     The fact that the websites—like all public websites—were "accessible" to the government entities, *see* Opp'n 49, does not transform their content into material misrepresentations directed at anyone who can access them. *See Finley Alexander Wealth Mgmt., LLC v. M&O Mktg.*, No. GJH-19-1312, 2020 U.S. Dist. LEXIS 48678, at *32 (D. Md. Mar. 20, 2020) (assessing whether plaintiffs had adequately pleaded materiality element for Maryland common law fraud claim and dismissing claim in part because Complaint failed to allege when they heard misrepresentations or "*why* these misrepresentations were material to Plaintiffs' decision to enter a business relationship with Defendants") (emphasis added)).

allegations are inconsistent with the inference that any alleged misrepresentation or omission by 3Ci conceivably—much less plausibly—could have been material. They have thus failed to state a claim that 3Ci committed the predicate acts of mail or wire fraud. The RICO claims must be dismissed as to 3Ci.

IV.    **DISMISSAL OF PLAINTIFFS' CLAIMS SHOULD BE WITH PREJUDICE.**

Plaintiffs "opted not to amend their complaint" (ECF No. 63) at the Court's invitation for the purpose of responding to the points raised in Defendants' pre-motion letter (ECF No. 57). While Plaintiffs argue in a footnote, Opp'n 50 n.20, that they should be granted leave to amend, their Opposition does not suggest any way in which they could cure the defects in the Complaint. Because Plaintiffs provide no reason to believe that amendment would not be futile, the Complaint should be dismissed with prejudice.

## CONCLUSION

Plaintiffs have failed to meet their burden of plausibly alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and RICO, 18 U.S.C. § 1962(c)-(d). Accordingly, and for all of the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss Plaintiffs' Complaint with prejudice.

Dated: January 22, 2021

Respectfully submitted,

/s/ Jason R. Scherr

Jason R. Scherr, Esquire (Bar No. 25633)
MORGAN LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.6000
F: 202.373.6001
jr.scherr@morganlewis.com

Elizabeth Herrington*
MORGAN LEWIS & BOCKIUS, LLP
77 W. Wacker Drive
Chicago, IL 60601
T: 312.324.1000
F: 312.324.1001
beth.herrington@morganlewis.com

R. Brendan Fee*
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5000
F: 215.963.5001
brendan.fee@morganlewis.com

COUNSEL FOR DEFENDANT SECURUS
TECHNOLOGIES, LLC

/s/ Jonathan I. Gleklen

Jonathan I. Gleklen, Esquire (Bar No. 21350)
Katherine Clemons*
Monique Boyce*
ARNOLD AND PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
T: (202) 942-5000
F: (202) 942-5999
jonathan.gleklen@arnoldporter.com
katherine.clemmons@arnoldporter.com
monique.boyce@arnoldporter.com
(Signed by Jason R. Scherr with permission of
Jonathan I. Gleklen)

Charles Scott Lent*
Javier Ortega*
ARNOLD AND PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
T: (212) 836-8000
F: (212) 836-8689
scott.lent@arnoldporter.com
javier.ortega@arnoldporter.com

COUNSEL FOR DEFENDANT GLOBAL
TEL*LINK CORP.

/s/ Jonathan Pitt
WILLIAMS & CONNOLLY LLP
Jonathan B. Pitt, Bar No. 16086
Colette T. Connor*
725 Twelfth Street, NW
Washington, DC 20005
T: 202.434.5000
F: 202.434.5029
jpitt@wc.com
cconnor@wc.com
(Signed by Jason R. Scherr with permission of
Jonathan Pitt)

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Jay B. Shapiro*
150 West Flagler Street, Suite 2200
Miami, FL 33130
T: 305.789.3229
F: 305.789.2664
jshapiro@stearnsweaver.com

COUNSEL FOR DEFENDANT 3CINTERACTIVE
CORP.


* admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on January 22, 2021, Defendants' Reply Memorandum in Support of Motion to Dismiss was served via the Court's CM/ECF system on all counsel of record in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland.

/s/ Jason R. Scherr
Jason R. Scherr