**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| ASHLEY ALBERT, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 20-cv-01936-LKG |
| v. | ) ) | Dated:  September 30, 2021 |
| GLOBAL TEL*LINK CORP., *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

**I.     INTRODUCTION**

This putative class action matter involves an alleged price-fixing and kickback scheme to inflate the prices of single call collect calls placed by inmates from correctional facilities located within the United States, among defendants Global Tel* Link Corp. ("GTL"), Securus Technologies, LLC ("Securus") and 3Cinteractive Corp. ("3Ci") (collectively, "defendants"), in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-38, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68.  *See generally* Compl., ECF No. 1.  Defendants have jointly moved to dismiss this matter pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  *See generally* Def. Mot., ECF No. 72; *see also* Def. Mem., ECF No. 72-1.  No hearing is necessary to resolve the motion.  *See* Local Rule 105.6.  For the reasons that follow, the Court **GRANTS-in-PART** and **DENIES-in-PART** defendants' motion to dismiss.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Factual Background[1]

In this putative class action case, plaintiffs allege that defendants engaged in a price-fixing and kickback scheme to inflate the prices of single call collect calls placed by inmates from correctional facilities located within the United States.  *See generally* Compl.  As a result of this alleged scheme, plaintiffs maintain that defendants committed a *per se* violation of the Sherman Antitrust Act, by conspiring to:  (1) eliminate competition between themselves; (2) fix and charge inflated prices; and (3) pay low site commission fees for their single call products.  *See* Compl. at Count I.  Plaintiffs also allege that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), by engaging in a widespread pattern of fraudulent misrepresentations and omissions to the contracting governments and to consumers, for the purposes of charging excessive rates and paying low site commission fees for single call products.  *See id.* at Counts II-VII

#### 1.  Defendants' Inmate Calling Services

Defendants GTL and Securus are providers of telephone calling services for inmates, and these defendants are headquartered in Falls Church, Virginia, and Carrollton, Texas, respectively.  *Id.* at ¶¶ 30, 32.  Defendant 3Ci is a mobile marketing company and payment processor, headquartered in Boca Raton, Florida.  *Id.* at ¶ 34.

Plaintiffs are persons or entities that have paid, or will pay, $9.99 or $14.99 to receive a single call collect call operated by 3Ci, pursuant to an inmate calling service ("ICS") contract by and between either Securus or GTL and the contracting governments.  *See id.* at ¶ 188.

As background, each year, ICS providers service hundreds of millions of calls from inmates housed in correctional facilities located throughout the United States.  *Id.* at ¶ 37.  To facilitate these services, the contracting governments enter into exclusive contracts with ICS providers to service a particular correctional facility.  *Id.* at ¶ 43.  The terms of the ICS contracts include both the rates that the ICS providers will charge to consumers to receive calls from inmates, as well as the "site commission"—a percentage of the revenue made from each call that

---

[1] The facts recited herein are derived from the complaint and are taken as true for purposes of resolving the pending motion to dismiss.

the ICS providers must pay to the contracting governments. *Id.* at ¶ 44. Because only the contracting governments can enter into ICS contracts with the ICS providers, inmates and consumers cannot choose which ICS provider or service to use to place their calls. *Id.* at ¶ 42.

Securus and GTL together service more than 80% of the ICS calls placed by inmates throughout the United States. *Id.* at ¶ 51. In 2010, Securus launched two "single call" services: (1) "PayNow," which charges a flat fee of $14.99 to the customer's credit card for calls lasting up to 15 minutes, and (2) "Text2Connect," which charges a flat fee of $9.99 to a customer's mobile phone account for calls lasting up to ten minutes. *Id.* at ¶¶ 54-57.

Securus contracted with 3Ci to operate these services. *Id.* at ¶ 62. And so, 3Ci collects payment information from customers, processes and bills payment, and establishes and manages the websites for the PayNow and Text2Connect services. *Id.* at ¶¶ 63-64. To accomplish this, 3Ci utilizes a patented technology that charges collect calls directly to a mobile phone account. *Id.* at ¶ 65. In return for operating the PayNow and Text2Connect services, 3Ci receives a "transaction fee" from Securus for each single call made via these services. *Id.* at ¶ 66.

Securus offers the PayNow and Text2Connect services under several ICS contracts with the contracting governments. *Id.* at ¶ 60. Pursuant to these ICS contracts, Securus provides a site commission to the contracting governments in the amount of $1.60, for each PayNow call made, and in the amount of $0.30, for each Text2Connect call made. *Id.* at ¶ 58.

In 2012, GTL began developing its own single call service, known as "AdvancedPay OneCall" ("APOC"). *Id.* at ¶ 70. GTL offers the APOC service through its ICS contracts with the contracting governments. *Id.* at ¶ 95. The APOC service charges a $3.00 transaction fee to the call recipient's credit card, along with the applicable standard per-minute rate contained in the relevant ICS contract. *Id.* at ¶ 104. Like Securus, GTL pays a site commission to the contracting governments for APOC calls. *Id.* at ¶ 71.[2]

---

[2] In 2018, Securus and GTL began to phase out the single call services that were operated by 3Ci. Compl. at ¶ 103.

### 2. The Alleged Scheme

Plaintiffs allege that defendants engaged in a horizontal price-fixing scheme, whereby Securus and GTL fixed inflated prices for ICS single call services and misrepresented information about the costs of these calls to government officials and to consumers. *Id.* at ¶ 1. Specifically, plaintiffs allege that Securus and GTL executives regularly and secretly communicated to eliminate competition in the ICS market. *Id.* at ¶ 77. To support this allegation, plaintiffs contend that, when GTL initially planned to launch APOC, GTL intended to charge call recipients significantly less for single calls than Securus charges for its PayNow and Text2Connect services. *Id.* at ¶¶ 70-71. But, plaintiffs contend that Securus and GTL later conspired to fix the prices of their respective single call services, resulting in GTL ultimately charging a higher price for its services and the elimination of price competition for single calls. *Id.* at ¶ 72.

Plaintiffs also allege that the groundwork for this price-fixing agreement was laid in November 2012, when Securus purchased 3Ci's patent for the technology used to charge mobile phone accounts for single calls. *Id.* at ¶ 73. In this regard, plaintiffs allege that—as a condition of agreeing to purchase the patent—Securus insisted that any agreement between 3Ci and GTL to market and operate ICS calls require that GTL's single call program charge the same prices as Securus charges for its single call program. *Id.* at ¶ 75.

In addition, plaintiffs allege that Securus and GTL violated RICO, by making several misrepresentations and/or omissions to the contracting government officials and to consumers about the magnitude of the transaction fees associated with ICS single calls operated by 3Ci. *Id.* at ¶ 3, 18. In this regard, plaintiffs allege that Securus and GTL incorrectly represented that the charges for single calls were comprised of necessary transaction fees paid to 3Ci during their contract negotiations with the contracting governments. *Id.* at ¶¶ 219, 244, 268, 293. Plaintiffs also allege that a former Securus executive said that his team would incorrectly inform these government officials that the "vast majority" of the $14.99 and $9.99 collected from PayNow and Text2Connect calls was paid to 3Ci to cover transaction fees. *Id.* at ¶ 145.

In addition, plaintiffs allege that a former GTL employee explained that "both Securus and GTL informed governments that the high price of single calls" was "a direct consequence of sizable transaction fees that were an unavoidable part of the cost of implementing those calls."

4

*Id.* at ¶ 148. Plaintiffs further allege that Securus and GTL misrepresented and/or omitted the true value of the transaction fees paid to 3Ci for single calls in their monthly commission reports to the contracting governments. *Id.* at ¶¶ 142, 153-58.

Lastly, plaintiffs allege that the public websites for Securus's PayNow and GTL's Collect2Card falsely state that the $14.99 charge for single calls "is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee." *Id.* at ¶ 159. In this regard, plaintiffs allege that consumers have been improperly billed twice for a call and transaction fee and that defendants failed to disclose the actual transaction fee paid to 3Ci in the billing statements mailed to consumers. *Id.* at ¶¶ 159-71.

### 3. Plaintiffs' Sherman Act And RICO Claims

Plaintiffs assert Sherman Antitrust Act and civil RICO claims in this matter. Specifically, plaintiffs allege in Count I of the complaint that defendants committed a *per se* violation of Section 1 the Sherman Antitrust Act, by "[entering] into a continuing agreement, understanding, and conspiracy in restraint of trade to prevent and eliminate price competition over single calls between Securus and GTL[,] and to fix, inflate, maintain, and stabilize the price of 3Ci-operated single calls charged to consumers in the United States." *Id.* at ¶ 201. Plaintiffs further allege that, as a result of this alleged scheme, defendants: (1) restrained or eliminated competition in the ICS market; (2) fixed and maintained inflated prices for single call services; and (3) deprived consumers of the benefit of true competition in the ICS market. *Id.* at ¶ 204.

In Counts II-VII of the complaint, plaintiffs further allege that defendants violated RICO, by making the misrepresentations and/or omissions to the contracting governments and to consumers, regarding the amount of the transaction fees that Securus and GTL paid to 3Ci. *See id.* at Counts II-VII.[3] *Id.* at ¶¶ 216, 241, 265, 290. And so, plaintiffs contend that they have been harmed in their business and property by defendants' alleged conduct. *Id.* at ¶¶ 228, 253, 277, 302.

---

[3] Plaintiffs' RICO claims are predicated upon the federal mail fraud statute, 18 U.S.C. § 1341, and the federal wire fraud statute, 18 U.S.C. § 1343. Plaintiffs allege that defendants committed mail fraud, by knowingly and intentionally mailing misrepresentations and/or omissions to the contracting governments and to consumers regarding the transaction fees paid to 3Ci for operating PayNow, Text2Connect, Collect2Card and Collect2Phone calls. Compl. at ¶¶ 217, 242, 266, 291. Plaintiffs further allege that

### B.     Procedural History

On October 30, 2020, defendants filed a joint motion to dismiss this matter for failure to state a claim upon which relief can be granted, and a memorandum in support thereof, pursuant to Fed. R. Civ. P. 12(b)(6). Def. Mot.; Def. Mem. Plaintiffs filed a response in opposition to defendants' motion on December 18, 2020. Pl. Resp., ECF No. 75. Defendants filed a reply in support of their motion on January 22, 2021. Def. Reply, ECF No. 76.

Defendants' motion to dismiss having been fully briefed, the Court resolves the pending motion.

## III.    LEGAL STANDARDS

### A.     Rules 12(b)(6) And 9(b)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombley*, 550 U.S. at 556). When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citations omitted). But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet*, 591 F.3d at 255. And so, the Court should grant a motion to dismiss for failure to state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II, L.P. v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989)).

When a fraud claim is asserted as the predicate act for a civil RICO violation, as is the case here, Fed. R. Civ. P. 9(b)'s particularity requirement applies. *See, e.g.*, *Lewis v. Md.*, No.

---

defendants committed wire fraud by knowingly and intentionally transmitting misrepresentations and/or omissions electronically to the contracting governments and to consumers. *Id.* at ¶¶ 218, 243, 267, 292.

PWG-17-1636, 2018 WL 1425977, at *5-6 (D. Md. Mar. 22, 2018) (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at *2, *6 (D. Md. Jan. 23, 2017) (same).  This rule requires "that a plaintiff alleging fraud must make particular allegations of the time, place, speaker, and contents of the allegedly false acts or statements." *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249-50 (D. Md. 2000); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (stating that the facts a plaintiff must plead in support of a fraud claim "are often 'referred to as the who, what, when, where, and how' of the alleged fraud" claim) (citation omitted); *Weidman v. Exxon Mobile Corp.*, 776 F.3d 214, 219 (4th Cir. 2015).   But, even under this heightened pleading standard, the Court "should hesitate to dismiss if it finds (1) that the defendant[s] [have] been made aware of the particular circumstances for which [they] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Nat'l Mortg. Warehouse, LLC v. Trikeriotis*, 201 F. Supp. 2d 499, 505 (D. Md. 2002) (citations and internal quotation marks omitted).

### B.     Sherman Antitrust Act Claims

Section 1 of the Sherman Antitrust Act prohibits a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1.  "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423-24 (4th Cir. 2015) (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013)).  In this regard, Section 1 applies only to concerted action that restrains trade.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). And so, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (internal quotations and punctuation omitted).

The United States Court of Appeals for the Fourth Circuit has adopted three analytical frameworks for determining whether a Sherman Antitrust Act violation occurred:  (1) the *per se* analysis, with respect to obviously anticompetitive restraints; (2) the quick-look analysis, for those combinations with procompetitive justification; and (3) the full rule of reason, for restraints

whose net impact on competition is particularly difficult to determine.  *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508-09 (4th Cir. 2002).  Courts have recognized that pleading "*per se* violations can lighten a plaintiff's litigation burdens."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3rd Cir. 2010).  But, doing so "is not a riskless strategy," because, if the Court "determines that the restraint at issue is sufficiently different from the *per se* archetypes[,] . . . plaintiff's claims will be dismissed."  *Id*. (emphasis added).  And so, the Supreme Court has cautioned that applying *per se* liability should be reserved for "only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis added) (citation and quotation marks omitted).

       The Fourth Circuit has also recognized that "certain recurring business practices, because of their pernicious effect on competition, are considered illegal *per se* under the Sherman Act."  *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 683 (4th Cir. 1982) (emphasis added) (internal quotation marks omitted).  Specifically relevant to this case, the Supreme Court has held that "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful."  *Texaco*, 547 U.S. at 5; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 646-47 (1980).  "To prove the existence of a horizontal price-fixing conspiracy, a plaintiff must demonstrate the following:  (1) the existence of an agreement, combination, or conspiracy, (2) among actual competitors, (3) with the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity, (4) in interstate or foreign commerce."  *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 819 (D. Md. 2013) (quoting *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215-16 (E.D.N.Y. 1996)) (internal quotation marks omitted).  The law appropriately tethers application of the *per se* rule to agreements between, or among, actual competitors.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606 (1972) (stating that, if Section 1 of the Sherman Act were "to be read in the narrowest possible way, any commercial contract could be deemed to violate it" since "[t]heoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other").  And so, courts have recognized that, when non-competitors—including vertically aligned entities or joint ventures—implement price restraints, it can have procompetitive effects.

8

*See Leegin*, 551 U.S. at 889-93; *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 23 (1979); *see also Dagher*, 547 U.S. at 5-6 (holding that the entities did not engage in *per se* unlawful horizontal price fixing because they were not acting as competitors in the relevant market).

A plaintiff can rely upon either "direct or circumstantial evidence that reasonably tends to prove that the [alleged conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *In re Titanium Dioxide*, 959 F. Supp. 2d at 820. Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (citation omitted). A showing based upon circumstantial evidence requires that a plaintiff show both parallel conduct by defendants and "plus factors" that "suggest[] that the parallel conduct resulted from concerted action." *Jien v. Purdue Farms, Inc.*, 2020 WL 5544183, at *7 (D. Md. Sept. 16, 2020). And so, an antitrust conspiracy can exist where a plaintiff provides "plus factors" that suggest the "parallel behavior would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *SD3,* 801 F.3d at 424 (quoting *Twombly,* 550 U.S. at 556 n.4), or alleges "further circumstances pointing toward a meeting of the minds." *Id.* (quoting *Twombly,* 550 U.S. at 557).

### C. Civil RICO Claims

Lastly, Congress enacted the Racketeer Influenced and Corrupt Organizations Act as Title IX of the Organized Crime Control Act of 1970. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). Title 18, United States Code, Section 1962 provides that "it [is] unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).[4] Congress has "granted a private civil right of action to

---

[4] RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise functioning as an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009) (citation omitted). "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, and many other crimes. *See* 18 U.S.C. § 1961(1)(B).

"[a]ny person injured in his business or property by reason of a violation of the RICO provisions." *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

To successfully plead a civil RICO claim, a plaintiff must allege "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima*, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985)); *see also Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 841-42 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012). A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005) (citing 18 U.S.C. § 1964(c)). But, the Fourth Circuit has cautioned that "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). And so, this Court has recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

## IV.     ANALYSIS

Defendants argue that the Court should dismiss this matter because plaintiffs fail to plausibly allege Sherman Antitrust Act or RICO claims in the complaint. *See generally* Def. Mem. Specifically, defendants argue that plaintiffs' Sherman Antitrust Act claims are deficient because: (1) plaintiffs fail to allege either direct or circumstantial evidence of a conspiracy among the defendants; (2) plaintiffs fail to plausibly allege a *per se* antitrust violation in the complaint; and (3) plaintiffs lack antitrust standing. Def. Mem. at 10-24. Defendants also argue that plaintiffs' RICO claims are deficient because: (1) plaintiffs' RICO claims based upon alleged misrepresentations and/or omissions made to the contracting governments are too remote to establish proximate causation under RICO; (2) plaintiffs' RICO claims based upon alleged misrepresentations and/or omissions made to consumers are deficient, because the alleged misrepresentations and/or omissions are not material and plaintiffs do not allege that anyone relied upon the misrepresentations and/or omissions; and (3) plaintiffs fail to allege a proper RICO enterprise in the complaint. *Id.* at 24-31.

10

In addition, defendant 3Ci separately argues that the Court should dismiss any antitrust and RICO claims asserted against it, because plaintiffs fail to adequately allege 3Ci's involvement in the antitrust conspiracy, or that 3Ci committed any predicate RICO acts. *Id.* at 31-35.

Plaintiffs counter that the Court should not dismiss this matter, because they have plausibly alleged a *per se* antitrust violation in the complaint, based upon both direct and circumstantial evidence of a horizontal price-fixing agreement among the defendants. Pl. Resp. at 10-26. Plaintiffs also argue that they have standing to pursue their antitrust claims, because they are the direct purchasers of defendants' single call products. *Id.* at 26-29. In addition, plaintiffs argue that they allege plausible RICO claims because: (1) their injury was directly caused by defendants' misrepresentations and/or omissions; (2) they are not required to plead materiality or reliance with regard to each of these alleged misrepresentations and/or omissions; (3) they have sufficiently pleaded facts to establish a RICO enterprise among the defendants; and (4) they have properly alleged that 3Ci participated in the antitrust conspiracy and committed predicate acts incident to the alleged RICO conspiracy. *Id.* at 29-50. And so, plaintiffs request that the Court deny defendants' motion to dismiss. *Id.* at 50.

For the reasons discussed below, plaintiffs have sufficiently alleged plausible Sherman Antitrust Act claims in the complaint, because the complaint contains allegations to show the existence of an agreement among the defendants to fix the prices of ICS single call services. Plaintiffs fail, however, to plausibly allege RICO claims in the complaint, because: (1) plaintiffs cannot show proximate causation under RICO with respect to their alleged injuries; (2) plaintiffs' RICO claims cannot be predicated upon the alleged misrepresentations and/or omissions made to the contracting governments; and (3) plaintiffs fail to allege that the alleged misrepresentations and/or omissions made to consumers were material, or that anyone relied upon these misrepresentations and/or omissions. And so, the Court **GRANTS-in-PART** and **DENIES-in-PART** defendants' motion to dismiss.

### A. Plaintiffs Plausibly Allege Sherman Antitrust Act Claims

As an initial matter, a careful review of the complaint shows that plaintiffs have plausibly alleged Sherman Antitrust Act claims against all defendants in this case. To prove the existence of the alleged horizontal price-fixing scheme among Securus, GTL and 3Ci, plaintiffs must

11

demonstrate: "(1) the existence of an agreement, combination, or conspiracy, (2) among actual competitors, (3) with the purpose or effect of 'raising, depressing, fixing, pegging, or stabilizing the price of a commodity,' (4) in interstate or foreign commerce." *In re Titanium Dioxide*, 959 F. Supp. 2d at 819 (D. Md. 2013) (quoting *In re Med. X-Ray Film*, 946 F. Supp. at 215-16). Plaintiffs can accomplish this by either showing "direct or circumstantial evidence that reasonably tends to prove that the [alleged conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 820 (brackets existing) (internal citation omitted). And so, plaintiffs may prevail in a Sherman Antitrust Act case, based upon circumstantial evidence, if they show both parallel conduct by the defendants and "plus factors" that "suggest[] that the parallel conduct resulted from concerted action." *Jien v. Purdue Farms, Inc.*, 2020 WL 5544183, at *7 (D. Md. Sept. 16, 2020) (citation omitted).[5]

      Plaintiffs have made such a showing here. The complaint in this case contains sufficient factual allegations, based upon circumstantial evidence, to show that Securus and GTL entered into a horizontal price-fixing agreement for ICS single call services. *See id.* at *8 (quoting *SD3*, 801 F.3d at 427) (stating that, to show parallel conduct, plaintiffs must "plead[] facts indicating that the defendants acted 'similarly,' or that their actions were uniform"). First, as defendants appear to acknowledge, plaintiffs sufficiently allege facts to show parallel conduct between Securus and GTL in the complaint. *See* Compl. at ¶¶ 82-85 (alleging that Securus' PayNow and Text2Connect services were, "in all material ways, identical and indistinguishable" from GTL's Collect2Card and Collect2Phone services); Def. Mem. at 15-16 (conceding that Securus and GTL launched their single call services at the same price). And so, the Court focuses its analysis on whether plaintiffs sufficiently allege facts in the complaint regarding plus factors that could support their antitrust claims. *SD3*, 801 F.3d at 430 (citation omitted) (holding that if the complaint provides "detailed fact allegations as to the 'who, what, when and where' of the claimed antitrust misconduct, [the complaint] not surprisingly survive[s] dismissal").

---

[5] The Court agrees with defendants that plaintiffs do not allege direct evidence of a horizontal price-fixing agreement. Def. Mem. at 11-13. The allegations in the complaint do not establish the existence of a price-fixing agreement without the need for the Court to draw further inferences regarding the timing and substance of the communications or anticompetitive behavior. *See* Compl. at ¶¶ 77-78, 115; *see also Am. Chiropractic Ass'n*, 367 F.3d at 226 (stating that direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted").

In this regard, a review of the complaint makes clear that plaintiffs sufficiently allege facts to demonstrate the existence of plus factors that would suggest that defendants' parallel conduct resulted from concerted action. Notably, plaintiffs allege that Securus and GTL had numerous opportunities to collude with each other, and with 3Ci, to fix the price of ICS single call services. *See* Compl. at ¶ 77 (alleging that executives for Securus and GTL met for "dinner and drinks" and discussed "what prices should be charged for ICS calls"); *see also id.* at ¶ 115 (alleging that executives for Securus and GTL "regularly shared with one another considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments"). The Fourth Circuit has recognized that allegations of communications between competitors can support an inference of a conspiracy agreement. *See SD3*, 801 F.3d at 432.

Plaintiffs also allege facts to establish a common motive for the defendants to agree to fix the prices of ICS single call services—a key circumstantial fact. Compl. at ¶ 116 (alleging that maintaining the price of single call products allowed Securus to "simultaneously charge consumers exorbitantly high prices [for ICS calls] and pay contracting governments abnormally low site commissions" and that "Securus was eager to prevent GTL from disrupting the extraordinary profitability of" the services by launching the APOC service at a lower price); *see also SD3*, 801 F.3D at 431 ("Motivation for common action is a key circumstantial fact.") (citation omitted).

Plaintiffs similarly allege facts to show that the purported agreement to fix the prices of ICS single call services was against GTL's self-interest. Compl. at ¶¶ 70-72 (alleging that GTL initially developed its APOC service at lower price for consumers and at higher site commission rate than Securus, but later decided to contract with 3Ci and launch essentially identical single call services for the same price and site commissions as Securus); *see also In re Titanium Dioxide*, 959 F. Supp. 2d at 827. And so, the Court is satisfied that the complaint contains sufficient factual allegations regarding the "who, what, when, where" and why of the alleged horizontal price-fixing scheme to survive defendants' motion to dismiss. *SD3*, 401 F.3d at 430; *see also* Fed. R. Civ. P. 12(b)(6).

Defendants' argument that the Court should dismiss plaintiffs' antitrust claims because 3Ci does not compete with Securus and GTL is also unpersuasive. Def. Mem. at 21. Defendants correctly observe in their motion to dismiss that the law tethers application of the *per se* rule for Sherman Antitrust Act claims to agreements between, or among, actual competitors. *Id.*; *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606 (1972). But, if plaintiffs sufficiently plead a horizontal price-fixing agreement between Securus and GTL, as they do here, the vertical aspects of the alleged conspiracy involving 3Ci can also be evaluated under the *per se* rule. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204-05 (4th Cir. 2002); *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015), *cert. denied*, 577 U.S. 1193 (2016) ("*Per se* price-fixing agreements may also include those where a vertical player participates in and facilitates a horizontal conspiracy," in which case "plaintiffs must demonstrate both that a horizontal conspiracy existed, and that the vertical player was a knowing participant in that agreement and facilitated the scheme"). The Court also observes that the complaint contains specific allegations of anticompetitive behavior by 3Ci executives in the furtherance of the alleged horizontal price-fixing scheme. *See* Compl. at ¶ 78 (alleging that the horizontal price-fixing agreement was reached with 3Ci's assistance and active participation). And so, plaintiffs do not allege a "rimless wheel conspiracy," as defendants suggest. *See Dickson*, 309 F.3d at 203 ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.").

Defendants' argument that plaintiffs do not plausibly allege a *per se* antitrust violation in the complaint is equally unavailing. Def. Mem. at 21-22. The parties agree that Securus and GTL are competitors in the ICS market and that the ICS contracts affect interstate commerce. *See* Def. Mem. at 3; Pl. Resp. at 2. As discussed above, plaintiffs also plausibly allege a horizontal price-fixing agreement in the complaint. *See* Compl. at ¶¶ 70-77. In addition, plaintiffs allege that the purpose of the purported horizontal price-fixing agreement was to fix and inflate the prices of ICS single call services. Compl. at ¶ 2. Given this, plaintiffs allege plausible *per se* antitrust violation claims in the complaint. *See In re Titanium Dioxide*, 959 F. Supp. 2d at 819 (stating that, to establish a *per se* antitrust violation, plaintiffs must show "(1) the existence of an agreement, combination, or conspiracy, (2) among actual competitors, (3) with

Case 8:20-cv-01936-LKG   Document 96   Filed 09/30/21   Page 15 of 18

the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity, (4) in interstate or foreign commerce") (internal quotation marks omitted).

Lastly, while a closer issue, defendants' argument that plaintiffs cannot show a direct injury, and thus lack antitrust standing, is also unpersuasive. The Fourth Circuit has applied a five-part analysis to determine whether a plaintiff has antitrust standing:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (citation omitted). Here, defendants argue that plaintiffs lack antitrust standing, because the decisions of the contracting governments to contract with Securus and GTL for ICS services "are independent, intervening causes of [p]laintiffs' alleged injuries" in this case. Def. Mem. at 22. While defendants correctly observe that the prices of ICS calls are dictated by the terms of the ICS contracts by and between either Securus or GTL and the contracting governments, plaintiffs also correctly observe that they paid Securus and GTL directly for these calls as the consumers of the ICS services. Pl. Resp. at 28; *see also* Compl. at ¶ 122 (alleging that plaintiffs paid higher rates for ICS calls as a result of the defendants' anticompetitive price-fixing agreement). Given this, the Court is satisfied that plaintiffs allege an injury in this case that is sufficiently direct, and of the type that Congress meant to prevent through the antitrust laws, to establish antitrust standing. *See Novell*, 505 F.3d at 315 (stating that Congress enacted the antitrust laws "to protect the freedom to compete by curtailing the destruction of competition through anticompetitive practices").

Because plaintiffs plausibly allege Sherman Antitrust Act claims against all defendants in the complaint, the Court DENIES defendants' motion to dismiss these claims. Fed. R. Civ. P. 12(b)(6).

### B. Plaintiffs Fail To Allege Plausible RICO Claims

Defendants' argument that the Court should dismiss plaintiffs' RICO claims is on much stronger footing. To succeed on their RICO claims, plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Morley v. Cohen*, 888 F.2d 1006,

15

1009 (4th Cir. 1989) (citation omitted). Plaintiffs must also show that they were "injured in [their] business or property" by a RICO violation—a showing that requires both "but-for" and "proximate" causation. 18 U.S.C. § 1964(c); *see also Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (stating that RICO claims "require[] a showing of proximate caus[ation], meaning some direct relation between the injury asserted and the injurious conduct alleged") (citation omitted) (emphasis removed).

Here, plaintiffs rely upon federal mail and wire fraud as predicate RICO offenses, and they allege that defendants utilized the mail and wires to make two types of material misrepresentations and/or omissions in furtherance of their horizontal price-fixing scheme: (1) misrepresentations and/or omissions made to the contracting governments during contract negotiations and in monthly commission reports, and (2) misrepresentations and/or omissions made to consumers in billing statements and charges, and on publicly accessible websites. Compl. at ¶¶ 139, 142. The Court agrees with defendants that plaintiffs fail to state plausible RICO claims based upon these allegations for two reasons.

First, as defendants persuasively argue, the RICO claims in the complaint that are based upon alleged misrepresentations and/or omissions made to the contracting governments are too remote to establish proximate causation under RICO. Def. Mem. at 25. The Supreme Court has explained that a causative "link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient" to establish proximate causation in the RICO context. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 6 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 271 (1992) (brackets existing)). And so, "regardless of how foreseeable [plaintiffs'] claimed injury might be or even what motive underlaid the conduct that caused the harm, the injury for which [plaintiffs] may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party." *Slay's Restoration*, 884 F.3d at 494. Here, plaintiffs allege injuries that are contingent on, or derivative of, harm suffered by a third party—namely, the contracting governments. Compl. at ¶¶ 138-58 (alleging that defendants made misrepresentations and/or omissions to the contracting governments that resulted in inflated

prices for the ICS single call services). And so, plaintiffs simply cannot show that they have been directly injured by any misrepresentations and/or omissions made to these governments.[6]

Plaintiffs' RICO claims that are based upon alleged misrepresentations and/or omissions made to consumers are also problematic. The federal mail and wire fraud statutes, upon which plaintiffs rely, require that the alleged fraud be material, or have "a natural tendency to influence, or . . . capabil[ity] of influencing, the decision of the decisionmaking body to which it was addressed." *Donaldson v. Severn Sav. Bank, F.S.B.*, JKB-15-901, 2015 WL 7294362, at * 3 (D. Md. Nov. 18, 2015) (citation omitted). But, plaintiffs do not allege any facts in the complaint to show that the misrepresentations and/or omissions allegedly made to consumers, via publicly accessible websites or in mailed billing statements, were material to the decision to enter into the ICS contracts with Securus and GTL. *See* Compl. at ¶¶ 159-69 (alleging that defendants made misrepresentations and omissions regarding the transaction fees paid to 3Ci on websites and in billing statements). In fact, plaintiffs acknowledge in the complaint that consumers had no role or involvement in the decisions of the contracting governments to contract with Securus and GTL for ICS services, or in establishing the prices for such services. *See* Compl. at ¶ 42. Given this, plaintiffs simply cannot show that the alleged misrepresentations and/or omissions directed to consumers were material. *Donaldson*, 2015 WL 7294362, at *3.

Plaintiffs also fail to allege that anyone relied upon the purported misrepresentations and/or omissions made to consumers. *See* Compl. at ¶¶ 159-69. While it is true that plaintiffs need not allege facts to show reliance as to each and every predicate act of mail or wire fraud, it is difficult to see how plaintiffs could prevail upon their RICO claims in this case without at least showing that someone relied upon the misrepresentations and/or omissions allegedly made to consumers. *See Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008) (stating that

---

[6] Plaintiffs only speculate about what actions the contracting governments might have taken if defendants had not made the alleged misrepresentations and/or omissions. Pl. Resp. at 36-37; *see also Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 542 (D. Md. 2019) (finding that the plaintiffs' theory that they would not have been harmed had the defendant not made material misrepresentations to the Mexican government was "too attenuated" to serve as the basis of plaintiffs' RICO claim, because it "rest[ed] on the independent actions of third[-parties] by assuming that the Mexican government would have taken" action to dismantle the alleged scheme "had it known the truth") (citation and internal quotation marks omitted).

"none of [the prior discussion] is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations") (citation omitted) (emphasis in original); *see also id.* at 659 ("Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation."). Given this, the Court agrees with defendants that plaintiffs do not allege plausible RICO claims in the complaint. And so, the Court must DISMISS these claims.[7]

## V. CONCLUSION

In sum, when read in the light most favorable to plaintiffs, the Court is satisfied that the complaint contains plausible Sherman Antitrust Act claims that plaintiffs should be allowed to further develop through the discovery process. Plaintiffs fail, however, to plausibly allege civil RICO claims against the defendants.

And so, for the foregoing reasons, the Court:

1. **GRANTS-in-PART** and **DENIES-in-PART** defendants' motion to dismiss; and
2. **DISMISSES** Counts II-VI of the complaint.

Defendants shall **ANSWER,** or otherwise respond to, the remaining count in the complaint, on or before **October 30, 2021**.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

---

[7] Because the Court concludes that plaintiffs have not plausibly alleged RICO claims against the defendants, the Court need not reach the issues of whether plaintiffs allege a proper RICO enterprise, or whether C3i committed a predicate RICO act.