**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| ASHLEY ALBERT, *et al.*,<br><br>                    Plaintiffs,<br><br>    v.<br><br>GLOBAL TEL *LINK CORP., *et al*,<br><br><br>                    Defendants. | Civil Action No. 8:20-CV-1936<br><br><br>**DEFENDANT SECURUS TECHNOLOGIES, LLC'S ANSWER TO PLAINTIFFS' COMPLAINT** |

Defendant Securus Technologies, LLC ("Securus") hereby submits, through counsel, its Answer to Plaintiffs' Complaint filed on June 29, 2020 (ECF No. 1), subject to this Court's Memorandum Opinion and Order of September 30, 2021 (ECF No. 96).

## I.    INTRODUCTION[1]

1.    This case concerns a scheme by the Defendants—including the nation's two largest providers of telephone calling services for inmates—to fix inflated prices for calls between incarcerated individuals and their family members, friends, attorneys, and others, while also repeatedly lying to local governments and their own customers about the costs of those calls in order to charge the inflated prices.

ANSWER:   Securus admits that it is a provider of telephone calling services for incarcerated individuals.  Securus denies all other allegations in Paragraph 1.

2.    During the period from January 2010 through the present ("Class Period"), Securus and then GTL implemented a new payment method for receiving a collect call from an inmate the

---

[1]    Plaintiffs' Complaint contains several headings and sub-headings.  Securus reproduces those headings and sub-headings herein for clarity only, and does not consider them to assert substantive allegations to which a response is required.  However, to the extent a responsive pleading is required, Securus denies any and all allegations within any such heading or sub-heading.

"single call" option. These single calls charged an astronomical flat price to accept a one-time collect call from an inmate. Securus and GTL were able to charge these excessive single call prices by agreeing to eliminate competition between themselves and to fix the same inflated single call prices to consumers in violation of the federal antitrust laws. Securus and GTL implemented this scheme to charge artificially inflated prices for single calls through and with the assistance of 3CI, a marketing company and payment processor.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 2, and therefore denies the same.  Securus admits that it implemented a "single call" option, but denies all remaining allegations directed at it in Paragraph 2.

3.      Defendants also engaged in a widespread pattern of fraudulent misrepresentations and omissions to governments and consumers for the purpose of charging inflated prices for single calls. Namely, in communications with both governments and consumers, Securus and GTL lied by indicating that the extremely high prices of single calls were justified because the bulk of revenue from those calls went to 3CI in the form of unavoidable "transaction fees." In truth, Securus and GTL were paying 3CI a mere fraction of the supposed "transaction fees" and secretly pocketing the difference. This deceptive scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

ANSWER:  Securus denies all allegations in Paragraph 3.

4.      To place phone calls from correctional facilities to family, friends, lawyers, and others, inmates must use special inmate calling services ("ICS"). Inmates and their call recipients cannot choose their ICS provider. Instead, local and state governments contract with a single ICS provider to provide ICS within a given facility.

2

<u>ANSWER</u>: Securus admits the allegations in Paragraph 4.

5.      Securus and GTL are the two leading ICS providers in the United States. For the past decade, Securus and GTL have dominated the market for the provision of ICS. They implement and charge for approximately 80% of the telephone calls placed by inmates in prisons and jails around the country.

<u>ANSWER</u>: Securus admits that it is a large ICS provider in the United States that competes with GTL and other ICS providers.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5, and therefore denies the same.

6.      To provide ICS, Securus, GTL, and other companies enter into contracts with local and state governments that operate prisons and jails.  Those contracts identify the rates to be charged to consumers for ICS calls. Those contracts also promise to provide local or state governments a specified percentage of the revenue—called "site commissions"—that is earned from the ICS calls made from prisons or jails. Site commissions average approximately 50%.

<u>ANSWER</u>:  Securus admits that it enters into contracts with local and state governments that operate prisons and jails, and that those contracts include certain terms, including rates. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6, and therefore denies the same.

7.      When the market is competitive, Securus, GTL, and other companies compete for contracts with local and state governments by submitting bids for the provision of ICS to jails and prisons. Local and state governments typically select winning bids based on the reasonableness of the ICS call rates and the size of the site commission percentage.

<u>ANSWER</u>:  Securus admits that it competes with other companies for contracts with local and state governments by submitting bids.  Securus lacks knowledge or information sufficient to

3

form a belief as to the truth of the remaining allegations in Paragraph 7, and therefore denies the same.

8.      For many collect calls made by inmates, Securus, GTL and other ICS providers charge consumers a per-minute rate. The recipient of such collect calls typically establishes an account with the ICS provider using a credit card, which permits the recipient to receive multiple calls from the inmate over a period of time. For collect calls made through the account, the recipient's credit card is charged the applicable per-minute rate, which is specified in the contract between the government entity and the ICS provider. In 2017, the average cost of a collect call from a state prison in the United States that charged a per-minute rate and lasted a total of 15 minutes was approximately $1.87.

ANSWER:  Securus admits that it charges consumers for collect calls made by incarcerated individuals in accordance with the terms of its contract for the particular facility, and that recipients of such collect calls may establish an account with Securus using a credit card.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8, and therefore denies the same.

9.      In 2010, Securus launched a new kind of collect call option for inmates: the "single call." To accept a single call, the call recipient did not need to establish an account and did not pay a per-minute rate. Instead, Securus charged an excessive flat price to accept a single call, regardless of the duration of the call. Securus offered two single call options that effectively charged recipients at least one dollar per minute: PayNow, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Text2Connect, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes. Securus included the PayNow and

Text2Connect programs in ICS contracts with state and local governments (in addition to offering traditional collect calls that charge a per-minute rate to consumers who set up an account).

ANSWER: Securus admits that in or around 2010 it launched a single call service for incarcerated individuals that used a flat rate of either $14.99 for a call typically lasting up to 15 minutes (PayNow) or $9.99 for a call typically lasting up to 10 minutes (Text2Connect).  Securus further admits that PayNow and/or Text2Connect were included in certain contracts it had with state and local governments (in addition to offering traditional collect calls that charge a per-minute rate to consumers who set up an account).  Securus denies that the flat rate charges were excessive and denies all remaining allegations in Paragraph 9.

10.     When Securus included the single call programs in contracts with state and local governments, it paid especially low site commissions. Securus paid site commissions of only $1.60 for each $14.99 PayNow call and only $0.30 for each $9.99 Text2Connect call. As a result, state and local governments received a site commission of only 3% or 11% from each single call sold by Securus, in comparison to the approximately 50% received on average from traditional per-minute ICS calls.

ANSWER: Securus admits that it made certain payments to state and local governments pursuant to applicable contracts.  Securus denies the remaining allegations in Paragraph 10.

11.     The single calls provided by Securus were marketed and implemented by and through 3CI. In particular, 3CI offered collect call recipients the PayNow and Text2Connect options, processed the $14.99 and $9.99 charges, and managed the single call websites. When Securus launched its single call program through 3CI, Securus was the largest and most important client of 3CI, accounting for approximately 80% of 3CI' s revenue.

ANSWER: Securus admits that single call products were marketed and implemented by 3CI and Securus. Securus admits the second sentence in Paragraph 11. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11, and therefore denies the same.

12.     Soon after Securus launched its PayNow program in 2010, GTL began developing its own single call program, then called AdvancePay OneCall ("APOC"). The APOC program offered recipients of collect calls from inmates the ability to pay for the calls without establishing an account. For each single call, the APOC program charged call recipients a transaction fee of up to $3 plus a per-minute rate equal to the per-minute rate that recipients with established accounts paid. Additionally, the APOC program paid site commissions to local and state governments at the same percentage that GTL paid for traditional per-minute calls. In other words, GTL's APOC program would not only charge call recipients significantly less for single calls than Securus's PayNow and Text2Connect programs, but also share a greater percentage of the resulting revenue to state and local governments than Securus's PayNow and Text2Connect programs.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore denies the same.

13.     If, as it had planned prior to the conspiracy, GTL had competed with Securus for ICS contracts by aggressively marketing and offering single call programs, such as APOC, that were more affordable for consumer call recipients and more lucrative for state and local governments, Securus would have been forced to lower its single call rates and also increase related site commissions in order to remain competitive.

ANSWER:  Securus denies the allegations in Paragraph 13.

14.     Instead, Securus and GTL entered into an agreement to eliminate price competition and fix the prices of single calls in violation of the antitrust laws. The groundwork for the price-fixing agreement was laid when, in November 2012, Securus purchased 3CI' s patent covering technology used to charge mobile phone accounts for single calls. According to a former 3CI executive, 3CI was subsequently not permitted to provide services involving the patented technology to GTL without Securus's express permission and approval of the contract terms.

ANSWER:   Securus admits that in November 2012, it purchased a patent covering technology used to charge mobile phone accounts for single calls.  Securus denies the remaining allegations in Paragraph 14.

15.     In early 2013, at the direction of Securus, 3CI approached GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced as those provided by 3CI for Securus. Initially, GTL rejected 3CI's offer, noting that GTL was developing its own single call program, APOC. Yet, prior to the launch of GTL's APOC program, Securus and 3CI successfully persuaded GTL to avert price competition over single calls and to, instead, agree to provide a single call program that was indistinguishable from Securus's single call program and priced at exactly the same rates. According to a former manager at GTL, the CEOs of GTL and Securus held private, in-person dinners during that time at which they "shared strategic information" and discussed "what prices should be charged for ICS calls."

ANSWER:  Securus lacks knowledge or information concerning the allegations concerning what GTL did in early 2013, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 15.

16.     As a result of and in furtherance of the agreement to fix single call prices, GTL entered into a contract with 3CI that directed 3CI to market and implement single calls on GTL's

behalf. GTL subsequently offered two single call options through 3CI: Collect2Card, which charged $14.99 to the recipient's credit card for a call lasting up to 15 minutes, and Collect2Phone, which charged $9.99 to the recipient's mobile phone account for a call lasting up to 10 minutes.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore denies the same.

17.    The single call programs offered by Securus and GTL through 3CI were identical. For example, both Securus's PayNow option and GTL's Collect2Card option charged credit cards the same price of $14.99 per call lasting up to 15 minutes and provided governments with non-negotiable site commissions of exactly $1.60 per call. Similarly, both Securus's Text2Connect option and GTL's Collect2Phone option charged mobile phone accounts the same price of $9.99 per call lasting up to 10 minutes and provided governments with non-negotiable site commissions of exactly $0.30 per call.

ANSWER:  Securus lacks knowledge or information concerning allegations concerning the single call programs offered by GTL, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 17.

18.    To justify charging consumers excessive rates and paying governments low site commissions, Defendants made a series of material misrepresentations and omissions to both governments and consumers about the magnitude of the transaction fees associated with single calls operated by 3CI. Specifically, Defendants repeatedly and falsely represented that *most* of the revenue from each such single call went to pay transaction fees imposed by 3CI to implement those calls. In actuality, the transaction fees paid by Securus and GTL to 3CI to operate single calls comprised *less than half* of the $14.99 or $9.99 charged for those calls. Although the actual value of those transaction fees was, according to a former GTL employee, a "well-kept industry secret,"

several former executives of Defendants have conceded that the *majority* of each $14.99 or $9.99 charge for a 3CI-operated single call was ultimately retained by Securus or GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 18, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 18.

19.    Defendants made the misrepresentations and omissions in at least six ways. First, when negotiating with state and local governments to include single call programs in ICS contracts, Securus and GTL informed those governments that most of the $14.99 and $9.99 charges for single calls was comprised of necessary transaction fees paid to third parties such as 3CI. Second, the ICS contracts entered into by Securus and GTL with those governments failed to disclose and/or affirmatively misrepresented the actual value of those transaction fees. Third, in monthly reports provided to contracting governments that itemize and calculate site commissions, Securus and GTL failed to disclose and/or affirmatively misrepresented both the revenue they retained from single calls and the value of the associated transaction fees. Fourth, the websites for Securus's PayNow and GTL's Collect2Card both falsely state that the $14.99 single call charge "is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee." Fifth, when consumers paid $14.99 for Securus's PayNow or GTL's Collect2Card, their credit card statements misleadingly included two lines for the charge—one line for a $1.80 "Call Fee" and another line for a fabricated $13.19 "Transaction Fee." Sixth, when consumers paid $9.99 for Securus's Text2Collect or GTL's Collect2Phone single calls, Defendants failed to disclose the actual transaction fees paid to 3CI from such calls.

ANSWER:  Securus admits that its PayNow website has included a statement that the $14.99 single call charge "is broken out as $1.80 for the Call Fee and $13.19 for the Transaction

Fee." Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 19, and therefore denies the same. Securus denies the remaining allegations in Paragraph 19.

20.     Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for such calls. Contracting governments would *not* have permitted Securus and GTL to charge such high prices for single calls in light of the actual costs of implementing them. Indeed, the amounts that Securus and GTL retained from each single call—after the deduction of all transaction fees—were *several times higher* than what consumers would pay for the same call had those consumers been charged the per-minute rate expressly agreed to by contracting governments and contained in ICS contracts.

ANSWER:  Securus denies the allegations in Paragraph 20.

21.     In sum, Securus and GTL entered into an agreement to eliminate price competition over, and charge identical supracompetitive prices for, single calls processed by 3CI. In order to charge those inflated prices, Defendants lied to governments and consumers by fabricating the transaction fees paid to 3CI to implement those single calls.

ANSWER:  Securus denies the allegations in Paragraph 21.

22.     Accordingly, Plaintiffs, on behalf of themselves and on behalf of the Class and Subclasses, bring this action to enjoin Defendants from continuing their unlawful conduct and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs assert claims against Defendants for violating the Sherman Act, 15 U.S.C. § 1 and RICO, 18 U.S.C. § 1962 et seq.

ANSWER:  Securus  denies the allegations in Paragraph 22.

## II.     JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337; 15 U.S.C. §§ 15(a) and 26; and 18 U.S.C. § 1964. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class and each Subclass contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class and each Subclass is a citizen of a state different from a Defendant.

ANSWER:  Securus admits that at the time of the filing of this Answer this Court has subject matter jurisdiction.  Securus denies the remaining allegations in Paragraph 23.

24.     This Court has personal jurisdiction over Defendants. Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, members of the Class and Subclasses located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Securus and GTL contracted with local governments in this district to provide ICS to inmates in prisons or jails;

- All Defendants charged artificially inflated prices for single calls to consumers in this district;

- 3CI processed credit cards provided by consumers in this district when they accepted single calls from inmates; and

- All Defendants made misrepresentations to consumers and governments in this district regarding the enormity of transaction fees associated with single calls.

ANSWER:  Securus admits that this Court has personal jurisdiction over it.  Securus otherwise denies the allegations in Paragraph 24 directed toward it, including but not limited to

that it committed any acts in furtherance of a purported scheme.  For allegations directed at other Defendants, Securus lacks knowledge sufficient to form a belief about the truth of such allegations, and therefore denies the same.

25.     Venue is proper in this District under 15 U.S.C. § 22, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants transacted substantial business, was found, had agents in, and/or resided in this District; a substantial part of the events giving rise to Plaintiff Melinda Jabbie's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

ANSWER:  Securus admits that venue is proper in this district.  To the extent a further response is required, Securus lacks knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 25, and therefore denies the same.

III.    **PARTIES**

A.     **Plaintiffs**

26.     Plaintiff Ashley Albert is a resident of the state of New Hampshire.  On June 13, 2016, she paid $14.99 to accept a PayNow single call that was sold by Securus.  On July 1, 2016, she paid $14.99 to accept a PayNow single call that was sold by Securus.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies the same.

27.     Plaintiff Ashley Baxter is a resident of the state of Oregon. On July 3, 2019, she paid $14.99 to accept a PayNow single call that was sold by Securus. On July 4, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 5, 2019, she paid $14.99 per call to accept five separate PayNow single calls that were sold by Securus. On July 6, 2019, she paid $14.99 per call to accept three separate PayNow single calls

that were sold by Securus. On July 7, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 8, 2019, she paid $14.99 per call to accept three separate PayNow single calls that were sold by Securus. On July 9, 2019, she paid $14.99 to accept a PayNow single call that was sold by Securus.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore denies the same.

28.     Plaintiff Karina Jakeway is a resident of the state of Washington. On December 12, 2019, she paid $9.99 per call to accept two Text2Connect single calls that were sold by Securus. On December 13, 2019, she paid $14.99 per call to accept three PayNow single calls that were sold by Securus.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and, therefore denies the same.

29.     Plaintiff Melinda Jabbie is a resident of the state of Maryland. During the period 2013 through 2015, she paid $14.99 per call to accept several Collect2Card single calls that were sold by GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies the same.

**B.     Defendants**

30.     Defendant GTL is an Idaho corporation with its principal place of business in Falls Church, Virginia. It is one of the two largest providers of ICS in the United States. GTL and its subsidiaries provide ICS to approximately 2,300 correctional facilities and 1.8 million inmates, in all 50 states, the District of Columbia, and Puerto Rico. GTL contracted with state, county, and municipal governments to provide ICS throughout relevant period.

13

ANSWER:  Securus admits that GTL is an Idaho corporation with its principal place of business in Falls Church, Virginia.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30, and therefore denies the same.

31.    Defendant GTL operates through wholly owned subsidiaries to provide ICS in the United States. Operating subsidiaries of GTL during the relevant period include, among others: DSI-ITI, Inc., an Idaho corporation headquartered in Falls Church, Virginia; Value-Added Communications, Inc., an Idaho corporation headquartered in Falls Church, Virginia; and Public Communications Services, Inc., an Idaho corporation headquartered in Falls Church, Virginia.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies the same.

32.    Defendant Securus is a privately held Delaware corporation with its principal place of business in Carrollton, Texas. Securus is one of the two largest providers of ICS in the United States. Securus and its subsidiaries provide ICS to approximately 3,400 correctional facilities and 1.2 million inmates, in all 50 states. Securus contracted with state, county, and municipal governments to provide ICS throughout the relevant period.

ANSWER: Securus admits that its principal place of business is in Carrollton, Texas. Securus further admits that it has contracted with state, county, and municipal governments to provide ICS throughout the Class Period.  Securus admits that it or its subsidiaries provide services to approximately 3,400 correctional facilities and 1.2 million incarcerated individuals. Securus denies the remaining allegations in Paragraph 32.

33.    Defendant Securus operates through wholly owned subsidiaries to provide ICS in the United States. Operating subsidiaries of Securus during the relevant period include, among

others: T-Netix, Inc., a Delaware corporation headquartered in Dallas, Texas, and T-Netix Telecommunications Services, Inc., a Delaware corporation headquartered in Dallas, Texas.

ANSWER:   Securus admits that during portions of the Class Period T-Netix Telecommunications Services, Inc., headquartered in Dallas, Texas, was a wholly-owned subsidiary.  Securus denies the remaining allegations in Paragraph 33.

34.    Defendant 3CI is a Delaware company with its principal place of business in Boca Raton, Florida. 3CI is a mobile marketing company and payment processor that provides technology and expertise to facilitate telecommunications services. During the relevant period, 3CI contracted with Securus and GTL to charge consumers around the country for ICS single calls.

ANSWER:   Securus admits that it contracted with 3CI.   Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34, and denies the same.

### C.    Agents and Coconspirators

35.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.

ANSWER:  Securus denies the allegations in Paragraph 35.

## IV.    TRADE AND INTERSTATE COMMERCE

36.    Defendants' activities were within the flow of interstate commerce of the United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States. Among other things, Defendants contracted with state and local governments around the country to provide ICS; many of the ICS calls provided by Defendants involved interstate communications between an inmate in one state and a recipient of

the call in another state; and Defendants made fraudulent misrepresentations through interstate mail and interstate wires to state and local governments and consumers around the country.

ANSWER: Securus admits that it contracted with state and local governments to provide ICS. Securus denies all remaining allegations in Paragraph 36.

V.     FACTUAL ALLEGATIONS

    A.     Background

        1.     *Value of ICS Calls*

37.     On any given day, there are approximately 2.3 million people incarcerated in prisons and jails in the United States. Over 11 million people cycle through prisons and jails in the United States each year. Those inmates often make telephone calls to family members, friends, lawyers, and others approved by correctional facilities. Indeed, hundreds of millions of calls are placed by inmates in jails and prisons in the United States each year.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, and therefore denies the same .

38.     These ICS calls are extremely important to the health of inmates and their families. When detention facilities totally isolate inmates from their communities, those inmates often suffer damage to their mental, physical, and cognitive health. Additionally, when incarcerated parents lack regular contact with their children, those children-2.7 million of them nationwide—suffer from higher rates of truancy, depression, and poor school performance.

ANSWER: Securus admits that ICS calls have value.  Securus lacks knowledge or information sufficient to form a belief as to the truth about the remaining allegations in Paragraph 38, and therefore denies the same.

39.     ICS calls are also important for maintaining community safety, as they materially lower recidivism rates. In a report published on May 8, 2013, the Prison Policy Initiative explained, "Affordable phone calls are directly related to the safety and well-being of all communities because communication reduces the likelihood that incarcerated people will commit another offense after their release."

ANSWER: Securus admits that Plaintiffs accurately quote the information from the May 8, 2013 Prison Policy Initiative report.  To the extent Plaintiffs mischaracterize the information included in that report, Securus denies the allegations in Paragraph 39, and otherwise denies the remaining allegations in Paragraph 39.

40.     Additionally, ICS calls are indispensable to the effective functioning of the judicial system. Inmates impeded from placing telephone calls are often precluded from effective consultation with their attorneys and thus denied adequate legal representation.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore denies the same.

41.     The costs of making ICS costs are often borne by the families of inmates. Those families tend to be poorer than average. As the nonprofit Prison Policy Initiative has noted, "The high prices of these communications products act like a regressive tax, charging the people who have the least the most to keep in touch. As a result, more than a third of families of incarcerated people fall into debt to cover phone and visitation costs."

ANSWER:  Securus admits that Plaintiffs accurately quote the information from the Prison Policy Initiative.  To the extent Plaintiffs mischaracterize the information from the Prison Policy Initiative, Securus denies the allegations in Paragraph 41, and otherwise denies the remaining allegations of Paragraph 41.

2.      *Government Contracts for ICS Calls*

42.      Inmates cannot choose their ICS providers. Instead, local and state governments determine which ICS providers will provide ICS calls to inmates in each prison and jail.

ANSWER:  Securus admits the allegations in Paragraph 42.

43.      To provide ICS calls to inmates, ICS providers enter into contracts with local and state governments that operate prisons and jails.  Each of these local and state governments enters into an exclusive contract with an ICS provider, granting that company a monopoly for the duration of the contract over the provision of ICS calls to inmates in the prisons and jails operated by the contracting government.

ANSWER: Securus admits that it enters into contracts with local and state governments that operate prisons and jails, and that those contracts include terms, including rates, that speak for themselves.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43, and therefore denies the same.

44.      The exclusive ICS contracts specify the rates that ICS providers must charge consumers for calls with inmates. Those contracts also promise to provide the contracting governments a specified percentage of the revenue—called "site commissions"—that is collected by the ICS provider from those ICS calls. Site commissions average approximately 50%.

ANSWER: Securus admits that it enters into contracts with local and state governments that operate prisons and jails, and that those contracts include terms, including rates, that speak for themselves.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44, and therefore denies the same.

45.      When the ICS market is competitive, ICS providers compete with each other for contracts with local and state governments by submitting bids for the provision of ICS calls to jails

and prisons. In such circumstances, ICS providers attempt to secure those contracts by making bids that offer lower ICS call rates and higher site commission percentages. Local and state governments typically select winning bids based on the reasonableness of the ICS call rates and the size of the site commission percentage.

ANSWER:  Securus admits that it competes with other companies for contracts with local and state governments by submitting bids.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45, and therefore denies the same.

46.     State and local governments that contract with ICS providers are often focused on limiting the cost of ICS calls to consumers. A former Securus employee involved in negotiating ICS contracts stated that government officials were sensitive to the cost of calls to consumers. He explained that government officials were particularly concerned that family members and friends of inmates would have difficulty paying for expensive ICS calls and that, in turn, the contracting governments would receive complaints from constituents.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about state and local governments in Paragraph 46, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 46.

47.     Many state and local governments have publicly expressed their commitment to limiting the cost of ICS calls to consumers. For example, multiple state and local governments have enacted regulations requiring prisons and jails to secure the lowest price for consumers of ICS calls. Many other state and local governments have formally modified their requests for ICS contract bids to emphasize and prioritize reducing the cost of ICS calls to consumers. And other

state and local governments have announced the goal of reducing prices for consumers when entering into new contracts for ICS.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, and therefore denies the same.

### 3.   *Per-Minute ICS Calls*

48.    A majority of ICS calls made by inmates are charged at a per-minute rate. The payor of such calls typically establishes an account with a credit card or deposit, which permits the inmate to make multiple calls over a period of time. In order to set up an account, ICS providers often require account holders to deposit a minimum balance and to pay deposit and payment processing fees on those deposits. Calls made by the inmate through the account are charged the applicable per-minute rate.

ANSWER: Securus admits that it charges consumers for collect calls made by incarcerated individuals in accordance with the terms of its contract for the particular facility, and that recipients of such collect calls may establish an account with Securus using a credit card.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48, and therefore denies the same.

49.    The applicable per-minute rate is specified in the written contract negotiated and entered by the ICS provider and the government that operates the jail or prison. Additionally, the site commission in the contract specifies what percentage of that per-minute rate will be shared with the contracting government.

ANSWER:   Securus admits that the applicable per-minute rate charged and site commission paid by it may be included in the written contract with the governmental entity operating a jail or prison.  Securus lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 49 with regard to the other Defendants, and therefore denies the same.

50.      In 2017, the average cost of a collect call from an inmate in a state prison in the United States that charged the contracted per-minute rate and lasted a total of 15 minutes was approximately $1.87, i.e. approximately 12.47 cents per minute for a 15-minute call.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, and therefore denies the same.

4.      *GTL and Securus Dominate the Market for ICS Calls*

51.      Securus and GTL dominate the market for the provision of ICS. They charge for, and connect, approximately 80% of the telephone calls placed by inmates in prisons and jails around the country.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, and therefore denies the same.

52.      Securus and GTL achieved market dominance primarily through acquisitions and mergers of rivals. The following chart prepared by the Prison Policy Initiative illustrates the frequency of acquisitions by Securus and GTL, or their predecessors, over the last 35 years.

**CORPORATE CONSOLIDATION**
How GTL and Securus came to dominate the prison and jail telecom industry

ANSWER: Securus admits that Plaintiffs accurately reproduced information from the Prison Policy Initiative's chart. To the extent Plaintiffs mischaracterize the information from the Prison Policy Initiative's chart, Securus denies the allegations in Paragraph 52, and otherwise denies the remaining allegations in Paragraph 52.

53.     Both GTL and Securus are owned by private equity firms. The private equity firm American Securities purchased GTL in 2011 for approximately one billion dollars, and Platinum Equity purchased Securus in November 2017 for approximately $1.6 billion.

ANSWER: Securus admits that Platinum Equity purchased it in November 2017 for approximately $1.6 billion. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 53, and therefore denies the same.

**B.     Defendants Conspired to Fix the Prices of Single Calls**

*1.     Securus Launched a Single Call Program*

54.     In 2010, Securus launched an ICS "single call" program. "Single calls" are ICS collect calls that charge a one-time fee to the call recipient's credit card or mobile phone account without the recipient having to establish an account with the ICS provider.

22

ANSWER:  Securus admits the allegations in Paragraph 54.

55.     Securus simultaneously launched two kinds of single calls: PayNow, which charges single calls to credit cards and Text2Connect, which charges single calls to mobile phone accounts.

ANSWER:  Securus denies the allegations in Paragraph 55.

56.     PayNow single calls charge recipients a flat price of $14.99 for a collect call lasting up to 15 minutes, regardless of the duration of the call.  The $14.99 price for PayNow single calls is charged to credit cards that are provided by call recipients. PayNow single calls can be made to both landline and mobile phones.

ANSWER:  Securus admits that PayNow single calls charged recipients a flat price of $14.99 for a collect call lasting typically up to 15 minutes, regardless of the duration of the call, but denies that every PayNow single call lasted fewer than 15 minutes.  Securus admits the remaining allegations in Paragraph 56.

57.     Text2Connect single calls charge recipients a flat price of $9.99 for a collect call lasting up to 10 minutes, regardless of the duration of the call. The $9.99 price for Text2Connect single calls is charged to the mobile phone accounts of call recipients. Accordingly, Text2Connect single calls can only be made to mobile phones.

ANSWER:  Securus admits Text2Connect single calls charged recipients a flat price of $9.99 for a collect call lasting typically up to 10 minutes, regardless of the duration of the call, but denies that every Text2Connect single call lasted fewer than 10 minutes.  Securus admits the allegations in the second sentence of Paragraph 57.  Securus admits Text2Connect single calls can be made to mobile phones with certain carriers.  Securus denies the remaining allegations in Paragraph 57.

58.     Despite the high prices associated with PayNow and Text2Connect single calls, Securus provides abnormally low site commissions from those calls to contracting governments. Specifically, Securus provides site commissions to contracting governments of only (1) $1.60 from each $14.99 PayNow call, which is less than 11% of the price of the call and (2) $0.30 from each $9.99 Text2Connect call, which is less than 3% of the price of the call. As a result, state and local governments received site commission payments of only 3% or 11% from each single call sold by Securus, in comparison to the approximately 50% received on average from traditional per-minute ICS collect calls.

ANSWER:  Securus admits that it paid site commissions related to PayNow and Text2Connect single calls to certain contracting governments at rates of $1.60 and $0.30, respectively.  Securus denies the remaining allegations in Paragraph 58.

59.     A former employee of Securus stated that both the $1.60 and $0.30 in site commission payments to contracting governments from PayNow and Text2Connect calls were "standard" and "non-negotiable" across all ICS contracts providing those single-call options and, further, that those site commission amounts were exclusively determined by Securus executives.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated.  Securus denies the remaining allegations in Paragraph 59.

2.     *Securus Incorporated PayNow and Text2Connect in ICS Contracts*

60.     In 2010, Securus began inserting PayNow and Text2Connect single call programs in ICS contracts with state and local governments. In addition to including the PayNow and Text2Connect single call programs, those ICS contracts continued to offer the option of traditional

collect calls, which charged a much lower per-minute rate to consumers who could establish an account.

ANSWER:  Securus admits that in or around 2010 it offered PayNow and Text2Connect single call programs and that some ICS contracts with state and local governments included the option for such services, in addition to traditional collect calls.  Securus denies the remaining allegations in Paragraph 60.

61.     Securus swiftly incorporated the PayNow and Text2Connect programs into ICS contracts with state and local governments. According to a former executive of Securus, the single-call services offered by Securus, *i.e.* PayNow and Text2Connect, were "automatically enabled" as part of ICS contracts with governments. The former Securus executive estimated that 98 percent of the company's ICS contracts with local governments contained both single-call programs. Another former Securus employee said he was "heavily pressured" not to "let any contract out the door" that omitted PayNow and Text2Connect.

ANSWER: Securus admits that PayNow and Text2Connect services were included in certain ICS contracts with state and local governments.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 61.

### 3.     3CI Operates Securus's PayNow and Text2Connect Programs

62.     Securus contracted with 3CI to develop, market, implement, and operate the PayNow and Text2Connect single call programs. Accordingly, all the transaction and incremental costs for each PayNow and Text2Connect call were assumed and expended by 3CI.

ANSWER: Securus admits that it contracted with 3CI in relation to PayNow and Text2Connect.  Securus denies the remaining allegations in Paragraph 62.

63.     To market and implement PayNow single calls, 3CI's system contacted collect call recipients by phone call. If the call recipient agreed to accept the $14.99 charge for the PayNow call, 3CI subsequently collected the recipient's credit card information, processed and billed the $14.99 charge and connected the caller to the call recipient. Under the direction of Securus, 3CI also established and managed the website for the PayNow program, which provided information about PayNow single calls to governments and consumers.

ANSWER:  Securus admits that 3CI managed the website for the PayNow program. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63.

64.     Similarly, to market and implement Text2Connect single calls, 3CI's system contacted call recipients via text message and phone call. If the call recipient accepted the $9.99 charge, 3CI subsequently charged the $9.99 price to the recipient's mobile phone account by sending a premium text message. 3CI was able to process such charges via text message because 3CI had contracted with multiple mobile phone carriers to do so. Notably, those mobile phone carriers capped the amount that 3CI could charge for Text2Connect calls at $9.99. Under the direction of Securus, 3CI established and managed the website for the Text2Connect program.

ANSWER: Securus admits that 3CI managed the website for the Text2Connect program. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64.

65.     In order to operate the Text2Connect single call program, 3CI utilized a patent that was developed by the company. The patent—U. S. Patent No. 8,190,121 ("System and Method for Authorizing and Monetizing Collect Cellular Telephone Calls")—involves a mechanism for charging a collect call to a mobile phone account. The patented technology first determines

whether a mobile phone carrier accepts service charges and, if so and after authorization from the call recipient, connects the caller to the call recipient and simultaneously charges a fee to the mobile phone number. 3CI applied for the patent on April 15, 2008, and the patent was issued on May 29, 2012.

ANSWER:  The referenced publicly available patent speaks for itself, and Securus denies any allegations that mischaracterize the patent.  To the extent a further response is required, Securus lacks sufficient knowledge or information to form a belief as to the allegations in paragraph 65, and therefore denies the same.

66.     In exchange for operating the PayNow and Text2Connect programs and marketing them to consumers, 3CI received a transaction fee from each such single call. When a recipient of a PayNow or a Text2Connect call was charged $14.99 or $9.99 respectively, 3CI would retain a portion of that fee as a transaction fee and transmit the remainder to Securus.

ANSWER: Securus admits that 3CI typically received a transaction fee for single calls on a Securus single call product.  Securus denies the remaining allegations in Paragraph 66.

4.     *Securus Was the Largest and Most Important Client of 3CI*

67.     When Securus launched the PayNow and Text2Connect single call programs, the company became, by far, the largest, most important, and most influential client of 3CI. At the time, Securus alone accounted for approximately 80% of the total revenue that 3CI earned, according to a former 3CI employee.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67, and therefore denies the same.

68.     A former employee of 3CI said that Securus was internally referred to as "the whale" and, further, that Securus was the "reason we can keep the air on" and the "reason 3CI is

where they are today." Another former employee of 3CI explained that Securus "paid their paychecks" and that 3CI "would be fucked if we lost Securus." Another former employee of 3CI called Securus a "cash cow" that was "keeping us afloat."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee of 3CI stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 68.

69.     Due to the indispensability of Securus to 3CI's profitability and viability, it was of paramount importance for 3CI to serve the interests of and satisfy Securus, including by facilitating the price-fixing agreement with GTL that eliminated price competition over single calls.

ANSWER:  Securus denies the allegations in Paragraph 69.

5.     *GTL and Other ICS Providers Developed Cheaper Single Call Programs*

70.     Soon after Securus launched the PayNow and Text2Connect programs in 2010, GTL began developing its own single call program. That single call program—called APOC—charged the credit cards of call recipients a transaction fee of up to $3 combined with the applicable standard per-minute rate. In other words, GTL permitted call recipients to pay the per-minute rate established in ICS contracts when accepting a single call, all without having to set up an account and only by paying a transaction fee of $3 or less. Based on the approximately 12.47-cent per-minute rate in 2017 for a call lasting 15 minutes, the average APOC single call from a state prison *lasting a full 15 minutes* would cost no more than $4.88 in 2017—less than one-third the cost of Securus's $14.99 PayNow call.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70, and therefore denies the same.

71.    In addition to charging consumers significantly lower rates than Securus's single call programs, GTL's APOC program was designed to make higher site commission payments to contracting governments than Securus's single call programs. Specifically, APOC paid site commissions to contracting governments at the same percentage that GTL was paying for tradtional per-minute calls, which was approximately 50% on average. Accordingly, while the average APOC single call from a state prison lasting 15 minutes would have cost no more than $4.88 in 2017, the average site commission paid to contracting governments from each such APOC call would have been approximately $2.44, which is more than the $1.60 in site commission paid by Securus from each PayNow call.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71, and therefore denies the same.

6.    *GTL Agreed to Fix Single Call Prices with Securus and 3CI*

72.    Rather than compete with Securus for ICS contracts with state and local governments by offering a single call program—APOC—that would simultaneously lower consumer charges and increase site commissions, GTL entered into an agreement with Securus and 3CI to restrain such competition and fix single call prices. Shortly prior to the launch of GTL's APOC program, Securus and 3CI persuaded GTL to forego price competition over single calls and, instead, contract with 3CI to provide a single call program that was indistinguishable from, and charged the exact same prices as, Securus's PayNow and Text2Connect programs.

ANSWER:  Securus denies the allegations in Paragraph 72.

73.    The formation of Defendants' agreement to restrain competition was facilitated by Securus's acquisition of 3CI's patent related to charging single calls to mobile phone accounts. Specifically, on November 7, 2012, Securus purchased 3CI's patent referenced above (U.S. Patent

29

No. 8,190,121) that covers technology used to charge mobile phone accounts for Text2Connect single calls. Securus purchased the patent from 3CI for approximately $20 million and, as part of that transaction, also made a multimillion-dollar payment to 3CI to prepay for future single call transactions and guarantee 3CI's business for a period of time. When Securus purchased the patent, it simultaneously awarded patent exclusivity to 3CI, thereby providing 3CI with an exclusive license to use the patent for a period of 10 years. Importantly, according to a former employee of 3CI, the company could not use the licensed patent to provide services to a competitor of Securus without the express approval of Securus.

ANSWER:  Securus admits that it purchased 3CI's patent referenced above (U.S. Patent No. 8,190,121) that covers technology used to charge mobile phone accounts for Text2Connect single calls on November 7, 2012.  Securus admits when it purchased the patent, it simultaneously awarded patent exclusivity to 3CI.  Securus denies the remaining allegations in Paragraph 73.

74.     Soon after Securus acquired the patent from 3CI in 2012, Securus and 3CI agreed that 3CI would approach GTL to request that GTL enter into a contract for 3CI to provide single call services identically priced to those provided by 3CI for Securus. As a result of the patent exclusivity agreement with Securus, 3CI could not contract with GTL to offer a single call option that charged mobile phone accounts (*i.e.* another version of Text2Connect) without Securus's express approval.

ANSWER:  Securus admits that it acquired the patent referenced above (U.S. Patent No. 8,190,121) from 3CI in 2012.  Securus denies the remaining allegations in Paragraph 74.

75.     A former 3CI executive explained that 3CI was not able to provide the technology it patented for charging mobile phone accounts to GTL without Securus's express permission. As a condition of providing that permission, Securus insisted that any agreement between 3CI and

GTL contain terms that require GTL's single call program to charge the same prices as Securus's single call program. The former 3CI executive explained that, because 3CI could not contract with GTL without Securus's express approval, all three companies had "more room for overcharging on the single call model based on their interests."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 75.

76.     In late 2012, at the direction of Securus, 3CI approached GTL to persuade GTL to enter into a contract for 3CI to provide a single call program. According to a former 3CI executive, GTL initially declined 3CI's offer and claimed that GTL could develop, and was developing, its own single call platform without going through 3CI. Yet, Securus and 3CI ultimately persuaded GTL to contract with 3CI to provide a single call program that was indistinguishable in every material way, including price, from Securus's single call program, even though GTL was already developing a rival single call program, APOC, that promised to charge lower rates and pay higher site commissions. Specifically, Securus and 3CI persuaded GTL to contract with 3CI so that GTL and Securus could both charge the exact same inflated price for single calls and pay the exact same low site commissions from those calls. Defendants thus unlawfully agreed to eliminate price competition regarding single calls between Securus and GTL, allowing all three Defendants to reap profits above and beyond what they would have earned in a competitive market.

ANSWER: Securus denies the allegations in Paragraph 76.

77.     This horizontal agreement to eliminate competition and fix single call prices was reached by senior executives of Securus and GTL. A former manager of GTL, who was employed at the company from 2011 through 2016, stated that although "Securus and GTL publicly identified

themselves as fierce competitors in the ICS industry," in reality, "behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success." He stated that, during his employment, he attended a dinner with the following three executives of GTL: Brian Oliver, then Chief Executive Officer of GTL; Jeffrey Haidinger, then President and Chief Operating Officer of GTL; and John Baker, then Senior Vice President of Consumer Channels and Payment Services for GTL. The former GTL manager explained that during that dinner, "both Brian Oliver and Jeffrey Haidinger boasted about how they met regularly with Rick Smith, then Chief Executive Officer of Securus, for dinner and drinks and about how they shared strategic information with Rick Smith during those dinners and drinks. Brian Oliver then explained to me that when he and Jeffrey Haidinger met with Rick Smith for dinners and drinks, the three of them would discuss what prices should be charged for ICS calls and which companies were securing which ICS contracts, among other industry issues."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 77.

78.    The horizontal agreement between ostensible competitors Securus and GTL to fix single call prices was also reached with the direct assistance and active participation of 3CI. A former 3CI executive explained that 3CI was "way, way in bed with Securus" and that there was "a lot of handshaking between" the two companies "behind the scenes." While the former 3CI executive was not directly involved in 3CI's relationship with Securus or GTL, he said he could think of no plausible explanation, in the absence of a conspiracy, for Securus and GTL to be identically pricing their single call programs, and he suspected that there was an agreement between Securus, 3CI, and GTL to charge artificially high prices for single calls. He explained that

3CI "wanted GTL's business really bad" and would have negotiated terms favorable to both Securus and GTL to secure contracts with both companies. He also noted that a price-fixing agreement was made more achievable by the fact that only a small set of 3CI executives, including CEO John Duffy and COO Mark Smith, simultaneously managed the relationships with both Securus and GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former 3CI employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 78.

79.     In early 2013, as a result of and in furtherance of Defendants' agreement to eliminate competition and fix single call prices, GTL formally entered into a contract with 3CI to provide single calls that customers could pay for via charges to both credit cards and mobile phone accounts. As part of that agreement, GTL agreed to charge consumers the exact same rates that Securus charged for those single products. Specifically, GTL agreed to charge $9.99 for single calls lasting up to 10 minutes that are billed to mobile phone accounts, which is exactly what Securus charges for Text2Connect calls, and to charge $14.99 for single calls lasting up to 15 minutes that are billed to credit cards, which is exactly what Securus charges for PayNow calls.

ANSWER: Securus admits that it charged $9.99 for single calls lasting typically up to 10 minutes to mobile phone accounts with Text2Connect and $14.99 for single class lasting typically up to 15 minutes to credit cards for PayNow.  Securus denies the remaining allegations in Paragraph 79.

80.     As part of the same agreement, GTL also agreed to pay contracting governments the exact same site commissions from those single calls as Securus. Specifically, GTL agreed to pay site commissions of only $0.30 from each single call that charges $9.99 to a mobile phone

account, which is exactly what Securus paid from Text2Connect calls, and to pay site commissions of only $1.60 from each single call that charges $14.99 to a credit card, which is exactly what Securus paid from PayNow calls.

ANSWER:  Securus denies the allegations in Paragraph 80.

>7.     *As a Result of the Anticompetitive Agreement, the Single Call Programs Provided by Securus and GTL Were Identical*

81.     In the summer of 2013, GTL launched its single call program with two single call options operated by 3CI. The single call option that charged $14.99 to the credit cards of call recipients was branded "Collect2Card." The single call option that charged $9.99 to the mobile phone accounts of call recipients was branded "Collect2Phone."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, and therefore denies the same.

82.     Securus's PayNow program and GTL's Collect2Card program are, in all material ways, identical and indistinguishable. Both programs:

- charge recipients of collect calls a flat fee per call lasting up to 15 minutes, regardless of the duration of the call;

- charge the exact same price of $14.99 per single call;

- charge $14.99 per single call to credit cards obtained from call recipients;

- provide governments with non-negotiable site commissions of exactly $1.60 per call;

- are marketed and implemented by 3CI;

- utilize websites that contain virtually identical language;

- utilize websites whose domain names are registered with and owned by 3CI;

- direct consumers to addresses in Boca Raton, Florida, where 3CI is headquartered.

34

<u>ANSWER</u>:  Securus denies the allegations in Paragraph 82.

83.     The extraordinary similarity between Securus's PayNow program and GTL's Collect2Card program is evident when comparing screenshots of the homepages of their respective websites. Aside from using a different stock photo, the pages are effectively identical:





<u>ANSWER</u>:  Securus admits that the screen capture of its webpage appears to be accurate. Securus denies the characterizations in Paragraph 83 and otherwise denies the remaining allegations in Paragraph 83.

84.     Securus's Text2Connect program and GTL's Collect2Phone program were also, in all material ways, identical and indistinguishable. Both programs:

- charge recipients of collect calls a flat fee per call lasting up to 10 minutes, regardless of the duration of the call;

- charge the exact same price of $9.99 per single call;

- charge $9.99 per call by billing the call recipient's mobile phone account through a premium text message;

- provide governments with non-negotiable site commissions of exactly $0.30 per call;

- are marketed and implemented by 3CI;

- utilize websites that contain virtually identical language;

- utilize websites whose domain names are registered with and owned by 3CI;

- direct consumers to the same address in Boca Raton, Florida, where 3CI is headquartered.

<u>ANSWER</u>:  Securus denies the allegations in Paragraph 84.

85.     The extraordinary similarity between Securus's Text2Connect program (which was publicly referred to as "Text Collect") and GTL's Collect2Phone program is also evident when

comparing the layout and language of the homepages of their respective websites:





ANSWER:  Securus admits that the screen capture of its webpages appears to be accurate. Securus denies the characterization in Paragraph 85 and otherwise denies the remaining allegations in Paragraph 85.

86.     The similitude of the single call programs employed by Securus and GTL was a direct consequence of their anticompetitive agreement. Securus and GTL instructed 3CI to charge identical prices for their single calls and to establish websites with the above content for those single calls.

ANSWER:  Securus denies the allegations in Paragraph 86.

8.     *Both Securus's and GTL's Single Call Programs Coerced Consumers to Purchase Those Calls*

87.     In addition to charging the same inflated prices and paying the same low site commissions, Securus's and GTL's single call programs also employed highly similar automated systems that effectively coerced consumers to pay for those expensive single calls rather than establish accounts to be charged much lower per-minute rates.

ANSWER:  Securus admits that it used an automated system.  Securus denies the remaining allegations in Paragraph 87.

88.     When inmates placed collect calls to mobile phones from prisons or jails that employed the 3CI-operated single call programs of Securus or GTL, call recipients typically heard an automated message that provided the following three options: (1) "If you would like to continue this call of up to 15 minutes by accepting a charge to your credit or debit card of $14.99, please press 1"; (2) "if you would like to continue this call of up to 10 minutes by accepting a charge to your mobile telephone bill of $9.99, please press 2"; (3) "If you would like to set up or add funds to a prepaid ... account in order to pay for future calls, please press 3." (If the call recipient was using either a landline or a mobile phone unable to accept premium text messages, only the first and third options would typically be provided by the automated system.)

ANSWER:  Securus denies the allegations in Paragraph 88.

89.     As the call options make clear, the only way for the call recipient to connect with the caller during that call was to pay $14.99 or $9.99 for a single call. If, instead, the call recipient opted to create a traditional account in order to be charged the much lower per-minute rate, the recipient would have to disconnect from the incoming collect call, subsequently establish an account with a credit card or deposit, and hope the caller would be able to make the collect call at a later time. In other words, to accept the incoming collect call, recipients of 3CI-operated single calls transmitted by Securus and GTL could not avoid paying $14.99 or $9.99 per call. In December 2014, the Alabama Public Service Commission concluded, "Call scripts structured in such a way are misleading and deceptive. They create the misconception that the consumer's only options are to either accept the inmate's call at the provider's single payment service price or reject the inmate's collect call."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 89 not directed at it, and therefore denies the same. Securus denies the remaining allegations in Paragraph 89.

90.     Securus and GTL also made it difficult to establish accounts to pay the lower per-minute call rates. To set up such accounts, both companies established minimum deposit requirements and also charged credit card and deposit processing fees. Indeed, some consumers paid for single calls because they could not afford the deposit minimums. GTL's website states that if "you do not have sufficient credit card funds for a minimum deposit, there is [an option] that allows you to pay for just one call."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations directed to GTL, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 90.

91.     A former Securus employee explained, "The process for setting up a pre-paid account was often cumbersome, time-consuming and frustrating. Many family members and friends of inmates gave up and subsequently accepted a PayNow or Text2Collect call. Securus failed to provide the expertise and information required by recipients of ICS collect calls to efficiently set up pre-paid accounts." A former GTL employee stated that "it was not an honest business" and that GTL's strategy "was to drive consumers to the costliest ICS product and take advantage of consumers' captivity to generate higher revenue and profit."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former Securus or GTL employee stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 91.

92.     In December 2015, Securus's then-CEO, Richard Smith, acknowledged the extreme pressure that call recipients face to accept Securus's exorbitantly priced single calls. Specifically, Smith wrote:

> Often, when an individual is arrested and first taken to jail, their most urgent need is to communicate with a family member or close friend. It can take several days for those parties to set up a new account with a provider like Securus, but PayNow and Text2Connect allow those parties to receive calls instantly. This can literally be the difference between life and death for some arrestees, who may be desperate and despondent at being cast into the dangerous and unfamiliar environment of a jail. And even in less desperate cases, the loss of freedom for a day or two, if a communications delay results in a delay in posting bail, is an irreparable and incalculable loss.

ANSWER:  Securus admits that Rick Smith wrote the quoted in language in an affidavit signed December 21, 2015.  Securus denies the remaining allegations in Paragraph 92.

42

93.     As a result, not only are inmates' loved ones and lawyers powerless to select their ICS provider, but many of them are also unable to set up an account that charges a lower per-minute rate rather than accept an expensive single call.

ANSWER:  Securus admits that ICS providers are selected by governmental entities. Securus denies the remaining characterization in Paragraph 93.

> 9.     *Defendants' Agreement Restrained Competition in the Market for Single Calls*

94.     When GTL launched the Collect2Card and Collect2Phone single call programs in 2013, it amended multiple existing ICS contracts with state and local governments around the country to add the Collect2Card and Collect2Phone options and charge $14.99 and $9.99, respectively, for single calls.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94, and therefore denies the same.

95.     As part of launching Collect2Card and Collect2Phone, GTL also delayed the rollout of APOC. Upon information and belief, although GTL eventually made APOC operational in 2014, it marketed Collect2Card and Collect2Phone as the primary single call products to state and local governments and only proposed APOC as an alternative in the event contracting governments rejected the 3CI-operated single calls.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and therefore denies the same.

96.     Thus, Defendants succeeded in eliminating and restraining price competition in the market for single calls. As a result of their anticompetitive agreement, both Securus and GTL charged, and profited from, the exact same artificially inflated prices of $14.99 and $9.99 for single

calls and also paid the same artificially-depressed site commissions of $1.60 and $0.30 from those single calls to contracting governments.

ANSWER:  Securus denies the allegations in Paragraph 96.

97.     Due to the anticompetitive agreement, GTL refrained from criticizing Securus's PayNow and Text2Connect programs when bidding for and negotiating ICS contracts with contracting governments because GTL was offering identical single call programs in the form of Collect2Card and Collect2Phone. On the contrary, as discussed in Section C below, both Securus and GTL made similar fraudulent misrepresentations and omissions about their high-priced single call products to contracting governments as part of their deceptive campaigns to persuade those contracting governments to accept them.

ANSWER:  Securus denies the allegations in Paragraph 97.

98.     In the absence of Defendants' anticompetitive price-fixing agreement, GTL would have vigorously competed with Securus for contracts with state and local governments by, in part, offering lower-priced single calls that simultaneously generated higher site commissions. In so doing, GTL would have marketed its single call products to distinguish them as superior to Securus's, distinctions which would have included the lower cost to consumers and higher return to governmental entities. Such competition, in turn, would have forced Securus to materially lower the prices charged to consumers for PayNow and Text2Connect calls.

ANSWER:  Securus denies the allegations in Paragraph 98.

99.     Indeed, whenever made aware of GTL's APOC alternative, contracting governments have predictably and overwhelmingly favored APOC over Collect2Card and Collect2Phone. A former GTL employee stated that APOC was much more "palatable to facilities" than Collect2Card and Collect2Phone. Had GTL not entered into the anticompetitive agreement

with 3CI and Securus, single calls that GTL provided through the Collect2Card and Collect2Phone programs would have, instead, been provided through the cheaper APOC program, providing substantial savings to many consumers.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 99.

100.    If, in the absence of a price-fixing conspiracy, GTL would have sought to supplement APOC by offering a single call option that charged mobile phone accounts, GTL would not have needed to contract with 3CI to do so. In fact, much smaller competitors to Securus and GTL independently developed their own single call programs that charged single calls to mobile phone accounts. In order to do so without running afoul of the patent obtained by 3CI, these much smaller companies simply contracted with competitors to 3CI, which used their own technology to charge fees to mobile phone accounts through premium text messages.

ANSWER:  Securus denies the allegations in Paragraph 100.

101.    For example, during much of the relevant period, NCIC Inmate Communications ("NCIC") offered a single call option that charged $5.99 to the mobile phone accounts of call recipients-40% less than the $9.99 charged by Securus's Text2Connect program. The CEO of NCIC, Bill Pope, said that it was "very easy" to develop a program that offered single calls to mobile phone users and that NCIC successfully contracted with GoLive Mobile, a competitor to 3CI, to charge $5.99 to mobile phone accounts. Indeed, on January 15, 2016, the Alabama Public Service Commission wrote, "NCIC charged $5.99 for the same single payment service that Securus and GTL offer at $9.99. The [Commission] reasonably concludes that if NCIC offered the service at $5.99, industry giants Securus and GTL can as well."

45

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101, and therefore denies the same.

102.    Additionally, even if, in the absence of a price-fixing conspiracy, GTL would have contracted with 3CI to access technology that facilitated charging single calls to mobile phone accounts, GTL would not have also: (1) contracted with 3CI to provide single calls that charge credit cards, when GTL was already developing APOC, a more competitively priced single call program that charges credit cards, (2) charged the exact same $14.99 price as Securus for each single call charged to a credit card, and (3) charged the exact same $9.99 price as Securus for each single call charged to a mobile phone account. GTL only took those three actions as a direct consequence of the agreement with Securus to eliminate competition and fix single call prices.

ANSWER: Securus denies the allegations in Paragraph 102.

> *10.    Securus and GTL Simultaneously Began Phasing Out 3CI-Operated Single Calls in 2018*

103.    Beginning in 2018, both Securus and GTL stopped including provisions in ICS contracts that permitted the charging of $14.99 and $9.99 for single calls operated by 3CI. Instead, both Securus and GTL began offering single calls at much lower rates without the involvement of 3CI. This simultaneous reversal further demonstrates that the prices Securus and GTL charged for 3CI-operated single calls were inflated and fixed by agreement between Securus and GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 103, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 103.

104.    GTL began phasing out the use of Collect2Card and Collect2Phone in 2018. In lieu of marketing those 3CI-operated single call products, GTL has continued to offer APOC, which only charges recipients of single calls the applicable per-minute rate, plus a transaction fee of up

to $3, and which provides contracting governments with site commission payments equal to the percentage collected from traditional per-minute calls.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore denies the same.

105.    Securus similarly began phasing out PayNow and Text2Connect calls in August 2018. Securus replaced those 3CI-operated calls with a program called AdvanceConnect Single-Calls, which also only charges recipients of single calls the applicable per-minute rate, plus a transaction fee of up to $3, and which also provides contracting governments with site commission payments equal to the percentage collected from traditional per-minute calls.

ANSWER:  Securus admits that it phased out PayNow and Text2Connect calls, and that it replaced 3CI-operated calls with a program called AdvanceConnect Single-Calls ("ACSC"). Securus admits that ACSC allows a call recipient who does not have a Securus account to accept a call and pay a transaction fee of $3, plus the Advance Connect per-minute call rate with a credit card.  Facilities receive the same commission percentage for the calls on the per-minute usage portion of the call that facilities receive for Advance Connect calls.  Securus denies the remaining allegations in Paragraph 105.

106.    Although both Securus and GTL began phasing out Collect2Card, Collect2Phone, PayNow, and Text2Connect in new ICS contracts in 2018, those products continue to be offered under certain existing ICS contracts and to charge the same inflated prices. Accordingly, call recipients purchasing those 3CI-operated single call products in or after 2018 have continued to be harmed by paying inflated amounts.

ANSWER:  Securus admits that Text2Connect and PayNow remained available under some existing ICS contracts after 2018.  Securus denies the remaining allegations in Paragraph 106.

*11.   Plus Factors Render the ICS Industry Susceptible to Price-Fixing*

107.   The ICS industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to the type of collusion described herein. These include: (1) industry concentration; (2) high barriers to entry; (3) inelastic supply and demand; (4) personal relationships between executives at competing ICS providers; (5) numerous opportunities to collude; (6) strong financial motive to conspire; and (7) extraordinary profits.

ANSWER:  Securus denies the allegations in Paragraph 107.

108.   The ICS industry is highly concentrated. For the past decade, Securus and GTL have dominated the market for the provision of ICS. They charge for, and connect, approximately 80% of all the ICS calls in the United States. An analyst from Moody's characterized the ICS market as "largely duopolistic."

ANSWER:  Securus admits that it is a large ICS provider in the United States that competes with GTL and other ICS providers.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108, and therefore denies the same.

109.   The ICS industry is characterized by high entry barriers. These barriers include the high cost of building a viable telecommunications system that can provide ICS to prisons and jails; bidding for and prevailing on contracts with state and local governments, which often require a substantial outlay of upfront capital; and complying with various regulations imposed by federal and state governments. Indeed, assembling a workable telecommunications system and securing ICS contracts with government entities requires a multimillion-dollar investment. As a result, it is

exceptionally expensive and logistically complex for new ICS providers to emerge and compete with Securus and GTL.

ANSWER:  Securus admits that it costs money to build a viable communications system that can provide ICS to prisons and jails and to bid for contracts with state and local governments. Securus denies the characterizations in Paragraph 109 as to encouraging or discouraging competition, and otherwise denies the remaining allegations in Paragraph 109.

110.    Additionally, smaller ICS providers that ostensibly compete with Securus and GTL have faced substantial hurdles to capturing greater market share. For example, many state and local governments require ICS providers to make substantial upfront payments as a condition of winning ICS contracts. Securus and GTL can afford to make such payments, but smaller ICS providers often lack the capital necessary to do so. A former GTL employee explained that the bidding process for ICS contracts often automatically excludes smaller competitors from the process.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations directed to GTL or concerning what a former GTL employee stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 110.

111.    The market for ICS is also characterized by inelastic supply and inelastic demand. An increase in the price of single calls causes no increase, or only a relatively small increase, in the supply of single calls, as each state and local government only enters into one contract at a time with a single ICS provider and, further, just two ICS providers dominate the market. Similarly, an increase in the price of single calls causes no decrease, or only a relatively small decrease, in the demand for single calls, because family members, friends and lawyers must often accept these important calls from inmates despite the excessive price and, further, those call recipients are unable to select their own, more affordable ICS providers. Indeed, when a former manager of GTL

asked his superiors whether the company could lower the prices of single calls to inmates' families, he was told that single call prices "should not be lowered" in part "because the family and friends of inmates are a captive audience without the ability to select an alternative provider."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 111.

112.    Because governments, not inmates, choose ICS providers, inmates and their families, friends and lawyers are captive markets for ICS providers. In a 2013 report, the Prison Policy Institute explained, "In an ordinary market for goods or services, consumers have the freedom to select the best seller. In the prison phone market, though, state and local government entities grant monopolies to telephone companies by entering into exclusive contracts. The actual consumers of the telephone service—the families of incarcerated persons—have no input on the contracts or ability to take their business elsewhere." Ajit Pai, the chairman of the Federal Communications Commission, explained in a statement issued in 2013 that "choice and competition are not hallmarks of life behind bars. Inmates cannot choose among multiple carriers for lower rates."

ANSWER:  Securus admits that governments choose ICS providers.  Securus admits that Paragraph 112 quotes the Prison Policy Institute and Ajit Pai.  To the extent Paragraph 112 mischaracterizes these quotes, Securus denies the allegations in Paragraph 112.  Securus denies the remaining allegations in Paragraph 112.

113.    Executives of the Defendants have close personal relationships with each other. Securus and GTL have publicly indicated that they detest each other and ostensibly engage in vigorous competition for ICS contracts with state and local governments. Yet, a former manager

at GTL explained that, despite appearances, senior executives of Securus and GTL "regularly communicated with each other to facilitate each other's success." According to the former GTL manager, then CEO of GTL, Brian Oliver, boasted that he met regularly with then CEO of Securus, Richard Smith, for drinks and dinner and that the two CEOs "shared strategic information" and discussed "what prices should be charged for ICS calls" during those private meetings. Similarly, a former Securus employee said that executives at Securus and GTL were "friends," and another former Securus executive said that the "industry was very incestual."

ANSWER:  Securus admits that GTL, Securus, and other ICS providers compete for ICS contracts with state and local governments.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what certain former employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 113.

114.    Indeed, many executives of GTL are former employees of Securus and vice versa. For example, George McNiff, the current Vice President of Technical Services at GTL, was previously the Director of Product Development at Securus. In fact, the current private equity owner of Securus—Platinum Equity LLC—is controlled and operated by CEO Tom Gores, and his brother Alec Gores is the founder and CEO of the Gores Group, which is the former private equity owner of GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what certain former employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 114.

115.    Defendants have had numerous opportunities to collude. Executives from Securus and GTL regularly attended conferences of professionals in charge of correctional facilities, including those hosted by the American Jail Association, National Sheriffs Association, and

Corrections Technology Association. For example, during the relevant period, annual summits of the Corrections Technology Association were supported by two platinum sponsors—Securus and GTL—and at least 20 employees from Securus and GTL attended each summit. A former GTL manager explained that, at these conferences and summits, employees of GTL and Securus "regularly shared with one another considerable strategic information, including the optimal statements to make to governments in order to secure ICS contracts, how to persuade governments to accept the terms of an ICS contract, and how to best market ICS calls to governments."

ANSWER:   Securus admits that it has been listed as an exhibitor of the Corrections Technology Association annual summit.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning GTL or what a former GTL employee stated, and therefore denies the same.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 115, and therefore denies the same.

116.    There was a particularly strong financial motive for Securus and GTL to fix single call prices. In sharp contrast to traditional per-minute ICS calls, single calls allowed Securus and GTL to simultaneously charge consumers exorbitantly high prices and pay contracting governments abnormally low site commissions. Accordingly, after Securus launched its single call program in 2010, Securus was eager to prevent GTL from disrupting the extraordinary profitability of that program.

ANSWER:  Securus denies the allegations in Paragraph 116.

117.    The following charts, which were prepared by the Prison Policy Initiative, reflect the distribution of revenue from Securus's PayNow and Text2Connect single call programs in Genesee County in Michigan during the month of April 2013—before GTL entered the single call market. The charts demonstrate how Securus's single call program reduced revenue paid to

contracting governments and increased revenue collected by Securus, thus motivating Securus to reach an agreement with GTL to eliminate price competition over single calls.





ANSWER:  Securus admits that Plaintiffs accurately reproduced the charts from the Prison Policy Initiative.  To the extent Plaintiffs mischaracterize the charts report, Securus denies the allegations in Paragraph 117.  Securus denies the remaining allegations in Paragraph 117.

118.    The Alabama Public Service Commission concluded, "Although single payment calls account for 14% of the calls and 17% of the minutes at the facility, they are responsible for 42% of all the revenue generated. The site commissions paid for the single payment calls was 7.9% of their associated revenue while the provider paid the facility 54% on the remaining inmate call revenue. ... It is, therefore, readily apparent why single payment calls are attractive for the providers that offer them."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118, and therefore denies the same.

119.    Defendants' conspiracy to restrain competition over, and fix the prices of, single calls generated extraordinary profits for Securus and GTL. For example, as demonstrated in the chart below, Securus's gross profit margin climbed from 32% in 2009 before the launch of PayNow and Text2Connect to 57% in 2017. That steady increase in gross profit margin was, in large part, due to the growth of Securus's single call program. Notably, due to Defendants' price-fixing agreement, Securus's profit margins continued to grow even after GTL's entry in the single call market in 2013.



ANSWER:  Securus admits that its gross profit margin rose from 2009 through 2017. Securus denies the remaining allegations in Paragraph 119.

### 12.    *Antitrust Injury Suffered by Plaintiffs and Subclass Members*

120.    As a result of Defendants' anticompetitive conduct alleged herein, the price of ICS single calls in the United States was fixed, stabilized, or maintained at artificially inflated levels from 2013 through the present. A former GTL employee stated that the 3CI-operated single calls were "exorbitantly expensive" and that consumers were paying "too much." A former Securus executive said that Securus was "profiteering" off inmates and their families.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 120.

121.    The purpose of the conspiratorial conduct of the Defendants was to inflate, fix, or maintain the price of ICS single calls in the United States. As a direct and foreseeable result of that conspiratorial conduct, Plaintiffs and the following persons and entities (hereafter the "Nationwide Antitrust Subclass") paid artificially inflated rates for 3CI-operated single calls:

> All persons and entities that, during the period January 1, 2013 until the present, paid: (i) a flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of $14.99 through GTL's Collect2Card program; (iii) a flat fee of $9.99 through Securus's Text2Connect program; and/or (iv) a flat fee of $9.99 through GTL's Collect2Phone program.

ANSWER:  Securus denies the allegations in Paragraph 121.

122.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the other members of the Nationwide Antitrust Subclass have sustained injury to their businesses or property, having paid more for ICS single calls from 2013 through the present than they would

have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Nationwide Antitrust Subclass have suffered damages.

ANSWER:  Securus denies the allegations in Paragraph 122.

123.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

ANSWER:  Securus denies the allegations in Paragraph 123.

124.    In a competitive market, Securus and GTL would have competed for ICS contracts with state and local governments by reducing the price of their single calls and increasing the associated site commissions. As a result, Plaintiffs and other members of the Nationwide Antitrust Subclass would have paid substantially less than $14.99 or $9.99 for such calls from 2013 through the present.

ANSWER: Securus denies the allegations in Paragraph 124.

## C.    Defendants Made Fraudulent Misrepresentations and Omissions About Transaction Fees to Contracting Governments and Consumers

125.    When Securus and GTL implemented their single call programs operated by 3CI, Defendants reaped extraordinary profits by charging consumers excessive flat rates (*i.e.* $14.99 and $9.99 per call) that were substantially higher than traditional per-minute rates and by providing contracting governments with site commissions that were a mere fraction of those paid from traditional per-minute calls.

ANSWER:  Securus admits that it generated profits from its single call programs.  Securus denies the remaining allegations in Paragraph 125.

126.    Defendants were able to charge such excessive prices for single calls, while simultaneously paying such abnormally low site commissions, by making a series of fraudulent misrepresentations and omissions to contracting governments and consumers. Specifically, in

communications with contracting governments and consumers, Defendants claimed that most of the prices charged and collected from single calls made through 3CI were expended on necessary transaction fees paid to 3CI to implement and operate those calls, which justified the high single call prices. In truth, most of the monies collected by 3CI as "transaction fees" from single calls were immediately kicked back to Securus and GTL as profit.

ANSWER: Securus denies the allegations in Paragraph 126.

1.    *Defendants Concealed the Amount of the Transaction Fees Paid to 3CI*

127.    In exchange for marketing and implementing Securus's and GTL's single call programs, 3CI retained a transaction fee from each single call. When implementing a single call, 3CI collected the revenue charged to the call recipient, retained a portion of that revenue as a transaction fee, and transmitted the remainder to Securus or GTL.

ANSWER:  Securus admits that 3CI typically retained a transaction fee for single calls on a Securus single call product and transmitted the remainder to Securus.  Securus denies the remaining allegations in Paragraph 127.

128.    Defendants carefully and systematically concealed the true amount of the transaction fees that 3CI received as compensation from each $14.99 and $9.99 single call. Defendants concealed those actual amounts paid to 3CI from contracting governments, consumers and even most of their own employees.

ANSWER:  Securus denies the allegations in Paragraph 128.

129.    A former executive of Securus explained that the company concealed how much 3CI and Securus received from each PayNow and Text2Connect call from the vast majority of Securus's own employees as well as from government officials and consumers.  He explained that

"only a handful of senior executives" at Securus possessed that information, and they were very careful not to share it with others or discuss it openly.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 129.

130.     Even a former Sales Director of Securus was not informed of the amounts that 3CI and Securus actually received from each PayNow or Text2Connect call, despite explicitly requesting such information. The former Sales Director repeatedly asked his superiors how revenue from PayNow and Text2Connect was allocated between 3CI and Securus, but they never provided the numerical breakdown to him. Instead, his superiors *falsely* informed him that 3CI received the majority of the revenue from each PayNow and Text2Connect call and, further, that contracting governments received *more* revenue from each PayNow and Text2Connect call than Securus did. The former Sales Director passed that fraudulent message on to his sales team, which in turn communicated it widely to government officials during ICS contract negotiations, as detailed below.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 130.

131.     Similarly, a former manager of GTL said that the actual amount of money that 3CI received from each Collect2Card and Collect2Phone call was a "well-kept industry secret" and that the vast majority of GTL employees did not know and could not access that secret. He explained that "only a limited number of employees at Securus and GTL knew the actual numerical values of the transaction fees that were paid by Securus and GTL to a third-party vendor to

implement single calls" and that those employees "concealed those numerical values from other employees of Securus and GTL and from governments."

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 131.

2.   *True Amount of the Transaction Fees Paid to 3CI for Single Calls*

132.   Although Defendants actively concealed the true amounts of the transaction fees paid to 3CI from single calls, Plaintiffs were able to uncover those transaction fee amounts through a painstaking and extensive investigation that involved contacting confidential witnesses with the assistance of a licensed private investigator.

ANSWER:  Securus denies that it actively concealed the true amounts of the transaction fees paid to 3CI from single calls.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 132, and therefore denies the same.

133.   To implement PayNow and Collect2Card calls (*i.e.* single calls charged to the credit cards of consumers), Securus and GTL paid fixed transaction fees to 3CI that were less than one-third of the $14.99 price charged to consumers' credit cards. Specifically, according to former employees of Defendants, 3CI received approximately $4.35 as a fixed transaction fee from each $14.99 single call made through PayNow or Collect2Card. The remainder of the $14.99 (*i.e.* $10.64) was transmitted by 3CI to Securus or GTL as income.

ANSWER:  Securus admits that 3CI typically retained a transaction fee for single calls on a Securus single call product and transmitted the remainder to Securus.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what former

employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 133.

134.    A former 3CI executive explained that transaction fees charged for PayNow and Collect2Card calls were not "that high" and that, as a result, the "lion's share" of the $14.99 in revenue generated from those calls was provided to and retained by Securus and GTL, not 3CI. Likewise, a former GTL employee explained that "most of the revenue" from Collect2Card calls was transmitted to and retained by GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what former 3CI and GTL employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 134.

135.    Similarly, to implement Text2Connect and Collect2Phone calls (*i.e.* single calls charged to the mobile phone accounts of consumers), Securus and GTL paid transaction fees to 3CI that were less than half of the $9.99 price charged to consumers' mobile phone accounts. According to former employees of Defendants, 3CI retained no more than $4.99 from each Text2Connect and Collect2Phone call. Thus, at least $5 from each such call was transmitted by 3CI to Securus or GTL as profit.

ANSWER: Securus admits that 3CI typically retained a transaction fee for single calls on a Securus single call product.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what former employees stated, and therefore denies the same.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning GTL, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 135.

136.    The transaction fees charged by 3CI to market and operate Text2Connect and Collect2Phone calls were not flat amounts, but rather determined as a percentage of the overall single call price. A portion of those transaction fees was used by 3CI to pay mobile phone carriers, such as Verizon and AT&T, whenever their subscribers were charged for a single call via premium text message, and those mobile phone carriers were compensated according to a percentage of the price of the single call. As a result, had Securus and GTL opted to charge less than $9.99 for Text2Connect and Collect2Phone calls, the transaction fees paid to 3CI to operate those calls would have been proportionally reduced.

ANSWER:  Securus admits that 3CI typically retained a transaction fee for single calls on a Securus single call product.  Securus denies the remaining allegations in Paragraph 136.

137.    For example, the CEO of NCIC, Bill Pope, approached 3CI in 2008 to develop and sell a single call product that would charge $5.99 to the mobile phone accounts of call recipients. During the negotiations, 3CI stated that it would charge NCIC a transaction fee of $2.99 from each $5.99 single call. Ultimately, NCIC decided against working with 3CI and, instead, contracted with another company to sell single calls priced at $5.99.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and therefore denies the same.

3.    *Misrepresentations and Omissions to Contracting Governments and Consumers about Transaction Fees Paid to 3CI*

138.    Had Defendants honestly represented the value of the transaction fees associated with 3CI-operated single calls, they would not have been able to charge $14.99 and $9.99 for such calls. State and local contracting governments would *not* have permitted Securus and GTL to charge such high prices for single calls considering the actual costs of implementing them. Indeed, the amounts that Securus and GTL retained from each single call—after the deduction of all

transaction fees—were *several times higher* than what consumers would pay for the same call had those consumers been charged the per-minute rate expressly agreed to by contracting governments and contained in ICS contracts.

ANSWER:  Securus denies the allegations in Paragraph 138.

139.    As a result, in order to charge the excessive prices of $14.99 and $9.99 for single calls, Defendants engaged in a widespread pattern of fraudulent misrepresentations and omissions to contracting governments and consumers regarding the enormity of the transaction fees paid to 3CI. Specifically, Securus and GTL made misrepresentations and omissions to contracting governments that substantially inflated the size of the transaction fees paid to 3CI from single calls, and Securus and GTL also instructed 3CI to make those misrepresentations and omissions to both contracting governments and consumers. At the direction of Securus and GTL, 3CI subsequently charged excessive single call prices to consumers that reflected those inflated transaction fees and simultaneously kicked back the majority of the revenue from those charges to Securus and GTL.

ANSWER:  Securus denies the allegations in Paragraph 139.

140.    With respect to PayNow and Collect2Card calls, Defendants falsely claimed that a whopping $13.19 of the $14.99 charged to the credit cards of consumers was, in fact, paid to 3CI as transaction fees, leaving Securus and GTL with only $1.80 in revenue from each such call. Based on that misrepresentation, Securus and GTL asserted to contracting governments and consumers that because the actual calling rate for PayNow and Collect2Card calls was only $1.80 for a call lasting up to 15 minutes after the deduction of transaction fees, the $14.99 price was justified. Securus and GTL also argued to contracting governments that because those companies only received $1.80 from each PayNow and Collect2Card call, the site commission payments of

$1.60 from each such call were generous, amounting to approximately 89% of the revenue collected by Securus and GTL from those calls.

ANSWER:  Securus denies the allegations in Paragraph 140.

141.    Similarly, with respect to Text2Connext and Collect2Phone calls, Defendants falsely claimed that the majority of the $9.99 charged to the mobile phone accounts of consumers was, in fact, paid to 3CI as transaction fees. Based on that misrepresentation, Securus and GTL asserted to contracting governments that because the actual calling rate charged for each Text2Connext and Collect2Phone call was merely a fraction of $9.99 after the deduction of transaction fees, that price was justified. Securus and GTL also argued to contracting governments that because those companies only received a small share of $9.99 from each PayNow and Collect2Card call, the site commissions of $0.30 paid to contracting governments from each such single call were fair.

ANSWER:  Securus denies the allegations in Paragraph 141.

142.    Defendants made the material misrepresentations and omissions about the transaction fees associated with their single call products in at least six distinct forms: (1) during direct communications and negotiations with contracting governments; (2) in written bids submitted to, and written contracts entered into with, contracting governments; (3) in monthly written commission reports provided to contracting governments; (4) on public websites directed toward consumers and governments; (5) in billing charges made to consumers' credit cards; and (6) in billing charges made to consumers' mobile phone accounts.

ANSWER:  Securus denies the allegations in Paragraph 142.

          a.     *Misrepresentations and Omissions to Contracting Governments during Direct Communications and Negotiations*

143.    When Securus and GTL negotiated with state and local governments to secure ICS contracts, they falsely informed those governments that the extraordinarily high prices and low site commissions associated with 3CI-operated single calls were a direct consequence of mandatory transaction fees paid to a third-party vendor. Specifically, whenever a contracting government raised questions about either the high single call prices or low site commissions, both Securus and GTL would assert that transaction fees consumed a substantial majority of the $14.99 and $9.99 charged to consumers, thereby justifying the high prices and low commissions.

ANSWER:  Securus denies the allegations in Paragraph 143.

144.    A former Securus executive explained that the company's sales force avoided identifying the price of single calls, and the site commissions associated with them, during negotiations with governments, and instead encouraged contracting governments to focus on the low rates and high site commissions associated with per-minute calls.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 144.

145.    Another former Securus executive stated that he, and the account managers that reported to him, did *not* proactively disclose the transaction fees associated with single calls when negotiating with contracting governments. Rather, he explained that the Securus salesforce would address transaction fees if a contracting government raised concerns about the cost of PayNow and Text2Connect calls to consumers. At that point, the Securus salesforce would falsely inform the contracting government that (1) the "vast majority" of the $14.99 collected from each PayNow call, and the "vast majority" of the $9.99 collect from each Text2Connect call, was necessarily paid to a third-party vendor (*i.e.* 3CI) to cover transaction fees and (2) as a result of those necessary

transaction fee payments to 3CI, "the contracting governments received more in revenue from each PayNow and Text2Connect call than Securus received." In reality, Securus was receiving more than *six times* the revenue from PayNow calls, and more than *16 times* the revenue from Text2Connect calls, than it was providing to contracting governments in the form of site commissions.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 145.

146.    The former Securus executive explained that, during his tenure, "the vast majority of governments that contracted with Securus raised concerns about the high prices charged to consumers for Securus's single calls and specifically wanted to know why those particular calls were so expensive and how the revenues from those single calls were allocated." The former Securus executive explained that he and the account managers he supervised "spent a substantial amount of time deflecting complaints from contracting governments about the high prices of Securus's single calls." The former Securus executive personally fielded questions from contracting governments about the high prices of PayNow and Text2Connect calls during in-person meetings, over the telephone, and by email.

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore the same.  Securus denies the remaining allegations in Paragraph 146.

147.    The former Securus executive explained that, in response to the substantial pushback from contracting governments regarding the price of PayNow and Text2Connect calls, the company's salesforce successfully relied on misrepresentations regarding the enormity of

unavoidable transaction fees paid to 3CI, and the minor share of revenue received by Securus, to counter such concerns and persuade governments to ultimately accept the single call rates. The former Securus employee explained that those misrepresentations "were effective in persuading" governments to include PayNow and Text2Connect in ICS contracts.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 147.

148.     Similarly, a former employee of GTL explained that "many county and other local governments raised concerns with Securus and GTL about the high price of single calls." He stated that to persuade those and other governments to accept single calls in ICS contracts, "both Securus and GTL informed governments that the high price of single calls was not the result of those companies collecting substantial profit from single calls but rather a direct consequence of sizable transaction fees that were an unavoidable part of the cost of implementing those calls."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 148.

149.     A former deputy sheriff of a county stated that when Securus was negotiating an ICS contract with him, he "raised concerns about the price" of single calls with Securus and "requested that Securus lower the price of those single calls." He explained that, in response, Securus stated that "the high cost of the single calls was attributable to substantial transaction fees that had to be paid to a third-party vendor to implement those calls."

ANSWER: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former deputy sheriff stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 149.

        *b.*     *Misrepresentations and Omissions in Written Bids Submitted to, and ICS Contracts with, Governments*

150.    When Securus and GTL submitted bids for and entered into ICS contracts, both companies omitted critical information about their respective 3CI-operated single call programs in the documents. While many pages of the bids and contracts delved into substantial detail breaking down the allocation of every cent collected from traditional per-minute calls, those same documents only cursorily mentioned single call programs. Many bids and contracts failed to even mention the price of the single calls (*i.e.* $14.99 and $9.99), and those that did so failed to identify the dollar value of the site commission ($1.60 and $0.30). And *none* of the bids and contracts disclosed how much would actually be paid from single call charges to 3CI as a transaction fee or how much Securus and GTL would actually receive from such calls in revenue. As a result, when entering into ICS contracts with Securus and GTL during the relevant period, contracting governments were uninformed of either the true size of the transaction fees associated with single calls or how the site commission payments compared to the revenue retained by Securus and GTL.

ANSWER:  Securus denies the allegations in Paragraph 150.

151.    A former Securus executive explained that the company did not disclose the actual amount of the transaction fees charged by Securus for PayNow calls either in ICS contracts with governments or during negotiations leading to such contracts.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 151.

152.     In fact, in some ICS contracts, Securus and GTL not only omitted the true value of
the transaction fees associated with 3CI-operated single calls, but also inaccurately indicated that
the *entire* $14.99 and $9.99 charges for single calls constituted transaction fees paid to vendors.
For example, the following is an excerpt from an ICS contract between Securus and Harris County,
Texas that was executed on November 9, 2010:

**3rd Party Vendor Transaction Fees**

| | |
|---|---|
| Western Union — End User Deposit Fee | Optional Fee of up to $11.99 charged for the expedited wiring of funds |
| Text2Connect — Wireless Text Message Fee | Optional Fee of up to $9.99 may be charged by end users wireless provider to complete promotional call and facilitate account establishment |
| Instant Pay Credit Card Calling | Provides the option for end users to receive and pay for a call with a credit card or debit card at the time of call without establishing an account. Fee of up to $14.99 including credit card charges. |

<u>ANSWER</u>:  Securus denies the allegations in Paragraph 152.

        *c.*      *Misrepresentations and Omissions in Monthly Commission*
            *Reports Provided to Contracting Governments*

153.    When Securus and GTL contracted to provide ICS to governments, the companies distributed monthly commission reports to those governments.  When addressing per-minute calls, those monthly reports identified the number of per-minute calls made, the duration of the per-minute calls, the revenue collected from the per-minute calls, and the amount of that revenue shared with the contracting governments as site commissions.

<u>ANSWER</u>:  Securus admits that it provided commission reports to governments with ICS contracts.  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 153, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 153.

154.    In those same monthly reports, however, when addressing single calls, both Securus and GTL either omitted comparable and material information about, and/or made affirmative misrepresentations regarding, 3CI-operated single calls and the transaction fees associated with them.

<u>ANSWER</u>:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations about GTL in Paragraph 154, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 154.

155.    In many monthly commission reports, Securus and GTL only listed the number of single calls made and the dollar value of the site commissions paid to the contracting governments—not the price of the single calls, the revenue received by Securus or GTL from those calls, or the percentage value of the site commission payments. Such information was deliberately

omitted to prevent contracting governments from determining the amount of revenue received by Securus and GTL from such calls or the amount in transaction fees actually paid to 3CI.

ANSWER:  Securus denies the allegations in Paragraph 155.

156.    In other monthly commission reports, Securus and GTL explicitly misrepresented the amount of revenue that they received from 3CI-operated single calls and, in turn, the site commission percentage paid to the contracting government. In so doing, Securus and GTL disguised the magnitude of the transaction fees paid to 3CI to implement those calls.

ANSWER:  Securus denies the allegations in Paragraph 156.

157.    For example, the below is an excerpt from a monthly commission report provided to the Sheriff's Office in Merced County, California for the month of February 2015. The excerpt shows that for Collect2Phone single calls, GTL reported that it received *zero dollars* in revenue from each such call—even though GTL actually received the majority of the $9.99 charge from each such call. The excerpt further shows that for Collect2Card calls, GTL reported that it only received $1.80 from each such $14.99 call and, in turn, paid $1.60 of that $1.80 to the Sheriff's Office in site commissions—even though GTL actually received approximately $10.64 in revenue from each Collect2Card call. The difference between what GTL actually received in revenue from these single calls and what GTL reported it received in the monthly commission report reflects the inflated transaction fee that was fabricated by GTL.

| Call Type | # Calls | % of Total Calls | # Minutes | % of Total Minutes | Revenue | # of Total Revenue | Commission % | Total Commission |
|---|---|---|---|---|---|---|---|---|
| Debit Local | 3,941 | 18.46% | 31,173 | 17.83% | $15,198.78 | 25.31% | 70.00% | $10,639.15 |
| Debit intrastate Intralata | 2,105 | 9.86% | 15,873 | 9.08% | $7,915.98 | 13.18% | 70.00% | 55,541.19 |
| Debit Intrastate Interlata | 1,241 | 5.81% | 11,256 | 6.44% | $5,160.36 | 8.59% | 70.00% | $3,612.25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debit Interstate Interlata | 9,365 | 43.889% | 68,330 | 39.08% | $14,349.30 | 23.89% | 0.00% | $0.00 |
| Collect Local | 661 | 3.10% | 3,840 | 2.20% | $2,447.25 | 4.08% | 70.00% | $1,713.08 |
| Collect Intrastate Intralata | 138 | 0.65% | 965 | 0.55% | $551.75 | 0.92% | 70.00% | $386.23 |
| Collect Intrastate Interlata | 24 | 0.11% | 202 | 0.12% | 5104.50 | 0.17% | 70.00% | $73.15 |
| Collect Interstate Intralata | 1 | 0.00% | 15 | 0.01% | $3.75 | 0.01% | 0.00% | $0.00 |
| Collect2Phone Local | 176 | 0.82% | 2,234 | 1.28% | $0.00 | 0.00% | 100.00% | $52.80 |
| Collect2Phone Intrastate Interal | 128 | 0.60% | 1,747 | 1.00% | $0.00 | 0.00% | 100.0% | $38.40 |
| Collect2Phone intrastate Interal | 57 | 0.27% | 721 | 0.41% | $0.00 | 0.00% | 100.00% | $17.10 |
| Collect2Phone Interstate Interal | 25 | 0.12% | 298 | 0.17% | $0,00 | 0.00% | 0.00% | $0.00 |
| Collect2Card Local | 135 | 0.63% | 1,813 | 1.04% | $243.00 | 0.40% | 100.00% | $216.00 |
| Collect2Card Intrastate Intrala | 120 | 0.56% | 1,465 | 0.84% | $216.00 | 0.36% | 100.00% | $192.00 |
| Collect2Card Intrastate Interla | 74 | 0.35% | 1,016 | 0.58% | $133.20 | 0.22% | 100.00% | $11840 |
| Collect2Card Interstate Interla | 16 | 0.07% | 205 | 0.12% | $28.80 | 0.05% | 0.00% | $0.00 |

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157, and therefore denies the same.

158.    Thus, the monthly commission reports concealed from contracting governments both the actual revenue received by Securus and GTL from their single calls and the actual transaction fees associated with those single calls.

ANSWER:  Securus denies the allegations directed at it in Paragraph 158.

> d.    *Misrepresentations and Omissions in Public Websites to Contracting Governments and Consumers*

159.    In public websites established and managed by 3CI and accessible to consumers and governments, Defendants repeatedly made misrepresentations about the enormity of the

transaction fees associated with their single calls that charged $14.99 to consumers' credit cards. Specifically, the websites for both Securus's PayNow program and GTL's Collect2Card program stated that each single call charging $14.99 involves a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80. For example, at the direction of Securus and GTL, 3CI included the following language on the "Pricing" page of both websites during the relevant period:

> The price for each call is $14.99 (USD). Maximum call times are dictated by the corrections facility. Prior to your acceptance of each call, you will be notified of the call charge and the maximum allotted call time as dictated by the corrections facility from which the call originates. The call charge is broken out as $1.80 for the Call Fee and $13.19 for the Transaction Fee and will be displayed in the same manner on your credit card statement.

ANSWER:  Securus admits that Plaintiffs accurately quote the language on the "Pricing" page of the website managed by 3CI for Securus's PayNow program.  To the extent Plaintiffs mischaracterize the information included in that report, Securus denies the allegations in Paragraph 159, and otherwise denies the remaining allegations in Paragraph 159.

160.    The following images are screenshots from the websites of Securus's PayNow and GTL's Collect2Card programs:



ANSWER:  Securus admits that the screen captures of its webpage appear to be accurate. Securus lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 160, and therefore denies the same.

161.    The statements on the websites for PayNow and Collect2Card regarding the transaction fees and call fees for each $14.99 call are plainly false. As noted above, the "Transaction Fee" charged by Securus and GTL and paid to 3CI was not $13.19, but rather approximately $4.35, and the "Call Fee" charged and retained by Securus and GTL was not $1.80, but rather approximately $10.64. Both websites fail to disclose to consumers and contracting governments that a substantial majority of the so-called "Transaction Fee" charged for the $14.99 single calls is kicked back to Securus and GTL as profit.

ANSWER:  Securus denies the allegations in Paragraph 161.

162.    When establishing and updating the websites, 3CI knew of the misrepresentations that Securus and GTL were making to contracting governments and, at their direction, intentionally aligned the false pricing information on its website to be consistent with Securus's and GTL's misrepresentations to contracting governments.

ANSWER:  Securus denies the allegations in Paragraph 162.

163.    The misrepresentations and omissions on the websites are particularly significant to consumers considering the blanket omission of information about transaction fees during the point of sale. When consumers received a 3CI-operated single call, they were asked to approve the total charge of $14.99 or $9.99 by the automated system without Securus, GTL, or 3CI disclosing the size of the transaction fee.

ANSWER:  Securus denies the allegations in Paragraph 163.

> e.    *Misrepresentations and Omissions to Consumers in Billing Charges for $14.99 Single Calls*

164.    In addition to making misrepresentations on the websites for PayNow and Collect2Card, Defendants misrepresented the amounts of the "Transaction Fee" and "Call Fee" associated with those products in the billing charges made to consumers' credit cards. At the direction of Securus and GTL, 3CI charged consumers two distinct, fraudulent charges whenever they accepted a PayNow or Collect2Card call: a fraudulent "Transaction Fee" and a fraudulent "Call Fee." Specifically, for each PayNow call charged by Securus and each Collect2Card call charged by GTL, the $14.99 call was billed to consumers as the following two separate charges: a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80.

ANSWER:  Securus admits that consumers were charged a transaction fee and a call fee. Securus denies the remaining allegations in Paragraph 164.

165.    The following is an image of actual billing charges to Plaintiff Ashley Albert, who paid a total of $14.99 for a PayNow call on June 13, 2016:



| 06/13/16 | CHECKCARD 0611 1TEL.COM TRANSACTION FE 877-2247002 FL 24436546164000820677274 | -13.19 |
| 06/13/16 | CHECKCARD 0611 1TEL.COM PER CALL FEE 877-2247002 FL 24436546164000820677308 | -1.80 |

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 165, and therefore denies the same.

166.    A former GTL manager explained that although inmates' families were billed $13.19 in transaction fees whenever they accepted a Collect2Card call, most of that charge was *not* used to pay a transaction fee but rather was retained by GTL as profit. Another former GTL employee said that Collect2Card single calls were highly profitable for the company because the "bulk" of the $13.19 in transaction fees charged to consumers was kicked back to GTL as revenue, rather than paid to 3CI. A former 3CI executive explained that the company did *not* receive $13.19 in transaction fees from PayNow and Collect2Card calls and, instead, a substantial majority of the $14.99 charged to consumers was kicked back to and retained by Securus and GTL.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what former 3CI and GTL employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 166.

167.    As a result, consumers around the country who paid $14.99 for a single call provided by GTL or Securus were expressly charged for a fabricated and artificially inflated transaction fee.

ANSWER:  Securus denies the allegations in Paragraph 167.

f.    *Omissions to Consumers in Billing Charges for $9.99 Calls*

168.    When Securus and GTL charged consumers for Text2Collect and Collect2Phone calls, those consumers paid $9.99 for each such call. That $9.99 charge constituted a substantial

overcharge, as it reflected an amount accepted by contracting governments as a result of misrepresentations and omissions by Securus and GTL regarding the magnitude of the transaction fees paid to 3CI to implement such calls.

ANSWER:  Securus admits that customers were charged $9.99 for Text2Collect services. Securus denies the remaining allegations in Paragraph 168.

169.    The $9.99 charges for Text2Collect and Collect2Phone appeared on premium text messages and mobile phone billing statements received by call recipients. Those $9.99 charges failed to disclose either the actual transaction fee paid to 3CI for such calls, or that Securus and GTL collected most of the revenue from such calls in the form of kickbacks from 3CI.

ANSWER:  Securus admits that billing statements for Text2Collect did not separate the applicable transaction fees.  Securus denies the remaining allegations in Paragraph 169.

4.    *Defendants' Misrepresentations and Omissions about Transaction Fees Injured Plaintiffs, the Class and Subclasses*

170.    The fraudulent misrepresentations and omissions made by Defendants regarding transaction fees caused Plaintiffs and the members of the Class and Subclasses to be overcharged for 3CI-operated single calls.

ANSWER:  Securus denies the allegations in Paragraph 170.

171.    With respect to PayNow and Collect2Card calls, instead of charging Plaintiffs and members of the Class and Subclasses the actual transaction fees paid to 3CI of approximately $4.35 per call, Defendants charged them $13.19 per call in artificially inflated and fabricated transaction fees, failing to disclose to contracting governments or consumers that Securus and GTL were pocketing $8.84 of the purported transaction fees. Similarly, with respect to Text2Connect and Collect2Phone calls, instead of charging Plaintiffs and members of the Class and Subclasses a price reflective of the actual transaction fees paid to 3CI, Defendants charged them an excessive

price that was inflated due to fabricated transaction fees, failing to disclose to contracting governments or consumers that Securus and GTL were pocketing most of the $9.99 charge.

ANSWER:  Securus denies the allegations in Paragraph 171.

172.    Had Defendants accurately disclosed the value of the transaction fees to contracting governments and consumers, Plaintiffs and members of the Class and Subclasses would have paid substantially less money for 3CI-operated single calls. Informed of the actual value of the transaction fees, a sufficient number of contracting governments would have insisted on lower-priced single call programs when selecting bids for, and negotiating the terms of, ICS contracts that the $9.99 and $14.99 prices charged nationwide would have been revised substantially lower. A former Securus executive explained that if contracting governments "had been informed that the transaction fees associated with PayNow and Text2Connect comprised less than half of the prices of those calls," then those governments "would have insisted on both lowering the price of single calls to consumers and increasing the amount of the commissions paid to those governments." Similarly, a former GTL manager explained that had contracting governments learned "that the actual value of transaction fees paid to a third-party vendor to implement single calls was less than half of the price charged to consumers for those single calls," then "the majority of those governments would have insisted on lowering the price of single calls to consumers."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what former Securus and GTL employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 172.

173.    Indeed, each contracting government had already negotiated an acceptable per-minute rate for ICS calls with Securus or GTL. Accordingly, if Defendants had disclosed that, *even after the deduction of actual transaction fees,* charges for 3CI-operated single calls were

substantially greater than the negotiated per-minute rate for calls, contracting governments would have required a reduction of those single call prices. In response, Securus and GTL would have been forced to reduce the prices of their single call products.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173, and therefore denies the same.

174.    Because PayNow, Text2Connect, Collect2Card, and Collect2Phone are national programs with nationwide websites that charge uniform rates across the country, pressure from multiple state and local contracting governments opposing unjustified and excessive single call prices would have resulted in Securus and GTL making nationwide reductions to those prices. Indeed, around the time when Securus and GTL began phasing out 3CI-operated single calls, there was increasing scrutiny of those companies' single call prices. A former Securus executive explained that the company ultimately phased out 3CI-operated single calls in 2018 because of "the increasing volume of complaints" from contracting governments about the high prices. In the absence of their fraudulent misrepresentations and omissions about transactions fees, Defendants would not have been able to charge those high prices for single calls in the first place.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 174.

## VI.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    Continuing Violation

175.    During the relevant period, Defendants' anticompetitive conspiracy and fraudulent misrepresentations were continuing violations in which Defendants repeatedly invaded the interests of Plaintiffs and members of the Class and Subclasses by adhering to, enforcing, and

reaffirming the anticompetitive agreement to fix the prices of 3CI-operated single calls and by continuously making fraudulent misrepresentations and omissions regarding the size of transaction fees associated with those calls to contracting governments and consumers. Indeed, Defendants continue to charge $14.99 for PayNow and Collect2Card calls and $9.99 for Text2Connect and Collect2Phone calls, and to fraudulently misrepresent and omit the amount of the transaction fees associated with those single calls.

ANSWER:  Securus admits that customers were charged $14.99 for PayNow and $9.99 for Text2Connect calls.  Securus denies the remaining factual allegations in Paragraph 175.

176.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive price-fixing agreement throughout the relevant period was consummated through, among other conspiratorial acts, private communications between Defendants and the charging of the price-fixed rate for 3CI-operated single calls.

ANSWER:  Securus denies the allegations in Paragraph 176.

177.    Defendants' continuing fraudulent misrepresentations and omissions regarding transaction fees throughout the relevant period were consummated through, among other communications, statements made to government officials during negotiations for ICS contracts, statements contained in written ICS contracts entered into with governments, statements contained in monthly commission reports provided to contracting governments, statements on public websites accessible to consumers and governments, and statements made to consumers in billing charges.

ANSWER:  Securus denies the allegations in Paragraph 177.

### B. Fraudulent Concealment

    *1.*    *Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct*

178.   Plaintiffs and members of the Class and Subclasses had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Class and Subclasses did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the misconduct alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy and in fraudulent misrepresentations and omissions that did not reveal facts that would put Plaintiffs or other members of the Class and Subclasses on inquiry notice that they had been overcharged for 3CI-operated single calls.

    <u>ANSWER</u>: Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning Plaintiffs and members of the putative Class and Subclasses, and therefore denies the same. Securus denies the remaining allegations in Paragraph 178.

179.   Defendants' anticompetitive conspiracy and fraudulent misrepresentations and omissions were and are, by their very nature, self-concealing. ICS providers are not exempt from antitrust regulation, and thus, Plaintiffs reasonably believed that ICS providers competed with one another to offer ICS. Moreover, no publicly available source disclosed that the transaction fees paid by Securus and GTL to 3CI during the relevant period comprised a mere fraction of the prices of the single calls, rather than a majority of those prices as Defendants repeatedly stated. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of single call prices charged to consumers by Defendants. Indeed, Plaintiffs' counsel only managed to discover Defendants' misconduct through an intensive and lengthy investigation with the assistance of licensed investigators who identified and communicated with confidential witnesses.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning Plaintiffs and Plaintiffs' counsel, and therefore denies the same. Securus denies the remaining allegations in Paragraph 179.

180.    Plaintiffs exercised reasonable diligence. Plaintiffs and members of the Class and Subclasses could not have discovered Defendants' misconduct and overcharges at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to conceal their misconduct and overcharges.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning Plaintiffs and members of the putative Class and Subclasses, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 180.

2.    *Defendants Actively Concealed their Misconduct and Overcharges*

181.    Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful conduct and overcharges from Plaintiffs and the other members of the Class and Subclasses. Defendants only engaged in unlawful conduct in a manner specifically designed to avoid detection.

ANSWER:  Securus denies the allegations in Paragraph 181.

182.    During the relevant period, Defendants actively concealed from Plaintiffs and members of the Class and Subclasses that the actual transaction fees associated with their 3CI-operated single calls were significantly smaller than the amounts that Defendants charged, and that Securus and GTL collected the difference between those figures in the form of kickbacks from 3CI. For example, in public websites published throughout the relevant period, Defendants falsely broadcast that transaction fees associated with PayNow and Collect2Card calls were $13.19, rather

than approximately $4.35. When charging consumers for those single calls, Defendants specifically billed consumers for a "Transaction Fee" of $13.19 and a "Call Fee" of $1.80.

ANSWER:  Securus denies the allegations in Paragraph 182.

183.    Defendants also actively concealed the true amount of the transaction fees associated with 3CI-operated single calls from government officials. In communications with contracting governments, Defendants falsely and repeatedly represented, in both oral and written communications, that the vast majority of the prices charged for 3CI-operated single calls comprised necessary transaction fees paid to a third-party vendor.

ANSWER:  Securus denies the allegations in Paragraph 183.

184.    In fact, Defendants concealed their overcharges for fabricated transaction fees so effectively that most employees of Securus and GTL were unaware of (1) the actual value of the transaction fees paid to 3CI to implement single calls and (2) how much Securus and GTL actually received in revenue from 3CI-operated single calls. A former executive of Securus explained that only a handful of executives were permitted to know exactly how much Securus received from each PayNow and Tex2Connect call, and a former manager of GTL said that the amount 3CI received from each Collect2Card and Collect2Phone call was a "well-kept industry secret" inaccessible to the vast majority of GTL employees.

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former Securus and GTL employees stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 184.

185.    Defendants also fraudulently concealed their conspiracy to fix single call prices from Plaintiffs and other members of the Class and Subclasses through various means and methods. To establish and effectuate the conspiracy without an accessible paper trail, Defendants

conducted surreptitious oral communications during confidential meetings between senior executives. For example, according to a former manager of GTL, the CEOs of GTL and Securus held private, in-person dinners during which they "shared strategic information" and discussed "what prices should be charged for ICS calls."

ANSWER:  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same. Securus denies the remaining allegations in Paragraph 185.

186.    Defendants also publicly represented during the relevant period that Securus and GTL fiercely competed with each other for ICS contracts with governments. For example, in a 10-K Form filed with the Securities and Exchange Commission on March 15, 2010, Securus wrote, "In the inmate telecommunications business, we historically have competed with numerous independent providers of inmate telephone systems such as Global Tel*Link . . . ." A former manager of GTL explained, "While I was employed at GTL, Securus and GTL publicly identified themselves as fierce competitors in the ICS industry. In reality, behind closed doors, Securus and GTL regularly communicated with each other to facilitate each other's success."

ANSWER:  Securus admits that Paragraph 186 accurately quotes from a portion of the March 15, 2010 Securus 10-K.  Securus lacks knowledge or information sufficient to form a belief as to the truth of allegations concerning what a former GTL employee stated, and therefore denies the same.  Securus denies the remaining allegations in Paragraph 186.

187.    By virtue of Defendants' fraudulent concealment of their unlawful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and other members of the Class and Subclasses have as a result of Defendants' misconduct alleged in this Complaint.

ANSWER:  Securus denies the allegations in Paragraph 187.

## VII.  CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed class and subclasses:

**Nationwide Class:**

All persons and entities that, during the period January 1, 2010 until the present, paid: (i) a flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of $14.99 through GTL's Collect2Card program; (iii) a flat fee of $9.99 through the Securus's Text2Connect program; and/or (iv) a flat fee of $9.99 through GTL's Collect2Phone program.

**Nationwide Antitrust Subclass:**

All persons and entities that, during the period January 1, 2013 until the present, paid: (i) a flat fee of $14.99 through Securus's PayNow program; (ii) a flat fee of $14.99 through GTL's Collect2Card program; (iii) a flat fee of $9.99 through Securus's Text2Connect program; and/or (iv) a flat fee of $9.99 through GTL's Collect2Phone program.

**Nationwide Securus Subclass:**

All persons and entities that, during the period January 1, 2010 until the present, paid: (i) a flat fee of $14.99 through Securus's PayNow program; and/or (ii) a flat fee of $9.99 through Securus's Text2Connect program.

**Nationwide GTL Subclass:**

All persons and entities that, during the period January 1, 2013 until the present, paid: (i) a flat fee of $14.99 through GTL's Collect2Card program; and/or (ii) a flat fee of $9.99 through GTL's Collect2Phone program.

ANSWER:  Securus admits that Plaintiffs purport to bring this action on behalf of a Nationwide Class, Nationwide Antitrust Subclass, Nationwide Securus Subclass, and Nationwide GTL Subclass, but denies that class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure.

189.    The following persons and entities are excluded from the proposed Class and Subclasses: Defendants and their employees, subsidiaries, affiliates, predecessors, officers, directors, legal representatives, heirs, and successors; co-conspirators; federal, state, and local governmental entities; and the judge, judicial officers, and associated court staff assigned to this case and their immediate family members.

ANSWER:  Securus admits that Plaintiffs purport to bring this action on behalf of a Nationwide Class, Nationwide Antitrust Subclass, Nationwide Securus Subclass, and Nationwide GTL Subclass, but denies that class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure.

190.    The Class and each Subclass are so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the Class and each Subclass contains thousands of members.

ANSWER:  Securus denies the allegations in Paragraph 190.

191.    The Class and each Subclass is readily identifiable and is one for which records should exist.

ANSWER:  Securus denies the allegations in Paragraph 191.

192.    Each named Plaintiff's claims are typical of those of the Class and subclasses the named Plaintiff seeks to represent. Each named Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and subclasses that the named Plaintiff

seeks to represent, and the relief sought by each named Plaintiff is common to the Class and subclasses the named Plaintiff seeks to represent.

ANSWER:  Securus denies the allegations in Paragraph 192.

193.    Plaintiffs and members of the Class and Subclasses were injured by the same unlawful conduct, which resulted in each of them paying more for telephone calls with inmates than they would have in the absence of the unlawful conduct.

ANSWER:  Securus denies the allegations in Paragraph 193.

194.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and Subclasses. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class and Subclasses.

ANSWER:  Securus denies the allegations in Paragraph 194.

195.    Questions of law and fact common to the members of the Class and Subclasses predominate over questions, if any, that may affect only individual members of the Class or Subclasses because Defendants have acted and refused to act on grounds generally applicable to the members of the Class and Subclasses.

ANSWER:  Securus denies the allegations in Paragraph 195.

196.    Questions of law and fact common to the Class and/or Subclasses include:

a.    Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the price of 3CI-operated single calls charged to consumers;

b.    The duration of the antitrust conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    c.     Whether Defendants made material misrepresentations and omissions to contracting governments and consumers about the size of transaction fees associated with 3CI-operated single calls;

    d.     The extent to which Securus and/or GTL accepted undisclosed kickbacks from the fabricated transaction fees charged to consumers;

    e.     Whether the misconduct by Defendants constituted violations of the Sherman Antitrust Act;

    f.     Whether the misconduct by Defendants constituted violations of RICO;

    g.     Whether Defendants fraudulently concealed their misconduct;

    h.     The extent to which Defendants' misconduct inflated the price of 3CI-operated single calls charged to consumers; and

    i.     The nature and scope of injunctive relief necessary to restore competition, transparency, and/or lawful pricing to the ICS market.

ANSWER:  Securus denies the allegations in Paragraph 196.

197.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

ANSWER:  Securus denies the allegations in Paragraph 197.

198.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class and Subclasses compared to the expense and burden of individual prosecution of the claims asserted

in this litigation means that, absent a class action, it would not be feasible for members of the Class and Subclasses to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class and Subclasses is impractical, and the prosecution of separate actions by individual members of the Class and Subclasses would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

ANSWER:  Securus denies the allegations in Paragraph 198.

199.    Defendants have acted on grounds generally applicable to the Class and Subclasses, thereby making final injunctive relief appropriate with respect to the Class and Subclasses as a whole.

ANSWER:  Securus denies the allegations in Paragraph 199.

I.    CAUSES OF ACTION

## COUNT 1
## CONSPIRACY TO FIX PRICES IN VIOLATION OF
## SECTION 1 OF SHERMAN ANTITRUST ACT
### (On behalf of the Nationwide Antitrust Subclass against All Defendants)

200.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding and succeeding paragraphs of this Complaint.

ANSWER: Securus incorporates its responses to the allegations contained in the Answer as if fully set forth herein.

201.    Beginning on or about January 1, 2013, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and

conspiracy in restraint of trade to prevent and eliminate price competition over single calls between Securus and GTL and to fix, inflate, maintain, and stabilize the price of 3CI-operated single calls charged to consumers in the United States, in violation of Section 1 of the Sherman Act, 15 U. S.C. § 1.

ANSWER:  Securus denies the allegations in Paragraph 201.

202.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:

a.    Reached agreements to fix, inflate, maintain, and stabilize the prices of PayNow, Text2Connect, Collect2Card and Collect2Phone calls charged to consumers in the United States;

b.    Charged the fixed, inflated, maintained and stabilized price of $14.99 for PayNow and Collect2Card calls to consumers in the United States;

c.    Charged the fixed, inflated, maintained and stabilized price of $9.99 for Text2Connect and Collect2Phone calls to consumers in the United States;

d.    Delayed, diminished and deprioritized the introduction of a lower-priced alternative to 3CI-operated single calls that had been developed by GTL; and

e.    Prevented price competition over single calls between Securus and GTL when they bid for, and entered into, contracts with state and local governments to provide ICS.

ANSWER:  Securus denies the allegations in Paragraph 202.

203.    Defendants' conspiracy to fix single call prices is a *per se* violation of Section 1 of the Sherman Act.

<u>ANSWER</u>:  Securus denies the allegations in Paragraph 203.

204.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.    Price competition in the sale of ICS single calls was restrained, suppressed, or eliminated in the United States;

      b.    Prices for PayNow, Text2Connect, Collect2Card and Collect2Phone calls charged by Defendants were fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

      c.    Consumers who purchased PayNow, Text2Connect, Collect2Card and/or Collect2Phone calls were deprived of the benefits of free and open competition.

<u>ANSWER</u>:  Securus denies the allegations in Paragraph 204.

205.    Plaintiffs and the other members of the Nationwide Antitrust Subclass have been injured and will continue to be injured in their businesses and property by paying more for PayNow, Text2Connect, Collect2Card and/or Collect2Phone calls than they would have paid and will pay in the absence of the combination and conspiracy.

<u>ANSWER</u>:  Paragraph 205 contains legal conclusions to which no response is required; to the extent a response is required those allegations are denied

**COUNT 2**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide Securus Subclass against Defendant Securus)**

In response to Paragraph 206 through Paragraph 229, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 2 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 206 through Paragraph 229.

**COUNT 3**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide Securus Subclass against Securus and 3CI)**
**<u>(Pled in the Alternative to Count 2)</u>**

In response to Paragraph 230 through Paragraph 254, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 3 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 230 through Paragraph 254.

**COUNT 4**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide GTL Subclass against Defendant GTL)**

In response to Paragraph 255 through Paragraph 303, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 4 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 255 through Paragraph 303.

**COUNT 5**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(On behalf of Nationwide GTL Subclass against GTL and 3CI)**
**<u>(Pled in the Alternative to Count 4)</u>**

In response to Paragraph 255 through Paragraph 303, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 5 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 255 through Paragraph 303.

**COUNT 6**
**VIOLATION OF RICO, 18 U.S.C. § 1962(D)**
**(On behalf of Nationwide Class against Securus and GTL)**

In response to Paragraph 304 through Paragraph 320, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 6 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 304 through Paragraph 320.

**COUNT 7**
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)**
**(On behalf of Nationwide Class against Securus, GTL and 3CI)**
**<u>(Pled in the Alternative to Count 6)</u>**

In response to Paragraph 321 through Paragraph 342, Securus incorporates its responses to the factual allegations contained in the Answer as if fully set forth herein.  Pursuant to this Court's Memorandum Opinion and Order dated September 30, 2021 (ECF No. 96), Count 7 has been dismissed and no response is required.  To the extent a response is required, Securus denies the allegations in Paragraph 321 through Paragraph 342.

## II.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and the Subclasses, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class and Subclasses defined herein, appoint Plaintiffs as representatives of the Class and Subclasses, appoint Plaintiffs' counsel of record as counsel for the Class and Subclasses, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class and Subclasses, once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Defendants' actions alleged herein be adjudged and decreed to be in violation of the RICO statute, 18 U.S.C. § 1962;

D.    Plaintiffs and other members of the Class and Subclasses recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trembled pursuant to 15 U.S.C. § 15(a) and 18 U.S>C. § 1964(c);

E.    Plaintiffs and the other members of the Class and Subclasses be awarded pre- and post- judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.    Defendants, their affiliates, successors, heirs, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or

persons acting or claiming to act on their behalf of in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracies, combinations, overcharges, misrepresentations, or omissions alleged herein, or from engaging in any other conduct, conspiracies, combinations, overcharges, misrepresentations or omissions alleged herein, or from engaging in any other conduct, conspiracy, combination, overcharges, misrepresentations or omissions having a similar purpose or effect;

G.  Plaintiffs and the other members of the Class and Subclasses recover the costs of this lawsuit and reasonable attorneys' fees, as provided by law; and

H.  Plaintiffs and other members of the Class and Subclasses be granted such other relief as the case may require and deemed proper to this Court.

ANSWER:  The preceding paragraph is a prayer for relief to which no response is required. To the extent any response is required, Securus denies that Plaintiffs are entitled to any relief whatsoever.

## III.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

ANSWER:  The preceding paragraph is a demand for a jury trial to which no response is required.

## **MISCELLANEOUS**

Securus denies all allegations of the Complaint not otherwise expressly admitted herein.

## **AFFIRMATIVE DEFENSES**

1.     Plaintiffs failed to state a claim for which relief may be granted.

2.      Plaintiffs' claims against Securus are barred because Securus was not part of any contract, combination, or conspiracy in restraint of trade.

3.      Plaintiffs' claims against Securus are barred because Securus alleged actions did not result in any harm to competition.

4.      Plaintiffs' claims against Securus are barred because Securus's alleged actions did not cause any harm to Plaintiffs.

5.      Plaintiffs' claims against Securus are barred because the Plaintiffs have not suffered any antitrust injury and/or because Plaintiffs' injury is too remote.

6.      Plaintiffs' claims against Securus are barred because their alleged damages, if any, are speculative and uncertain.

7.      Plaintiffs do not allege conduct by Securus that is *per se* unlawful under United States antitrust law.

8.      Plaintiffs' claims are barred because Securus's actions were undertaken in good faith to promote legitimate business purposes and in order to and did have the effect of promoting competition.

9.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and the putative class lack Article III and statutory standing to assert their claims.

10.     Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations and/or by the equitable doctrine of laches.

11.     Plaintiffs' claims are barred in whole or in part by the state action doctrine and/or the *Noerr-Pennington* doctrine.

12.     Plaintiffs' claims are barred in whole or in part because Securus's conduct was within the scope of its legitimate patent rights.

13.    Plaintiffs failed to mitigate damages and losses, if any.

14.    Plaintiffs have unclean hands.

15.    Plaintiffs' claims have been released or are barred in whole or in part by the doctrines of waiver or estoppel.

16.    Injuries alleged by Plaintiffs were caused in whole or in part by the conduct of third parties for whom Securus was not responsible, through forces in the marketplace over which Securus had no control, or through acts or omissions on the part of one or more of the Plaintiffs.

17.    Plaintiffs' claims are or in the future may be barred in whole or in part by the "filed rate" doctrine.

18.    Plaintiffs' claims are barred in whole or in part because of ratification, agreement, acquiescence, or consent to Securus's alleged conduct.

19.    Plaintiffs' claims are barred because Plaintiffs have failed to join indispensable parties.

20.    Plaintiffs' claims are barred by the voluntary payment doctrine.

21.    Plaintiffs' claims for damages are barred in whole or in part to the extent that Plaintiffs seek damages, restitution, or other monetary relief that is duplicative of damages, restitution, or other monetary relief sought or recovered in other actions.

22.    The Complaint fails to state facts sufficient to maintain a class action.

23.    Plaintiffs are required by their agreements with Securus to arbitrate the claims alleged in the Complaint.

24.    The decision by individual government facilities to enter into agreements with Securus or GTL is an intervening cause of Plaintiffs' alleged injuries that is independent of any alleged agreement between GTL and Securus.

25.     Plaintiffs cannot maintain a claim for an antitrust violation because they cannot articulate a relevant antitrust market.

26.     Plaintiffs cannot maintain a claim for an antitrust violation because Defendants do not have market power in any relevant antitrust market.

27.     Securus incorporates by reference any other affirmative defenses asserted by any other Defendant in this action and reserves the right to assert any additional defenses.

Respectfully submitted,

/s/ *Jason R. Scherr*

Dated:  November 1, 2021

Jason R. Scherr, Bar No. 25633
MORGAN LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.6000
F: 202.373.6001
jr.scherr@morganlewis.com

Elizabeth Herrington*
MORGAN LEWIS & BOCKIUS, LLP
77 W. Wacker Drive
Chicago, IL 60601
T: 312.324.1000
F: 312.324.1001
beth.herrington@morganlewis.com

R. Brendan Fee*
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5000
F: 215.963.5001
brendan.fee@morganlewis.com

COUNSEL FOR DEFENDANT SECURUS
TECHNOLOGIES, LLC

\* admitted *pro hac vice*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 30, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all counsel of record in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland.


       /s/ Jason R. Scherr
       Jason R. Scherr